# Exhibit A

# FREEDOM COURT REPORTING

Page 9

1    Q.   Lee?
2    A.   Uh-huh.
3    Q.   And is Mr. Moore employed?
4    A.   Yes.
5    Q.   Where?
6    A.   Thermal Components.
7    Q.   What is --
8    A.   Here in Montgomery.
9    Q.   What is his job there?
10    A.   He is an A operator. He
11 operates some machine. I don't know.
12    Q.   That's fine. How long has he
13 been at Thermal Components?
14    A.   Since about 1990. I think
15 1990.
16    Q.   Working on twenty years, close
17 to it?
18    A.   I think.
19    Q.   Sometime in the early '90s
20 best recollection?
21    A.   Yes.
22    Q.   Where did he work before that?
23    A.   He worked at -- He had his own

Page 10

1 business.
2    Q.   And what kind of work did he
3 do?
4    A.   He had a pawn shop.
5    Q.   And as I understand it,
6 Ms. Moore, you are employed by the
7 Department of Justice here at the U.S.
8 Attorney's office?
9    A.   I am.
10    Q.   And how long have you been
11 here or in that job?
12    A.   I've been in this office since
13 April 1979. So what is that? Twenty-eight
14 years, I believe.
15    Q.   What is your job? What do you
16 do at the U.S. Attorney's office?
17    A.   Right now my position is
18 administrative assistant to the U.S.
19 Attorney.
20    Q.   How long have you been in that
21 position?
22    A.   Since 2001.
23    Q.   Are you from Montgomery?

Page 11

1    A.   Lowndes County.
2    Q.   How long have you lived in
3 Montgomery?
4    A.   1978.
5    Q.   How about Mr. Moore, is he
6 from Montgomery or surrounding county?
7    A.   Surrounding county, Lowndes.
8    Q.   He's also from Lowndes County?
9    A.   Yes.
10    Q.   Where in Lowndes are y'all
11 from?
12    A.   Hayneville.
13    Q.   Both of you?
14    A.   Yes.
15    Q.   How many family members do you
16 have in Montgomery County? Do you have any?
17    A.   In-laws.
18    Q.   Do you have any children?
19    A.   Yes.
20    Q.   How old?
21    A.   Thirty and twenty-seven.
22    Q.   Do they live around here?
23    A.   Yes.

Page 12

1    Q.   I don't need an address. They
2 live in Montgomery County?
3    A.   Yes.
4    Q.   What are their names?
5    A.   Latrice Moore and Wynetta
6 Moore.
7    Q.   Are they employed?
8    A.   Yes.
9    Q.   Can you tell me at what
10 companies they work?
11    A.   Latrice is employed at Hyundai
12 plant; and Wynetta is employed at Daihan,
13 that's a Hyundai supplier.
14    Q.   Are they married?
15    A.   Latrice is divorced, Wynetta
16 is not married.
17    Q.   What is her former husband's
18 name?
19    A.   Marcus Quinn.
20    Q.   Quinn?
21    A.   Q-U-I-N-N.
22    Q.   Who are -- Are your in-laws
23 that are in this area all Moores?

3  (Pages 9 to 12)

## FREEDOM COURT REPORTING

Page 13

1    A.    Yes.
2    Q.    How about over in Lowndes
3    County, do you have relatives that are still
4    living in Lowndes County?
5    A.    Yes.
6    Q.    A ton of them or just a
7    handful?
8    A.    Well, I've got four sisters
9    and a brother and my mother.
10    Q.    And they all still live in
11    Lowndes County?
12    A.    Yes.
13    Q.    What is your maiden name?
14    A.    Gordon.
15    Q.    Are your sisters that live in
16    Lowndes County married?
17    A.    Two are married.
18    Q.    What are their married names?
19    A.    One is Middleton, Geraldine
20    Middleton; and Alma Gordon, she married a
21    Gordon also.
22    Q.    And I don't want to take this
23    out any farther than I already have.  But I

Page 14

1    do want to ask you where your relatives that
2    currently still live in Lowndes County work.
3    A.    Well, one of my sisters work
4    at a sewing factory; one work at -- one of
5    my sisters work at Thermal Components where
6    my husband work; one work at Mobis, which is
7    a Hyundai supplier; and my brother does like
8    construction work, I don't know who he works
9    for.
10    Q.    You know, Ms. Moore, I have
11    jumped into this line of questioning just by
12    habit.  As you were giving me the names, I
13    realized this is not a jury case so I don't
14    need to know all of your relatives because
15    they won't be sitting on my jury so we can
16    move on.
17    As you know, we're here in
18    Montgomery to take your deposition --
19    shouldn't take too long, by the way --
20    regarding a car wreck that occurred on
21    August 29, 2003; right?
22    A.    Yes.
23    Q.    Where were you coming from at

Page 15

1    the time that car wreck occurred?
2    A.    I was coming from an LECC
3    conference in Perdido Beach, which is in
4    Orange Beach, Alabama.
5    Q.    Were y'all at Perdido Hilton
6    there, what used to be called Perdido Beach
7    Hilton right there on the point?
8    A.    It's called Perdido Beach
9    Resort.  I don't know what it used to be
10    called.
11    Q.    Right by the bridge?
12    A.    Yes.
13    Q.    What is LECC?
14    A.    Law enforcement coordinator
15    committee.
16    Q.    You were down there doing
17    something connected with your job?
18    A.    Right.
19    Q.    Were other people from this
20    office attending the LECC seminar,
21    conference?
22    A.    Yes.
23    Q.    How many of y'all had gone

Page 16

1    down, do you know?
2    A.    I don't know.
3    Q.    Did you go by yourself?  And
4    by that I mean, did your husband go with you
5    or anybody?
6    A.    I drove by myself.
7    Q.    All right.  And you stayed
8    there at the Perdido Resort?
9    A.    Yes.
10    Q.    How long had y'all been at the
11    beach before you were coming back?
12    A.    Went there on Tuesday and was
13    returning on Friday.
14    Q.    This wreck happened on a
15    Friday?
16    A.    Yes.
17    Q.    About what time of day?
18    A.    About two-thirty.
19    Q.    Do you remember what the
20    weather was like?
21    A.    It was raining.
22    Q.    Hard?
23    A.    At times.

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1    Q.    The wreck report indicates
2  that the wreck happened about two-thirty, it
3  actually says 2:25. Is that consistent with
4  your memory about the time of day that this
5  occurred?
6    A.    Yes. It was about -- That was
7  about the time I last looked at the time,
8  yes.
9    Q.    All right. Had you stopped
10 since leaving Gulf Shores before the wreck
11 happened?
12   A.    No.
13   Q.    All right. So you had gassed
14 up while you were still down at the beach?
15   A.    Yes.
16   Q.    And were going to drive all
17 the way back to Montgomery?
18   A.    Yes.
19   Q.    And your plan, at least, was
20 to not stop anywhere between the two?
21   A.    Right.
22   Q.    Had you eaten lunch before
23 leaving the beach?

Page 18

1    A.    I don't remember.
2    Q.    Had you had anything alcoholic
3  to drink that day?
4    A.    No.
5    Q.    Do you drink --
6    A.    Occasionally.
7    Q.    -- socially?
8    A.    Yes.
9    Q.    As part of the conference at
10 the seminar, had there been a cocktail party
11 or anything the night before?
12   A.    There had been a dinner on the
13 balcony. And there was drinks available.
14 You purchased it.
15   Q.    Did you have any drinks at the
16 party the night before?
17   A.    No.
18   Q.    Did you have any drinks the
19 night before at all, whether it was at the
20 party or otherwise?
21   A.    No.
22   Q.    Do you remember about what
23 time you left the beach to head back?

Page 19

1    A.    I think it was around 12:30.
2    Q.    Was it your intention to go
3  home or were y'all -- or were you going to
4  come back and swing by the office on the way
5  home?
6    A.    I was going home.
7    Q.    You were done for the week and
8  headed home for the weekend?
9    A.    Right.
10   Q.    What happened?
11   A.    Well, I was driving, looking
12 ahead, my hands on the steering wheel, and
13 it was raining. And I was in the inside
14 lane coming around a car, and I heard this
15 noise like my tire blew. And I lost all
16 control of my car. I didn't have any
17 control after that.
18   Q.    All right. As I understand
19 what you said, you were driving north on
20 I-65; correct?
21   A.    Right.
22   Q.    And you had moved from the
23 right-hand lane -- it's a two-lane highway

Page 20

1  where you were?
2    A.    Right.
3    Q.    Or four, but two going north?
4    A.    Yes.
5    Q.    You had moved from the
6  right-hand lane to the left-hand lane to
7  pass someone?
8    A.    Yes.
9    Q.    And you heard a noise?
10   A.    I heard a popping sound -- A
11 pop like my tire blew, that's what it felt
12 like, because I didn't have control of it.
13   Q.    And all of a sudden you felt
14 like you lost control of your car?
15   A.    Yes.
16   Q.    And you have a memory of what
17 you just described?
18   A.    Yes.
19   Q.    Do you have a memory of the
20 wreck kind of unfolding after that?
21   A.    No. I remember hitting the
22 median. I don't remember anything after
23 that.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    Q.    Until when?
2    A.    Until I woke up in the
3   hospital pretty much. I kind of remember a
4   little bit in the airplane -- I mean the
5   helicopter.
6    Q.    And do you, sitting here
7   today, know when that was when you -- when
8   your memory recovers, if you will, and you
9   were in the hospital?
10    A.    The next morning.
11    Q.    All right. So if this
12   happened at about two-thirty on a Friday
13   afternoon, you don't remember anything from
14   entering the median until sometime Saturday
15   morning, except you have a vague memory of
16   being in the helicopter?
17    A.    Yes.
18    Q.    Is that correct?
19    A.    That's correct.
20    Q.    When y'all left the beach to
21   head back to Montgomery, were you
22   caravanning in any way? Was there some
23   coordinated effort among you and the other

Page 22

1   people in the office to let's head out, or
2   were you just heading back?
3    A.    I was just heading back.
4    Q.    So do you know, having talked
5   to the people in your office since the day
6   of the wreck, whether or not any of the
7   other employees from the U.S. Attorney's
8   office were behind you when this wreck
9   occurred?
10    A.    No. No one has said they were
11   behind me or saw me.
12    Q.    Has anyone indicated to you
13   that they came upon the wreck as they were
14   driving back to Montgomery?
15    A.    Yes.
16    Q.    Who?
17    A.    Well, my boss, for one. She
18   did not know it was me at the time.
19    Q.    So she just kept going?
20    A.    No. She got a call from the
21   office about the accident, and then she
22   realized it was me.
23    Q.    And who are we talking about,

Page 23

1   the U.S. Attorney, Ms. Canary?
2    A.    Yes.
3    Q.    Anyone else in the office
4   indicate to you that they saw a wreck,
5   whether they knew it was yours or not, as
6   they came up 65 on their way back to
7   Montgomery?
8    A.    Yes.
9    Q.    Who?
10    A.    Tommie Hardwick, she's an
11   attorney in the office.
12    Q.    Tommie Hardwick?
13    A.    Yes.
14    Q.    That's H-A-R-T?
15    A.    H-A-R-D.
16    Q.    Did she stop or do you know?
17    A.    I don't know.
18    Q.    Anybody else?
19    A.    No. No one that just actually
20   said they saw the wreck -- you know, saw the
21   accident. I think traffic was backed up so
22   some people were caught in that and they
23   didn't know what happened.

Page 24

1    Q.    Right. Did Ms. Canary, after
2   getting a call from the office, return to
3   the scene of the wreck?
4    A.    I don't know if she returned
5   to the scene, but she went to the place
6   where my car had been towed.
7    Q.    That day?
8    A.    Yes.
9    Q.    And where was that?
10    A.    I don't -- I don't know.
11    Q.    How long were you in the
12   hospital?
13    A.    From Friday until -- I think I
14   came home Tuesday -- Monday or Tuesday. I
15   don't remember.
16    Q.    Other than Ms. Canary and
17   Ms. Hardwick, are you aware of anybody,
18   whether it's someone in the office or
19   otherwise, that either witnessed the wreck
20   itself, as it was happening, or came upon it
21   after it had -- everything had come to a
22   stop?
23    A.    No.

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 29

1    A.    No.
2    Q.    And at what point in this --
3 the day of the wreck is 2:30, Friday, the
4 29th of August. At what point did you speak
5 with the state trooper who was investigating
6 the wreck?
7    A.    I'm trying to remember if I
8 ever did talk to him.
9    Q.    And if you don't know an exact
10 day, that's fine. Do you remember ever
11 talking to the police officer?
12    A.    Let me see. I don't know
13 whether it was him. Someone called about my
14 license or something and said they had my
15 license or something.
16    Q.    And did you talk to them?
17    A.    I did. Whoever said they had
18 my license and they mailed it to me.
19    Q.    I see. Somebody had your
20 driver's license?
21    A.    Yes.
22    Q.    And you don't remember whether
23 or not that was the trooper or someone from

Page 30

1 the trooper station?
2    A.    Right. I don't.
3    Q.    Other than that phone call, do
4 you remember any conversation that you
5 had -- ever had with the investigating
6 trooper into this wreck?
7        MR. DOYLE: Objection. She
8 didn't testify that she had spoken with the
9 trooper. And the form of your question
10 is --
11        MR. SPARROW: Fair enough.
12    Q.    Other than the conversation
13 about your license, do you remember ever
14 having a conversation with the state trooper
15 or anyone -- Let me just strike all of that
16 and ask you if you ever had a conversation
17 with the state trooper?
18    A.    I don't recall. I don't
19 recall.
20    Q.    And I mean ever, up to and
21 including today.
22    A.    Regarding that wreck?
23    Q.    Yes.

Page 31

1    A.    I don't recall.
2    Q.    Okay. Well, then, let me
3 follow up on that. Have you ever spoken
4 with Trooper Fisher about anything, this
5 wreck or anything else?
6    A.    What's the name?
7    Q.    Trooper Fisher?
8    A.    I don't remember.
9    Q.    I think Robert Fisher. Have
10 you ever seen a copy of the wreck report?
11    A.    Yes.
12    Q.    And do you remember when you
13 first saw that?
14    A.    I don't remember.
15    Q.    When you got it, did you look
16 at it to see what the state trooper had put
17 on it, what information was included on it?
18    A.    I scanned, yes.
19    Q.    Did you, when you scanned it,
20 see anything on there that you disagreed
21 with?
22        And I've got a copy here, I
23 don't want you to -- Do you remember?

