## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL P. ALLEN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **CV 2:06-cv-879-WKW** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **WALLACE MONTGOMERY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **CV 2:06-cv-880-WKW** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' JOINT BRIEF IN OPPOSITION TO THE APPLICATION OF THE SUDDEN EMERGENCY DOCTRINE

### I.  Factual Background

This case arises from a high speed, multi-vehicle wreck which happened on August 29, 2003.  The wreck occurred on I-65 near the Butler County Line and County Road 1220.  On the day of the collision, Michael Allen, Lou Ellen Allen, and Lorie Allen (husband, wife, and daughter respectively) were on their way to Gulf Shores, Alabama to visit with family.  Wallace and Phyllis Montgomery (husband and wife) were headed to the Mississippi gulf coast.  Bertha Moore was returning to Montgomery, Alabama after attending a law enforcement conference in

Perdido Beach, Alabama.    While traveling north on I-65, Mrs. Moore lost control of her vehicle and crossed the median into the southbound lanes of I-65.  After crossing the grass median and culvert, Mrs. Moore's vehicle first came in contact with the Allen vehicle, traveling south.  Mrs. Moore's vehicle then rotated and struck the vehicle occupied by the Montgomerys.  According to the accident report, Mrs. Moore's rate of speed was 83 mph at the time of the accident.  A full description of the accident is contained in the accident report attached hereto as Exhibit A.  The first notice the plaintiffs had that the defendant was claiming a mechanical defect was a July 3, 2007 letter informing counsel that the government had a tire.  This revelation eventually manifested itself into the claimed sudden emergency.

## II.  The Sudden Emergency Doctrine Does Not Apply in this Case.

The "sudden emergency doctrine" should not be applied in the instant case. In the context of deciding whether a jury should be charged on the doctrine, the Alabama Court of Civil Appeals has explained that

> "[i]n order for the sudden emergency doctrine to be applicable, there must be (1) a sudden emergency; and (2) the sudden emergency must not be the fault of the one seeking to invoke the rule." Friedlander v. Hall, 514 So. 2d 914, 915 (Ala. 1987). "'[W]hen the evidence presents a question of fact as to whether the defendant contributed to the emergency, the giving of the charge is proper and the jury must determine whether the defendant was faced with a "sudden emergency."'" Nichols v. Elizer Indus., 613 So. 2d 1259, 1260 (Ala. 1993), quoting Williams v. Worthington, 386 So. 2d 408, 409 (Ala. 1980).

Waters v. Williams, 821 So. 2d 1000, 1007 (Ala. Civ. App. 2001).

Here, the preponderance of the evidence—indeed, its great weight—will demonstrate that no such "sudden emergency" occurred and that Bertha Moore ("Moore") certainly did "contribute" to any purported emergency.  As the finder of fact, the Court should therefore decline to apply the doctrine, just as a jury would have to decline to apply it under the foregoing rule.

**A.**    **Moore's Speeding Precludes Application of the Sudden Emergency Doctrine.**

Assuming for the moment that the tire **deflation** was in fact a "sudden" event as required by the doctrine, the preponderance of the evidence will nevertheless show that Moore "'contributed to the emergency'" by speeding at the time of the accident. <u>Waters</u>, 821 So. 2d at 1007.

Specifically, the Alabama courts have recognized that speeding is a factor properly considered by the finder of fact in deciding whether the defendant contributed to an "emergency" arising in the context of an automobile accident. <u>See</u> <u>McKinney v. Alabama Power Co</u>., 414 So. 2d 938, 939 (Ala. 1982)(speeding and inattention); <u>Moore v. Horton</u>, 694 So. 2d 21, 22 (Ala. Civ. App. 1997)(speeding and failure to keep a proper lookout). Here, there will be strong evidence that Moore was speeding at the time of the accident; as such, the Court should decline to apply the doctrine.[1]

That Moore was speeding will be substantiated by the physical evidence, as well as by expert testimony. Moore's vehicle was traveling fast enough to cross the wide  median on I-65 and through a concrete drainage ditch or culvert with sufficient momentum to cause substantial damage to two other vehicles (in addition to her own) and to cause permanent injuries to everyone involved.  (See Photographs of scene attached as Exhibit B; photographs of vehicles attached as Exhibit C (Allen), Exhibit D (Montgomery), and Exhibit E (Moore)).  The plaintiffs' expert, Peter Flanner, has testified that in his almost fifty years in the tire industry he has never seen a tire damaged as severely from external forces as the one involved in this case.  (Flanner

---

[1] Although the juries in <u>McKinney</u> and <u>Moore</u> rendered verdicts for the defendants, that does not change the fact that speeding was a factor the juries were allowed to consider when charged as to the sudden emergency doctrine, nor does it mean that the Court, as finder of fact here, cannot conclude that Moore's speeding was a contributing factor in the instance case.

deposition, Exhibit F, p. 61; photographs of subject tire attached as Exhibit G).[2] Mr. Flanner has testified that the damage is consistent with the vehicle traveling at excessive speeds and hitting a concrete drainage culvert in the median.  (Flanner deposition, Exhibit F pp. 60, 61, 90, 91, 92).

Moreover, the trooper investigating the accident also concluded that Moore was traveling at an excessive rate of speed—**83 mph**. (See Accident Report as Exhibit A and Affidavit of Robert Fisher, Exhibit K).  Although the United States attempts to belittle this report as being "unreliable" as to some minor collateral matters, it is nevertheless admissible under Rule 803(8), Fed. R. Evid. as a  "public record," because there is nothing in the report to undermine the essential reliability of the trooper's conclusion that Moore was speeding—including the fact that his conclusion was based in part on an interview with a witness at the scene:

> A public official usually does not have personal knowledge of all the facts reported in an investigative report. An official who investigates the cause of a car accident . . . is not likely to have personal knowledge about how the cars looked and sounded at the time of the accident. Often the official must rely on information from bystanders and others with personal knowledge pertinent to the investigation. The question is whether this reliance renders the official's factual findings and opinions untrustworthy.
>
> * * *
>
> Yet it is fair to state that most Courts have considered the multiple hearsay problem somewhat flexibly under Rule 803(8), given the strong presumption that public reports are reliable. Thus, if the Court finds that the person with firsthand knowledge had no reason under the circumstances to misrepresent information to the public official, the report will probably be found admissible—even though there was, strictly speaking, no duty to report to the public agency or means of verification, and even though no specific hearsay exception or non-hearsay use is applicable.

4 S. Saltzburg, M. Martin & D. Capra, <u>Federal Rules of Evidence Manual</u> § 803.02[9][g], pp. 803-64 through -66 (9th ed. 2006).

---

[2] It is undisputed that the damage to the tire depicted in Exhibit G is post-deflation damage.

Finally, even if Moore testifies she was traveling within the speed limit—and assuming the Court finds her testimony credible—that is not the end of the inquiry on the question of her "speeding" in the circumstances of the instant case. In Alabama, as elsewhere, "although the *violation* of a statutory standard may constitute negligence *per se* . . . , it does not follow that *compliance* with the 'letter' of a statutory standard is *non*negligence *per se*." Henderson v. Alabama Power Co., 627 So. 2d 878, 884 (Ala. 1993), overruled on other grounds, Ex parte Apicella, 809 So. 2d 865 (Ala. 2001)(citing W. Keeton, D. Dobbs, R. Keeton, and D. Owen, Prosser and Keeton on the Law of Torts § 36, at 233 (5th ed. 1984))(emphasis in original). As the Court explained, "[u]nder the totality of the circumstances in a particular case, a defendant's conduct, although technically in compliance with a minimal standard, may be unreasonable . . .." Henderson, 627 So. 2d at 884.

Given Mrs. Moore's testimony regarding the weather conditions and the resulting wet surface of the roadway on which the accident occurred—not to mention the undisputedly worn condition of the tire itself—the issue of whether traveling at a rate of sixty-five miles an hour constituted a "safe" speed under the circumstances is at issue, even if such a speed is "technically" within the posted limit. See Ala. Code § 32-5A-170 ( 1975)("No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing," including "special hazards" that exist "by reason of weather or highway conditions."); Nelson v. Meadows, 684 So. 2d 145, 148 (Ala. Civ. App. 1996)(given existence of wet streets, fact that defendant "was not exceeding the speed limit is not conclusive evidence that he acted in a manner that a jury would consider reasonable and prudent under the conditions present at the time of the accident").

Accordingly, the plaintiffs submit that Moore's speed—whether 83 mph or 65 mph is a "contributing factor" precluding the application of the sudden emergency doctrine, even if her testimony is accepted as true.

B. **Moore's Failure to Inspect and Maintain her Vehicle Precludes Application of the Sudden Emergency Doctrine.**

Similarly, the evidence will also show that Moore "contributed to the emergency" by her failure to properly inspect and maintain the tires on her automobile. Although research to date has disclosed no Alabama cases directly addressing a failure to inspect or maintain an instrumentality in the context of the sudden emergency doctrine, such a failure would naturally be a contributing factor in such cases.

In particular, the evidence is undisputed that Moore's tires were 80% worn with respect to Alabama's statutory requirements, see Ala. Code § 32-5-210 (1975), and even the defendant's expert has described the tires as almost but not completely worn out. (Cunningham deposition, Exhibit H, p. 55). Moreover, that expert went on to say that if the other tires had been in the same condition as the subject tire, then that worn condition could have been a **contributing factor to the loss of control** of the Moore vehicle. (Cunningham deposition, Exhibit H, pp. 51-52). Coupled with the experts' agreement that the screw or similar object that caused the deflation had been in the tire for some time, the inference arises that Moore failed to properly inspect and maintain her tires and that her actions thus contributed to any alleged sudden emergency.