Page 32

1    A.    I don't recall what was on it.
2    Q.    One thing that is on it is he
3 has your estimated speed at eighty-three
4 miles per hour. Do you agree or disagree
5 with that?
6    A.    I disagree with that.
7        MR. KELLS: Objection. What
8 number did you quote for that?
9        MR. SPARROW: Eighty-three
10 miles per hour.
11        MR. KELLS: Can you show me
12 that for her speed?
13        MR. SPARROW: (Indicates.)
14        MR. KELLS: Okay. Thanks. I
15 just wanted to verify that.
16    Q.    Do you have a judgment,
17 Ms. Moore, as to how fast you were traveling
18 as you were passing the vehicle that you
19 described earlier just before this incident
20 occurred?
21    A.    Between sixty and sixty-five.
22 And when the tire blew, or whatever happened
23 to the tire, it picked up speed. And I

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1  couldn't do anything -- I couldn't stop it,
2  so.
3      Q.    And how is it that you know
4  you were going sixty to sixty-five as you
5  were passing that vehicle?
6      A.    Because I looked at my
7  speedometer.
8      Q.    As you were passing?
9      A.    Yeah.  Just kind of looked
10  down.
11      Q.    Were you on cruise control or
12  just -- I just drove down, and I'm just
13  curious, did you have your car on cruise
14  control or were you just driving with your
15  foot?
16      A.    Driving with my foot.
17      Q.    Do you remember or can you
18  tell me, Ms. Moore, who, since the day of
19  this wreck, you have told that you had a
20  blowout?
21      A.    I told everybody that asked
22  me.  I don't remember how many, I mean, or
23  who.

Page 34

1      Q.    Okay.  Did you ever make an
2  effort to contact the state trooper to
3  inform him that it was your position that
4  there had been some problem with your tire
5  that contributed to the cause of this wreck?
6      A.    No, I did not.  I didn't know
7  I could do that.  No, I didn't.
8      Q.    Did you -- When you say you
9  looked at the wreck report, look at it
10  closely enough to see that it didn't include
11  anything about a problem with the tire or
12  anything else on your car?
13      A.    No, I did not.
14      Q.    I have a tire in my office
15  that Mr. Kells has provided me.  Did you
16  provide that to him?
17      A.    No.
18      Q.    After this wreck, did you make
19  an effort to recover one or more of the
20  tires from the car that you were in at the
21  time of this wreck?
22      A.    No, I didn't.
23      Q.    Are you aware that someone

Page 35

1  else obtained one or more of the tires off
2  of the car that you were driving that was
3  involved in this wreck?
4      A.    Yes, I am.
5      Q.    All right.  Who got the tires?
6      A.    Beasley, Wilson's attorneys.
7      Q.    And that would be because you
8  had contacted them about this issue?
9      A.    No.
10      Q.    Do you know why Beasley,
11  Wilson and them went and got one or more of
12  your tires from your car?
13          (Off-the-Record discussion
14              was held.)
15      Q.    Have you ever or did Beasley,
16  Wilson or Allen, whatever the firm name is
17  now, file any claim on your behalf as a
18  result of any investigation they made into
19  the tire on your car?
20      A.    No, they didn't.
21      Q.    Do you know how many tires
22  they recovered from your car?
23      A.    No, I don't.

Page 36

1      Q.    Do you know where on your car
2  the tire that Mr. Kells provided to me came
3  from?
4      A.    Well, the tire that -- I don't
5  know where it came from.  But the tire that
6  I -- that felt like it blew on my car was
7  the tire on the left side, the driver's
8  side, the back tire.
9      Q.    Left, back tire?
10      A.    Yes.
11      Q.    What kind of car were you
12  driving?
13      A.    I was driving a Mountaineer.
14  It was an SUV.  I don't remember exactly
15  what year or model.
16      Q.    Wreck report says '97 Mercury;
17  does that sound right?
18      A.    Mountaineer, yes.
19      Q.    Do you know if a determination
20  was ever made if that tire had blown out?
21      A.    No, I don't.
22      Q.    Were you told by the people at
23  Beasley, Wilson whether or not they thought

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1  were marked for
2  identification.)
3  A.  They look like pictures of my
4  car.
5  Q.  Okay.  They look like pictures
6  of your car after this wreck?
7  A.  Uh-huh.
8  Q.  Do you see in Plaintiff's 1 --
9  Did you take these?
10  A.  No.  My husband did.
11  Q.  Do you have the ones that have
12  color to them?
13  A.  Yes.
14  Q.  I'm going to ask you if you
15  would, either have copies made and I'll pay
16  you for that if I need to, or provide those
17  to your lawyer?
18  A.  He just took them with the
19  Polaroid, with the sixty second camera.  He
20  just wanted to show it to me.  They are not
21  very good, but I have them.
22  MR. KELLS:  They are in color?
23  THE WITNESS:  Yes.

Page 46

1  Q.  Probably a little clearer than
2  these are?
3  A.  Yes.
4  Q.  Would you provide those to
5  Conor, and then I'll do what needs to be
6  done to get copies of those made and we'll
7  get the originals back to you.  Okay?
8  A.  Okay.
9  Q.  Do you know anything about the
10  circumstances of these pictures being taken?
11  I know your husband took them, do you know
12  when?
13  A.  He took them while I was still
14  in the hospital.  He went and took them so I
15  could look at it.
16  Q.  So just within a few days?
17  A.  Yes.
18  Q.  Do you know, in Plaintiff's 1,
19  why that tire is not still attached to the
20  car?
21  A.  No, I don't.
22  Q.  Okay.  Do you know who took it
23  off?

Page 47

1  A.  I don't.
2  Q.  You mentioned earlier that you
3  did have some kind of surgery in Pensacola.
4  Which of those injuries did you operate, you
5  mentioned shoulder and a lot in your pelvis?
6  A.  No.  The diaphragm.
7  Q.  Are you aware of any other
8  photographs of either your vehicle or the
9  tire in question that are not in that stack
10  of Plaintiff's 1 through 6?
11  A.  No.  I'm not aware of any
12  others.
13  Q.  And are those -- Did your
14  husband take six pictures?
15  A.  He took all of those, yes.
16  Q.  Did he take, for instance,
17  another thirty that aren't there?
18  A.  No.  That's all he took.
19  Q.  That's all he took.
20  MR. SPARROW:  Let me take a
21  short break.
22  (Recess taken.)
23  Q.  Ms. Moore, I just have a few

Page 48

1  more questions.
2  Just to clarify a few things.
3  You mentioned when you were telling us
4  earlier what happened at the wreck that you
5  heard -- and correct me if I'm wrong, I just
6  want to make sure I've got it right.  You
7  heard a noise, and I think you referred to
8  it as a pop; is that correct?
9  A.  Yes.
10  Q.  And then all of a sudden you
11  lost control?
12  A.  Yes.
13  Q.  You said that after hearing
14  the pop, your car accelerated?
15  A.  Yes.  Well, I tried to -- When
16  you put your foot on the brake to try to
17  stop it, it just seemed like it picked up
18  speed.
19  Q.  Did you put your foot on the
20  brake --
21  A.  Yes.
22  Q.  -- when you heard the noise?
23  A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 49

1    Q.    Was there any other sensation
2  that accompanied the noise?
3    A.    Yes.
4    Q.    What?
5    A.    Felt like the car dropped to
6  the side, kind of dropped down.
7    Q.    In the back?
8    A.    Yes.
9    Q.    Have you ever been driving
10  when you had a flat tire before this
11  happened?
12    A.    Yes.
13    Q.    Had you ever had that occur to
14  you on the interstate?
15    A.    No.
16    MR. KELLS:  Just to clarify,
17  when you say that, you mean a flat tire?
18    MR. SPARROW:  Yes.  Flat tire,
19  blowout, whatever you want to call it.
20    Q.    Also, to clarify, you
21  mentioned that Ms. Canary and Ms. Hardwick
22  indicated to you that they had seen a wreck
23  as they went by; correct?

Page 50

1    A.    Came along after it happened,
2  yes.
3    Q.    That was my question.
4  Actually I think you mentioned that with
5  Canary.  Did Hardwick see the wreck or just
6  come by and see that somebody had had a
7  wreck?
8    A.    Came by and saw that someone
9  had had a wreck.
10    Q.    And are you aware if
11  Ms. Hardwick stopped there at the scene?
12    A.    I'm not aware.
13    Q.    She never mentioned if she got
14  out of her car, for instance, to come check
15  on you and see what was going on?
16    A.    No.  She did not know it was
17  me.
18    Q.    All right.  As I understand
19  it, your memory drops off as you entered the
20  median; is that correct?
21    A.    Yes.
22    Q.    So maybe it's fortunate, but
23  you don't remember coming out of the median

Page 51

1  on the other side, or the impact with either
2  of the cars on the southbound lanes?
3    A.    No, I don't.
4    Q.    Do you remember either -- from
5  any standpoint in time, recognizing or
6  realizing that those cars were even coming
7  toward you in the southbound lane?
8    A.    No, sir, I did not.
9    Q.    Is it your contention,
10  Ms. Moore, that either the driver of the car
11  in which the Allens were --
12    MR. KELLS:  I'm going to
13  object to the form.  She's not a party to
14  the case, so it wouldn't be her contention.
15  Just that clarification.
16    Q.    With that objection you can
17  answer.  Do you believe, or is it your
18  contention, that either the driver of the
19  Allen vehicle or the Montgomery vehicle did
20  anything to contribute to this wreck?
21    A.    Is it my opinion what?  Can
22  you please repeat?
23    Q.    That either of the two cars in

Page 52

1  the southbound lane that were involved in
2  this accident or this wreck did anything
3  wrong?
4    A.    I don't know.
5    Q.    When you were in the hospital,
6  Ms. Moore, at any time during your stay,
7  were you asked by hospital staff to tell
8  them what had happened that led to you being
9  in the hospital?
10    A.    I don't remember.  I was
11  heavily sedated.  I don't know.
12    Q.    Pretty much the whole time you
13  were down there?
14    A.    Well, not the day I came home.
15  But I don't remember them asking me
16  anything.
17    Q.    Okay.  When did you first
18  contact your insurance company about it?
19    A.    I don't remember that either.
20    Q.    Did you make the contact or
21  did your husband?
22    A.    I'm not sure whether I did or
23  he did.  I don't remember that either.

13  (Pages 49 to 52)

# Exhibit B

*TIRExpertise Inc*

# *T I R E x p e r t i s e  I n c.*

## Tire Consultancy and Tire  Failure Analysis
### *PETER.L.FLANNER*
### *PRESIDENT.*

104,Bluebelle Drive,
Madison,Al. 35758

**Phone/Fax:**  (256) 772-4971
**Cell Phone:**  (256) 655-3465
**E-mail:**  plflanner@AOL.com

<u>Wallace Montgomery et al & Michael Allen et al vs. United States of America.</u>

I have been retained by the plaintiffs in the above captioned case to review evidence & carry out a detailed inspection of the tire involved in an August,2003 accident on I-65 near mile marker 106 in Alabama.This report is submitted pursuant to Federal Rules of Civil Procedures 26(a)(2)(B).

<u>Identity of Expert Witness.</u>

PETER L.FLANNER

President,

TIRExpertise,Inc.

104,Bluebelle Drive,

Madison,

Alabama,35758

(256)772-4971.

<u>Summary Opinion.</u>

I have completed my examination of the incident tire installed on the Left Rear position on the 1997 Mercury Mountaineer involved in the above-captioned matter.After a detailed examination of the physical evidence & a review of the information provided,I have concluded that the incident tire suffered an air loss following the ejection of a large screw that had previously penetrated the tire structure.The massive damage to the tire detailed in my Inspection Report & Photographs occurred after the tire deflation,when the vehicle went out of control,crossed the median & impacted the vehicles being driven by Mr.Allen & Ms. Montgomery.



1

*TIRExpertise Inc*

<u>Complete Statement of All Opinions to be Expressed and the Basis and Reasons</u>
<u>Therefore.</u>

I,Peter Flanner,will testify on behalf of the plaintiffs,Messrs Montgomery & Allen as an expert in the field of tire failure analysis and will address the issues regarding tire failure mode and effects.

My opinions & conclusions are based upon my training,experience & expertise in tire design/development,tire testing,the analysis & evaluation of failed tires,visual & tactile examination of the incident tire & review of file materials provided by counsel,especially Alabama Uniform Traffic Accident Report #3522163,Accident Scene Photographs & the deposition of Bertha M.Moore.

My opinion & conclusions will include the following:-

1. The incident tire was punctured by a large screw,which would have caused a gradual loss of inflation pressure.Approximate dimensions,1/8" diameter with a screw head of ~3/8" diameter.

2. The screw is no longer in the tire.

3. The screw completely penetrated the tire structure.

4. Although it is impossible to determine the length of time that the screw had been in the tire,the imprint of the screw head around the ingress point would suggest that it had been in the tire for some time & <u>did not penetrate the tire</u> <u>for the first time at the time of the accident.</u>

5. The massive damage to the tire occurred after the loss of control as the vehicle crossed the central grass median,which,from accident scene photographs,includes a concrete culvert,became airborne & crashed into the plaintiffs' vehicles traveling in the Southbound lanes of I-65.

6. There was no manufacturing defect in the P235/75R15 Cordovan XRT Wild Trac steel-belted radial tire mounted on the Left Rear position.Based upon the D.O.T. number,this tire was manufactured during the 27th. week of 2000 by Goodyear at their Fayetteville,N.C. Plant for T.B.C. Corporation-a large distributor of Private Brand tires.This tire is an appropriate fitment on a Mercury Mountaineer based upon size & load carrying capacity.

7. Ms.Moore purchased the 1997 Mercury Mountaineer vehicle (similar to the Ford Explorer) in May of 2003,less than 4 months before the accident.She stated in her deposition that the tires on the vehicle at the time of the accident were on the vehicle at the time of purchase.

8. The tire was approximately 80% worn with an average of 2/32" of usable tread remaining with relatively even tread wear.

<u>Background</u>

On August 29th.2003,according to deposition testimony of Ms.B. Moore,she was returning from a conference in Perdido Beach to her residence in Montgomery in her 1997 Mercury Mountaineer.She was traveling North on I-65 in rainy weather.She estimated her speed at 60 -65 m.p.h. & at 2:25 p.m. near the 106.1

2

*TIRExpertise Inc*

mile post,she experienced a rapid deflation of the Left Rear tire,lost control,crossed the median & impacted the plaintiffs' vehicles,which were traveling South-bound on I-65.Although accident scene photographs show the median as being largely grassy there are also regularly spaced concrete culverts located in the median.The Left rear tire suffered massive trauma resulting in multiple sidewall splits & 2 areas in the tread portion where the impacts had completely severed the tire structure in the tread area.