Moreover, as noted above, the United States is not exonerated as a matter of law by Moore's "technical" compliance with the requirements for tread wear under Ala. Code § 32-5-210 (1975). Again, "it does not follow that *compliance* with the 'letter' of a statutory standard is *non*negligence *per se*." Henderson, 627 So. 2d at 884.

**C.  The "Emergency" Was Not "Sudden" Nor Was the Deflation an "Emergency."**

It has been assumed to this point that Moore may have been confronted with a "sudden" emergency, as is required for the application of the doctrine. See Waters, 821 So. 2d at 1007 ("[i]n order for the . . . doctrine to be applicable, there must be . . . a *sudden* emergency")(emphasis added). The evidence, however, will be to the contrary.

According to the defendant's expert, the tire **deflated** in five seconds or less after the screw was ejected.  (Cunningham deposition, Exhibit H, p. 91).  Under those circumstances, five seconds is a long time.  Even assuming Moore was traveling approximately sixty-five miles per hour, she would have traveled almost five hundred feet (over one and one-half football fields) during the deflation process.  This is based upon evidence provided by the defendant, and it does not indicate a sudden occurrence but rather a relatively common occurrence that an attentive driver, traveling the appropriate speed, could address.

In addition, the treatise, R. Grogan, The Investigator's Guide to Tire Failures, (Exhibit I) is relied upon by all of the experts involved in this case.  In fact, the defendant's expert, Ralph Cunningham, testified that he uses the book and has found nothing in it to be unreliable. (Cunningham deposition, Exhibit H, p. 110).  In that book, Mr. Grogan states that if a car is traveling straight (as Moore was) at speeds of 50 mph or more, ***"punctures do not cause loss of control."***   (Exhibit I, p. 219, emphasis added).  In fact, the defendant's own expert states that statistically, most often, deflation does not cause a loss of control.  (Cunningham deposition, Exhibit H, p. 108).  Furthermore, he testified that loss of control as the result of a tire deflation while traveling straight is **"extremely unlikely."**   (Cunningham deposition, Exhibit H, p. 112). His testimony is that in order to lose control there must be some driver input.  (Cunningham deposition, Exhibit H, p. 83).

The only logical conclusion to be drawn from this evidence is that the deflation of her tire did not present Ms. Moore with any type of emergency—sudden or otherwise. Any "emergency" was the loss of control, and that loss of control must be attributed to Moore, not to the deflation of the tire.

### III.    Spoliation of Evidence

Finally, plaintiffs submit that the defendant should not be allowed to avail itself of the sudden emergency doctrine in that some evidence important to the determination of whether or not Mrs. Moore contributed to any emergency is not available for inspection or analysis.

Mrs. Moore has testified that she does not know what happened to her car after it was taken from the wreck scene. (Moore deposition, Exhibit J, pp. 38, 39). The plaintiffs have only been given the one tire from Mrs. Moore's car and neither the remaining tires nor is the car is now available. In fact, the left tires existence was only revealed to plaintiffs counsel by letter dated July 3, 2007. Inspection and analyses of the other three tires as well as inspection of the various systems of the car could have a crucial impact on determining what caused loss of control in this wreck. In fact, as discussed above, the defendant's expert testified that if the other tires had been available **he would like to have examined them "to determine whether or not other tires may have been involved as a contributing factor in the loss of control."** (Cunningham deposition, Exhibit H, p. 51). Furthermore, as also discussed above, Mr. Cunningham testified that if the other three tires on Ms. Moore's car had been in the same condition as the subject tire, then that worn condition could have been a contributing factor to the loss of control. (Cunningham deposition, Exhibit H, pp. 51, 52). A failure by Mrs. Moore to maintain her vehicle or to operate it in a manner consistent with its condition bears directly on

the governments ability to assert the sudden emergency doctrine as these matters show Mrs. Moore contributed to any sudden emergency that is alleged.

In addition to the tires themselves, the interaction between tires and the vehicle can affect both the wear of the tire and the performance or handling of the vehicle - i.e., loss of control. Mr. Grogan in his book <u>The Investigators Guides to Tire Failures</u> states "in accident investigation it is not possible to separate the effect of tire and vehicle completely because they interact with each other." (Exhibit I, p. 213). Mr. Grogan makes the point that while most tire failures do come from within the tire itself there can be an effect from the various systems involved in the operation of the vehicle. Obviously, the same can be said for the loss of control of the vehicle. It is common sense that people have flat tires on interstates all over the country every day without incident. In this case, something happened to cause Mrs. Moore to move from the northbound to southbound lanes. It is the plaintiffs' position that the evidence at hand clearly establishes Mrs. Moore's negligence in the operation of her vehicle caused this incident. However, a full investigation of the incident should include an analysis and inspection of the vehicle itself including the wheel upon which this tire was mounted, vehicle suspension, steering and braking systems, the wheel bearings, alignment, and all other tires. These inspections and analyses cannot be done because neither the vehicle nor the other three tires is available.

As this Court has noted, in the Eleventh Circuit, issues relating to the spoliation of evidence are ultimately decided by reference to state law. See <u>Pioneer Services, Inc. v. Auto-Owners Insurance Co.</u>, No. 2:06-CV-377-WKW, 2007 U.S. Dist. LEXIS 50678, at *19 (M.D. Ala. July 12, 2007). Moreover, in <u>Vesta Fire Insurance Corp. v. Milam & Co. Construction, Inc.</u>, 901 So. 2d 84 (Ala. 2004), the Alabama Supreme Court suggested that remedies for spoliation might well exist for "innocent" spoliation arising from merely negligent conduct. "'Even in

instances where the circumstances surrounding the destruction of evidence suggest simple negligence, an instruction that is not so severe as to allow an inference of wrongdoing . . . but that shifts the burden of proof, might be appropriate . . . .'" Id. at 98 (quoting Alabama Power Co. v. Murray, 751 So. 2d 494, 503-04 (Ala. 1999)(Lyons, J. dissenting))(dictum). Such "'a burden-shifting instruction in the case of a merely negligent loss would not require the innocent party to suffer the consequences resulting from the fact that his or her burden of proof has been made greater by the negligence of the adversary, and, at the same time, it would not impose an excessively harsh sanction upon a merely negligent party.'" Vesta Fire Insurance Corp., 901 So. 2d at 98 (quoting Murray, 751 So. 2d at 503-04). A similar remedy might well be appropriate here, i.e., absolving the plaintiffs of answering the assertion of the sudden emergency doctrine, given that relevant evidence relating to that issue is forever lost.

By raising this issue, the plaintiffs do not suggest any malicious or intentional conduct on the part of the United States or Mrs. Moore, however, the plaintiffs are especially prejudiced if defendant is allowed to hold up the sudden emergency doctrine to avoid liability when the plaintiffs have not been given the opportunity to fully explore whether or not Mrs. Moore's negligence contributed to the alleged sudden emergency and subsequent wreck.  This is perhaps highlighted in this case because the evidence that is available indicates that loss of control under these circumstances is rare.  It begs the question of what affect the other tires may have had on the loss of control and whether Mrs. Moore's negligent maintenance or inspection was a contributing cause of any alleged sudden emergency she now claims.  We cannot know that, and it would be unjust to allow the government to benefit having had knowledge of these claims since 2003 yet having done nothing to preserve evidence central to its recent defense to plaintiffs' claims of negligence.

IV.    <u>**Conclusion**</u>.

For all the foregoing reasons, the Court should decline to apply the sudden emergency doctrine in this case.

Respectfully submitted this the 4th day of February, 2008.

/s/ Annesley H. DeGaris
Annesley H. DeGaris (ASB-9182-A63A)
Attorney for the Allen Plaintiffs
CORY, WATSON, CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, Alabama 35205
Telephone:  205-328-2200
Facsimile:  205-324-7896
E-mail:  adegaris@cwcd.com

/s// J. Callen Sparrow
J. Callen Sparrow (ASB-4515-R79J)
Attorney for Montgomery Plaintiffs
HENINGER GARRISON DAVIS, L. L. C.
P. O. Box 11310 (35202)
2224 1st Avenue North
Birmingham, AL 35203
Telephone:  205-326-3336
Facsimile:   205-326-3332
E-mail:   jcsparrow@hgdlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February 2008, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties:

Conor Kells
Gail K. Johnson
Trial Attorney, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station
Post Office Box 888
Washington, DC 20044

Attorney for Defendant
UNITED STATES OF AMERICA


/s/ Annesley H. DeGaris
Annesley H. DeGaris

EXHIBIT "A"



DEFENDANT'S EXHIBIT 4 / FLANDERS

PENGAD 800-631-6989

AST-27
REV. 1/91

SEP 3 0 2003    ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT    OPS Accid. 3522163

Shaded Areas To Be Used By Data Processing Only    Sheet 1 of 3 Sheet(s)    Microfilm No.    Local Case No.