Qualifications of P.L.Flanner.

I retired from Goodyear Dunlop Tires North America at the end of 2003 after a 45 year career in various Technical & Managerial capacities.My attached curriculum vitae lists the positions held over that period. I hold a Higher National Certificate in Applied Physics.

I joined Dunlop Tyres Ltd. at their World Technical Headquarters in Birmingham,England in 1958 as a Technical Trainee.After assignments in Quality Assurance,Tire Test Research & Radial Tire Technology transfer to Overseas plants,I was appointed to Dunlop U.S.A.'s HQ in Buffalo N.Y. in 1976. to continue with the transfer of Dunlop European Radial Tire Technology to the North American Plants.Additionally,I established relationships with the U.S. Offices of vehicle manufacturers fitting Dunlop tires & set-up a Field/Customer Service function to gather & analyse complaints on imported Dunlop tires.This model was adopted Company-wide & I headed up that Organization & also introduced the techniques for statistical analysis of product performance as a tool to continually improve the performance & acceptance of Dunlop tire products in the U.S.A.This also included the analysis & dissection of tires returned from the market & coordinating the adoption & evaluation of corrective countermeasures.Over that & subsequent periods I examined many thousands of tires-motorcycle,passenger car,light & medium truck,industrial & O.T.R. tires.

Other areas of expertise include design,development & testing of passenger car,light truck & medium truck radial tires for the U.S. market.At the time of my retirement I was Product Evaluation Manager at the Huntsville,Alabama facility charged with the testing & analysis of Dunlop products to Customer,Federal & stringent internal Dunlop requirements.

After my retirement I established TIRExpertise Inc.,specializing in Tire Consultancy & Tire Failure Analysis in Madison,Alabama.My business covers many types of tires ranging from Motorcycle,Passenger Car,Light Truck & Medium Truck tires to large Off-The-Road Earthmover tires.I accept commissions from both Plaintiffs & Defendants,where I & they feel my knowledge & experience would be beneficial.

This broad experience makes me qualified to deliver authoritative opinions in areas of my expertise in regard to the Moore tire.

Methodology;The Data or any Information Considered by the Witness in Forming His Opinion.

3

*TIRExpertise Inc*

The primary basis for opinions expressed in this Report was derived from detailed examination of the incident tire from the Moore vehicle utilizing visual,tactile & measurement techniques & methods well-known in the tire failure analysis community.

The examination notes from inspection of the incident tire are appended,as are copies of digital photographs.

Additionally,I have reviewed the following information sources:-

Deposition.

    1. Moore,Bertha M. August 7,2007.

Accident Report.

    1. Alabama Uniform Traffic Accident Report,August 29,2003 by Trooper Fisher.

Accident Scene Photographs.

    1. Provided by J.C.Sparrow.

Other Documents.

    1. "Who Makes It & Where"-a Bennett Garfield Publication.

    2. "Tire Guide"-a Bennett Garfield Publication.

    3. "The Tire & Rim Association Yearbook."

    4. "The Investigator's Guides to Tire Failures.Chapter 6-'Penetrations & Punctures' " R.J.Grogan.Institute of Police Technology & Management.

Any Exhibit to be Used as a Summary or in Support of the Opinions.

    1. Tire Report & Opinions.

    2. Tire Examination Notes.

    3. Incident Tire.

    4. Wear Measurements.

    5. Digital Photographs of Incident Tire.

    6. Literature References denoted in the Report or Excerpts there from.

The Qualifications of the Witness including a List of Publications Authored by the Witness within the Preceding Ten(10) Years.

A curriculum vitae is attached hereto.All publications authored during the preceding ten(10) years were made during my employment with Dunlop & Goodyear & are subject to Confidentiality Agreements.

Compensation to be Paid for the Study & Testimony.

A copy of my Professional Services Agreement is Attached.

Listing of Other Cases the Witness has Testified in as an Expert Witness at Trial or Deposition within the Preceding Four(4) Years.

4

*TIRExpertise Inc*

A list reflecting the above-required information is included in my curriculum vitae.

I reserve the right to supplement this report should additional information become available.

Peter L. Flanner.

President,

*TIRExpertise Inc.*

<u>Date: 9-17-2007</u>

5

Exhibit C

# Report 07.036

Cordovan Tire Failure
Mercury Mountaineer Collision Sequence

## INTRODUCTION

According to a furnished copy of the police report of the incident, a 1997 Mercury Mountaineer was northbound on I-65 in Alabama at mile 106.1 under daylight conditions and rain when the driver of the Mountaineer lost control, crossing the median and entering the southbound lanes, where a collision occurred between the Mountaineer and a southbound Lincoln Town Car. Subsequently, the Mountaineer collided with a southbound Volvo V70. The loss of control of the Mountaineer was reportedly caused by a sudden deflation of the left (driver's side) rear tire of that vehicle.

In a letter dated June 19, 2007, the undersigned was asked to examine the tire reportedly removed from the left rear of the Mountaineer to determine, if possible, the cause of the reported sudden deflation of that tire. The undersigned was also asked to express opinions regarding whether or not the failure of that tire was likely to have been anticipated, the likelihood that a driver would lose control as a result of a deflation, and what steps might have been taken to avoid loss of control after a deflation. The tire was received without rim in a secure cardboard box at the business address of the undersigned on June 20, 2007. The tire was examined in detail on June 29, 2007, at which time the attached photographs were taken. An optical disc present in a plastic sleeve attached to the inside rear cover of this report contains all photographs taken on that date, the text of this report in Word 2007 format, and other digitized files pertaining to this investigation and report.

## TIRE EXAMINATION AND FINDINGS

The tire is shown as received in Photographs A, B, and C. Although there was no rim provided with this tire, examination of the carcass did not reveal any indications of tire damage due to a size mismatch between tire and rim or to other improper mounting methods or techniques. Similarly, although no valve stem was available for examination and testing, there was no evidence in the carcass that this tire had been operated in an overdeflected condition (which is almost universally caused by underinflation in passenger cars and light trucks), indicating that the valve stem had performed its function properly and that the tire had been maintained at a normal and proper pressure for most of its service life.

Selected tire markings are shown in Photographs D through H. This was a Cordovan brand, size P235/75R15, standard load, tubeless, radial-ply tire. Tire construction included two polyester cord body ("sidewall") plies and two steel tread plies (belts). The serial number indicated that this tire was manufactured in the 27th week of 2000 at the Goodyear Tire and Rubber Company plant at Fayetteville, North Carolina. Remaining tread groove depths were all 4/32 to 5/32 inch, indicating uniform wear of the tread ribs; uniform wear indicates that this tire was operated on properly aligned axle(s) and that the inflation pressure was satisfactory for its service life.

There were numerous mechanical damages to this tire, which will not be enumerated in detail in this report. Examination of those damages revealed that all were the result of externally applied, abnormal forces acting on the tire body, including both beads. Examination of the carcass did reveal the location of a penetration by an object which was no longer present with the tire (Photographs K through O). Examination of the inter-ply surfaces of this penetration revealed wear; i.e., the object which made this penetration was carried by the tire for a

significant number of miles.  The absence of the penetrating object with the carcass strongly

suggests that it was discharged from this tire before the loss of vehicle control and subsequent

extensive mechanical damages to this tire.  Most probably, this object was dislodged/discharged

from this tire as the Mountaineer was traveling on the interstate highway.

Tubeless tires have an inner liner which is designed to seal around puncturing objects,

allowing a punctured tire to be driven a substantial distance before significant deflation occurs,

as long as the penetrating object stays with the tire.  If the penetrating object is lost, deflation

occurs very quickly.  It should also be noted that water is a lubricant for rubber and the objects

which are likely to penetrate a tire, and the Mountaineer was traveling on a wet road in the rain.

## DISCUSSION

It is common knowledge that tire traction is reduced when the road is wet.  In Chapter 5

of *Mechanics of Pneumatic Tires,* Samuel K. Clark, Editor, U.S. Department of Transportation,

National Highway Traffic Safety Administration, Washington, D.C., the authors of that chapter

wrote, "When fluid contaminants such as water, . . . are present on the pavement surface, contact

area between tire and pavement is reduced due to the persistence of a fluid film . . ." "The reduc-

tion in traction that occurs on a fluid contaminated pavement is indirect evidence of this loss in

dry contact area."  Among other statements in that chapter were observations that higher speeds

and lower tread groove depths reduced the coefficient of friction available to resist sideward

travel of a vehicle operated on a wet road.  Those observations are best summarized by Figure

5.105 on page 339 of that reference.

In an article written by Rex Grogan and apparently published in England in the Journal of

the Forensic Science Society, 12, 285, 1972, entitled "The Effect of Tyre Deflation on Vehicle

Behavior," several tests and reviews of testing by others were summarized.   One of the

interesting outcomes of these activities was the observation that a deflated rear tire could cause a sudden oversteer configuration of a motor vehicle, one which could not be overcome even by an experienced driver who knew he was being tested for a failed rear tire.  Mr. Grogan also referenced an article by W. J. Dobie of Uniroyal, published in 1969 in *Materials Research and Standards,* who had reportedly shown that a tire is six times more likely to sustain a puncture or other hazard-related failure during the second half of its life than during the first half and that a wet tire is much more likely to sustain a puncture than a dry one.

For that same article, many data sources in England had been collected for analysis regarding tire failures resulting in loss of vehicle control.  From a detailed study of 61 such cases, 40 of the cases were the result of rear tire failures, while 21 were the result of front tire failures.

In a publication prepared by Dunlop in 1980 to assist police officers in England who were investigating tire failures as contributing factors to losses of vehicle control, page 18 contained the following:  "It is often stated that a discerning driver should feel the drag produced by a deflating or flat tire; he should also be able to detect that the vehicle is lower on one corner.  This is not true.  With modern vehicles the suspension and general design of the vehicle completely masks many of the effects of deflation."

It is also intuitive and has been confirmed by testing that tire deflations do not necessarily result in loss of vehicle control.  However, it has been well documented that deflations can cause loss of control in virtually any over-the-road vehicle.

During the days of the Ford Explorer/Firestone tire issues, the undersigned personally investigated a number of Firestone tire failures on Ford Explorers.  In every case in which the undersigned was asked to investigate (which request would not have been made if not for a

serious extent of injury and/or property damage), it was a rear tire failure which was involved in the loss of control. In not one of the cases which the undersigned was asked to investigate was a front tire failure a factor in loss of vehicle control.

Rex Grogan and C. S. Murray published an undated paper on "The Rate of Deflation of Car Tyres." For a 6.70-15 tubeless tire (a common size in the time frame of that study), a one-quarter-inch hole would cause an essentially complete deflation in less than one second. A one-eighth-inch hole would cause an essentially complete deflation in less than five seconds.

A final point regards the effect of tread depth on wet-road control. In his book, "The Investigator's Guide to Tire Failures," Institute of Police Technology and Management, University of North Florida, Jacksonville: 1999, Rex Grogan includes a chart showing the effect of tread depth on wet braking grip as a function of speed. With approximately one-tenth of an inch of water on the road, the skid number at 60 mph falls from 65 with full tread depth to 38 at half of the original tread depth. There is a direct correlation between braking skid number and a tire's ability to resist side-slipping.

In that book, Mr. Grogan also wrote, referring to the oversteering event which might occur with a rear tire failure, ". . . it became apparent that loss of (vehicle) control (with a deflated tire) was so sudden and so violent that there was virtually no chance of modifying the loss of control . . ." In the next paragraph, he wrote, "All this suggests that loss of control is a fundamental consequence of a flat tire, yet this cannot be true. We know that many drivers . . . do not experience any loss of control."

## CONCLUSIONS

Examination of the remains of this tire did not reveal any indications that it had been mounted on a rim of improper size or type, nor was there any other indication of improper or

defective mounting methods or procedures. The overall condition of the carcass and the even tread wear indicated that this tire had been properly used and had been properly inflated for virtually all of it service life.

The vehicle on which this tire had been mounted experienced an out-of-control, expressway-median crossing followed by separate collisions with two oncoming vehicles. The tire exhibited numerous and extensive mechanical damages which obviously resulted after the driver lost control of the Mountaineer. However, the presence of an obvious puncture with wear indicated that an apparently round object of significant diameter had penetrated this tire and had been carried for an indeterminate period of time. The penetrating object was in the serial-side tread shoulder, which side was mounted inboard on the Mountaineer, based on review of furnished photographs. As such, this object would have gone unnoticed unless someone was making a detailed inspection of the tire. Since this is a tubeless tire, the object could have been (and probably was) carried for many miles with inconsequential loss of pressure while the object remained in the tire. Although there has been some limited tested to demonstrate wear on bolts and nails as penetrating objects as a function of driven miles, one would have to have the object to evaluate its wear, and no such object was presented to the undersigned.

The examination of the tire and the review of the police report indicate that the most probable loss of control of the Mountaineer was a rapid deflation of its left rear tire when the object which had earlier penetrated the tire and was being carried by it was shed, possibly as a result of the lubricating qualities of the rainwater. This deflation probably occurred in less than five seconds, but it may not have been evident to the driver of the Mountaineer until a lane change was begun or until some other lateral load was placed upon that vehicle, at which time

the absence of lateral stability at the left rear wheel position would likely have placed this Mountaineer into an oversteer configuration from which the driver could not recover.

Tire deflations do not always cause loss of vehicle control, but a rear tire deflation is more likely to create loss of vehicle control than a front tire deflation, due to understeer/oversteer effects. Once a vehicle with a deflated rear tire enters an oversteer configuration, vehicle control is virtually never regained until the vehicle comes to a complete stop. In the case of the Mountaineer, collisions quickly followed loss of vehicle control.

The location of the penetrating object in the left rear tire was such that it is unlikely to have been observed by anyone not conducting a detailed tire examination. There would not necessarily have been any notice of the presence of that object to the driver, nor would there have been any notice of impending failure. Once the tire deflated, loss of control would not necessarily have been immediate, but the overall condition of the carcass demonstrates that it did not travel very far (feet to hundreds of yards) after deflation. Many tire failures do not result in loss of vehicle control; some do. Even experienced test drivers have been surprised by vehicle behavior with a deflated rear tire and have lost control during staged, deflated-tire testing.

The provided tire will be returned to you by common carrier. Please call if you have any questions.