## LOCATION AND TIME

Date 08 29 2003    Time 2:25    Day of Week M T W Th F S Su    County    City    Rural [X]

Highway Classification: M—Municipal I—Interstate S—State Private, Prop. F—Federal C—County O—Other    Local Zone

On Street, Road or Highway: I-65    At Intersection of or Between (Node 1): Butler Co Line    And (Node 2): Co Rd 1220

Street or Road Code: I065    7631    Code 7620    D.O.D. 1:01    From [ ] N S E W (Circle One)    At Node

Intersection Related: 1 - Node 1  2 - Node 2 [X] Not Int. Related    Mile Post: 106 1.10    Control Access: Hwy Full    1 - Main Rd  2 - Interchange  5 - Exit Ramp    Prime Cont Circms 26    Prime Cont Unit No    Unit 1 Type

First Harmful Event 70    Event Location 1    Distance to Fixed Object: NA FT.    50 060 03

### UNIT NO 1

Driver Full Name: Bertha Gordon Moore    Street Address: 4731 Queensbury Ct    City and State: Montgomery Al 36116    Telephone No. NONE

DOB: 01 22 1955    Race B Sex F State AL    Driver License No. 4627606    DL Class M    DL Status C    List Restrictions Not Complied With N    CDL Status    List Endorsements Not Complied With N    Residence Less Than 25 Miles

Place of Employment: Dept of Justice (Montgomery Al)    Liability Insurance Co.— Alfa    Social Security No. 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

Driver Condition: 1 No Defect    2 - Fatigued  8 - Other    Sobriety    Officer's Opinion: Alcohol— Drugs— Yes [No]    Test Type    No Test    1 - Blood Test  3 - Urine Test  2 - Breath Test  4 - Unable to Administer    5 Refused Test    Test Results NA

Maneuver: Travel Road Name I-65    Road Code I065    Travel Direction N E [S] W -A-Not on Rd U-Urb    Other Contr Circumstance 06    Prime Harm Event 20    Event Loc

#### COM VEH

Veh Year 1997    Make Merc    Model Mou    Body NA    V.I.N. 4M2DU52P7VUJ01642    License Tag Number 3A6707M    State Al    Year 2004

Owner's Name: Same    Street or R.F.D.    City    State    ZIP

#### UNIT 1 VEHICLE

Type: 1 - Auto (circled)
Speed Limit 70 MPH    Est. Speed 83 MPH    Citation Offense Charged NONE    Damage Severity: 1 - None Visible  2 - Not Disabled    Vehicle Towed Away? Yes No    Occupants in Unit    Enter Point of Initial Impact 4

Vehicle Towed By Whom? A+ (Rotation)    To Where: A+ (Evergreen Al)

Totaled

### UNIT NO 2

Driver/Pedestrian Full Name: Michael Phillie Allen    Street Address: 107 Paradise Isle    City and State: Riverside Al 35135    Telephone No. 305 338-1803

DOB: 03 26 1948    Race W Sex M State AL    Driver License No. 2451775    DL Class DAY C    DL Status    List Restrictions Not Complied With N    CDL Status    List Endorsements Not Complied With N    Residence Less Than 25 Miles

Place of Employment: IMI (Birmingham Al)    Liability Insurance Co.— Alfa    Social Security No. 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

Driver/Ped Condition: 1 No Defect    Sobriety    Officer's Opinion: Alcohol— Drugs— Yes [No]    Test Type No Test    1 - Blood Test  3 - Urine Test  2 - Breath Test  4 - Unable to Administer    5 Refused Test    Test Results NA

Maneuver/Action 01    Travel Road Name I-65    Road Code I065    Travel Direction N E [S] W -A-Not on Rd U-Urb    Other Contr Circumstance 91    Prime Harm Event 20    Event Loc

#### COM VEH

Veh Year 2003    Make Line    Model Tow    Body 40    V.I.N. 1LNHM82W53Y618276    License Tag Number 59G431H    State Al    Year 2004

Owner's Name: Same    Street or R.F.D.

#### VEHICLE OR PEDESTRIAN [X]

Type: 1 - Auto (circled)
Speed Limit 70 MPH    Est. Speed 75 MPH    Citation Offense Charged NONE    Damage Severity: 1 - None Visible  2 - Not Disabled [Disabled]    Vehicle Towed Away? [Yes] No    Occupants in Unit 3    Enter Point of Initial Impact 8

Totaled

Vehicle Towed By Whom? Windom (Rotation)    To Where: Windom (Evergreen Al)

## CODES

Contributing Circumstances / Driver Maneuver / Pedestrian Action / Event Loc (columns of numbered codes)

AST-27
REV. 1/91

ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

DPS Accident No. 3522153

Shaded Areas To Be Used By Data Processing Only     Sheet 2-3 Sheet(s)     Microfilm No.     Local Case No.

**LOCATION AND TIME**

| Date 08 29 2003 | Time 21:35 AM PM | Day of Week M T W TH | County | City | Rural X | Highway Classification: 1—Interstate  3—State  5—Municipal  2—Federal  4—County  6—Private Prop. | Local Zone |

On Street, Road or Highway **I-65**

At Intersection of or Between (Node 1) **Butler Co Line**     And (Node 2) **Co Rd 1220**

| Street or Road Code **-7631** | Node Code **76.20** | (0|0|0|+|0) From (1) Node (2) 26 | NONCOLLISION EVENT ... COLLISION EVENT ... |

Intersection Related: 1—Node 1  2—Node 2  (N) Not Int. Related
Mile Post **110.6|+|0**

Control Access Hway Loc: 1—Main Rd  2—Frontage Rd  3—Interchange  4—Entrance Ramp  5—Exit Ramp  6—N/A

Prime Contr Cir(nos) **26**

Prime Contr Unit No

First Harmful Event **20** | Event Location **1** | Distance to Fixed Object **NA** FT. | No. of Vehicles | No. Pedestrians | No. Injured | No. Fatalities | Unit 1 Type | Unit 2 Type

**UNIT NO 3 — DRIVER — LEFT SCENE — COM VEH — UNIT 1 VEHICLE**

Driver Full Name **Phyllis Daulton Montgomery** Street Address **5005 With Ginger Cv.** City and State **Norcross GA** Zip **30092** Telephone No. **NONE**

| Month 03 Day 14 Year 1943 | Race W Sex F DL State GA | Driver License No. 053628642 | DL Class C | DL Status C | List Restrictions Not Complied With | CDL Status N | List Endorsements Not Complied With | Residence Less Than 25 Miles Yes NA |

Place of Employment **Georgia Perimeter Collage (Atlanta GA)**  Liability Insurance Co. **State Farm**  Social Security No. **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**

Driver Condition: 1—No Defect  2—Apparently Asleep  3—Fatigued  4—Ill  8—Other  9—Unknown | Sobriety | Officer's Opinion: Alcohol Yes No Unk / Drugs Yes No Unk | Type Test Given: | 9—No Test | 1—Blood Test  3—Urine Test  2—Breath Test  4—Unable to Administer | 5—Refused Test | Test Results **NA**

Maneuver **01** Travel Road Name **I-65** Road Code **I065** Travel Direction N E(S)W A-Not on Rd U-Unk **97** Other Contr Circumstance Prime Harm Event **20** Event Loc

| Veh Year 2001 | Make Volv | Model V70 | Body V.I.N. **YV15W53DX121I4722** | License Tag Number 759 NTO | State GA | Year 2003 |

Owner's Name **Same**     Street or R.F.D.     City     State     Zip

Type: 1—Auto  (2)—Sta/Wagon  3—Pick Up  4—Van  5—Truck Tractor  6—Comm. Bus  8—School Bus  9—Other Bus  10—Motorcycle  11—Moped  12—M. Scooter  13—Pedal Cycle  14—Farm Mach.  15—Train  16—Road Equip.  17—Ridden Animal  18—M. Home (R.V.)  19—ATV  98—Other

Usage: (1)—Personal  2—Driver Trng.  3—Construction  4—Ambulance/Paramedical  5—Military  6—Taxi  7—Transport (Pers)  8—Agriculture  9—Wrecker/Tow  10—Police  11—Other Business  12—Bus/Pass. Transport.  13—Fire Fighting  98—Other  Placard Yes No NA

Hazardous Cargo: (1)—None  2—Explosive  3—Gas  4—Flam/Combust Liq.  5—Flammable Solids  6—Oxidizer/Peroxide  7—Poison  8—Radioactive Matl.  9—Corrosive Matl.  98—Other

Oversized Load (Req. Permit) Yes No NA

Attachment: (1)—None  2—Mobile Home  3—Semi Trailer  4—Utility Trailer  5—4-Wheel Trailer  6—Boat Trailer  7—Camper Trailer  8—Towed Vehicle  9—Tanker  10—Pole Trailer  11—Double Trailer  98—Other

If Yes, Did Owner Have Permit? Yes No NA

Contributing Defect: (97)—None  1—Brakes  2—Steering  3—Power Plant  4—Suspension  5—Tires  6—Exhaust  7—Lights  8—Turn Signal  98—Windows/W. Shield  10—Restraint Sys.  11—Wheels  12—Truck Coupling  13—Cargo  14—Fuel System  98—Other  99—Unknown

Circle areas Damaged On Diagram  (10)—Under Carriage ... **Total** ... Enter Point of Initial Impact **1**

| Speed Limit 70 MPH | Est. Speed 70 MPH | Citation Offense Charged **NONE** | Damage Severity: 1—None (3)—Disabled  2—Not Disabled | Vehicle Towed Away? Yes No | Occupants in Unit **2** | Total Injuries in Unit |

Vehicle Towed By Whom: **Interstate (Rotation)** To Where: **Interstate (Evergreen Al)**

**UNIT NO X — DRIVER — LEFT SCENE — COM VEH — VEHICLE OR PEDESTRIAN**

Driver/Pedestrian Full Name     Street Address     City and State     Zip     Telephone No.

| Month Day Year | Race Sex DL State | Driver License No. | DL Class | DL Status | List Restrictions Not Complied With | CDL Status | List Endorsements Not Complied With | Residence Less Than 25 Miles Yes No |

Place of Employment     Liability Insurance Co.     Social Security No.