Respectfully submitted,

Ralph Cunningham

Enclosures

# Exhibit D

58

1  something you can say to show statistically or
2  otherwise that that part of his opinion is
3  wrong?
4  A       I think it's just common sense that
5  he's wrong.  He makes -- because he makes no
6  comment here that there is an ongoing loss of
7  inflation pressure in the tire.
8          What he's saying, I think, here is,
9  the only way a tire is going to lose pressure is
10 if it gets punctured and that's not true.  And
11 everybody in the tire business knows that that's
12 not true.
13         So the -- any puncturing object would
14 potentially give you an additional loss of
15 pressure -- pressure over and above what the
16 tire would see anyway.  And then it becomes --
17 then it becomes really consequential.
18 Q       Now, I don't see anything in your
19 findings and opinions and basis of reasons
20 therefore.
21         But if you look at page 2 of Mr.
22 Cunningham's report, Defendant's Exhibit 5 --
23 A       Let me just go back one point.  You

59

1  said you didn't see any reference.
2          Point 1 of mine, it says, (Reading)
3  The incident tire was punctured by large screw
4  which would have caused a gradual loss of
5  inflation pressure.
6  Q       Correct.
7          And I just wanted to ask you about one
8  -- one portion of Mr. Cunningham's report --
9  A       Sure.
10 Q       -- which was that page 2 in the first
11 paragraph there, right around the middle of the
12 -- that paragraph.
13         (Reading)  There was no evidence in
14 the carcass that this tire had been operated in
15 an overdeflected condition, which is almost
16 universally caused by underinflation in
17 passenger cars and light trucks.
18         Would you agree that when you looked
19 at the tire there was no evidence of an
20 overdeflected condition?
21 A       Yes, I would agree with that
22 statement.
23 Q       Let's move on to number 5 on

60

1  Defendant's Exhibit 2, which is your report.
2          (Reading)  The massive damage to the
3  tire occurred after the loss of control as the
4  vehicle crossed the central grass median, which
5  from accident scene photographs includes a
6  concrete culvert, became airborne and crashed
7  into the plaintiff's vehicle traveling in the
8  southbound lanes of I-65.
9  A       Yes.
10 Q       What was the basis for that particular
11 opinion regarding the damage to the tire
12 occurring after loss of control?
13 A       Well, I've looked at a lot of failed
14 tires and I've never seen a tire with more
15 massive damage than this one ever.  This really
16 did take a hit.
17         So this sort of damage that we're
18 looking at can only have occurred in my view at
19 relatively high rate of speed and the vehicle
20 impacting something other than a grass median
21 had to be something really substantial because
22 it actually split the tire down the tread, down
23 the center of the tread.  And that's shown on --

61

1  in some of my photographs.  And that's very,
2  very difficult.
3  Q       If you could, just identify one of
4  those photographs and we'll mark it as a
5  Defendant's Exhibit.
6  A       It's very difficult to split a tire
7  tread down the center.  And in the tire testing
8  business we've been trying to do it for years
9  unsuccessfully because it's very difficult to
10 do.  And it requires so much force it becomes a
11 little bit of a hazard for anybody performing
12 the test.
13         And, so, that said, I've never seen a
14 tire with this much damage, particularly in the
15 tread area.  And my -- it can only be
16 supposition, is that the vehicle hit a part of a
17 concrete culvert, which was probably raised,
18 particularly over the grass median, such that
19 all of the weight of the vehicle fell onto that
20 area of the tire and it just destroyed it.
21         And let me just find that photograph.
22         MR. DEGARIS:  Is that the one?
23         THE WITNESS:  That's the one.

70

1  in the -- in service of some problems and it's
2  exactly what happened.
3  Q         Well, you don't have an opinion as to
4  whether or not the tire was in any sort of poor
5  condition or poor maintenance at the time that
6  she was driving on August 29, 2003, do you?
7  A         All I can say is that we know that it
8  had a puncturing object in it. Nowhere in her
9  deposition did she make any comment about doing
0  any maintenance on the tire.
1  Q         You don't know whether or not she did
2  or did not?
3  A         She didn't make any comment about it
4  at all.
5  Q         Did she make any comment about having
6  not done maintenance as opposed to having done
7  maintenance?
8  A         Well, I think one would probably make
9  a statement you had done maintenance rather than
0  I didn't do any maintenance, don't you agree?
1  Q         I'm asking if you know.
2  A         No, I don't know. Nothing was said in
3  her deposition along those lines.

71

1  Q         And once, again, do you have any
2  reason to believe that -- any basis for
3  believing that her tire was underdeflated at the
4  time she got in her vehicle on that day?
5  A         Well, only based, again, upon my long
6  experience in looking at tires and their
7  operation in the market. All tires lose air,
8  all tires lose air.
9  Q         Let me put it to you this way: Did
0  you measure the air pressure of her tire before
1  she got in her vehicle on August 29, 2003?
2  A         How could I have done that?
3  Q         Did you visually see the tire before
4  she got in her car on August 29, 2003?
5  A         Of course I didn't.
6  Q         Let's move on to your last opinion in
7  Defendant's Exhibit 2. And that number 8 is,
8  (Reading) The tire was approximately 80% worn
9  with an average of 2/32's of an inch of usable
0  tread remaining with relatively even tread wear.
1  A         Uh-huh (affirmative response.)
2  Q         You briefly explained -- what does
3  usable tread refer to?

72

1  A         Yes. Well, all tires come with a
2  specified tread depth, usually maximum of 32nd's
3  of an inch. And it can vary by manufacturer to
4  manufacturer and by tire size and tread life, et
5  cetera.
6            But the one thing that's constant is
7  that 2/32's remaining, there's a wear bar, which
8  by law, has to be in the tires. All tires are
9  worn out when that wear bar is exposed.
10           So in terms of usable tread depth, if
11  you look at what the original specification was
12  and subtract two; then that's what your usable
13  tread depth is.
14           So what I'm saying here is that there
15  were 2/32 usable tread remaining and I think
16  Cunningham says four because he's -- he doesn't
17  make the differentiation between tread depth and
18  usable tread depth.
19  Q         Let me ask you this: If you have
20  2/32's of an inch of usable tread remaining --
21  A         Uh-huh (affirmative response.)
22  Q         -- and at 2/32's of an inch is when
23  the tread is completely worn and should be

73

1  replaced, does that mean that you would have
2  4/32's of an inch of total tread depth
3  remaining?
4  A         Yes, that's correct.
5  Q         So just taking a look at Mr.
6  Cunningham's report, which you referenced
7  earlier --
8  A         Yes.
9  Q         -- which is Defendant's Exhibit 5,
10  when Mr. Cunningham states, (Reading) The
11  remaining groove depth were all 4/32's to 5/32's
12  of an inch with uniform wear of the tread ribs.
13           Is that at least consistent with your
14  finding of number 8?
15  A         Oh, yes, it is. Yes.
16  Q         Thank you.
17           MR. KELLS: Could I just take a two
18  minute break, two or three maybe, and take a
19  quick break. And go off the record and let me
20  confer with Gail quickly.
21           MR. DEGARIS: Sure.
22           (Whereupon, the taking of the
23           deposition was recessed from

82

1       THE WITNESS: -- degrees what -- what
2  time is that, you know.
3       So, in my view, it just sort of
4  indicates that somebody really wasn't trained
5  scientifically, if you like, to --
6       MR. KELLS:  I'm going to object again
7  as non-responsive.  There wasn't a question
8  pending.
9       THE WITNESS:  So, anyway, given the --
10 put down exactly the areas of damage and various
11 other indications that I see, I can indicate the
12 direction of rotation of the tire.
13      Knowing, for example, this was the
14 left rear and the serial side was fitted on the
15 inside facing in.  So, therefore, it was
16 rotating that direction (indicating.)
17      That can be helpful sometimes in
18 looking at -- particularly when you have a tire
19 of structural failure, not so much in this case
20 because all of the things that you see are
21 accident damage, all of this is accident damage
22 (indicating.)  That's on the serial side.
23      Similar on the outline, raised outline

83

1  white letter.
2  Q       (By Mr. Kells)  If I could just
3  interject for -- for one moment.
4       I've noticed that on both page 3A and
5  3B of Defendant's Exhibit 2 Subsection G, you
6  have a left rear in both instances?
7  A       Yes.
8  Q       So are you in agreement that this is
9  the left rear tire from that vehicle?
10 A       Yes, I am.
11      So this -- again, this is the raised
12 outline, white letter side.  And shows it again
13 some damages that we see -- that I saw and
14 notated in that fashion.
15      Sheet 3C would be wheel information
16 except no wheel was provided.  So that's
17 obviously blank.
18 Q       What is number 4?
19 A       Sheet 4 is tread depth information
20 using a tread depth gauge, a calibrated tread
21 depth gauge.  And I go around the tire in this
22 particular case in four positions and measure
23 the tread depth to the bottom of the grooves at

84

1  each of these positions so that I've got a good
2  idea at 90 degree intervals going around the
3  tire the relative wear regularity.
4       So I can look in two directions.  I
5  can look across the tire from one shoulder to
6  the other shoulder or I can look circumventally
7  around the tire to see if there's areas with
8  excessively heavy wear in certain areas.
9       The -- the tread wear was relatively
10 even as one would expect.
11      The shoulder area is a little bit more
12 worn, but they start off with less tread anyway.
13      So, you know, just saying I expect the
14 point relatively even wear, some choppy shoulder
15 wear on the serial side shoulder.
16      Tread hardness was rated 85 to 88
17 degrees, which is pretty hard.
18 Q       And these results are reflected in
19 your report?
20 A       Yea.  Where I talk about an average
21 remaining tread depth of 2/32's of useable.
22      I've actually got the full tread
23 depths as much as Cunningham has there, but from

85

1  those just subtract two.
2       Then sheet 5A is observations, the
3  major observations that I saw.
4       And then, of course --
5  Q       That looks like most of that is
6  reflected in your report.
7       Is there anything in there that is
8  not?
9  A       No, I don't believe so.  And, of
10 course, it's also shown in more detail, in
11 graphic detail in the various photographs that
12 were attached.
13 Q       Sure.
14 A       So no need to go through that.
15      And then one can refer back from those
16 photographs to those schematics if you ever have
17 any need.
18      So that -- well, the -- so you've got
19 the clock markings on the photograph and also on
20 the schematics and one could go back and look at
21 the severity of the damage.  You can see from my
22 annotations here, but you can also see more
23 directly on the photograph.

# Exhibit E

## Clifford A. Prosser

**Traffic Accident Consulting Services**
4248 Fieldstone Drive
Birmingham, Alabama 35215
Clifford A. Prosser, Senior Consulting Reconstructionist

Phone (205) 681-6869
Fax (205) 681-4761
e-mail: cprosser6869@charter.net

September 17, 2007

To:   **Mr. Annesley DeGaris**
      Cory, Watson, Crowder & DeGaris
      2031 Magnolia Avenue South
      Birmingham, Alabama 35205

RE:   ***Michael P. Allen, et al. vs. United States of America***
      **Civil Action No.: 06-cv-879-WKW**

Dear **Mr. DeGaris** ,

As you requested, I have examined the currently available evidence that you provided pertaining to the above referenced motor vehicle accident. Please allow this correspondence to constitute a brief report of my findings and opinions to date.

### Items Examined, Reviewed or Considered

* Alabama Uniform Traffic Accident Report
* Deposition of Bertha Moore
* Photographs of involved 2003 Lincoln Town Car
* Copies of photographs of involved 1997 Mercury Mountaineer
* Copies of photographs of reported accident scene area (not immediately post accident)
* Expert report of tire examination by Peter L. Flanner
* SAE technical paper 970954
* Michelin passenger car and light truck owner's manual
* Telephone interview of Alabama State Trooper Fisher

### Findings and Opinions

The tire deflation alleged to have occurred on the Mercury Mountaineer should not have resulted in a catastrophic loss of control. Mrs. Moore, in my opinion, contributed to the control loss of her vehicle by braking, as per her deposition testimony, when she perceived the tire deflation. As it appears that the deflation was not explosive in nature, the driver of the vehicle, Bertha Moore, should have been able to maintain control of the vehicle in the north bound lane of the roadway and the reported lateral excursion into the south bound traffic lanes should not have occurred. It is most likely, in my opinion, that the driver, Bertha Moore, contributed to the control difficulty by improper braking of the vehicle. This reported loss of control event would


DEFENDANT'S EXHIBIT

be consistent with the effects of hard braking during the effects of unequal drag. As stated previously, Bertha Moore testified during her deposition that she applied her brakes after feeling the disablement, and this likely contributed to the control loss.

The submitted report of tire expert Peter L. Flanner opines that the onset of the deflation of the subject tire was a result of the ejection of a screw that had punctured the tire previously, and there is no opinion rendered by Mr. Flanner that the deflation would have been explosive or even particularly sudden. This is a normal driving occurrence, on dry roads and on wet roads, and should not lead to catastrophic loss of control. If a driver reacts by slowly decreasing vehicle speed without hard braking and holds the vehicle straight with minimal corrective steering, he or she should be able to stop the vehicle without significant lateral movement or severe control difficulty. There is no published information or test results that I am aware of that would suggest that gradual, or even rapid, non-explosive deflation of a tire on a passenger vehicle, in the absence of additional factors, would be expected to cause catastrophic loss of control.

*Reference SAE paper 970954 by Robinette, Deering and Fay, "Drag and Steering Effects of Under Inflated and Deflated Tires".*
*Also reference Michelin passenger vehicle and light truck product manual, page 7*

The cited technical paper reports the effects of testing on vehicles with deflated single front and rear tires on a variety of vehicles. The specific resultant drag coefficients, lateral acceleration factors and distances are given for various distances for each vehicle tested, and the tests were conducted with hands-off roll out. In other words, the drag effect of a flat tire was evaluated initially without corrective steering. The paper reports that there was some lateral movement of a vehicle with a flat tire as an effect of the drag introduced if the vehicle was allowed to proceed and roll out without corrective steering. The paper concludes that in all of the tests conducted control of the vehicle was easily maintained with moderate appropriate steering input. The two test conditions that were not representative of the subject accident are:
1. The pavement during testing was dry asphalt
2. The test speeds were somewhat lower than the reported speed, 45 mph or below.

I am not aware of any published sources of test results at present that suggest that a non-explosive deflation of a tire at highway speeds on a wet roadway would be expected to cause loss of control with a lateral excursion distance evident in this accident situation. The fact that the road surface was wet would indicate the likelihood that the overall friction coefficient was lower, but the resultant drag effect of one flat tire should be proportionately the same as on a dry surface. Once again, a tire deflation while operating a vehicle on wet roads is an expected, normal occurrence from time to time, and should not be a control compromising event if reacted to properly.