Driver/Ped Condition: 1—No Defect  2—Apparently Asleep  3—Fatigued  4—Ill  8—Other  9—Unknown | Sobriety | Officer's Opinion: Alcohol Yes No Unk / Drugs Yes No Unk | Type Test Given: 9—No Test | 1—Blood Test  3—Urine Test  2—Breath Test  4—Unable to Administer | 5—Refused Test | Test Results

Maneuver/Action     Travel Road Name     Road Code     Travel Direction N E S W A-Not on Rd U-Unk     Other Contr Circumstance     Prime Harm Event     Event Loc

| Veh Year | Make | Model | Body | V.I.N. | License Tag Number | State | Year |

Owner's Name     Street or R.F.D.     City     State     ZIP

Type: 1—Auto  2—Sta/Wagon  3—Pick Up  4—Van  5—Truck Tractor  6—Comm. Bus  8—School Bus  9—Other Bus  10—Motorcycle  11—Moped  12—M. Scooter  13—Pedal Cycle  14—Farm Mach.  15—Train  16—Road Equip.  17—Ridden Animal  18—M. Home (R.V.)  19—ATV  98—Other

Usage: 1—Personal  2—Driver Trng.  3—Construction  4—Ambulance/Paramedical  5—Military  6—Taxi  7—Transport (Pers)  8—Agriculture  9—Wrecker/Tow  10—Police  11—Other Business  12—Bus/Pass. Transport.  13—Fire Fighting  98—Other  Placard Yes No NA

Hazardous Cargo: 1—None  2—Explosive  3—Gas  4—Flam/Combust Liq.  5—Flammable Solids  6—Oxidizer/Peroxide  7—Poison  8—Radioactive Matl.  9—Corrosive Matl.  98—Other

Oversized Load (Req. Permit) Yes No NA

Attachment: 1—None  2—Mobile Home  3—Semi Trailer  4—Utility Trailer  5—4-Wheel Trailer  6—Boat Trailer  7—Camper Trailer  8—Towed Vehicle  9—Tanker  10—Pole Trailer  11—Double Trailer  98—Other

If Yes, Did Owner Have Permit? Yes No NA

Contributing Defect: 97—None  1—Brakes  2—Steering  3—Power Plant  4—Suspension  5—Tires  6—Exhaust  7—Lights  8—Turn Signal  9—Windows/W. Shield  10—Restraint Sys.  11—Wheels  12—Truck Coupling  13—Cargo  14—Fuel System  98—Other  99—Unknown

Circle areas Damaged On Diagram — Under Carriage ... Enter Point of Initial Impact

| Speed Limit MPH | Est. Speed MPH | Citation Offense Charged | Damage Severity: 1—None  2—Not Disabled  3—Disabled | Vehicle Towed Away? Yes No | Occupants in Unit | Total Injuries in Unit |

Vehicle Towed By Whom:     To Where:

**CODES**

Contributing Circumstances: 01—Improper Passing  02—Improper Lane Change/Usage  03—Improper Turn/Cut Turn  04—Following Too Close  05—Misjudge Stopping Dist  06—Over Speed Limit  07—Avoid Object/Person/Veh  08—Unseen Object/Person/Veh  09—Improper Backing  10—Improper Turn  11—Improper/No Signal  12—Fail to Heed Sign/Signal

13—Improper Driving Erratum  14—Road Defect  15—Vision Obstruction  16—Defective Equipment  17—DUI  18—Under Infl Speed  19—Improper Load/Fly Load  20—Improper Attachment  21—Fail to Yield Right-of-Way  22—Driver Condition  23—Wrong Side of Road  24—Veh Pushed/Force by Veh

25—Veh Pushed by Person  26—Veh Left Road  27—Driver Not in Control  28—Load Shift  29—Parts/Cargo from Veh  30—Fed Violation  31—Veh Wgt/Hgt/Length  32—Fell Under Influence  33—Illegal/Improper Parking  34—None  98—Other

Driver Maneuver: 11—Go Straight Ahead  12—Pass on Left  13—Pass on Right  14—Pass on Hill  15—Change Lanes  16—Go Straight—Left Turn Lane  17—Change Lanes—Left  18—Change Lanes—Right  19—Enter Parked Position  20—Wrong Side of Road  21—Wrong Way—1 Way

13—Right Turn  14—Left Turn  15—U-Turn  16—Slow or Stop  17—Back Up  18—Stopped in Traffic  19—Parked—Legally  20—Parked—Illegally  21—Enter/Leave Driveway  22—Enter/Leave Parked Pos.  98—Other

Ped/Cyc Rule Actions: 1—Traffic Hit Pd  2—Ped/Cyc Going Wth Traffic  3—Ped/Cyc Going Agnst Traffic  4—Ped/Cyc Ride or Stds Path  5—Crossing Intersection  6—Standing in Roadway  7—Parked  98—Other  99—Unknown

Pedestrian Actions: 01—Cross/Enter—Intersection  02—Cross/Enter—Not Intersec.  03—Walk in Road—With Traffic  04—Walk in Road—Agnst Traffic  05—Stand in Roadway  06—Get out of Vehicle  07—Push/Work on Vehicle  98—Other

Event Loc: 10—On Roadway  11—Shoulder  12—Median  13—Roadside  14—Gore  15—Driveway  16—In Parking Lane/Property  98—In Intersection

ALABAMA
UNIFORM TRAFFIC ACCIDENT REPORT

3522163

LOCAL CASE NO.

SHEET 3 OF 3 SHEET(S)

AST No. 34 Rev. 4/86    SUPPLEMENTAL SHEET

| | | Name / Address / Taken to / Taken by | Unit No. | Seat Pos. | Injury Type | Age | Sex | Ejec-tion | First Aid By |
|---|---|---|---|---|---|---|---|---|---|
| | 3 | Name: Ellen Allen  107 Paedise Isle  Riverside Al 35135 | 2 | 6 | A | 49 | F | N | O |
| | | Taken to: Evergreen Medical Center    Taken by: Coneauh County EMS | | | | | | | |
| | 4 | Name: Phyllis Daulton Montgomery 5005 Will Ginger Cv. Naness 5A | 3 | 1 | A | 60 | F | N | O |
| | | Taken to: Evergreen Medical Center    Taken by: Coneauh County EMS | | | | | | | |
| ADDITIONAL ACCIDENT VICTIMS | 5 | Name:    Address:    Taken to:    Taken by: | | | | | | | |
| | 6 | Name:    Address:    Taken to:    Taken by: | | | | | | | |
| | 7 | Name:    Address:    Taken to:    Taken by: | | | | | | | |
| | 8 | Name:    Address:    Taken to:    Taken by: | | | | | | | |
| | 9 | Name:    Address:    Taken to:    Taken by: | | | | | | | |
| | 10 | Name:    Address:    Taken to:    Taken by: | | | | | | | |
| | 11 | Name:    Address:    Taken to:    Taken by: | | | | | | | |
| | 12 | Name:    Address:    Taken to:    Taken by: | | | | | | | |

**DESCRIBE WHAT HAPPENED (Refer to vehicles by number)**

U1 left the ROAD onto the left shoulder. U1 crossed the median and went airborn. U1 struck U2 with the right rear of the vehicle. U2 came to rest on the left shoulder of the south bound lanes. U1 rotated counterclockwise and struck U3 with the driver's side. U3 then rotated clockwise into the median. U1 overturned onto the driver's side.

ADDITIONAL NARRATIVE SPACE

EXHIBIT "B"

View south from center of median at mile marker 106.10



View north from 106.10 Mile Marker



View south from 106 1/10 MM on north-bound side facing south



View traveling north (I-65) at mile marker 106



View south from center of median at mile marker 106.10



EXHIBIT "C"









# EXHIBIT "D"



EXHIBIT "E"















- Tires fitted ROWL outboard
- SS inboard.
- Screw in tire on SS.

EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
Northern Division

MICHAEL ALLEN,                      )
                                    )
     Plaintiff,                     )Case No. 2:06-cv-879-WKW
                                    )
-vs-                                )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
     Defendant.                     )
_____

WALLACE MONTGOMERY, et al.,)
                                    )
     Plaintiff,                     )Case No. 2:06-cv-880-WKW
-vs-                                )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
     Defendant.                     )

## C A P T I O N

THE DISCOVERY DEPOSITION OF PETER FLANNER, taken pursuant to Notice before R. Keith Kennedy, a Notary Public for the State of Alabama at Large, on the 13th day of November 2007, beginning at approximately 9:00 a.m., at the law offices of Heninger Garrison Davis, L.L.C., 2224 1st Avenue North, Birmingham, Alabama; said deposition taken pursuant to the Federal Rules of Civil Procedure.