The dynamic effect of a single tire deflating while a vehicle is in motion is a relatively simple concept. As the tire deflates, additional drag is introduced to the side of the vehicle that the deflating or deflated tire is on. This gives the driver the feeling of the vehicle being pulled and the heading of the vehicle possibly being changed. This effect is validated by the SAE technical paper cited above. If the driver's response is to brake hard, the vehicle is likely then dedicated to a new heading in the direction of the "pull". Braking, and in particular hard braking, is not the safe and effective response to a tire deflation while in motion. *(See Michelin manual, page 7)*

There is no reported evidence or mention of hydroplaning in the accident report, or in Mrs. Moore's deposition. The expert report of Mr. Flanner indicates that the tread depth on the subject tire was approximately 2/32 inch and was evenly worn. It further indicated that the wear life of the tire was approximately 80% expended. I have no way of knowing whether the remaining three tires on the vehicle were of the same wear and tread depth. As a hypothetical, if a hydroplane event occurred, it would most likely be as a result of a combination of low average tread depth, water depth and driver braking. It would not be directly related to the tire deflation, in my opinion.

This report is true and correct to the best of my knowledge, training and experience, and is based upon my understanding of evidence available to me at present. As with any investigation or reconstruction effort, I reserve the right to add, withdraw, or modify any opinions rendered based upon the import of evidence made available to me at a later time.

Respectfully submitted,

Clifford A. Prosser

Attachments:    *Current CV*
*Testimony history (Of particular reference:*
*Nichols & Metivier vs. United States of America*
*United States District Court*
*Middle District of Alabama*
*Judge Allbritton*
*2004*
*For: William Horsley, Opelika, Alabama)*
*Fee and expense schedule*
*SAE technical paper 970954*
*Michelin passenger vehicle and light truck manual*

# Exhibit F

# FREEDOM COURT REPORTING

Page 53

1　high-traction situation. And when you get to
2　the point where you have 2/32" of an inch or
3　less remaining depth of tread, it becomes a
4　serious safety hazard on any wet road.
5　　Q.　Is there anything that you could
6　tell from the photographs of the vehicle about
7　the other tires that either help support or in
8　any fashion influence your opinion?
9　　A.　No, sir.
10　　Q.　All right. So, as a practical
11　matter we don't know and you didn't know what
12　the condition or what type of tires were on
13　the rest of this vehicle or were on the other
14　three positions of this vehicle?
15　　A.　I don't recall that anyone has
16　provided me with that information, no, sir.
17　　Q.　All right. And in any event, it
18　didn't play any part in your opinions?
19　　A.　Not in the opinions I've expressed
20　in this report.
21　　Q.　Yes, sir, that's what I mean.
22　　And the opinions in your report are
23　the ones you're going to offer at trial if we

Page 54

1　try this case or when we try this case?
2　　A.　Well, if I'm asked, yes, sir.
3　　Q.　I understand.
4　　A.　I offer opinions in response to
5　questions that I'm asked.
6　　Q.　I understand that.
7　　All right. Now, we've got the
8　letter, and we can read that. But based upon
9　the letter and the other phone conversation
10　that you had with Mr. Kells, it's my
11　understanding from your report that you were
12　asked to express your opinions regarding the
13　failure of the tire, whether or not it was
14　likely to have been anticipated, and the
15　likelihood that a driver would lose control as
16　a result of that deflation, and what steps
17　might have been taken to avoid loss of control
18　after deflation. Is that a correct recitation
19　of what you were asked to do when you first
20　got into this case?
21　　A.　Yes, sir.
22　　Q.　And you performed your inspection.
23　Your report sets out where the tire came from

Page 55

1　and when it was made as well as the remaining
2　tread groove depth. What were the tread
3　groove depths that you determined on this
4　tire?
5　　A.　4/32" to 5/32" in an inch.
6　　Q.　Is that the entire tread depth?
7　　A.　Yes, sir. Not the useful, that's
8　the entire tread depth.
9　　Q.　All right. Is that good tread, bad
10　tread, or somewhere in between as far as
11　you're concerned?
12　　A.　Well, as I previously stated, a
13　tread depth of 2/32" of an inch is considered
14　unsafe on roads. So, basically this tire had
15　2/32" of an inch of what you might call
16　useful depth left, which is almost, but not
17　completely worn out.
18　　Q.　I'm sorry. I did not hear you say
19　that earlier. How deep are the treads on this
20　tire when it's brand new just to give me
21　some --
22　　A.　On car tires new tread depths are
23　typically 11/32" of an inch. There may be

Page 56

1　some exceptions to that, but that's a typical
2　new tire tread depth.
3　　Q.　Is it -- or do you know -- I guess
4　should be the question -- required under the
5　laws of Alabama that a tread depth be at least
6　a certain amount?
7　　A.　I don't know.
8　　Q.　All right. So, this had more than
9　what you're telling us is considered a
10　dangerous depth but not a lot more; is that
11　fair?
12　　A.　That's correct.
13　　Q.　All right. So, while --
14　　A.　And, again, dangerous on a wet road.
15　　Q.　I understand.
16　　A.　A dry road doesn't matter. But on a
17　wet road, 2/32" in an inch or less is
18　hazardous.
19　　Q.　Help me out. If I were looking at a
20　tire, not this one, not the one in this case,
21　just a tire that had 2/32" of tread depth or
22　less, would it be obvious -- is that a tire
23　that I'm looking at thinking it doesn't have

14 (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 57

1  much tread left?
2  A.  Well, obviously, yes, sir, you
3  would.  And all tire manufacturers for car --
4  passenger car tire manufacturers are required
5  to install tread wear bars that are 2/32" of
6  an inch deep such that when the tread wears
7  down to 2/32" of an inch of depth, you can
8  see a bar continuously across at various
9  points around the periphery of the tire.  So,
10  if you ever see a tire where the tread bars --
11  where the tread is worn down to the bars, that
12  means you better go immediately to the tire
13  store and buy another tire.
14  Q.  Buy new tires.  Okay.
15  All right.  So, you examined the
16  tire, and it's my understanding that you
17  determined that the tire was punctured by some
18  kind of object; correct?
19  A.  A bolt of some type, yes, sir.  A
20  bolt or a screw.  It had a hex head bolt,
21  screw.  I don't know exactly what it was
22  because it was gone, but it was a hex head
23  fastener of some type.

## Page __

1  will, "the discussion," in your report.  A
2  it starts off, the first sentence.  "It is
3  common knowledge that tire traction is
4  when the road is wet."  And then you go
5  that and site somewhere in "Mechanics o
6  Pneumatic Tyres" to support that positic
7  it fair to say, Mr. Cunningham, that you
8  opinions in this case are based upon and
9  assume that Highway 65 was wet at the t
10  this incident occurred, the road surface?
11  happened on 635.
12  A.  I understand that it happened on
13  I-65.  And it's my understanding that the ro
14  was wet, and probably the best way I could
15  answer that question is that the fact that it
16  was wet would have reduced the ability of a
17  tire to maintain traction --
18  Q.  All right.
19  A.  -- and that, therefore, may have
20  been a contributing factor to the loss of
21  vehicle control and was not necessarily the
22  cause.
23  Q.  Correct.  Okay.  I understand.

## Page 58

1  Q.  All right.  And you determined it
2  was a hex head fastener how?
3  A.  By the pattern on the tire.
4  Q.  All right.
5  A.  The wear pattern on the surface.
6  Q.  It's your opinion that prior to this
7  incident occurring, that object was ejected
8  from the tire, as a result, the tire then
9  deflated over some period of time, and then in
10  it's deflated condition, in your opinion,
11  caused the loss of control; is that a fair
12  thumbnail sketch?
13  A.  I believe that's an
14  oversimplification.
15  Q.  Okay.  I'll give you plenty of
16  opportunity to complicate it.
17  A.  Do you want me to complicate at this

## Pa__

1  Is it your -- strike that.
2  Does your opinion assume that it
3  raining at the time that this incident
4  occurred?
5  A.  It does not assume that.  It's show
6  as rain in the police report, but whether it'
7  raining at that time or not as long as the
8  road is wet, the traction capabilities -- the
9  traction limitations are there.  If it's not
10  raining at that instant but the road is
11  sufficiently wet, then you still have the sar
12  traction limitations.
13  Q.  And that was my next question.
14  is sufficiently wet?
15  A.  Basically standing water.
16  Q.  All right.
17  A.  It may only be over low

# FREEDOM COURT REPORTING

## Page 57

1  much tread left?
2      A.   Well, obviously, yes, sir, you
3  would.  And all tire manufacturers for car --
4  passenger car tire manufacturers are required
5  to install tread wear bars that are 2/32" of
6  an inch deep such that when the tread wears
7  down to 2/32" of an inch of depth, you can
8  see a bar continuously across at various
9  points around the periphery of the tire.  So,
10  if you ever see a tire where the tread bars --
11  where the tread is worn down to the bars, that
12  means you better go immediately to the tire
13  store and buy another tire.
14      Q.   Buy new tires.  Okay.
15          All right.  So, you examined the
16  tire, and it's my understanding that you
17  determined that the tire was punctured by some
18  kind of object; correct?
19      A.   A bolt of some type, yes, sir.  A
20  bolt or a screw.  It had a hex head bolt,
21  screw.  I don't know exactly what it was
22  because it was gone, but it was a hex head
23  fastener of some type.

## Page 58

1      Q.   All right.  And you determined it
2  was a hex head fastener how?
3      A.   By the pattern on the tire.
4      Q.   All right.
5      A.   The wear pattern on the surface.
6      Q.   It's your opinion that prior to this
7  incident occurring, that object was ejected
8  from the tire, as a result, the tire then
9  deflated over some period of time, and then in
10  it's deflated condition, in your opinion,
11  caused the loss of control; is that a fair
12  thumbnail sketch?
13      A.   I believe that's an
14  oversimplification.
15      Q.   Okay.  I'll give you plenty of
16  opportunity to complicate it.
17      A.   Do you want me to complicate at this

## Page

1  will, "the discussion," in your report.  A
2  it starts off, the first sentence.  "It is
3  common knowledge that tire traction is
4  when the road is wet."  And then you go
5  that and site somewhere in "Mechanics o
6  Pneumatic Tyres" to support that positio
7  it fair to say, Mr. Cunningham, that you
8  opinions in this case are based upon and
9  assume that Highway 65 was wet at the t
10  this incident occurred, the road surface?
11  happened on 635.
12      A.   I understand that it happened on
13  I-65.  And it's my understanding that the ro
14  was wet, and probably the best way I could
15  answer that question is that the fact that it
16  was wet would have reduced the ability of a
17  tire to maintain traction --
18      Q.   All right.
19      A.   -- and that, therefore, may have
20  been a contributing factor to the loss of
21  vehicle control and was not necessarily the
22  cause.
23      Q.   Correct.  Okay.  I understand.

## Page

1          Is it your -- strike that.
2          Does your opinion assume that it
3  raining at the time that this incident
4  occurred?
5      A.   It does not assume that.  It's show
6  as rain in the police report, but whether it'
7  raining at that time or not as long as the
8  road is wet, the traction capabilities -- the
9  traction limitations are there.  If it's not
10  raining at that instant but the road is
11  sufficiently wet, then you still have the sa
12  traction limitations.
13      Q.   And that was my next question.
14  is sufficiently wet?
15      A.   Basically standing water.
16      Q.   All right.
17      A.   It may only be  even  l

Exhibit G

RST-27
REV. 1/61

SEP 3 0 2003

**ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT**

Sheet 1 of 2 Sheet(s)        Microfilm No.        Local Case No.        3522163

**LOCATION AND TIME**

| Date 08/29/2003 | Time 2:25 AM/PM | Day of Week M T W TH F S SU | County | City | Rural ☒ |

On Street, Road or Highway: **I-65**   At Intersection of or Between (Node 1) **Butler Co Line** And (Code 2) **Co Rd 1220**

Street or Road Code: **I065** 7631    Road Code 7620   Node 0 0 1 0 1 1 0 1   Feet □ From 26   Prime Cont. Unit No.

First Harmful Event 20   Location 1   Dist. to Fixed Object NA FT.   No. of Vehicles 5   No. Pedestrians 0   No. Injured 6   No. Fatalities 0   No. Lanes 3   Hwy Type

**UNIT NO 1**

Driver Full Name: **Beatha Gordon Moore** 4731 Queensbury Ct Montgomery Al   Zip 36116   Telephone No. NONE

DL No. 01 22 1951 B F Al   Driver License No. 4627606   DL Class DM   DL Status C

Place of Employment: **Dept of Justice** (Montgomery Al)   Liability Insurance Co. **Alfa**   Social Security No. 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

Driver Condition 01   Travel Road Name **I-65**   Road Code I065   Travel Direction S W   Other Cont. Circumstance 016   Prime Harm Event 20

Veh Year 1997   Make **Merc**   Model Mou   Body NA   V.I.N. 4M2DU52P7VUJ01642   License Tag Number 3A6707M   State Al   Year 2004

Owner's Name: **Same**

Speed Limit 70 MPH   Est. Speed 83 MPH   Citation Offense Charged NONE
Vehicle Towed By Whom A+ (Rotation) To Where: A+ (Evergreen Al)   Point of Initial Impact 4

**UNIT NO 2**

Driver/Pedestrian Full Name: **Michael Phillip Allen** 107 Paedise Isle Riverside Al   Zip 35135   Telephone No. 305 338-1803

DL No. 03 26 1948 W M Al   Driver License No. 2451775   DL Class DM V   DL Status C

Place of Employment: **IMI** (Birmingham Al)   Liability Insurance Co. **Alfa ERROR**   Social Security No. 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

Driver/Ped Condition 01   Travel Road Name **I-65**   Road Code I065   Travel Direction N E W   Other Cont. Circumstance   Prime Harm Event 20

Veh Year 2003   Make **Linc**   Model Tow   Body 4D   V.I.N. 1LNHM82W53Y618276   License Tag Number 59G431H   State Al   Year 2004

Owner's Name: **Same**

Speed Limit 70 MPH   Est. Speed 75 MPH   Citation Offense Charged NONE
Vehicle Towed By Whom Windom (Rotation) To Where: Windom (Evergreen Al)   Point of Initial Impact 8

Exhibit G- page 1



## ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

OPS
Accident No. _____

**LOCATION AND TIME**

| Date | Time | Day of Week | County | City | Rural |
|---|---|---|---|---|---|
| 08 29 2003 | 2:35 AM | M T W TH F S S | 21 | | X |

Highway Classification:
01 – Interstate  5 – State  M – Municipal
P – Private Prop.
F – Federal  C – County  Local Zone

On Street, Road or Highway: **I-65**
At Intersection of or Between (Node 1): **Butler Co Line**
And (Node 2): **Co Rd 1220**

Street or Road Code: **7631**   Road Code: **7620**
Feet Miles From: **0.010/10**   N S E W (Circle One): **1**

Intersection Related: Nodes 1 ☐  Nodes 2 ☐  X Not Int. Related: **1.06|1|10**

Control Access 1 – Main Rd  Primo Cont: **26**  Unit 1 Type: Unit 2 Type:
Away 2 – Frontage Rd  Prime Conv Unit No: **1**

First Harmful Event: **20**  Event Location: **1**  Distance to Fixed Object: **NA** FT.