58

1  something you can say to show statistically or
2  otherwise that that part of his opinion is
3  wrong?
4  A    I think it's just common sense that
5  he's wrong. He makes -- because he makes no
6  comment here that there is an ongoing loss of
7  inflation pressure in the tire.
8      What he's saying, I think, here is,
9  the only way a tire is going to lose pressure is
10  if it gets punctured and that's not true. And
11  everybody in the tire business knows that that's
12  not true.
13      So the -- any puncturing object would
14  potentially give you an additional loss of
15  pressure -- pressure over and above what the
16  tire would see anyway. And then it becomes --
17  then it becomes really consequential.
18  Q    Now, I don't see anything in your
19  findings and opinions and basis of reasons
20  therefore.
21      But if you look at page 2 of Mr.
22  Cunningham's report, Defendant's Exhibit 5 --
23  A    Let me just go back one point. You

59

1  said you didn't see any reference.
2      Point 1 of mine, it says, (Reading)
3  The incident tire was punctured by large screw
4  which would have caused a gradual loss of
5  inflation pressure.
6  Q    Correct.
7      And I just wanted to ask you about one
8  -- one portion of Mr. Cunningham's report --
9  A    Sure.
10  Q    -- which was that page 2 in the first
11  paragraph there, right around the middle of the
12  -- that paragraph.
13      (Reading)    There was no evidence in
14  the carcass that this tire had been operated in
15  an overdeflected condition, which is almost
16  universally caused by underinflation in
17  passenger cars and light trucks.
18      Would you agree that when you looked
19  at the tire there was no evidence of an
20  overdeflected condition?
21  A    Yes, I would agree with that
22  statement.
23  Q    Let's move on to number 5 on

60

1  Defendant's Exhibit 2, which is your report.
2      (Reading)    The massive damage to the
3  tire occurred after the loss of control as the
4  vehicle crossed the central grass median, which
5  from accident scene photographs includes a
6  concrete culvert, became airborne and crashed
7  into the plaintiff's vehicle traveling in the
8  southbound lanes of I-65.
9  A    Yes.
10  Q    What was the basis for that particular
11  opinion regarding the damage to the tire
12  occurring after loss of control?
13  A    Well, I've looked at a lot of failed
14  tires and I've never seen a tire with more
15  massive damage than this one ever. This really
16  did take a hit.
17      So this sort of damage that we're
18  looking at can only have occurred in my view at
19  relatively high rate of speed and the vehicle
20  impacting something other than a grass median
21  had to be something really substantial because
22  it actually split the tire down the tread, down
23  the center of the tread. And that's shown on --

61

1  in some of my photographs. And that's very,
2  very difficult.
3  Q    If you could, just identify one of
4  those photographs and we'll mark it as a
5  Defendant's Exhibit.
6  A    It's very difficult to split a tire
7  tread down the center. And in the tire testing
8  business we've been trying to do it for years
9  unsuccessfully because it's very difficult to
10  do. And it requires so much force it becomes a
11  little bit of a hazard for anybody performing
12  the test.
13      And, so, that said, I've never seen a
14  tire with this much damage, particularly in the
15  tread area. And my -- it can only be
16  supposition, is that the vehicle hit a part of a
17  concrete culvert, which was probably raised,
18  particularly over the grass median, such that
19  all of the weight of the vehicle fell onto that
20  area of the tire and it just destroyed it.
21      And let me just find that photograph.
22      MR. DEGARIS:    Is that the one?
23      THE WITNESS:    That's the one.

90

1  claims 83 or something.
2        So the only point I would make is that
3  the -- the inertia and centrifugal forces
4  involved between an accident at 65 miles an hour
5  and 83 miles an hour are very, very substantial.
6        I'm not saying either way, but all I'm
7  saying is at that area speed and one would --
8  could well expect to see the source of damages
9  that this tire suffered.
10 Q     Can you show me where you have that in
11 your report?
12 A     Well, I am -- I'm making that make, if
13 you like, side bar comment based upon the fact
14 that I have said throughout the massive damage
15 to the tire itself.
16       And the massive damage is a -- is a
17 matter of physics of that tire on that vehicle
18 hitting something really hard.
19       And one -- and it's not my job to -- I
20 haven't been retained to make those
21 calculations.  I believe that's an accident
22 reconstructionist's.
23 Q     Right.

91

1        And your area of expertise is tire
2  failures?
3  A     Yes.
4  Q     So then your statements in this regard
5  are speculation and not part of your area of
6  expertise?
7  A     No.
8        MR. DEGARIS:  Object to the form.
9  That's not what he said.
10       THE WITNESS:  No, I'm not saying that.
11       I said earlier that in all of the
12 tires that I've looked at that have been
13 involved in accidents or the facts that I
14 actually know, I've never seen a tire suffer as
15 much damage as this one, never.
16 Q     (By Mr. Kells)  Can you show me that
17 in your report, please?
18 A     I think probably the reference to
19 massive damage would probably cover that,
20 wouldn't it, if I actually used that phrase.
21       MR. DEGARIS:  Number 5.
22       THE WITNESS:  Number 5, the massive
23 damage -- massive damage to the tire occurred

92

1  after loss of control.
2        So -- and I've -- I've said also,
3  testified also that this is the most destroyed
4  tire I've ever seen in an accident of this type
5  that didn't involve something like fire or
6  something else.
7  Q     (By Mr. Kells)  But you are not an
8  accident reconstructionist --
9  A     No, I'm not, but I'm just making --
10 Q     -- so your opinion is limited to the
11 tire failure and not the damage caused to the
12 tire?
13       You can testify as to the fact that it
14 was damaged, but you can't testify as to the
15 cause of that damage?
16 A     That's true.  But I can make the
17 statement that the tire -- I've never seen a
18 tire this massively damaged before.  I mean,
19 that's a statement I can make because I haven't
20 seen one like that.
21 Q     But that's not contained in number 5?
22       You say there was massive damage, but
23 not the most substantial massive damage I have

93

1  ever seen in any tire that I've evaluated?
2  A     No.  Because between the time I wrote
3  this and the time of the deposition I may have
4  well seen a tire that was even worse, but I
5  haven't.
6  Q     And you haven't, okay.  All right.
7        Just returning quickly to Ms. Moore's
8  deposition, which is number 6.
9  A     Uh-huh (affirmative response.)
10 Q     You testified earlier that there's no
11 evidence one way or the other that Ms. Moore had
12 maintained the vehicle or done maintenance on
13 the tire.
14       Is there any notation in your report
15 or in her deposition transcript that you
16 reviewed that -- that indicates that?
17 A     Well, no.  Again, I think this came
18 out earlier today in my testimony that there are
19 other aspects which aren't necessarily including
20 opinions, conclusions 1 though 8, but are
21 general background to the situation we're
22 looking.
23       And certainly nowhere in her report --

# EXHIBIT "G"













EXHIBIT "H"

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

CIVIL ACTION NO: CV-2:06-CV-879-WKW

MICHAEL P. ALLEN, et al.

    Plaintiff,

vs.

UNITED STATES OF AMERICA,

    Defendant.

CIVIL ACTION NO: CV-2:06-CV-880-WKW

WALLACE MONTGOMERY, et al.

    Plaintiff,

vs.

UNITED STATES OF AMERICA,

    Defendant.

DEPOSITION OF: RALPH CUNNINGHAM
10:00 A.M.
NOVEMBER 9, 2007

In accordance with Rule 5(d) of The Alabama
Rules of Civil Procedure, as Amended,
effective May 15, 1988, I, Cindy C. Jenkins,
am hereby delivering to Mr. J. Callen Sparrow
the original transcript of the oral testimony
taken on the 9th day of November, 2007, along

## STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Ralph Cunningham, a witness in the above-entitled cause may be taken before Cindy C. Jenkins, a Court Reporter and Notary Public for the State of Alabama, at 1804 Thornhill Pass Southeast, Conyers, Georgia, on the 9th day of November, 2007, commencing at 10:00 a.m., pursuant to the Federal Rules of Civil Procedure.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is not waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of court relating to the taking of the depositions.

## STIPULATIONS

(continued)

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition is waived.

## APPEARANCES

Appearing On Behalf Of The Plaintiff:
    HENINGER, GARRISON & DAVIS, LLC
    Mr. J. Callen Sparrow
    2224 First Avenue North
    Birmingham, Alabama 35203
    205-326-3336

    CORY, WATSON, CROWDER & DEGARIS, P.C.
    Mr. Douglas A. Dellaccio, Jr.
    2131 Magnolia Avenue
    Birmingham, Alabama 35205
    205-271-7120

Appearing On Behalf Of The Defendant:
    U.S. DEPARTMENT OF JUSTICE
    TORTS BRANCH
    CIVIL DIVISION
    Mr. Conor Kells
    1331 Pennsylvania Avenue Northwest
    Room 8006-N
    Washington, DC 20004
    202-616-4273

Also Present:
    Clifford A. Prosser
Reported By:
    Cindy C. Jenkins
    Freedom Court Reporting
    367 Valley Avenue
    Birmingham, Alabama 35209

# FREEDOM COURT REPORTING

Page 49

1    A.   No, sir.
2    Q.   When you do reconstruction of an
3  accident involving the potential failure of a
4  tire, would it be helpful to you to have
5  access to the other tires on that vehicle?
6    A.   Not necessarily.
7    Q.   All right.
8    A.   It depends -- you know, it depends
9  on the circumstances.
10   Q.   Would it have been helpful to you in
11 this case?
12   A.   No, sir, I don't believe so.
13   Q.   All right. So, the type or
14 condition of the other three tires, in your
15 opinion, would have had no effect one way or
16 the other on this accident if it occurred in
17 the way that you say it did?
18   A.   No, sir, that's not what I said.
19   Q.   All right. Tell me what you said
20 then. I misunderstood.
21   A.   What I said was as far as evaluating
22 the cause of the failure of this tire it would
23 not have benefitted me to have examined the

Page 50

1  other three tires on this vehicle.
2    Q.   I misunderstood. And I meant to
3  take it one step further.
4         With regard to your analysis of this
5  situation, if you will, being the -- whatever
6  happened to the tire, as well as the
7  subsequent loss of control and wreck, would
8  having the opportunity to see the condition
9  and type of other tires on the vehicle been of
10 some benefit to you?
11   A.   Yes, sir.
12   Q.   All right. In what way? But would
13 you, if you had had the opportunity, been able
14 to look at and determine if you had the
15 opportunity to see the other tire?
16   A.   Well, if I had been called upon to
17 examine this vehicle at some time much more
18 proximate to the date of the accident and been
19 able to examine the other tires on this
20 vehicle, I would like to have examined them
21 from the standpoint of the size, brand, type
22 et cetera, to have verified that we at least
23 had the same brand, size, type tire on both