**DRIVER / UNIT 1**

Driver Full Name: **Phyllis Daulton Montgomery**  Street Address: **5005 With Ginger Cir. Norcross GA**  ZIP: **30092**  Telephone No.: **NONE**

DOB: **03 | 14 | 1943**  Race: **W**  Sex: **F**  DL State: **GA**  Driver License No.: **053628642**  DL Class: **C**  DL Status: **C**

Place of Employment: **Georgia Perimeter College   (Atlanta GA)**  Liability Insurance Co.: **State Farm**  Social Security No.: **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**

Driver's Condition: 01 – No Defect  Sobriety: **2 – Unknown**

Maneuver/Action: **01**  Travel Road Name: **I-65**  Road Code: **I-65**  Travel Direction N E S W A–Not on Rd  U–Unk  Other Cont Circumstance: **20**

Veh Year: **2001**  Make: **Volv**  Model: **V 70**  Body: **NA**  V.I.N.: **YV1SW53DX12114722**  License Tag Number: **759 NTO**  State: **GA**  Year: **2003**

Owner's Name: **Same**

Type: **01 – Auto**   Usage: **2 – Driver Temp.**

Speed Limit: **70 MPH**  Est. Speed: **70 MPH**  Citation Offense Charged: **NONE**

Vehicle Towed By Whom: **Interstate (Rotation)**  To Where: **Interstate (Evergreen Al)**

**Exhibit G- page 2**

# ALABAMA
# UNIFORM TRAFFIC ACCIDENT REPORT

3522163

LOCAL CASE NO.

SHEET **3** OF **3** SHEET(S)

## SUPPLEMENTAL SHEET

AST No. 34 Rev. 4/86

| | | Unit No. | Seat Pos. | Injury Type | Age | Sex | Ejection | First Aid By |
|---|---|---|---|---|---|---|---|---|
| **3** | Name *Ellen Allen 107 Paedise Isle Riverside Al 35135* Address | 2 | 6 | A | 49 | F | N | D |
| | Taken to *Evergreen Medical Center* Taken by *Conecuh County EMS* | | | | | | | |
| **4** | Name *Phyllis Chulton Montgomery 5005 Wild Ginger Cv. Montgomery* Address | 3 | 1 | A | 60 | F | N | D |
| | Taken to *Evergreen Medical Center* Taken by *Conecuh County EMS* | | | | | | | |
| **5** | Name / Taken to | | | | | | | |
| **6** | Name / Taken to | | | | | | | |
| **7** | Name / Taken to | | | | | | | |
| **8** | Name / Taken to | | | | | | | |
| **9** | Name / Taken to | | | | | | | |
| **10** | Name / Taken to | | | | | | | |
| **11** | Name / Taken to | | | | | | | |
| **12** | Name / Taken to | | | | | | | |

*ADDITIONAL ACCIDENT VICTIMS*

## DESCRIBE WHAT HAPPENED (Refer to vehicles by number)

U1 left the road onto the left shoulder. U1 crossed the median and went airborn. U1 struck U2 with the right rear of the vehicle. U2 came to rest on the left shoulder of the south bound lanes. U1 rotated counterclock wise and struck U3 with the drivers side. U3 then rotated clockwise into the median. U1 overturned onto the driver's side.

*ADDITIONAL NARRATIVE SPACE*

Exhibit G- page 3

## SEATING

| Other Involved Unit (Circle One) | Other Involved Unit (Circle One) | CODES |
|---|---|---|
| Unit 1 | 41 | Unit 2 | 41 / 41 / 34 | SAFETY EQUIPMENT |

12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstances/ Codes Not Applicable

Other Involved Safety Equipment

## VICTIMS

| Name | Address | Unit No | Seat Pos | Injury Type | Age | Sex | Ejection | Fire Aid By |
|---|---|---|---|---|---|---|---|---|
| Beatha Gordan Moore | 4731 Queensbury Ct Montg Al 36116 | 1 | 1 | A | 51 | F | N | D |
| Evergreen Medical Center | Conecuh County EMS | | | | | | | |
| Michael Phillip Allen | 157 Pardise Isle Riverside Al 35135 | 2 | 1 | A | 55 | M | N | D |
| Evergreen Medical Center | Conecuh County EMS | | | | | | | |

## CODES

Injury Type
X - Killed
K - Bruise/Abrasion/Swelling

A - Visible or Carried from Scene
C - Not Visible - Has Pain/Faint

Ejected
N - Not
F - Fully
P - Partially

T - Trapped
U - Unknown
X - Not Applicable

A - Ambulance Attended
D - Doctor

First Aid By
M - Paramedic
O - Other

P - Police
U - Unknown
N - None

## NARRATIVE AND DIAGRAM

SEE PAGE 3 of 3

Officer's Opinion of What Happened: SEE PAGE 3 of 3

## ROADWAY ENVIRONMENT

For Each Roadway Environment Field, Circle One Entry for Each Involved Unit

| Unit 1 | Contributing Road Defects | Surface Construction | Condition | Accident Is Or Related To Road Construction Zone? | Material In Roadway (Contributing) | Material Source | Character |
|---|---|---|---|---|---|---|---|

Unit 1 / Unit 2

## INVESTIGATION

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer |
|---|---|---|---|
| 2:30 PM | 2:50 PM | 2:40 PM | TPR. FISHER |

Light: 2 - Dawn
Weather: 1 - Clear
Locale: 1 - Open Country
Non-Vehicular Property Damage: 1 - None Visible

Property Damage Description
Description: NA
Owner:

Witness Full Name | Address | Telephone
Witness Full Name | Address | Telephone

Name of Investigating Officer | Officer ID | Agency ORI AST2100 | Supervisor Reviewed

Name of Other Investigating Officer at Scene | Officer ID | Agency ORI

The data on this report reflects the information covering this accident but no warranty is made as to the factual accuracy thereof.

Signature of Investigation Officer: [signature] 1067

Date 8-31-03

Exhibit G- page 4

**SEATING**

Other Involved Unit (Circle One)
| 3 | 41 | 41 |
Unit 1

12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstances/Codes Not Applicable

Other Involved Safety Equipment

Other Involved Unit (Circle One)
X
Unit 2

12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstances/Codes Not Applicable

Other Involved Safety Equipment

**VICTIMS**

| Name | Address | Unit No | Seat Pos | Injury Type | Age | Sex | Ejection | First Aid |
|---|---|---|---|---|---|---|---|---|
| Wallace Montgomery | 5005 Wild Finger Cv. Narcross GA | 3 | 3 | A | 58 | M | N | D |

Taken To: Evergreen Medical Center    Taken By: Conecuh County EMS

| Lori Allen 407 Pandise Isle Riverside Al 35135 | | 2 | 3 | A | 31 | F | N | D |

Taken To: Evergreen Medical Center    Taken By: Conecuh County EMS

**CODES**

Injury Type
K - Killed
B - Bruise/Abrasion/Swelling

Visible or Carried from Scene
C - Not Visible - Has Pain/Faint

Ejection
M - Fully    U - Unknown
P - Partially    N - Not Applicable

A - Ambulance Attended    E - Paramedic    P - Police
D - Doctor    H - Other    N - None    U - Road

**NARRATIVE AND DIAGRAM**

SEE PAGE 3 of 3

Officer's Opinion of What Happened:    SEE PAGE 3 of 3

**ROADWAY ENVIRONMENT**

For Each Roadway Environment Field, Circle One Entry for Each Involved Unit

| | Contributing Road Defect | Surface Construction | Condition | Accident In Or Related To Road Construction Zone? | Material In Roadway (Contributing) | Material Source | Character |
|---|---|---|---|---|---|---|---|
| Unit 1 | 4 - None | 1 - Asphalt | 1 - Dry | Yes  No | 1 - None  5 - Gravel | 1 - Not Applicable | 1 - Straight - Level  5 - Curve - Down Grade |
| Unit 2 | 1 - Shoulders Low | 2 - Concrete | 2 - Wet | | 2 - Rocks  6 - Oil/Patrol | 2 - Natural Environment | 2 - Straight - Down Grade  6 - Curve - Up Grade |
| 3 | 2 - Shoulders High | 3 - Brick | 3 - Icy | | 3 - Trees/Limbs  8 - Other | 3 - Dropped From Vehicle | 3 - Straight - Up Grade  8 - Curve - Hillcrest |
| 3 | 8 - Other | 4 - Unpaved | 4 - Snow/Slushy | | 4 - Dirt | 4 - Already In Road, But Fell From Vehicle | 4 - Straight - Hillcrest |
| | | 8 - Other | 5 - Muddy | | | 8 - Other | 5 - Curve - Level |
| | | | 8 - Other | | | 9 - Unknown | |

Vision Observed By
| | | |
|---|---|---|
| 1 - Not Observed | 10 - Blinded by Sunlight | |
| 2 - Building(s) | 11 - Fire/Smoke | |
| 3 - Signboard | 12 - Dust | |
| 4 - Blowing Snow/Sand | 13 - Blinded by Headlights | |
| 5 - Hillcrest | 16 - Rain on Windshield | |
| 6 - Curve in Road | 16 - Snow on Windshield | |
| 7 - Fog | 98 - Other | |
| 8 - Parked Vehicle | 99 - Unknown | |
| 9 - Moving Vehicle(s) | | |

Traffic Control
| | | |
|---|---|---|
| 1 - Police Officer | 11 - Flagger | |
| 2 - R.R. Crossing Gates | 12 - No Passing Zone | |
| 3 - R.R. Flashing Lights | 97 - None | |
| 4 - R.R. Cross Bucks/Pave Mark | 98 - Other | |
| 5 - Pedestrian Control | | |
| 6 - Traffic Signal | | |
| 7 - Flashing Beacon | | |
| 8 - Stop Sign | | |
| 9 - Yield Sign | | |
| 10 - Lane Control Device | | |

Traffic Control Functioning
| | Yes No |
|---|---|
| | N/A  N/A |
DOT Railroad Crossing No.    N/A

Opposing Lanes Separated By:
97 - None
1 - Paved Surface
2 - Unpaved Surface
3 - Broken Painted Line
4 - Solid Painted Line
5 - Concrete Barrier
6 - Metal Guard Rail
7 - Fence
98 - Other Barrier

Trafficway Lanes
1 - One Lane
2 - Two Lanes
3 - Three Lanes
4 - Four Lanes
5 - Five Lanes
6 - Six Lanes or More

One-Way Street
Yes  No

**INVESTIGATION**

Light
1 - Daylight
2 - Dawn
3 - Dusk
4 - Darkness - Road Not Lit
5 - Darkness - Road Lit

Weather
1 - Clear
2 - Cloudy
3 - Rain
4 - Sleet/Hail
5 - Snow
6 - Fog
8 - Other

Locale
1 - Open Country
2 - Residential
3 - Shop'g or Business
4 - Mfg. or Industrial
5 - School
6 - Playground
8 - Other

Non-Vehicular Property Damage
1 - None Visible    3 - Moderate
2 - Light    4 - Severe

Description:

Property Damage Description
N/A

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer |
|---|---|---|---|
| 2:130 PM | 2:50 PM | 2:40 PM | Tpr. Fisher |

Witness Full Name:    Address:    Telephone:

Witness Full Name:    Address:    Telephone:

Name of Investigating Officer:    Tpr. Fisher    Officer ID: 10E7    Agency ORI: Al AST2100    Supervisor Reviewed

Name of Other Investigating Officer(s) at Scene:    Officer ID:    Agency ORI:

The data on this report reflects my best knowledge, opinion, and belief concerning this accident, but do warrant as to the factual accuracy thereof.