Page 51

1  sides of the same axle and also, I would like
2  to have examined them for tread depth to
3  determine whether or not other tires may have
4  been involved as a contributing factor in the
5  loss of control .
6    Q.   Would -- I'm assuming -- for
7  purposes of these questions I'm assuming
8  that -- my questions assume that the tire you
9  saw was, in fact, on the left rear of
10 Mrs. Moore's car, and, in fact, deflated as a
11 result of the conditions and reasons that you
12 set forth in your report, okay?
13   A.   Okay.
14   Q.   All right. Assuming those things in
15 this question, is there anything about the
16 other three tires that may have influenced
17 the behavior of the car or the ability of the
18 driver to control the car following the
19 sequence of events as you have set them out in
20 your report?
21   A.   Well, I mean, yes and no. I mean,
22 if you're talking in terms of possibilities,
23 if all four of the tires on this vehicle were

Page 52

1  in the same general condition as this tire was
2  before it deflated and then was subsequently
3  mangled --
4    Q.   Yes, sir.
5    A.   -- then basically a tire with less
6  useful tread is more susceptible to loss of
7  control on a wet road.
8    Q.   Meaning the other tires?
9    A.   Right. So, if the other three tires
10 were in this same condition, that may have
11 been a contributing factor to the loss of
12 control.
13   Q.   All right. Is the flip side of that
14 true, if the tires had more tread depth, would
15 it increase control or ability to control
16 following the sequences of events set out in
17 your report?
18   A.   Well, only -- I mean, in generic
19 terms, a tire with new or essentially new
20 tread depth provides optimal traction on a
21 given wet road surface. And as the tread
22 wears, the more the tread wears, the more
23 likely that tire would be to slip in a

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  high-traction situation. And when you get to
2  the point where you have 2/32" of an inch or
3  less remaining depth of tread, it becomes a
4  serious safety hazard on any wet road.
5      Q.  Is there anything that you could
6  tell from the photographs of the vehicle about
7  the other tires that either help support or in
8  any fashion influence your opinion?
9      A.  No, sir.
10     Q.  All right. So, as a practical
11  matter we don't know and you didn't know what
12  the condition or what type of tires were on
13  the rest of this vehicle or were on the other
14  three positions of this vehicle?
15     A.  I don't recall that anyone has
16  provided me with that information, no, sir.
17     Q.  All right. And in any event, it
18  didn't play any part in your opinions?
19     A.  Not in the opinions I've expressed
20  in this report.
21     Q.  Yes, sir, that's what I mean.
22         And the opinions in your report are
23  the ones you're going to offer at trial if we

Page 54

1  try this case or when we try this case?
2      A.  Well, if I'm asked, yes, sir.
3      Q.  I understand.
4      A.  I offer opinions in response to
5  questions that I'm asked.
6      Q.  I understand that.
7          All right. Now, we've got the
8  letter, and we can read that. But based upon
9  the letter and the other phone conversation
10  that you had with Mr. Kells, it's my
11  understanding from your report that you were
12  asked to express your opinions regarding the
13  failure of the tire, whether or not it was
14  likely to have been anticipated, and the
15  likelihood that a driver would lose control as
16  a result of that deflation, and what steps
17  might have been taken to avoid loss of control
18  after deflation. Is that a correct recitation
19  of what you were asked to do when you first
20  got into this case?
21     A.  Yes, sir.
22     Q.  And you performed your inspection.
23  Your report sets out where the tire came from

Page 55

1  and when it was made as well as the remaining
2  tread groove depth. What were the tread
3  groove depths that you determined on this
4  tire?
5      A.  4/32" to 5/32" in an inch.
6      Q.  Is that the entire tread depth?
7      A.  Yes, sir. Not the useful, that's
8  the entire tread depth.
9      Q.  All right. Is that good tread, bad
10  tread, or somewhere in between as far as
11  you're concerned?
12     A.  Well, as I previously stated, a
13  tread depth of 2/32" of an inch is considered
14  unsafe on roads. So, basically this tire had
15  2/32" of an inch of what you might call
16  useful depth left, which is almost, but not
17  completely worn out.
18     Q.  I'm sorry. I did not hear you say
19  that earlier. How deep are the treads on this
20  tire when it's brand new just to give me
21  some --
22     A.  On car tires new tread depths are
23  typically 11/32" of an inch. There may be

Page 56

1  some exceptions to that, but that's a typical
2  new tire tread depth.
3      Q.  Is it -- or do you know -- I guess
4  should be the question -- required under the
5  laws of Alabama that a tread depth be at least
6  a certain amount?
7      A.  I don't know.
8      Q.  All right. So, this had more than
9  what you're telling us is considered a
10  dangerous depth but not a lot more; is that
11  fair?
12     A.  That's correct.
13     Q.  All right. So, while --
14     A.  And, again, dangerous on a wet road.
15     Q.  I understand.
16     A.  A dry road doesn't matter. But on a
17  wet road, 2/32" in an inch or less is
18  hazardous.
19     Q.  Help me out. If I were looking at a
20  tire, not this one, not the one in this case,
21  just a tire that had 2/32" of tread depth or
22  less, would it be obvious -- is that a tire
23  that I'm looking at thinking it doesn't have

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 81

1  think I can answer that without looking at it.
2      Q.  (By Mr. Sparrow) Okay.
3      A.  This Mercury Mountaineer was not
4  traveling at 30 miles an hour around a
5  200-foot radius curve --
6      Q.  Right?
7      A.  -- wet or dry.
8      Q.  Right.
9      A.  It was being operated on an
10 interstate highway at a speed that was
11 probably at least twice that great.
12     Q.  Correct.
13     A.  And therefore, the specific
14 observations and conclusions that pertain to a
15 200-foot radius curve taken at 30 miles an
16 hour would not necessarily apply to the
17 situation involving this Mercury Mountaineer.
18     Q.  Correct. And I guess what I'm
19 asking is can you point me to any of Grogan's
20 tests or anybody else's that were performed
21 under conditions similar to those faced by
22 Mrs. Moore in this case?
23     A.  No, sir.

Page 82

1      Q.  All right.
2      A.  Nobody would perform a test under
3  those circumstances. That's why you have
4  accidents.
5      Q.  Are the conclusions drawn from these
6  tests performed by Mr. Grogan that were
7  performed on the curve of whatever radius
8  similar enough to take the data learned from
9  them and apply it to the situation in this
10 case?
11     A.  Only in the general sense that a
12 sudden tire deflation can cause a loss of
13 control, but it does not necessarily always
14 result in a sudden loss of control.
15     Q.  In fact, it usually doesn't, does
16 it?
17     A.  It usually doesn't, that's correct.
18 It usually does not.
19     Q.  As I understand your opinion in this
20 case, you are testifying that, in your
21 opinion, more likely than not that is what
22 happened in this case?
23     A.  That what is what happened in this

Page 83

1  case?
2      Q.  That the deflation of the tire
3  caused the loss of control?
4      A.  Yeah, the deflation of the tire and
5  then some driver response to it, either a lane
6  change or stepping on the brake or something
7  is what caused the loss of control, that that
8  control would not have been lost if the tire
9  had retained its inflation air.
10     Q.  And we will get back to this, but
11 let me just -- farther down on page 4 in that
12 first paragraph -- not first full but the
13 first paragraph on page 4, you mention that
14 it's more likely to sustain a puncture or
15 other hazard-related failure in the second
16 half of the tire's life and that a wet tire is
17 more likely. Do either of those two
18 statements really have anything to do with
19 your opinions in this lawsuit?
20     A.  Not as to the opinion about this
21 tire failure although they are consistent with
22 the fact that this tire was in the second half
23 of its life and it was a wet road --

Page 84

1      Q.  Okay.
2      A.  -- with a wet tire. At least that's
3  what's been reported to me.
4          So, it would statistically be six
5  times more likely to sustain a puncture or
6  other hazard-related failure.
7      Q.  Are the -- strike that. Does the
8  deflation -- is the deflation more likely to
9  cause a loss of control if the vehicle is
10 being driven on a road around a bend or around
11 a curve, is the loss of control more likely?
12     A.  Well, yes and no. It depends on the
13 amount of the curve, the degree of curvature.
14 What typically causes -- what often happens
15 maybe is the best way to put it. What often
16 happens when there is a loss of control as a
17 result of a rear tire failure or deflation is
18 that the vehicle may continue normally as long
19 as its traveling on a straight path. Then
20 when something happens to change the dynamics
21 such as trying to negotiate a curve or trying
22 to make a lane change or stepping on the
23 brakes, then that one tire that's deflated

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 89

1  from the carcass of the tire; correct?
2      A.   That's correct.
3      Q.   And it doesn't even necessarily
4  involve or include a deflation of the tire;
5  correct?
6      A.   Not necessarily, that's true.
7      Q.   I understand your point was that
8  they were all rear tire failures, but a tread
9  separation is completely different from the
10  situation that was involved in the incident in
11  this case; is that a fair statement?
12     A.   No, sir, it's not a fair statement
13  to say that it's completely different because
14  when the tread separates even if the tire
15  retains its inflation air, there is a
16  substantial difference in the traction
17  capabilities of a tire whose tread has been
18  stripped from it and the other three tires.
19     Q.   Is it the same as a tire that is
20  completely flat?
21     A.   Well, I don't know because I don't
22  know that anybody's ever done any tests to
23  compare a tire with no tread as opposed to a

Page 90

1  deflated tire.  That would depend perhaps on
2  the involvement of the rim with the pavement,
3  the inflation pressure of the tire.  I just
4  don't know.  But it is obvious that a tire
5  from which the tread has been stripped would
6  have a lower -- significantly lower
7  coefficient of friction with the pavement than
8  one that's intact although it would probably
9  be higher than that of a deflated tire.
10     Q.   All right.  Then you go on to talk
11  about the rate of deflation, and, in fact, you
12  have provided us with the article that you
13  cite in your report, which is called "The Rate
14  of Deflation of Car Tires," in which, not
15  surprisingly, is written by Mr. Grogan?
16     A.   Right.
17         (Whereupon Plaintiff's Exhibit
18          No. 11 was marked for identification
19          and is attached to the original of
20          the transcript.)
21     Q.   Now, later in your report, in your
22  conclusions, in fact, you state that this
23  deflation -- I'm looking now at page 6, bottom

Page 91

1  of the page.  This deflation, quote, "probably
2  occurred in less than five seconds," close
3  quote.  Now, I want to want to make sure I
4  understand that it's your opinion and your
5  testimony that in Mrs. Moore's case, the tire
6  probably deflated in less than five seconds
7  after the ejection of whatever the object was
8  in the tire?
9      A.   That's correct.
10     Q.   All right.  And as I understand
11  your --
12     A.   Five seconds or less.
13     Q.   Right.  And as I understand your
14  report, you are basing that, at least in some
15  significant part, on the data or information
16  as set forth in what is now marked as
17  Plaintiff's Exhibit 11 being Grogan's article
18  on the rate of deflation in car tires?
19     A.   Yes, sir.
20     Q.   All right.  You mention in your
21  report that the tires used in that study were
22  6.70-15 tubeless tires; correct?  It's in your
23  report if you want to look at it.