Signature of Investigating Officer:    Robt. John 10E7    Date: 8-31-03

**CODES**
SAFETY EQUIPMENT
21 - Safety Belt Used
22 - Not Applicable
23 - Shoulder & Lap Belt
24 - Child Restraint Type

Exhibit G- page 5

2nd A.O.I

1st A.O.I

Median

N

I-65

Road Width 27.3 ft

NOT TO SCALE

| Diagram Not to Scale Diagram Scale 1 inch | = | (20 feet) (10 feet) | Location I-65 106mm | | Time 2:25 | A.M. P.M. MT. |
| Signature of Reporting Officer(s) | | | Officer ID 1067 | Reporting Police Agency ORI AST | DATE Month 08 Day 29 Year 2003 | |

Exhibit G- page 6

# Exhibit H

REV 1/91

## ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

DPS
Accident No ___

Shaded Areas To Be Used By Data Processing Only    Sheet _1_ of _3_ Sheets    Microfilm No. ___    Local Case No ___

### LOCATION AND TIME

Date: 08 / 29 / 2003
Time: 2:05 AM / PM
Day of Week: M T W TH F S SU — 21
County: 21
Rural: X

Highway Classification: M—Municipal, Local Zone
1—Interstate  3—State  P—Private Prop
2—Federal  4—County  O—Other

On Street, Road or Highway: I-65
At Intersection With or Between (Node 1): Butler Co Line
And (Node 2): Co Rd 1220

Street or Road Code: 7631    Node Code: 7620    Node: 1 | 0 |    Milepost: 26

First Harmful Event: 70
Event Location: 1
Distance to Fixed Object: NA FT.
No. of Vehicles: — No. Pedestrians: — No. Injured: — No. Fatalities: — Unit 1 Type: — Unit 2 Type: —

### UNIT NO 1 — DRIVER (LEFT SCENE)

Driver/Pedestrian Full Name: Bertha Gordon Moore    Street Address: 4731 Queensbury Ct    City and State: Montgomery Al    ZIP: 36116    Telephone No.: NONE

Month: 01  Day: 22  Year: 1953    Race: B  Sex: F  DL State: Al    Driver License No.: 4627606    DL Class: OM  DL Status: C    List Restrictions Not Complied With: —    CDL Status: —    List Endorsements Not Complied With: —    Residence Less Than 25 Miles: Yes —

Place of Employment: Dept of Justice (Montgomery Al)    Liability Insurance Co.: State Farm    Social Security No.: 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

### COM VEH / UNIT 1 — VEHICLE

Veh Year: 1997  Make: Merc  Model: Mou  Body: NA  VIN: 4M2DU52P7VUJ01642    License Tag Number: 3A6707M  State: Al  Year: 2004

Owner's Name: Same    Street or R.F.D.: ___    City: ___    State: ___  ZIP: ___

Type:
1 - Auto   11 - Moped
2 - StaWagon   12 - M. Scooter
3 - Pick Up   13 - Pedal Cycle
4 - Van   14 - Farm Mach.
5 - Truck Tractor   15 - Train
6 - Other Truck   16 - Road Equip.
7 - Comm. Bus   17 - Ridden Animal
8 - School Bus   18 - M. Home (R.V.)
9 - Other Bus   19 - ATV
10 - Motorcycle   98 - Other

Speed Limit: 70 MPH    Est. Speed: 33 MPH    Citation Offense Charged: NONE    Damage Severity: — Disabled    Vehicle Towed Away?: Yes — No    Occupants in Unit: — Total Injuries in Unit: —    Enter Point of Initial Impact: 4

Totalled

Vehicle Towed By Whom: A+ (Rotation)    To Where: A+ (Evergreen Al)

### UNIT NO 2 — DRIVER (LEFT SCENE)

Driver/Pedestrian Full Name: Michael Phillip Allen    Street Address: 107 Paradise Isle    City and State: Riverside Al    ZIP: 35135    Telephone No.: 205 338-1803

Month: 03  Day: 26  Year: 1948    Race: W  Sex: M  DL State: Al    Driver License No.: 2451775    DL Class: DMV  DL Status: C    CDL Status: —    Residence Less Than 25 Miles: Yes —

Place of Employment: IMI (Birmingham Al)    Liability Insurance Co.: Alfa    Social Security No.: 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

### UNIT 2 — VEHICLE

Veh Year: 2003  Make: Linc  Model: Tow  Body: 40  V.I.N.: 1LNHM82W53Y618276    License Tag Number: 57G431H  State: Al  Year: 2004

Owner's Name: Same    Street or R.F.D.: ___    City: ___    State: ___  ZIP: ___

Speed Limit: 70 MPH    Est. Speed: 75 MPH    Citation Offense Charged: NONE    Damage Severity: — Not Disabled    Disabled    Vehicle Towed Away?: Yes — No    Occupants in Unit: 3  Total Injuries in Unit: —    Enter Point of Initial Impact: 8

Totalled

Vehicle Towed By Whom: Windom (Rotation)    To Where: Windom (Evergreen Al)

Exhibit H- page 1

Page 1 of 6

CODES

SAFETY EQUIPMENT

| | Other Involved Unit (Circle One) | | Other Involved Unit (Circle One) | |
|---|---|---|---|---|

Unit 1: 41 | 10
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance; Codes Not Applicable

Unit 2: 41 41 24 | 10 11
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance; Codes Not Applicable

Other Involved Safety Equipment

**VICTIMS**

| Name / Address | Unit No | Seat Pos | Injury Type | Age | Sex | Eject-ion | First Aid By |
|---|---|---|---|---|---|---|---|
| Bertha Gordon Mease 4731 Queensbury Ct Monty, Al 36116 | 1 | 1 | A | 51 | F | N | D |
| Taken To: Evergreen Medical Center | Taken By: Conecuh County EMS | | | | | | |
| Michael Phillip Allen 107 Pardise Isle Riverside Al 35135 | 2 | 1 | A | 55 | M | N | D |
| Taken To: Evergreen Medical Center | Taken By: Conecuh County EMS | | | | | | |

**CODES**

Injury Type
K - Killed
B - Bruise/Abrasion/Swelling
A - Visible or Carried Item Scene
C - Not Visible - Has Pain/Faint
N - Not
Ejected
T - Trapped
F - Fully
U - Unknown
P - Partially
A - Not Applicable
First Aid By
E - Ambulance Attended
O - Doctor
M - Paramedic
D - Other
P - Police
U - Unknown
N - None

**NARRATIVE AND DIAGRAM**

SEE PAGE 3 of 3

Officer's Opinion of What Happened: SEE PAGE 3 of 3

**ROADWAY ENVIRONMENT**

For Each Roadway Environment Field, Circle One Entry for Each Involved Unit.

Unit 1 / Unit 2

Contributing Road Defects
1 - None
2 - Shoulders Low
3 - Shoulders High
3 - Holes, Bumps, Etc
8 - Other

Surface Construction
A - Asphalt
C - Concrete
B - Brick
D - Unpaved
8 - Other

Condition
1 - Dry
2 - Wet
3 - Icy
4 - Snowy/Slushy
5 - Muddy
8 - Other

Accident In Or Related To Construction Zone?
No / Yes

Material in Roadway (Contributing)
N - None
D - Rocks
E - Treestumps
8 - Other
5 - Gravel
6 - Oil/Petrol
8 - Other

Material Source
Not Applicable

**INVESTIGATION**

Light
1 - Daylight
2 - Dawn
3 - Dusk
4 - Darkness — Road Not Lit
5 - Darkness — Road Lit

Weather
1 - Clear
2 - Cloudy
3 - Rain
4 - Snow
5 - Sleet/Hail
6 - Crosswind
7 - Fog
8 - Other

Locale
1 - Open Country
2 - Residential
3 - Shop'g or Business
4 - Mfg or Industrial
5 - School
6 - Playground
8 - Other

Non-Vehicular Property Damage
1 - None Visible
2 - Light
3 - Moderate
4 - Severe

Description

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer | Owner |
|---|---|---|---|---|
| 2:30 AM/PM | 2:50 AM/PM | 2:40 AM/PM | TPR. FISHER | NA |

Property Damage NA

| Witness Full Name | Address | Telephone |
|---|---|---|
| Witness Full Name | Address | Telephone |

Name of Investigating Officer / Officer ID / Agency ORI / Supervisor Reviewed

Name of Other Investigating Officer(s) at Scene / Officer ID / Agency ORI

The data on this report reflects my best recording, opinion and/or covering the accident, but no warrant is made as to the factual accuracy thereof.

Signature of Investigating Officer: _____ 1067   Date 8-31-03

Exhibit H- page 2

Page 7 of 6

## ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

Sheet 2 of 3 Sheet(s)

**Year:** 99 2003
**Time:** 2:25 AM
**Day of Week:** M T W TH (circle)
**County:** 21
**City:**
**Highway Classification**

**At, Road or Highway:** I-65
**At Intersection of or Between Node 1:** Butler Co Line and iNode 2: Co Rd 1220

I065  7631  None Code 7620  |0|0|0.|0|  Nodes from 1 or 2  2c  1

No. of Vehicles: 01  No. Pedestrians:  No. Injured:  No. Fatalities:  Unit 1 Type:  Unit 2 Type:

Event Location: 20  1  Distance to Fixed Object: NA FT.

### DRIVER
**Driver Full Name:** Phyllis Daulton Montgomery 5005 With Ginger CV. Norcross GA  ZIP 30092
**DOB:** 05 14 1943  Race: W  Sex: F  DL State: GA  Driver License No.: 053628642  DL Class: C  DL Status: C  CDL Status: N
**Residence Less Than 25 Miles:** Yes NO
Unemployed  Liability Insurance Co: State Farm  Social Security No.: Unknown

### VEHICLE 1
**Veh Year:** 20ci  **Make:** Volv  **Model:** V70  **Body:** NA  **V.I.N.:** YV15W53DX1211 4722  **License Tag Number:** 759 NTO  **State:** GA  **Year:** 2003
**Owner's Name:** Same

Speed Limit: 70 MPH  Est. Speed: 70 MPH  Citation Offense Charges: NONE

Vehicle Towed By Whom: Interstate (Rotation)  To Where: Interstate (Evergreen Al)

**CODES**

SAFETY EQUIPMENT

| Other Involved Unit (Circle One) | Other Involved Unit (Circle One) |
|---|---|

Unit 1 — fields: 3 | 41 | 41

12 - Pedestrian
14 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance,
Codes Not Applicable

Other Involved Safety Equipment

Unit 2 — X

12 - Pedestrian
14 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstances,
Codes Not Applicable

Other Involved Safety Equipment

**VICTIMS**

| Name / Address | Unit Nic | Seat Pos | Injury Type | Age | Sex | Lica tion | First Aid By |
|---|---|---|---|---|---|---|---|
| Wallace Montgomery 5005 WildGinger Cv. Norcross GA | 3 | 3 | A | 58 | M | N | D |
| Evergreen Medical Center    Taken By: Conecuh County EMS | | | | | | | |
| Lori Allen 167 Paradise Isle Riverside Al 35135 | 2 | 3 | A | 21 | F | N | D |
| Evergreen Medical Center    Taken By: Conecuh County EMS | | | | | | | |

**CODES**

Injury Type
X - Killed
E - Bruise/Abrasion/Swelling
A - Visible or Carried from Scene
C - Not Visible—Has Pain Faint

N - Not Visible—Has Pain Faint
F - Fully
P - Partially

Ejected
T - Trapper
U - Unknown
N - Not Applicable

First Aid By
A - Ambulance Attendant
C - Doctor
D - Other
P - Police
U - Unknown
N - None

**NARRATIVE AND DIAGRAM**

SEE PAGE 3 of 3

Officer's Opinion of What Happened:  SEE PAGE 3 of 3

**ROADWAY ENVIRONMENT**

N/A — For Each Roadway Environment Field, Circle One Entry for Each Involved Unit.

Unit 1 — 3
Unit 2 — X

Contributing Road Defects
4 - None
1 - Shoulders Low
2 - Shoulders High
3 - Holes, Bumps, Etc
8 - Other

Surface Construction
1 - Asphalt
2 - Concrete
3 - Brick
4 - Unpaved
8 - Other

Condition
1 - Dry
2 - Wet
3 - Icy
4 - Snowy/Slushy
5 - Muddy
8 - Other

Accident In To Road Construction Zone?
Yes    No

Material In Roadway (Contributing)
1 - None    5 - Gravel
2 - Rocks    6 - Oil/Petrol
3 - Trees/Limbs  8 - Other
4 - Dirt

Material Source
1 - Not Applicable
2 - Natural Environment
3 - Dropped From Vehicle
4 - Already In Road, But Fell From Vehicle
8 - Other
9 - Unknown

Shoulder
1 - Straight—Level
2 - Straight—Down Grade
3 - Straight—Up Grade
4 - Straight—Hillcrest
5 - Curve—Level

Vision Obscured By:
No Obstruction
Buildings
Signs/Board
Trees, Crops, Bushes
Blowing Snow/Sand
Hillcrest
Curve in Road
Fog
Parked Vehicle
Moving Vehicle(s)
Blinded by Sunlight
Trees/Crops
Dust
Blinded by Headlights
Embankment
Rain on Windshield
Snow on Windshield
None
Unknown

Traffic Control
1 - Police Officer
2 - R R Crossing Gates
3 - R R Flashing Lights
4 - R R Cross Bucks/Pave Mark
5 - Pedestrian Control
6 - Traffic Signal
7 - Flashing Beacon
8 - Stop Sign
9 - Yield Sign
10 - Lane Control Device
11 - Flagger
12 - No Passing Zone
98 - Other

Traffic Control Functioning    Yes  No  N/A

DOT Railroad Crossing No  NA

Opposing Lanes Separated By:
97 - None
1 - Paved Surface
2 - Unpaved Surface
3 - Broken Painted Line
4 - Solid Painted Line
5 - Concrete Barrier
6 - Metal Guard Rail
7 - Fence
98 - Other Barrier

Light
1 - Daylight
2 - Dawn
3 - Dusk
4 - Darkness—Road Not Lit
5 - Darkness—Road Lit

Weather
1 - Clear    5 - Sleet/Hail
2 - Cloudy   6 - Crosswind
3 - Rain     7 - Fog
4 - Snow     8 - Other

Locale
1 - Open Country
2 - Residential
3 - Shop'g or Business
4 - Mfg. or Industrial
5 - School
6 - Playground

Non-Vehicular Property Damage
1 - None Visible  3 - Moderate
2 - Light         4 - Severe

Description:

Owner:  NA

**INVESTIGATION**

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer |
|---|---|---|---|
| 2:30 PM | 2:50 PM | 2:40 PM | Tpr. Fisher |

Witness Full Name                Address               Telephone
Witness Full Name                Address               Telephone

Name of Investigating Officer: Tpr. Fisher
Officer ID: 1067    Agency ORI: AL AST2100
Supervisor Reviewed

The data on this report reflects my best knowledge, opinion and belief concerning the accident, but no warrant is made as to the factual accuracy thereof.

Signature of Investigating Officer: Robert John 1067    Date: 8-31-03

Exhibit H- page 4

## ALABAMA
## UNIFORM TRAFFIC ACCIDENT REPORT

LOCAL CASE NO. _____

aT No. 34 Rev. 4/86

### SUPPLEMENTAL SHEET

| | | SHEET 3 OF 3 SHEET(S) |
|---|---|---|

**AUDITIONAL ACCIDENT VICTIMS**

| | | Unit No. | Seat Pos. | Injury Type | Age | Sex | Ejection | First Aid By |
|---|---|---|---|---|---|---|---|---|
| 3 | Name *Ellen Allen 107 Paradise Isle Riverside Al 35135* | 2 | 6 | A | 49 | F | N | O |
| | Taken to *Evergreen Medical Center*   Taken by *Conecuh County EMS* | | | | | | | |
| 4 | Name *Phyllis Chilton Montgomery 5005 Will Ginger Cir. Nowers 6A* | 3 | i | A | 60 | F | N | O |
| | Taken to *Evergreen Medical Center*   Taken by *Conecuh County EMS* | | | | | | | |
| 5 | Name | | | | | | | |
| | Taken to          Taken by | | | | | | | |
| 6 | Name          Address | | | | | | | |
| | Taken to          Taken by | | | | | | | |
| 7 | Name          Address | | | | | | | |
| | Taken to          Taken by | | | | | | | |
| 8 | Name          Address | | | | | | | |
| | Taken to          Taken by | | | | | | | |
| 9 | Name          Address | | | | | | | |
| | Taken to          Taken by | | | | | | | |
| 10 | Name          Address | | | | | | | |
| | Taken to          Taken by | | | | | | | |
| | Name          Address | | | | | | | |
| | Taken to          Taken by | | | | | | | |
| 12 | Name          Address | | | | | | | |
| | Taken to          Taken by | | | | | | | |

**DESCRIBE WHAT HAPPENED (Refer to vehicles by number)**

U1 left the road onto the left shoulder. U1 crossed the median
airborn. U1 struck U2 with the right ___ of the _____
to rest on the left shoulder of the ___ with __
counterclockwise and struck U3 with the _____
rotated clockwise into the median. U1 overturned with ____
side.