Page 92

1      A.   Where in my report did I reference
2  that?
3      Q.   Page 5, first full paragraph.
4      A.   Oh, okay.  Yeah.  Yes, sir.
5      Q.   Is it your understanding that that
6  tire is similar in its properties to the tire
7  involved in this case?
8      A.   It would have been a smaller tire
9  but not substantially smaller.
10     Q.   Is it a bias tire?
11     A.   Yes, sir, that's a bias ply tire.
12     Q.   All right.  Is there a difference in
13  the deflation rate or the -- well, in your
14  opinion, a difference in the deflation rate of
15  a biased tire and a type of tire that is
16  involved in this wreck?
17     A.   Not for a given size hole, in my
18  opinion.
19     Q.   All right.  Since we've identified
20  the tire used in Grogan's study as a biased
21  tire, what can we call the one in our case?
22     A.   It was a radial ply tire.
23     Q.   A radial ply tire.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1  deflation. So, I guess that's somebody else's
2  decision about what was reasonable. And I
3  don't know what training Mrs. Moore had
4  regarding driving.
5  Q.   (By Mr. Sparrow) Is everybody who
6  has a back left tire deflation on a wet
7  highway going to lose control of their car if
8  they haven't had specific driving training?
9  A.   No, sir.
10  Q.   Is everybody -- strike that.
11      Is your statement that the object
12  caused, quote, "inconsequential loss of
13  pressure," closed quote, speculation?
14  A.   Where? Which statement?
15  Q.   It's in your conclusion. It's on
16  page 6.
17  A.   I said, "The object could have been
18  and probably was carried for many miles with
19  inconsequential loss of pressure while the
20  object remained in the tire."
21  Q.   Right.
22  A.   Yes, sir.
23  Q.   Right. Is the inconsequential loss

Page 106

1  of pressure just speculation on your part?
2  A.   No. It was basically my knowledge
3  of what happens with tubeless tires that are
4  punctured by objects such as this.
5  Q.   And the fact that you didn't see any
6  evidence of overdeflection?
7  A.   And the fact that I didn't see any
8  evidence of overdeflection, yes. And the fact
9  that it was retained for a while. I didn't
10  see any evidence of long-term rim ride and
11  things like that.
12  Q.   Right. But it could have been
13  deflated enough to notice without leaving the
14  evidence of overdeflection; is that true?
15  A.   Well, notice in what way?
16  Q.   Look at it and see it's low.
17  A.   Well, the thing about radial ply
18  tires is they look about the same when they're
19  low as they do when they're properly inflated.
20  They have to get really, really low like five
21  or ten PSI before they -- before the eyeball
22  can say, hey, that tire is low for most people
23  anyway.

Page 107

1  Q.   All right. In your -- on the
2  last -- on the very bottom of page 6 of your
3  report where you state that it probably -- the
4  deflation probably occurred in less than five
5  seconds, which we discussed earlier, that goes
6  back to Mr. Grogan's article using the biased
7  tires; correct?
8  A.   Yes, sir.
9  Q.   The deflation occurred -- and then
10  you say, "But it may not have been evident to
11  the driver of the Mountaineer until a lane
12  change was begun or some other lateral load
13  was placed on the vehicle." Did I read that
14  right?
15  A.   Yes, sir.
16  Q.   Are you telling us that the tire
17  could have been completely flat and she
18  wouldn't have known it?
19  A.   Yes, sir.
20  Q.   Really?
21  A.   Yes, sir. Obviously, it didn't
22  drive that way for a substantial distance, but
23  it could have been completely deflated.

Page 108

1  People have been known to drive on completely
2  deflated tires and not realize it until they
3  try to change lanes or take an exit or go
4  around a curve.
5  Q.   Now, her testimony in her deposition
6  is that she was in the left-hand lane when
7  this occurred; correct?
8  A.   That's my understanding, yes, sir.
9  Q.   All right. And you say several
10  times in your report that deflations do not
11  always cause loss of vehicle control; right?
12  A.   That's right.
13  Q.   And that's common sense, we know
14  that; right?
15  A.   That's correct. That's also
16  statistically --
17  Q.   Proven?
18  A.   -- demonstrated that most often
19  deflations do not cause loss of control. But
20  it's also demonstrated that they can.
21  Q.   Can?
22  A.   Yes, sir.
23  Q.   And, Mr. Grogan, in fact, in his

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 109

1 book, "The Investigator's Guide of Tyre
2 Failures" says the same thing, doesn't he?
3    A.    I would imagine so, yes, sir.
4    Q.    By the way, since you've brought it
5 and since I have a copy, is "The
6 Investigator's Guide to Tyre Failure," do you
7 consider that to be a reliable source
8 regarding the issues discussed in the book
9 about tire failures?
10    A.    The best way that I can answer that
11 without reading every sentence in the book
12 right now --
13    Q.    Right.
14    A.    -- is to say that I met Mr. Grogan
15 when he taught the course, and I was very
16 impressed with his knowledge, and I don't
17 right now recall seeing anything that he's
18 written that I would disagree with.
19    Q.    All right. Would you say that this
20 book is authoritative and reliable? I mean,
21 you use it a lot?
22    A.    Yes, sir.
23    Q.    So, I assume you think it's

Page 110

1 reliable?
2    A.    I have found it useful.
3    Q.    And reliable?
4    A.    So far, I have not found anything in
5 it that I would consider unreliable. I'll put
6 it that way.
7    Q.    All right. Well, on page 219 of the
8 book, last paragraph, he's talking about
9 punctures and being driven on a straight
10 highway or a curved highway. The paragraph
11 states this, quote, "On the straight" -- and
12 my understanding is that means on a straight
13 highway. Is that your understanding?
14    A.    Yes, sir.
15    Q.    "However, especially if the speed
16 the high, 50 miles per hour or more, punctures
17 do not cause loss of control." Do you agree
18 with that statement?
19    A.    As a general rule, yes. Not that
20 this would apply to absolutely 100 percent of
21 every puncture that ever occurred. And I
22 think if -- again, if you'll take -- if you
23 can take one sentence out of context, it can

Page 111

1 be misleading because I'm sure if you read
2 elsewhere in his materials, you'll find where
3 punctures have caused loss of control.
4    Q.    Clearly they have?
5    A.    Yes, sir.
6    Q.    But this is at least the second
7 source of Mr. Grogans that we now have in
8 evidence in your deposition that has stated
9 that they didn't cause loss of control when
10 the car was traveling in a straightward
11 manner. Remember, we said that earlier where
12 the results of that test were unremarkable?
13    A.    Well, and I believe that's what I've
14 said also that generally a deflated tire will
15 not cause loss of control while traveling in a
16 straight line unless and until some dynamic
17 change occurs either from a steering input or
18 from a braking input.
19    Q.    Do you understand that this portion
20 of the interstate was dead straight?
21    A.    I believe that's what's shown on the
22 police report, and, frankly, most interstates
23 do not have --

Page 112

1    Q.    Sharp turns.
2    A.    -- sharp curves and do not have
3 curves of the type radii. You know, they're a
4 lot of straight roads and gentle curves on
5 interstates, gentle hills, up gentle hills,
6 down for the most part.
7    Q.    So, she has -- she, Mrs. Moore, has
8 testified that she's in the left-hand lane.
9 She did not testify that she was changing
10 lanes. She was in the left-hand lane
11 traveling on a straight highway above 50 miles
12 an hour. Do you agree with Mr. Grogan that in
13 that situation a tire puncture does not cause
14 loss of control?
15    A.    I agree that statistically a loss of
16 control as a result of a tire deflation while
17 traveling on the straight road is extremely
18 unlikely, but that once that vehicle is
19 subjected to some dynamic change, a loss of
20 control may occur.
21    Q.    But that change is driver input?
22    A.    Usually is driver input, yes, sir.
23    Q.    And you have no opinion in this

28  (Pages 109 to 112)

# EXHIBIT "I"

# THE INVESTIGATOR'S GUIDES TO TIRE FAILURES

### R.J. GROGAN



 **Institute of Police Technology and Management**

THE INVESTIGATOR'S GUIDES TO TIRE FAILURES

R.J. GROGAN

# CHAPTER 22

# TIRE AND VEHICLE INTERACTION

In accident investigation it is not possible to separate the effect of tire and vehicle completely because they interact with each other. Certain types of tires are not recommended for some sensitive vehicles and a check should be made to ensure that any departure from the standard equipment has not produced detrimental handling. For this reason, the investigator should be alert for characteristic types of damage or wear produced by certain vehicles. While most tire failures come from within the tire itself, there can be an effect from the wheel, vehicle suspension, steering, braking, wheel bearing, alignment, etc.