Doc 5 of 6



2nd A.O.I

1st A.O.I

Median

N

I-65

Road Width 27.3ft

NOT TO SCALE

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL ALLEN, et al.               )
                                    )
                    Plaintiffs,     )
                                    )
V.                                  )        Case No. 2:06-cv-879-WKW
                                    )
UNITED STATES OF AMERICA            )
                                    )
                    Defendant.      )

---

WALLACE MONTGOMERY, et al.          )
                                    )
                    Plaintiffs,     )
                                    )        Case No. 2:06-cv-880-WKW
                                    )
V.                                  )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                    Defendant.      )

## DEFENDANT UNITED STATES' BRIEF IN SUPPORT OF
## APPLICATION OF THE SUDDEN EMERGENCY DOCTRINE

Comes now the Defendant, United States of America, to brief the applicability of

Alabama's sudden emergency doctrine, pursuant to this Court's order dated January 23, 2008.

### FACTS

On August 29, 2003, Mrs. Bertha Gordon Moore, then and presently an administrative

assistant for the United States Attorney for the Middle District of Alabama, was driving her

Mercury Mountaineer sport-utility vehicle on Interstate 65 in the northbound lanes, returning

from a law enforcement conference in Perdido Beach.  Exhibit A, Moore Dep. 10:5-19, 14:23-

15:4, 19:2-20:8, Aug. 7, 2007.  Somewhere near Evergreen, Alabama, Mrs. Moore recalls driving

her vehicle at around 65 m.p.h. when she heard a loud bang.  Id. at 32:2-33:10.  She felt the left

rear side of her vehicle suddenly drop, hit her brakes, and at that point lost control of her vehicle. Id. at 48:19-49:8.  She has no further recollection of what occurred and remembers briefly waking up in a helicopter that was transporting her to a hospital.  Id. at 20:19-21:5.

After the vehicle lost control, it crossed the median and entered the southbound lanes of Interstate 65 where the vehicle collided with the Lincoln Towncar driven by Michael Allen, with front passenger Lori Allen and rear passenger Lou Ellen Allen, and also a Volvo S70 driven by Phyllis Montgomery, with Wallace Montgomery as front passenger.

Subsequent analysis of the left rear tire on Mrs. Moore's vehicle revealed that a bolt or screw had, at some point prior to the collision, fully penetrated the tire-wall and became lodged in the tire on the side facing the wheel well.  Exhibit B, Report of Peter Flanner at 2, ¶ 3, No. 1; Exhibit C, Report of Ralph Cunningham at 6, ¶ 1.  The treads of the tire were evenly worn, indicating that the tire was not operated in an underdeflated or overdeflated manner.  Exhibit C, Report of Ralph Cunningham at 2, ¶¶ 1-2; Exhibit B, Report of Peter Flanner at 2, ¶3, No. 8; Exhibit D, Flanner Dep. 59:13-22, 73:5-15, 84:4-10, Nov. 13, 2007.  While Mrs. Moore was driving, the screw or bolt was suddenly ejected, leaving a hole through which all of the remaining air in the tire escaped, completely deflating the tire in a matter of seconds.  Exhibit C, Report of Ralph Cunningham at 6-7; Exhibit B, Report of Peter Flanner at 1.  To date, only the plaintiffs' accident reconstructionist, Clifford Prosser, has suggested that Mrs. Moore contributed to the cause of this accident by stepping on her brake when her left rear tire suddenly and rapidly deflated on her.  Exhibit E, Report of Cliff Prosser at 1, ¶2.

## THE SUDDEN EMERGENCY DOCTRINE IN ALABAMA

Under Alabama law, "a motorist, without fault of [her] own, confronted with a sudden emergency, is not required to exercise the same presence of mind as would a prudent person under more deliberate circumstances." Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala. 1985), quoting Williams v. Worthington, 386 So.2d 408 (Ala. 1980). While not a defense, per se, to negligence, the "sudden emergency" doctrine "provides a qualified standard of care by which . . . a party's conduct can be measured." Burns v. Martin, 589 So.2d 147, 149 (Ala. 1991). For the doctrine to apply, a party must show that (1) there was a sudden emergency, and (2) the emergency was not the fault of the party invoking the rule. Friedlander v. Hall, 514 So.2d 914, 915 (Ala. 1987).

Alabama continues to recognize the sudden emergency doctrine. See Mitchell v. Johnson, 641 So.2d 238, 239 (Ala. 1994) (rejecting request to abolish the sudden emergency doctrine). Alabama courts have applied the sudden emergency doctrine to cases where a third-party's intervening action of swerving into a defendant's lane caused an accident, see State Farm Mutual Automobile Insurance Co. v. Outlaw, 578 So.2d 1369, 1370 (Ala. Ct. App. 1991), as well as to situations when the driver of a motor vehicle suddenly finds himself rapidly approaching the rear of another vehicle traveling at a much slower speed. Gleichert v. Stephens, 280 So.2d 776, 777 (Ala. 1973).

While research revealed no Alabama cases directly on point (i.e. involving a tire blow out), multiple jurisdictions have persuasively held that a defendant should not be liable when a tire blow-out is the cause of an accident. See, e.g., Huffman v. Mercer, 295 S.W.2d 27, 33 (Mo. 1956) ("If one be precipitated to the left of the road by virtue of circumstances [a blowout] over

which he has no control, one is not negligent.") <u>citing</u> <u>Seligman v. Orth</u>, 236 N.W. 115, 116 (Wis. 1931); <u>Lasseigne v. Kent</u>, 142 So. 867, 868 (La. App. 1932) ("The puncture of an automobile tire by a large spike, causing the car to upset and fatally injuring a guest therein, will, under the evidence set out in the case, be considered an accident, which is a casualty which could not be prevented by ordinary care and diligence.") (citation omitted).

In a very similar case, the Nebraska Supreme Court upheld a verdict that the puncture of a tire and accompanying deflation was the proximate cause of a car swerving off the road and overturning and, therefore, the driver of the car was not liable for the injuries caused. <u>See</u> <u>Bonacci v. Cerra</u>, 279 N.W. 173, 176-77 (Neb. 1938); <u>see also</u> <u>Kelly v. Gagnon</u>, 236 N.W. 160, 164 (Neb. 1931) (holding that a driver who stepped on brake following a puncture of a tire did not act negligently even though the car "swayed and upset," causing the death of a passenger).

In the instant case, Mrs. Bertha Moore was confronted with a sudden emergency when her left rear tire ejected a screw or bolt that had been lodged in it, causing the tire to suddenly and rapidly deflate while she was operating her Mercury Mountaineer (a sports utility vehicle) on a highway at 65 miles per hour. This emergency was through no fault of Mrs. Moore's. There was no indication that the tire was in an unsafe condition. Both the plaintiffs' and the defendant's experts have stated that a tire is not worn to an unsafe condition until the tire tread is at or less than 2/32". Exhibit D, Flanner Dep. 72:6-73:15, Nov. 13, 2007; Exhibit F, Cunningham Dep. 55:1-57:13, Nov. 9, 2007. The tire that suddenly deflated on Mrs. Moore still had between 2/32" and 3/32" of safe, usable tread. Exhibit D, Flanner Dep. at 72:1-73:15, Nov. 13, 2007; Exhibit F, Cunningham Dep. 55:9-57:13, Nov. 9, 2007. Put another way, Mrs. Moore's full tire tread was at 4/32" to 5/32", above the minimum tread necessary to safely operate a vehicle. While the

-4-

plaintiffs' expert, Peter Flanner, opines that the tread on the tire was 80% worn, there was still

20% of usable, safe tread on the tire.  Exhibit B, Report of Peter Flanner, at 2, ¶3, No. 8; Exhibit

D, Flanner Dep. 71:16-73:15, Nov. 13, 2007.  Absent some other indication that the tire was

damaged in some way, Mrs. Moore was completely justified in continuing to operate her vehicle

with a tire that had 20% of its remaining usable tread.[1]

In addition, both the plaintiffs' and the defendant's tire experts opine that the tread was

evenly worn, indicating that the tire was properly aligned and was not over or underinflated

during its service life.  Exhibit D, Flanner Dep. 59:13-22, 73:5-15, 84:4-10, Nov. 13, 2007;

Exhibit C, Report of Ralph Cunningham at 2, ¶¶ 1-2.  The location of the screw or bolt that was

ejected from the tire was on the side of the tire facing the wheel well and, thus, out of plain view.

Id. at 6, ¶¶ 1-2.  This means that, unless Mrs. Moore had a lift in her garage, she would never

have known that the screw or bolt was lodged in her tire.  Moreover, due to the construction of

the tire, the screw or bolt would have prevented air from escaping the tire, thus preventing the

driver from knowing that something was wrong with the tire in the first place.  Id. at 6, ¶ 1;

Exhibit B, Report of Peter Flanner at 2, ¶ 1 (suggesting a puncture would result in only gradual

loss of pressure).  This is supported by the fact that the tire itself exhibited no evidence of having

been operated in an overdeflected or underinflated manner.[2]  Exhibit D, Flanner Dep. at 59:7-22,

---

[1] To draw an analogy, a full tank of fuel would be at 100% of its capacity for storing fuel. After burning 80% of that fuel, a driver still has 20% of his fuel remaining and does not yet have to refill the tank.

[2] Plaintiffs may suggest that Mrs. Moore's speed was excessive and, therefore, per se negligent under Alabama law, thus preventing the application of the sudden emergency doctrine. To date, however, no expert has testified that Mrs. Moore's speed caused the tire to suddenly deflate or her loss of control of the vehicle following the sudden tire deflation.  Moreover, the only sworn evidence of Mrs. Moore's speed comes from Mrs. Moore herself, who testified that

Nov. 13, 2007; Exhibit C, Report of Ralph Cunningham at 2, ¶ 1.

Mrs. Moore, faced with a sudden emergency when her tire suddenly and rapidly deflated at highway speeds of 65 miles per hour, applied her brakes. Under the circumstances, it was not negligent to take this action as the move was clearly designed to slow her vehicle down in a response to the emergency situation. According to the plaintiffs' expert, Clifford Prosser, the act of stepping on the brake was negligent. Exhibit E, Report of Clifford Prosser at 1, ¶ 2. Given, however, the sudden emergency Ms. Moore faced, her instinctive reaction of stepping on the brake, even if not the best course of action, was not negligent. See Crowe v. Crowe, 129 S.E.2d 585, 586 (N.C. 1963) (holding that the defendant's act of stepping on the brakes after a tire exploded was not negligent where the driver was faced with an emergency and there was no evidence he was aware of any defect in his tires); see also Pickett v. Cooper, 116 S.E.2d 48, 51

---

she was traveling around 65 miles per hour -- within the posted speed limit -- immediately before losing control. Exhibit A, Moore Dep. 32:16-33:10.

The only evidence that Mrs. Moore's speed was excessive comes from the Alabama Uniform Traffic Accident Reports, which estimates her speed at 83 miles per hour. See Exhibits G and H, Alabama Uniform Traffic Accident Reports. These accident reports, however, contain erroneous and inaccurate information which indicates their unreliability as well as inadmissibility. For example, both reports list Michael Allen's insurance carrier as Alfa but it was, in fact, State Farm. Id. at 1, "Liability Insurance Co." section for Driver Michael Allen. Furthermore, one version of the report lists Phyllis Montgomery as unemployed while the other lists her as employed at Georgia Perimeter College. Compare Exhibit G at 2, "Place of Employment" section for Phyllis Montgomery with same section of Exhibit H at 3. Upon close examination of the two reports, it is obvious that someone "whited out" the erroneous job information and then wrote in the college. The reports also inaccurately state that Mrs. Moore was taken to Evergreen Medical Center. See "Victims" section for Bertha G. Moore on Exhibit G at 4 and same section on Exhibit H at 2. In fact, she was airlifted by helicopter to a trauma center in Pensacola, Florida. Neither set of reports has been authenticated nor has a foundational basis for the calculation of the speed estimate been established. With the glaring inaccuracies of information, these reports are unreliable, inadmissible, and cannot be the basis upon which Plaintiffs establish Mrs. Moore's alleged excessive speed.

-6-

(Va. 1960) (holding that the sudden emergency doctrine was properly submitted to the fact finder where defendant alleged that a tire blow-out, and not his own negligence, resulted in his vehicle crossing onto the wrong side of the road).

In sum, the sudden emergency doctrine properly applies to the facts of this case. Mrs. Moore did not act in a negligent manner while operating her car on August 29, 2003. Moreover, the tire deflation, and not Mrs. Moore's actions, was the proximate cause of the accident and, consequently, the plaintiffs' injuries. Despite the unfortunate facts of this matter, the United States is not liable for those injuries.

Respectfully submitted this 28th day of January, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
Civil Division

PHYLLIS J. PYLES
Director, Torts Branch
Civil Division

GAIL K. JOHNSON
Senior Trial Counsel, Torts Branch
Civil Division


/s/ Conor Kells
CONOR KELLS
Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
Post Office Box 888
Benjamin Franklin Station
Washington, DC 20044
Tel: (202) 616-4400
Fax: (202) 616-5200
Attorneys for Defendant United States

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon counsel for

Plaintiffs by electronic filing, CM/ECF:

> Annesley H. DeGaris
> Attorney for the Allen Plaintiffs
> Cory, Watson, Crowder & DeGaris, P.C.
> 2131 Magnolia Avenue, Suite 200
> Birmingham, Alabama 35205
>
> J. Callen Sparrow
> Attorney for the Montgomery Plaintiffs
> Heninger Garrison Davis, L.L.C.
> P.O. Box 11310 (35202)
> 2224 1st Avenue North
> Birmingham, Alabama 35203

Dated this 28th day of January, 2008.

> /s/ Conor Kells
> Trial Attorney, Torts Branch
> Civil Division