The investigator will often be asked to comment upon the effect of tire pressures, combinations of tires, tire damage or tire wear on the handling of specific vehicles. Naturally this is a huge subject which requires extensive vehicle knowledge but a few general principles are worthy of consideration.

**Wear and Inflation Pressure**

Everyone "knows" that underinflation causes heavier shoulder wear and overinflation causes more rapid crown wear. This is another of those myths which abound in the tire business. Like all myths, it has some basis in fact. In the old days, when all tires were bias ply, tires were sensitive to inflation pressure and did display that characteristic wear. Nowadays radial ply tires with their braced treads exhibit much less movement against the road and the flatter profile of modern tires reduces wear still further. This means that uneven wear due to incorrect inflation pressure is **much** less and in practice has been overtaken by the characteristic wear which arises from wheel position, the shoulders tending to wear away before the crown in front tires, while in rear tires the converse is true, the center wearing quicker than the shoulders. Of course, extreme pressure variations still have some

213 (22)

**Brakes** — Distortion in the braking system results in a preferred stopping position of the wheel so that wear on the tire tread becomes concentrated at one or two points (see Fig. 9-4). The resulting vibration is caused by a combination of heavy local wear and brake grab and is very similar to the effect experienced with an out-of-balance tire and wheel unit.

**Shock Absorbers** — Worn shock absorbers may exaggerate the natural tendency of the tire and wheel unit to bounce. At certain speeds the suspension system, which itself has a natural vibration frequency, may cause increased tire oscillation (bounce) in the absence of the restraining influence of shock absorbers in good condition. Again, the effect is patchy irregular wear on the tire tread but the abrasion pattern shows no clear direction of movement.

Little more than general guidance can be given here on the complex problem of tire and vehicle suspension interaction. Suffice it to say that any local irregularity in tread wear which shows evidence of having taken time to appear should give rise to at least some suspicion of tire/vehicle interaction, and the driver's or onlooker's statements should be studied for possible confirmation.

**Punctures** — One of the most dramatic examples of tire and vehicle interaction is provided by the behavior of an automobile or truck with a flat tire.

In the vast majority of cases, a front tire deflation results in a loss of control towards the side with the deflation. But a rear tire deflation (and this kind is much more common, remember!) results in violent oversteer and a loss of control away from the side with the puncture.

On the straight, however, especially if the speed is high, 50 mph or more, punctures do not cause loss of control. A combination of centrifugal force (which is greater, obviously, on a new tire) and aerodynamic lift on the vehicle is sufficient to hold the tire in position and to support a significant proportion of the load.

EXHIBIT "J"

# FREEDOM COURT REPORTING

| Page 1 | Page 3 |
|---|---|
| 1    IN THE UNITED STATES DISTRICT COURT<br>2    FOR THE MIDDLE DISTRICT OF ALABAMA<br>3       NORTHERN DIVISION<br>4   CASE NUMBER: CV-2:06-cv-879-WKW<br>5   MICHAEL P. ALLEN, et al.,<br>6       Plaintiffs,<br>7       vs.<br>8   UNITED STATES OF AMERICA,<br>9       Defendant.<br>10   * * * * * * * * * * * * * * * *<br>11   CASE NUMBER: CV-2:06-cv-880-WKW<br>12   WALLACE MONTGOMERY, et al.,<br>13       Plaintiffs,<br>14       vs.<br>15   UNITED STATES OF AMERICA,<br>16       Defendant.<br>17<br>18<br>19<br>20<br>21<br>22     DEPOSITION OF BERTHA MOORE<br>23        August 7, 2007 | 1   deposition is offered in evidence, or prior<br>2   thereto.<br>3      IT IS FURTHER STIPULATED AND<br>4   AGREED that the notice of filing of the<br>5   deposition by the Commissioner is waived.<br>6<br>7     * * * * * * * * * * * * *<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23 |

| Page 2 | Page 4 |
|---|---|
| 1      S T I P U L A T I O N<br>2     IT IS STIPULATED AND AGREED by and<br>3   between the parties through their respective<br>4   counsel, that the deposition of Bertha Moore<br>5   may be taken before Angela Smith, RPR, CRR,<br>6   at the offices of the U.S. Attorneys of<br>7   Alabama, at 131 Clayton St., Montgomery,<br>8   Alabama 36104, on the 7th day of August,<br>9   2007.<br>10     IT IS FURTHER STIPULATED AND<br>11   AGREED that the signature to and the reading<br>12   of the deposition by the witness is waived,<br>13   the deposition to have the same force and<br>14   effect as if full compliance had been had<br>15   with all laws and rules of Court relating to<br>16   the taking of depositions.<br>17     IT IS FURTHER STIPULATED AND<br>18   AGREED that it shall not be necessary for<br>19   any objections to be made by counsel to any<br>20   questions except as to form or leading<br>21   questions, and that counsel for the parties<br>22   may make objections and assign grounds at<br>23   the time of the trial, or at the time said | 1     * * * * * * * * * * * * *<br>2      I N D E X<br>3     EXAMINATION<br>4       PAGE<br>5   By Mr. Sparrow ...................... 8<br>6   By Mr. Kells ....................... 54<br>7   PLAINTIFF'S EXHIBITS<br>8       PAGE<br>9   Exhibit 1 - 6 - photos ............ 44<br>10   * * * * * * * * * * * * *<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23 |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  that tire had blown out?
2       A.   They told me that --
3            MR. KELLS: I'm just going to
4  object to the extent that it's
5  attorney-client privilege.
6            MR. SPARROW: I understand
7  that. You can certainly claim that
8  privilege. It's your privilege to claim.
9  So if you want to talk to me about it,
10  you're certainly welcome to. If you choose
11  not to, I guess at this point, at least, you
12  can also choose not to.
13       A.   It's up to me?
14            MR. DOYLE: It's your
15  privilege.
16       Q.   I'll just tell you what we're
17  talking about. You have a privilege between
18  you and a lawyer that represents you. I
19  don't know if that's true of --
20       A.   I'll tell what you they told
21  me. I don't mind.
22       Q.   Let me tell you this first,
23  because I don't want it to be an issue down

Page 38

1  the road. It is your privilege, so anything
2  that you and your attorney talk about, if
3  you don't want to talk about it, then you
4  don't have to, at least unless until I get a
5  Judge to make you.
6            If you don't have a problem
7  with it, then you can waive that privilege
8  and we can go forward.
9       A.   I don't have a problem with
10  it.
11       Q.   All right. Go ahead.
12       A.   They told me that the tire was
13  so torn up that they could not determine.
14       Q.   Do you know -- and I may have
15  asked you this a minute ago, but I want to
16  make sure I have it.
17            Do you know if the people from
18  the Beasley firm at any time had more than
19  the one tire that I'm assuming is the one
20  that I have now?
21       A.   I do not know.
22       Q.   What happened to your car, do
23  you know?

Page 39

1       A.   I don't. We never did get it
2  from the wrecker place. I don't know
3  whether the insurance company got it or
4  what. I don't know.
5       Q.   Did you tell your insurance
6  company after this wreck that -- this
7  business about the tire and the blowout?
8       A.   Yes.
9       Q.   All right. When had you
10  purchased the tire -- Strike that.
11            Were all four of the tires
12  that were on your car at the time of this
13  wreck purchased at the same time?
14       A.   Well, we purchased the car in
15  May of 2003 and the tires were on the car.
16       Q.   All right. So you'd only had
17  the car three or four months?
18       A.   Yes.
19       Q.   And this was the set of tires
20  that came on it when you bought it?
21       A.   Yes.
22       Q.   In that three or four months,
23  had you had an occasion to have to perform

Page 40

1  any kind of maintenance on the tire?
2       A.   No.
3       Q.   For instance, had you had a
4  flat and had to have it plugged or patched
5  or anything of that nature?
6       A.   No.
7       Q.   Had you had any trouble with
8  this car between the time you bought it --
9  did you say May?
10       A.   Yes.
11       Q.   -- and when this wreck
12  happened in August?
13       A.   Not that I can recall.
14       Q.   Did you or can you tell me or
15  lend any information to where Trooper Fisher
16  got the estimated speed of eighty-three
17  miles per hour?
18       A.   I have no idea.
19       Q.   When you looked at the wreck
20  report, did you notice that it had your
21  speed as eighty-three miles per hour?
22       A.   I did not.
23       Q.   And I asked this, I think, in

10 (Pages 37 to 40)

# EXHIBIT "K"

## AFFIDAVIT

STATE OF ALABAMA          )

CREHSHAW COUNTY          )

1.      My name is Robert Fisher.  I am over the age of 19 and a resident of the State of Alabama.

2.      On August 29, 2003, I was an Alabama State Trooper working in the vicinity of Butler County.

3.      I received a call to an accident that occurred on I-65 near the Butler County line and County Road 1220.

4.      I came upon the scene of a multi-car accident and began my investigation.

5.      In the course of my investigation, I was informed by a female witness that the 1997 Mercury Mountaineer driven by Bertha Moore was traveling at approximately 83 MPH at the time of this accident.  The witness left before I was able to get her statement and contact information.

Robert Fisher

Sworn and subscribed to before me on this

the ____ day of _____, 2008.

Notary Public

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Sept 20, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

My Commission Expires: _____