THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL ALLEN, et al.       )
                                      )
                Plaintiffs,   )
V.                         )    Case No. 2:06-cv-879-WKW
                                      )
UNITED STATES OF AMERICA    )
                                      )
               Defendant.   )

---

WALLACE MONTGOMERY, et al.   )
                                      )
                Plaintiffs,   )
                                      )    Case No. 2:06-cv-880-WKW
V.                         )
                                      )
UNITED STATES OF AMERICA,   )
                                      )
               Defendant.   )

**DEFENDANT UNITED STATES' BRIEF IN REPLY
TO THE PLAINTIFFS' JOINT BRIEF IN OPPOSITION
TO THE APPLICATION OF THE SUDDEN EMERGENCY DOCTRINE**

Comes now the Defendant, United States of America, in reply to the plaintiffs' joint brief

in opposition to the application of the sudden emergency doctrine ("Plaintiffs' Brief"), filed on

February 4, 2008.

### A.    Mrs. Bertha Moore's speed

The plaintiffs contend that Mrs. Moore's speed was excessive, negligent, and a

contributing factor to the sudden emergency that she was confronted with on August 29, 2003,

when her tire suddenly deflated.  Plaintiffs' Brief at 3-6.  For these allegations they rely on the

testimony of Peter Flanner regarding the substantial damage caused to the tire during the wreck

and the accident report generated by Trooper Robert Fisher estimating the speed of Mrs. Moore's vehicle at 83 miles per hour. Id. at 3-4. Mr. Flanner's expert testimony, however, relates solely to the failure of the tire in question, not to accident reconstruction. Exhibit A, Deposition of Peter Flanner, Nov. 14, 2007, at 42:6-14. Mr. Flanner cannot opine as to the actual speed of Mrs. Moore's vehicle on the day in question, and his testimony regarding the cause of the accident is speculative and outside the scope of his expertise. Id. at 89:10-90:23. It is undisputed that the left rear tire of Mrs. Moore's vehicle was badly damaged in the wreck. Given the highway speeds of all the vehicles involved, this undisputed fact is not surprising.

Furthermore, the plaintiffs, for the first time, have produced an affidavit from Trooper Robert Fisher detailing how some unnamed female witness estimated Mrs. Moore's speed at the time of the accident. See Exhibit K to Plaintiff's Brief. Notwithstanding that the United States has never before been furnished a copy of Trooper Fisher's affidavit, it is now clear that the estimate of speed contained in Trooper Fisher's report is pure hearsay, based entirely on someone else's statement, and not the result of any independent investigation or scientific methodology. The estimate of 83 miles per hour is the statement of an unidentified witness to the accident, whose basis for determining that Mrs. Moore's vehicle was traveling 83 miles per hour is also unknown. Id. ¶ 5. Federal Rule of Evidence 803(8) predicates the admissibility of public reports on trustworthiness, which in this case is wholly lacking. Fed. R. Evid. 803(8)(C).[1] Perhaps it is

---

[1] In fact, witness statements in police reports offered to prove the truth of the matters asserted are generally inadmissible. See Jacobs v. City of Port Neches, 7 F. Supp. 2d 829, 835 (E.D. Tex. 1998) (collecting cases). Trooper Fisher's affidavit makes clear that the 83 miles per hour estimate is just that: a witness statement. See Exhibit K to Plaintiffs' Brief. More troubling still is that this unknown witness's vantage point, direction, relation to the parties, basis for the estimate, and other relevant information are unknown. Thus, there is no basis for concluding that the witness's recollection or estimate is a trustworthy account of Mrs. Moore's speed.

-2-

for this reason that Trooper Fisher never issued a traffic citation to Mrs. Moore for speeding or any other violation of the rules of the road.

Lastly, and perhaps most important, not a single expert has opined that Mrs. Moore's speed had anything to do with the sudden, rapid deflation of her tire, which was the direct and proximate cause of the accident. Plaintiffs attempt to evade this point by arguing that even if Mrs. Moore was not exceeding the posted speed limit, her speed may somehow still be unreasonable based on the road conditions and the weather. Plaintiffs' Brief at 5. What is ironic is that the plaintiffs themselves dispute that the weather was rainy or that the road was wet at the time of the accident. Exhibit B, Deposition of Wallace Montgomery, Dec. 11, 2007, at 13:8-14:16; Exhibit C, Deposition of Phyllis Montgomery, Dec. 11, 2007, at 11:4-14:18; Exhibit D, Deposition of Michael Allen, Dec. 28, 2007, at 13:15-15:4; Exhibit E, Deposition of Lou Ellen Allen, Dec. 28, 2007, at 8:20-9:8, 13:4-14:21; Exhibit F, Deposition of Lori Allen, Dec. 28, 2007, at 13:11-17.

**B.    Mrs. Moore's inspection and maintenance of the vehicle**

The plaintiffs place much emphasis on the fact that Mrs. Moore's tire tread was 80% worn at the time of the accident. Plaintiffs' Brief at 6. The United States has briefed this point, see Defendant's Brief in Support of Application of the Sudden Emergency Doctrine at 4-6, 5 n.1, and wishes only to point out that while both tire experts in this case agree that the screw or bolt had been lodged in the tire before the accident, the penetrating object was in a location in which no person would have known about it through ordinary inspection. Exhibit G Report of Ralph Cunningham at 6 ¶ 1; Exhibit A Deposition of Peter Flanner at 82:13-16 (confirming that the serial side of the tire, where the object penetrated, faced the inside of the wheel well). Mrs.

-3-

Moore had no way of knowing that her tire had been breached by a foreign object and, therefore, could not have contributed to the sudden emergency in this case by failing to maintain or inspect her tires.

### C.    A sudden, rapid deflation at highway speed is the very definition of a sudden emergency

The plaintiffs have suggested that the sudden and rapid deflation of a tire at highway speeds is neither a sudden event nor an emergency. Plaintiffs' Brief at 7-8. The expert testimony in this case is that, from the moment the bolt or screw in Mrs. Moore's tire was ejected, total deflation of the tire occurred in less than five seconds. Exhibit H, Deposition of Ralph Cunningham at 91:1-12; Exhibit G, Report of Ralph Cunningham at 6 ¶ 2. Moreover, the deflation "may not have been evident to the driver of the Mountaineer until a lane change was begun or until some other lateral load was placed upon that vehicle." Exhibit G, Report of Ralph Cunningham at 6 ¶ 1. This is because the suspension and design of modern vehicles completely masks many of the effects of deflation. Id. at 4 ¶ 2. This correlates with Mrs. Moore's description of events: as she was changing lanes, she heard a popping noise, felt her car drop, and stepped on the brakes in response. Exhibit I, Deposition of Bertha Moore, Aug. 7, 2007, at 19:10-20:15, 48:2-49:1-8 She has no further recollection of events because she lost control of her vehicle immediately after realizing that her tire had blown out or deflated. Mrs. Moore stepped on her brake in response to a sudden emergency not of her making. For the plaintiffs to contend that the circumstances confronting Mrs. Moore—a tire deflation in under five seconds, a loud bang, a feeling of the rear of the car dropping—all while traveling at highway speed—were neither sudden nor an emergency defies the record and common sense.

-4-

**D.    The plaintiffs' spoliation of evidence claim is frivolous.**

The plaintiffs argue that the United States should be precluded from raising the sudden emergency doctrine because "some evidence" is not available for inspection or analysis. Plaintiffs' Brief at 8-10. This is a frivolous argument.

The defendant's expert, Ralph Cunningham, while he agreed that inspection of the other tires might hypothetically shed light on whether other tires contributed to the loss of control, expressly testified that the other tires would not have helped in evaluating the failure of the left rear tire, which is the only one relevant to this case. Deposition of Ralph Cunningham, Plaintiff's Exhibit H, at 49:13-52:12. Furthermore, Mr. Cunningham testified that, but for the loss of air to the left rear tire, no loss of control would have occurred. Id. at 83:2-9. Thus, the plaintiffs' assertion that there is not sufficient evidence to determine the cause of the loss of control is meritless.

Furthermore, the reason that the plaintiffs were unaware of the existence of the left rear tire until July 3, 2007, when the undersigned informed them that the United States had the tire in its possession, was because plaintiffs' counsel failed to properly investigate the case. Mrs. Moore had the tire evaluated shortly after the accident to determine if she had a cause of action for a tire defect. Exhibit I, Deposition of Bertha Moore at 34:23-37:2, 38:12-13. She consistently told others that a tire blowout caused the accident, and even informed the plaintiffs of this fact by telephone. Id. at 26:1-28:20, 33:17-23. The plaintiffs did not submit administrative claims until, at the earliest, the summer of 2004. Under the FTCA, the plaintiffs were free to file a lawsuit when, after six months had passed, no resolution or settlement had been made. 28 U.S.C. § 2675(a). The plaintiffs chose not to do so. By the time current counsel

for the United States became involved in the litigation, more than three years had passed.  At all times, plaintiffs' counsel had the opportunity to develop the case facts, including inspection of Mrs. Moore's vehicle and the four tires.  Their failure to do so should not now inure to their benefit.

The plaintiffs, furthermore, never requested production of the car or tires after the accident.  The United States volunteered that it had located the tire and offered it to the plaintiffs for their own inspection.  See Exhibit J, July 3, 2007, letters to plaintiffs' counsel.  The plaintiffs responded by requesting to examine the tire on July 27, 2007, and the United States willingly complied that same day.  See Exhibit K, July 27, 2007, letter to plaintiffs' counsel.  To suggest at this juncture that the United States is somehow responsible for failing to preserve evidence central to a case until three years after the accident is disingenuous.  While the plaintiffs state that they do not suggest any malicious or intentional conduct on the part of the United States or Mrs. Moore, see Plaintiff's Brief at 10, that is precisely the tone and tenor that the plaintiffs take by even raising this issue before the Court.  What the plaintiffs, in essence, are seeking to do is blame the United States for their investigative or discovery failings.  Had the plaintiffs done even a cursory investigation into the cause of this accident, they would have discovered, at a minimum, that Mrs. Moore's left rear tire played a crucial role in the cause of this accident.

The plaintiffs are not free to suggest alternative possible causes for Mrs. Moore's loss of vehicle control in a willy-nilly fashion.  They must present competent expert testimony as to the alleged cause.  Cf. D.A.C. by and through D.D. v. Thrasher, 655 So.2d 959, 961 (Ala. 1995) ("We have a well-defined rule that the burden is upon plaintiffs to show by an unbroken sequence of cause and effect, that the negligence alleged was the proximate cause of the

Case 2:06-cv-00879-WKW-WC    Document 50    Filed 02/07/2008    Page 7 of 8

intestate's injury and death.") (citation omitted). Their own expert, Clifford Prosser, suggests that Mrs. Moore's negligence was stepping on her brake when she became aware of her deflated tire. See Exhibit L, Report of Clifford Prosser at 1 ¶ 1, 2 ¶ 4. Not content with this causation theory, they now attempt to muddy the waters with alleged issues such as speed and maintenance. They should not be allowed to do so. Nor should they be allowed to claim prejudice to their case due to their failure to investigate and develop the case thoroughly.

For the reasons stated above and in the United States' initial brief, the sudden emergency doctrine applies to this case, and the United States is not liable for the plaintiffs' injuries. Moreover, the plaintiffs' spoliation of evidence claim is meritless and frivolous

Respectfully submitted this 7th day of February, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
Civil Division

PHYLLIS J. PYLES
Director, Torts Branch
Civil Division

GAIL K. JOHNSON
Senior Trial Counsel, Torts Branch
Civil Division

/s/ Conor Kells
CONOR KELLS
Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
Post Office Box 888
Benjamin Franklin Station
Washington, DC 20044
Tel: (202) 616-4400
Fax: (202) 616-5200
Attorneys for Defendant United States

-7-

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon counsel for

Plaintiffs by electronic filing, CM/ECF:

>Annesley H. DeGaris
>Attorney for the Allen Plaintiffs
>Cory, Watson, Crowder & DeGaris, P.C.
>2131 Magnolia Avenue, Suite 200
>Birmingham, Alabama 35205

>J. Callen Sparrow
>Attorney for the Montgomery Plaintiffs
>Heninger Garrison Davis, L.L.C.
>P.O. Box 11310 (35202)
>2224 1st Avenue North
>Birmingham, Alabama 35203

Dated this 7th day of February, 2008.

>/s/ Conor Kells
>Trial Attorney, Torts Branch
>Civil Division

Exhibit A

42

1   I mean, others may come up as we go through --
2   through my report.
3   Q      But those are the major references?
4   A      The major references.
5   Q      Thank you.
6          Mr. Flanner, do you hold yourself out
7   as an expert in accident reconstruction?
8   A      No, I do not.
9   Q      So I take it that you've expressed no
10  opinions regarding anything other than the cause
11  of the tire failure in this case?
12  A      Yes.  That was why I was retained.  I
13  was asked to address the issues regarding tire
14  failures, mode and effects.
15  Q      Mr. Flanner, do you -- do you only get
16  retained in cases where a tire failure results
17  and no injury to anybody?
18  A      Well, this -- the plaintiffs and the
19  defendants sides of any case, and I have been
20  retained more frequently -- well, more recently
21  by Buick North America being a major employer of
22  mine to -- to look at tire failures.  And you'll
23  see in my rate schedule I make no promises up

43

1   front.
2   Q      Let me -- yeah, let me -- I guess let
3   me rephrase it.
4   A      Yes, sir.
5   Q      Assuming that there is a tire
6   failure --
7   A      Yes, sir.
8   Q      -- and nobody ends of getting hurt as
9   a result of that tire failure, have you ever
10  been retained for a case in which no one was
11  hurt from a tire failure analysis?
12  A      I think a couple of occasions for
13  property damage, but where no injury was
14  involved.  I mean, typically those things get
15  settled fairly easily.  So there's often not a
16  need for a tire expert to get involved.
17  Q      But even in those cases you would say
18  that there was damages, there was property
19  damage of some sort?
20  A      Oh, yes, certainly, there has to be
21  some damage.
22  Q      So it would be fair to say that, you
23  know, your services are needed only in cases

44

1   where tire failure results in damage of some
2   sort?
3   A      Or where a client, a potential client
4   thinks that my expertise would be helpful to
5   them for whatever reason.  And if I think I can
6   help; then I will take on the case.
7          If I think there isn't a case to
8   answer; then I'll tell him that as well.  I have
9   to be independent.
10  Q      I -- do we have -- he has a copy of
11  his report here; right, Defendant's Exhibit 2?
12  A      Yes.
13  Q      Is that the same report that I was
14  previously provided?
15         If you could just take a look and make
16  sure that I have the same copy that you have.
17         MR. DEGARIS:  Without the Exhibits
18  obviously.
19  Q      (By Mr. Kells) Without the Exhibits,
20  yeah.  I'm just looking at the -- the report
21  itself.
22         It's four pages or something?
23  A      Yes, sir, they're the same.

45

1   Q      Terrific.
2          Now, I'm going to show you what's
3   marked as Defendant's Exhibit 5.  And I believe
4   it's a copy of Ralph Cunningham's report.
5          But if you could just take a look and
6   let me know if this was the report that was
7   provided.
8   A      Yeah.  This is the report that was
9   provided to me by Mr. Callen -- Callen Sparrow.
10  Q      Do you -- do you ordinarily get
11  provided with the opposing side's expert report?
12  A      Yes, that's why I'm employed I
13  believe.
14  Q      Do you -- do you use the report?
15         Do you review the report and -- and
16  provide comments on it?
17  A      Usually, yes.
18  Q      I didn't see any markings or anything
19  on this particular one --
20  A      No.
21  Q      -- did you have any further comments
22  on that written down other than the yellow
23  sheet --

82

1      THE WITNESS: -- degrees what -- what
2  time is that, you know.
3          So, in my view, it just sort of
4  indicates that somebody really wasn't trained
5  scientifically, if you like, to --
6          MR. KELLS:  I'm going to object again
7  as non-responsive.  There wasn't a question
8  pending.
9          THE WITNESS:  So, anyway, given the --
10  put down exactly the areas of damage and various
11  other indications that I see, I can indicate the
12  direction of rotation of the tire.
13          Knowing, for example, this was the
14  left rear and the serial side was fitted on the
15  inside facing in.  So, therefore, it was
16  rotating that direction (indicating.)
17          That can be helpful sometimes in
18  looking at -- particularly when you have a tire
19  of structural failure, not so much in this case
20  because all of the things that you see are
21  accident damage, all of this is accident damage
22  (indicating.)  That's on the serial side.
23          Similar on the outline, raised outline

83

1  white letter.
2  Q      (By Mr. Kells)  If I could just
3  interject for -- for one moment.
4          I've noticed that on both page 3A and
5  3B of Defendant's Exhibit 2 Subsection G, you
6  have a left rear in both instances?
7  A      Yes.
8  Q      So are you in agreement that this is
9  the left rear tire from that vehicle?
10  A      Yes, I am.
11          So this -- again, this is the raised
12  outline, white letter side.  And shows it again
13  some damages that we see -- that I saw and
14  notated in that fashion.
15          Sheet 3C would be wheel information
16  except no wheel was provided.  So that's
17  obviously blank.
18  Q      What is number 4?
19  A      Sheet 4 is tread depth information
20  using a tread depth gauge, a calibrated tread
21  depth gauge.  And I go around the tire in this
22  particular case in four positions and measure
23  the tread depth to the bottom of the grooves at

84

1  each of these positions so that I've got a good
2  idea at 90 degree intervals going around the
3  tire the relative wear regularity.
4          So I can look in two directions.  I
5  can look across the tire from one shoulder to
6  the other shoulder or I can look circumventally
7  around the tire to see if there's areas with
8  excessively heavy wear in certain areas.
9          The -- the tread wear was relatively
10  even as one would expect.
11          The shoulder area is a little bit more
12  worn, but they start off with less tread anyway.
13          So, you know, just saying I expect the
14  point relatively even wear, some choppy shoulder
15  wear on the serial side shoulder.
16          Tread hardness was rated 85 to 88
17  degrees, which is pretty hard.
18  Q      And these results are reflected in
19  your report?
20  A      Yea.  Where I talk about an average
21  remaining tread depth of 2/32's of useable.
22          I've actually got the full tread
23  depths as much as Cunningham has there, but from

85

1  those just subtract two.
2          Then sheet 5A is observations, the
3  major observations that I saw.
4          And then, of course --
5  Q      That looks like most of that is
6  reflected in your report.
7          Is there anything in there that is
8  not?
9  A      No, I don't believe so.  And, of
10  course, it's also shown in more detail, in
11  graphic detail in the various photographs that
12  were attached.
13  Q      Sure.
14  A      So no need to go through that.
15          And then one can refer back from those
16  photographs to those schematics if you ever have
17  any need.
18          So that -- well, the -- so you've got
19  the clock markings on the photograph and also on
20  the schematics and one could go back and look at
21  the severity of the damage.  You can see from my
22  annotations here, but you can also see more
23  directly on the photograph.

86

1  Q        Thank you.  And we will make copies of
2  all of that and return it to you.
3          Just following up on the -- he
4  methodology and the sources of that you used in
5  your report.
6          You referenced the deposition of Ms.
7  Bertha M. Moore dated August 7, 2007.
8  A     Yes.
9  Q        This was previously marked as
10  Defendant's Exhibit 6.
11         And this is a copy of Ms. Moore's
12  deposition?
13  A     Yes.
14  Q        I didn't see any markings in that
15  deposition which was in your file.
16         For what purpose did you use Ms.
17  Moore's deposition when creating your report?
18  A       Oh, to -- well, it's obviously general
19  background.  And then more specifically when she
20  talks about how long she had had the vehicle and
21  so on, and the trip she was making that day,
22  it's all good background information.
23         Really, other than that, I really

87

1  don't see an awful lot facts in here.  It's just
2  general background and that's really how I
3  looked at it.
4  Q        You also referenced the Alabama
5  Uniform Traffic Accident Report?
6  A      Yes.
7  Q        Which we may have previously marked.
8  I don't know if it's Exhibit 3 or --
9  A      It's in one of those.  Here you go.
10  Q      It's marked Defendant's Exhibit 4.
11         I see it's a part of your files, but I
12  don't see any markings on this either.
13  A      Yes.
14  Q      Would you mind telling me how you used
15  the Alabama Uniform Accident Report to -- in
16  your -- making your own conclusions?
17  A      Yes.  Because this is a more factual
18  document than the other things that we see.
19         And this gives Trooper Fisher, I
20  believe his name is, Trooper Fisher's best
21  judgment on the actual accident scene itself,
22  which also has a diagram on the back giving his
23  interpretation of the likely movement of

88

1  vehicles in this -- in this accident.
2          And, really, one only ever sees this
3  from the accident report itself.  Often
4  witnesses will say this happened and that
5  happened, but until somebody actually sits down
6  and lays it out, it's just supposition until
7  that fact.
8          And, of course, this is still his best
9  opinion on what probably happened in terms of
10  the relationships of the vehicles.
11         So it's good, factual information.
12  And that's the way I looked at it.
13  Q        Now, what was -- what, Trooper
14  Johnson?
15  A      Fisher.
16  Q        Trooper Fisher?
17  A      Yes.
18  Q        Do you know whether Trooper Fisher
19  witnessed the accident?
20  A      No, I don't believe he did.  I think
21  he came on it afterward.
22  Q        Do you know whether Trooper Fisher is
23  a certified accident reconstructionist?

89

1  A      That, I don't know.
2  Q        Do you know how he came up with this
3  diagram on the back of the accident report?
4  A      I believe that's his job.
5  Q        Do you know how he did it?
6  A      I haven't spoken to Trooper Fisher.
7  Q        Are you aware of any other diagrams of
8  the accident that were completed?
9  A      I'm not aware of any more.
10  Q        Is there anything, in particular, in
11  this report that you relied upon to come up with
12  your conclusions about the tire failure itself?
13  A      Not specifically.
14  Q        So then would it be fair to say that
15  nothing in this report was relied upon by you to
16  come up with your analysis of the tire failure?
17         MR. DEGARIS:  Object to the form.
18         THE WITNESS:  Well, it may be the one
19  area.  If I could just have that back.
20  Q      (By Mr. Kells)  Sure.
21  A      I think there's some dispute about the
22  speed involved in the accident.  I think Ms.
23  Moore claims she was doing 65.  This trooper

90

1  claims 83 or something.
2        So the only point I would make is that
3  the -- the inertia and centrifugal forces
4  involved between an accident at 65 miles an hour
5  and 83 miles an hour are very, very substantial.
6        I'm not saying either way, but all I'm
7  saying is at that area speed and one would --
8  could well expect to see the source of damages
9  that this tire suffered.
10 Q    Can you show me where you have that in
11 your report?
12 A    Well, I am -- I'm making that make, if
13 you like, side bar comment based upon the fact
14 that I have said throughout the massive damage
15 to the tire itself.
16       And the massive damage is a -- is a
17 matter of physics of that tire on that vehicle
18 hitting something really hard.
19       And one -- and it's not my job to -- I
20 haven't been retained to make those
21 calculations.  I believe that's an accident
22 reconstructionist's.
23 Q    Right.

91

1        And your area of expertise is tire
2  failures?
3  A    Yes.
4  Q    So then your statements in this regard
5  are speculation and not part of your area of
6  expertise?
7  A    No.
8        MR. DEGARIS:  Object to the form.
9  That's not what he said.
10       THE WITNESS:  No, I'm not saying that.
11       I said earlier that in all of the
12 tires that I've looked at that have been
13 involved in accidents or the facts that I
14 actually know, I've never seen a tire suffer as
15 much damage as this one, never.
16 Q    (By Mr. Kells)  Can you show me that
17 in your report, please?
18 A    I think probably the reference to
19 massive damage would probably cover that,
20 wouldn't it, if I actually used that phrase.
21       MR. DEGARIS:  Number 5.
22       THE WITNESS:  Number 5, the massive
23 damage -- massive damage to the tire occurred

92

1  after loss of control.
2        So -- and I've -- I've said also,
3  testified also that this is the most destroyed
4  tire I've ever seen in an accident of this type
5  that didn't involve something like fire or
6  something else.
7  Q    (By Mr. Kells)  But you are not an
8  accident reconstructionist --
9  A    No, I'm not, but I'm just making --
10 Q    -- so your opinion is limited to the
11 tire failure and not the damage caused to the
12 tire?
13       You can testify as to the fact that it
14 was damaged, but you can't testify as to the
15 cause of that damage?
16 A    That's true.  But I can make the
17 statement that the tire -- I've never seen a
18 tire this massively damaged before.  I mean,
19 that's a statement I can make because I haven't
20 seen one like that.
21 Q    But that's not contained in number 5?
22       You say there was massive damage, but
23 not the most substantial massive damage I have

93

1  ever seen in any tire that I've evaluated?
2  A    No.  Because between the time I wrote
3  this and the time of the deposition I may have
4  well seen a tire that was even worse, but I
5  haven't.
6  Q    And you haven't, okay.  All right.
7        Just returning quickly to Ms. Moore's
8  deposition, which is number 6.
9  A    Uh-huh (affirmative response.)
10 Q    You testified earlier that there's no
11 evidence one way or the other that Ms. Moore had
12 maintained the vehicle or done maintenance on
13 the tire.
14       Is there any notation in your report
15 or in her deposition transcript that you
16 reviewed that -- that indicates that?
17 A    Well, no.  Again, I think this came
18 out earlier today in my testimony that there are
19 other aspects which aren't necessarily including
20 opinions, conclusions 1 though 8, but are
21 general background to the situation we're
22 looking.
23       And certainly nowhere in her report --

Exhibit B

# FREEDOM COURT REPORTING

| Page 13 |
|---|
| 1    A.  I wasn't looking. |
| 2    Q.  When you drove past the scene of |
| 3  the accident the following day, did you |
| 4  notice anything different about the scene |
| 5  of the accident from the day of the |
| 6  accident? |
| 7    A.  I didn't notice anything. |
| 8    Q.  Okay.  When you left Norcross, |
| 9  Georgia, what was the weather like? |
| 10    A.  Warm, clear. |
| 11    Q.  Well, was it sunny? |
| 12    A.  Yeah. |
| 13    Q.  Partly cloudy? |
| 14    A.  I thought it was clear. |
| 15    Q.  When you crossed into Alabama, |
| 16  was the weather still clear? |
| 17    A.  Are you comparing to partly |
| 18  cloudy? |
| 19    Q.  Compared to when you left |
| 20  Norcross? |
| 21    A.  I don't remember the weather |
| 22  changing, but then I was spending most of |
| 23  my time trying to read.  So, I really was |

| Page 14 |
|---|
| 1  not being particularly observant. |
| 2    Q.  So, you don't recall whether or |
| 3  not it was raining that day? |
| 4    A.  It was not raining.  I know that. |
| 5  The windshield wipers were not on. |
| 6    Q.  Do you recall whether it had |
| 7  rained earlier that day? |
| 8    A.  Not that I'm aware of. |
| 9    Q.  At the scene of the accident, do |
| 10  you recall whether or not it was raining? |
| 11    A.  It was not. |
| 12    Q.  Do you recall whether or not the |
| 13  roadway was wet? |
| 14    A.  I don't know about the roadway. |
| 15  The grass is what I saw, and that was not |
| 16  wet. |
| 17    Q.  Do you have any recollection of |
| 18  the visibility from your vehicle prior to |
| 19  the accident? |
| 20    A.  Say it again. |
| 21    Q.  Do you have recollection -- was |
| 22  -- did you have clear visibility from your |
| 23  vehicle at the time of the accident?  Was |

| Page 15 |
|---|
| 1  it foggy? |
| 2    A.  No, it was not foggy.  It was a |
| 3  clear day, yeah.  So, the visibility should |
| 4  have been fine. |
| 5    Q.  Any impediments on your |
| 6  windshield? |
| 7    A.  No. |
| 8    Q.  Any rain on your windshield? |
| 9    A.  No. |
| 10    Q.  Any wetness on your windshield? |
| 11    A.  No. |
| 12    Q.  Do you recall whether there was |
| 13  any construction near the scene of the |
| 14  accident? |
| 15    A.  I don't recall any. |
| 16    Q.  Although you were reading at the |
| 17  time, do you have any recollection of |
| 18  whether the traffic was light or heavy that |
| 19  day? |
| 20    A.  My impression was that the |
| 21  traffic was not particularly heavy.  It was |
| 22  -- there was traffic present, but there was |
| 23  nothing stopping or slowing down.  It was |

| Page 16 |
|---|
| 1  moving smoothly. |
| 2    Q.  I take it you were in the |
| 3  passenger seat of your own vehicle? |
| 4    A.  Correct. |
| 5    Q.  And it was a Volvo? |
| 6    A.  Correct. |
| 7    Q.  Station wagon? |
| 8    A.  Correct. |
| 9    Q.  What color was it? |
| 10    A.  Green. |
| 11    Q.  Was your vehicle new? |
| 12    A.  No. |
| 13    Q.  How long had you had it? |
| 14    A.  It sounds stupid for a boy.  I |
| 15  don't remember what year that car was. |
| 16    Q.  Do you have any -- |
| 17    A.  We had had it for a little while |
| 18  because I believe it had -- I was wanting |
| 19  to say over 50,000 miles on it, but all of |
| 20  a sudden that sounds high. |
| 21    Q.  Let me see if I can help you jog |
| 22  your memory.  Do you recall -- well, let's |
| 23  start with this.  How many vehicles did you |

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit C

# FREEDOM COURT REPORTING

Page 9

1 wouldn't do it if I didn't want to fully
2 develop the facts of this case.
3     A.  (Witness nods head.)
4     Q.  With that said, I'd like to show
5 you what I'll mark as Defendant's Exhibit 1,
6 and this is a notice of deposition that I
7 sent to your attorney, Callen Sparrow's
8 office, have you seen this before?
9         (Whereupon Defendant's Exhibit
10       No. 1 was marked for
11       identification and is
12       attached to the original of the
13       transcript.)
14     A.  No, I have not seen this.
15     Q.  Then I imagine his office informed
16 you of the time and the place for this
17 deposition?
18     A.  Yes, sure.
19     Q.  Okay.  So, just to confirm, we are
20 here in Atlanta, Georgia at the U.S.
21 Attorney's Office for the Northern District
22 of Georgia at 75 Spring Street on the sixth
23 floor in conference room 514.

Page 10

1         As you know, we're here because
2 you were involved in a motor vehicle
3 accident some time ago.  I believe the date
4 was August 29th, 2003.  Do you recall that?
5     A.  That's correct.
6     Q.  Do you recall that day?
7     A.  Absolutely.
8     Q.  Would you give me a description of
9 where you were driving that day?
10     A.  Yes, sir.  We were headed
11 southbound on interstate I-65 going through
12 Alabama.  It was the Friday of Labor Day
13 weekend, and we were headed down to
14 Mississippi to our boat to spend the
15 weekend.
16     Q.  All right.  You were driving
17 southbound?
18     A.  Yes, sir.
19     Q.  How many lanes were there on I-65?
20     A.  Two lanes on our side, two lanes
21 on the other with a divided median, grass
22 median.
23     Q.  Was the roadway asphalt?  Was it

Page 11

1 concrete?
2     A.  The best of my knowledge, it's
3 asphalt.
4     Q.  Was there any artificial lighting
5 that day?
6     A.  No, it was beautiful sunny day.
7     Q.  Were there any signs posted in the
8 vicinity of where the accident occurred?
9     A.  Such as?
10     Q.  Were there any speed limit signs
11 that you remember?
12     A.  Not that I recall.  I mean, the
13 last sign I remember seeing was the one that
14 said you're entering Conecuh County.
15     Q.  You said that it was a beautiful
16 sunny day.  My recollection of the accident
17 report was that it was rainy and wet.  Do
18 you recall whether it was wet and rainy that
19 day as opposed to sunny?
20     A.  Not at the time of the accident.
21 It was dry and sunny.  We had to be on the
22 ground waiting for quite a while before we
23 were taken away to the hospital.  And during

Page 12

1 that period of time, a big thunderstorm came
2 up from the southwest and there was
3 lightening and a considerable amount of
4 rain.  I got very wet.
5     Q.  So, is it your testimony that at
6 the time of the accident the road surface
7 was not wet?
8     A.  No, sir, it was not.
9     Q.  So, then, if the accident report
10 stated that the roadway was wet, you would
11 say that the accident report was incorrect?
12     A.  Yes, I would say it was incorrect.
13     Q.  Do you remember how warm it was
14 that day?
15     A.  It was a pretty warm day.  I had
16 on a short sleeve top and capri pants and
17 the air-conditioner, of course, was on in
18 the car.  It was, you know, a basic August
19 afternoon.
20     Q.  If the roadway wasn't wet, was it
21 damp at all at the scene?
22     A.  No, sir.
23     Q.  How was visibility while you were

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1 driving that day?
2    A.  It was fine.  That's a relatively
3 -- you know, we drive that road a lot
4 because we go down to Mississippi, and
5 that's a pretty straight stretch of road
6 right in that area.
7    Q.  Let me ask you this:  Was the
8 roadway wet at any point during your drive
9 down to Mississippi?
10    A.  I don't recall it having been wet
11 previous to that.  You know, in the summer,
12 you get some showers.  But I know right
13 there wasn't wet because when the accident
14 occurred, we were, of course, on the road
15 and in the grass, and it wasn't wet.
16    Q.  And just so I understand this,
17 where do you currently reside?
18    A.  I live in Atlanta, Georgia.
19    Q.  Atlanta, Georgia?
20    A.  Actually, my mailing address is
21 Norcross, Georgia, but it's a suburb.
22    Q.  Norcross.  Okay.  Were you living
23 in the Norcross on August 29th, 2003?

Page 14

1    A.  Yes, sir.
2    Q.  And were you leaving from Norcross
3 to head to Mississippi?
4    A.  Yes.
5    Q.  So, it's your testimony that at no
6 point from Norcross, Georgia to the scene of
7 the accident that there was wet roadway at
8 all?
9    A.  Not that I recall, but, you know,
10 I wouldn't want to swear to that for sure.
11 I don't remember going through any stormy
12 weather.
13    Q.  Do you remember driving through
14 any wet roadway?
15    A.  No, I don't recall it.
16    Q.  Do you know whether the northbound
17 lanes of I-65 had any water on them?
18    A.  Not that I recall.
19    Q.  Were you ever on the northbound
20 lanes of I-65 that day?
21    A.  No.
22    Q.  Was there any construction near
23 the scene of the accident?

Page 15

1    A.  No.
2    Q.  Was there any other distractions
3 that you can recall at the scene of the
4 accident?
5    A.  No.
6    Q.  Do you remember what the volume of
7 traffic was like that day?
8    A.  As I said earlier, it was, you
9 know, more than a normal day.  That's a
10 pretty heavily traveled road, and there
11 might have been a little more than usual,
12 but it certainly -- it was running at the
13 speed limit.  There was no backup or
14 anything like that.
15    Q.  Being Labor Day weekend, a little
16 heavier than normal?
17    A.  Yeah, a little bit, but not bad.
18 Not too bad.
19    Q.  Do you recall what speed you were
20 traveling at the time of the accident?
21    A.  Probably -- I usually set the
22 cruise control on about 75, 78, something
23 like that.  A little bit over the speed

Page 16

1 limit.
2    Q.  You ran cruise control at the time
3 of the accident?
4    A.  Yes.  That would be my
5 recollection.  That's my usual practice
6 unless the traffic is particularly heavy and
7 then sometimes, of course, obviously, you
8 have to kick out, but I usually use the
9 cruise control.
10    Q.  When you use the cruise control,
11 do you use the manual buttons on the
12 steering wheel to control your speed in
13 traffic, or do you hit the brake and resume?
14    A.  I brake and resume, yeah.
15    Q.  Do you check your speed by looking
16 down at the dash?
17    A.  Oh, periodically, sure.
18    Q.  What type of vehicle were you
19 driving that day?
20    A.  I was driving a Volvo station
21 wagon.
22    Q.  Do you remember what model that
23 was?

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit D

# FREEDOM COURT REPORTING

| Page 13 |
|---|
| 1    that if you don't keep them trimmed. |
| 2        Q. Do they flower? |
| 3        A. I don't think so.  I don't know.  They |
| 4    turn green.  I like them because they are a |
| 5    good barrier. |
| 6        Q. How dense are they? |
| 7        A. Very dense. |
| 8        Q. And so these elaeagnuses were there |
| 9    the day of the accident but they are no |
| 10   longer there when you drive southbound past |
| 11   there? |
| 12       A. I don't think so.  I think they cut |
| 13   them down.  I don't -- I try to shut my eyes |
| 14   when I go past there.  I let my wife drive. |
| 15       Q. Do you recall what the weather was |
| 16   like when you left your home that day? |
| 17       A. Uh-huh. |
| 18       Q. What was the weather like? |
| 19       A. It was probably in the low 90's, |
| 20   beautiful, sun shining. |
| 21       Q. When you got on I-65 heading |
| 22   southbound, and this is before the accident, |
| 23   do you recall what the road conditions were |

| Page 14 |
|---|
| 1    like? |
| 2        A. The same. |
| 3        Q. Would you say that they were dry? |
| 4        A. Oh, yeah. |
| 5        Q. How bad was the sun glare? |
| 6        A. We didn't have a glare. |
| 7        Q. No glare.  Were there any clouds in |
| 8    the sky? |
| 9        A. Very few. |
| 10       Q. Was it humid? |
| 11       A. No. |
| 12        MR. DEGARIS:  We need to define humid; |
| 13   humid for Alabama and humid for Washington |
| 14   -- |
| 15        MR. KELLS:  Actually, Washington, D.C. |
| 16   is built on a swamp.  It's one of the most |
| 17   humid places I have ever lived in my life. |
| 18       Q. (BY MR. KELLS) At the time of the |
| 19   accident, do you recall what the weather was |
| 20   just prior to the accident? |
| 21       A. It was the same, beautiful skies, |
| 22   probably low 90's. |
| 23       Q. Do you recall any clouds in the sky? |

| Page 15 |
|---|
| 1        A. Not very many, a few. |
| 2        Q. How would you describe your visibility |
| 3    at the time of the accident? |
| 4        A. It was as good as you could get on an |
| 5    interstate. |
| 6        Q. What was the traffic like at the time |
| 7    of the accident? |
| 8        A. Like I say, moderate; not heavy but |
| 9    not light. |
| 10       Q. Do you recall how fast you were |
| 11   driving at the time of the accident? |
| 12       A. We were doing right at the speed |
| 13   limit; going the same speed as the other |
| 14   cars around us. |
| 15       Q. Do you recall whether anybody was |
| 16   passing you? |
| 17       A. Oh, yeah, a lot of people passed us. |
| 18       Q. Were you positioned in the right lane |
| 19   or the left lane? |
| 20       A. As far as I can recall, I'm almost |
| 21   positive I was in the right lane. |
| 22       Q. Do you recall whether there were any |
| 23   distractions on the roadway such as |

| Page 16 |
|---|
| 1    construction or detour signs or anything |
| 2    like that? |
| 3        A. No. |
| 4        Q. Other than maybe the elaeagnuses, |
| 5    although I doubt those were a distraction. |
| 6        What kind of vehicle were you driving |
| 7    on the date of the accident? |
| 8        A. A Lincoln. |
| 9        Q. What make and model was it, do you |
| 10   recall? |
| 11       A. A 2003 Towncar. |
| 12       Q. What color was it? |
| 13       A. I guess gold or mocha. |
| 14       Q. What was the purpose of your trip? |
| 15       A. We were having a family reunion; a |
| 16   family get-together. |
| 17       Q. A get-together.  Had your Lincoln |
| 18   Towncar had any recent damage or repair? |
| 19       A. It was two days old. |
| 20       Q. Two days old.  Okay.  And I imagine |
| 21   the brakes were functioning fine? |
| 22       A. Uh-huh. |
| 23       Q. Sir? |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit E

# FREEDOM COURT REPORTING

| Page 5 | Page 7 |
|---|---|

**Page 5**

1  I, Susan Masters Goldman, CSR, License
2  Number 83, acting as Notary Public, certify
3  that on this date as provided by the Federal
4  Rules of Civil Procedure, and the foregoing
5  stipulations of counsel, there came before
6  me at the law offices of Cory, Watson,
7  Crowder & DeGaris, 2131 Magnolia Avenue,
8  Birmingham, Alabama, on the 28th day of
9  December, 2007, at or about 11:30 a.m., LOU
10  ELLEN ALLEN, witness in the above cause, for
11  oral examination, whereupon, the following
12  proceedings were had:
13
14  LOU ELLEN ALLEN,
15  after having been first duly sworn,
16  testified as follows:
17
18  EXAMINATION BY MR. KELLS:
19  Q. Ms. Allen, as I previously introduced
20  myself, my name is Conor Kells. I'm with
21  the Department of Justice, and I represent
22  the United States in a litigation involving
23  an automobile accident that you were

**Page 6**

1  involved in on August 29th, 2003.
2  Before I get started, have you ever
3  been deposed before?
4  A. No.
5  Q. As I stated when I deposed Mr. Allen,
6  all your testimony here is under oath the
7  same as it would be if you were in front of
8  a judge giving the same testimony. I'll be
9  here asking you a series of questions about
10  the accident and about the injuries you
11  sustained. If you don't understand one of
12  my questions, please feel free to say so,
13  and I'll be happy to try to rephrase it. If
14  you do answer the question, I will assume
15  that you have understood what I have asked
16  you.
17  If at any time -- I know we will be
18  breaking for lunch in probably half an hour
19  or 40 minutes, but if at any other time you
20  need a break for whatever reason, please let
21  us know and we will do our best to
22  accommodate you.
23  If you could, allow me to try to

**Page 7**

1  finish my question for the court reporter's
2  sake and I'll try to afford you the same
3  opportunity to respond; however, you need to
4  -- if Mr. DeGaris feels the need to object,
5  you can pause. Most of the time that's
6  simply to preserve the record, and you will
7  be able to answer the question. There will
8  be some instances where that may or may not
9  be the case.
10  Other than that, do you have any
11  questions before we get started here?
12  A. No, I'm fine.
13  Q. Okay. Terrific. We are here at the
14  law offices of Cory, Watson, Crowder &
15  DeGaris in Birmingham, Alabama for the
16  deposition of Mrs. Ellen Allen.
17  Ms. Allen, can you please tell me your
18  current address?
19  A. 4900 Cedar Lane, Pell City.
20  Q. Was that the address that you lived in
21  on August 29th, 2003?
22  A. Yes.
23  Q. On August 29th, 2003, do you recall

**Page 8**

1  taking a trip to Gulf Shore, Alabama?
2  A. Yes.
3  Q. Is it Gulf Shore, Alabama?
4  A. Gulf Shores.
5  Q. Gulf Shores, Alabama?
6  A. Yes.
7  Q. Is that near Mobile?
8  A. Kind of.
9  Q. Do you recall what the purpose of that
10  trip was?
11  A. We were going down for a family
12  vacation. My husband's family was all down
13  there.
14  Q. Was that a Labor Day trip?
15  A. Yeah.
16  Q. Do you recall what time you left your
17  home that day?
18  A. We left the house about mid morning;
19  about nine o'clock in the morning.
20  Q. Do you recall what the weather
21  conditions were as of nine o'clock that
22  morning?
23  A. It was nice. It was pretty.

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

```
1    Q. By pretty --
2    A. Sun shining.
3    Q. -- sun shining, dry?
4    A. Uh-huh.
5    Q. Were there any clouds?
6    A. Yeah.
7    Q. A few?
8    A. Yeah.
9    Q. How long a drive is it to Gulf Shores?
10   A. It's about a five-hour drive.
11   Q. Five hours?
12   A. Yeah.
13   Q. Somewhere along your trip to Gulf
14   Shores, you were involved in an automobile
15   accident; is that correct?
16   A. Yes.
17   Q. Do you recall what road you were
18   driving on when the accident occurred?
19   A. It was I-65 South.
20   Q. And is that an interstate highway?
21   A. Yes.
22   Q. Do you recall how many lanes?
23   A. Two going down and two going up.
```

Page 10

```
1    Q. And what was your seat in the vehicle?
2    A. I was in the back seat behind the
3    passenger.
4    Q. Okay. So the back rear side of the
5    car?
6    A. Uh-huh.
7    MR. DEGARIS: Yes?
8    A. Yes. I'm sorry.
9    MR. DEGARIS: That's okay. I'll
10   remind you periodically.
11   MR. KELLS: Off the record.
12   (OFF-THE-RECORD.)
13   Q. (BY MR. KELLS) How would you describe
14   your view from the rear passenger seat?
15   A. I could see out of the front, and I
16   could see out my right side and the left
17   side.
18   Q. Was your view obstructed in any way?
19   A. Just from the front seat, the
20   headrests.
21   Q. Would you say that your eye level was
22   above the headrest, even with it?
23   A. No. Between the headrest, it was eye
```

Page 11

```
1    level, but the two headrests, I couldn't see
2    over them.
3    Q. Okay. Do you recall whether or not
4    there was a solid center line or a dotted
5    center line?
6    A. I couldn't tell.
7    Q. Do you recall whether there was any
8    artificial lighting present in the area?
9    A. No.
10   Q. Do you recall what the speed limit was
11   if you had any occasion to look?
12   A. I didn't have an occasion, no.
13   Q. Do you recall any traffic signs in the
14   immediate area of the accident?
15   A. No.
16   Q. Do you recall seeing any traffic
17   signs --
18   A. No.
19   Q. -- five or 10 minutes before the
20   accident occurred?
21   A. Well, there was an exit we talked
22   about getting off to go to the restroom, but
23   we decided not to.
```

Page 12

```
1    Q. Have you had occasion to drive I-65
2    southbound past the scene of that accident?
3    A. Yes.
4    Q. Do you recall whether there are any
5    changes to that area?
6    A. The bushes were cut down.
7    Q. So at the time of the accident, do you
8    recall there being bushes present?
9    A. Yes, because there's three bridges,
10   and there's always been brushes around them.
11   I can't say I actually looked at it, but I
12   remember bushes being there; big bushy
13   bushes.
14   Q. Where were the bushes?
15   A. They were at the beginning of the
16   bridge and at the end of the bridge --
17   Q. Okay.
18   A. -- on the inside.
19   Q. In the median?
20   A. Yes, in the median. And there were
21   woods on the right side.
22   Q. Woods on the right?
23   A. Uh-huh.
```

3 (Pages 9 to 12)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit F

# FREEDOM COURT REPORTING

Page 13

1    Q. Okay. You know the road pretty well?
2    A. A little bit.
3    Q. Have you had an opportunity to drive
4    past the scene of the accident since the day
5    it occurred?
6    A. Unfortunately, yes.
7    Q. Do you recall noticing any changes in
8    the scene of where the accident occurred?
9    A. They cut down those bushes that
10   blocked us from the other side of the road.
11   Q. What was the weather like in Leeds,
12   Alabama when you were picked up?
13   A. Clear, sunny.
14   Q. At any point from the time you left
15   Leeds to the time the accident occurred, did
16   the weather change?
17   A. Not to my knowledge.
18   Q. How would you describe the visibility
19   at the time the accident occurred?
20   A. I would say clear.
21   Q. Was it clear in all directions?
22   A. Yes.
23   Q. Do you recall whether there was any

Page 14

1    construction going on in the vicinity around
2    the accident?
3    A. I do not recall any construction.
4    Q. Were you paying attention to traffic
5    in the passenger's seat?
6    A. Not at that particular moment.
7    Q. So you wouldn't be aware whether there
8    was a car to your left or your right at that
9    point in time?
10   A. No, I don't recall any cars that I was
11   paying any attention to.
12   Q. Do you know whether the traffic was
13   light or heavy that day?
14   A. Medium.
15   Q. Medium?
16   A. Medium.
17   Q. The vehicle you were driving in, I
18   understand it was a new vehicle?
19   A. Brand-new; at least for us, it was.
20   Q. It was a Lincoln Towncar?
21   A. A Lincoln Towncar 2003.
22   Q. Do you recall what color it was?
23   A. A goldish silverish color. I don't

Page 15

1    know the exact color.
2    Q. This wasn't your vehicle?
3    A. No, it was not.
4    Q. What were you doing immediately before
5    the accident?
6    A. Looking out my right-hand window at
7    the sky.
8    Q. So did you have any prior notice of a
9    vehicle crossing the median and heading in
10   your direction?
11   A. None.
12   Q. Do you recall seeing the bushes prior
13   to the accident?
14   A. How it happened, we were driving. We
15   went over one -- went over some bridges. We
16   now know them to be one, two, and then the
17   third bridge. We saw the bushes to the
18   left, pretty fluffy bushes. I was looking
19   straight. On the left-hand side of -- I
20   didn't a car on the left-hand side or
21   anything like that that stood out. About
22   that time, mom said, oh -- she told me to
23   look at the sky. I looked up, boom.

Page 16

1    Q. So you didn't see the vehicle at all
2    until after impact?
3    A. I did not see the vehicle at all until
4    after impact.
5    Q. Do you recall hearing anything prior
6    to the impact?
7    A. I know now that my father said hold
8    on.
9    Q. You didn't hear him?
10   A. I'm sure I did. I don't remember. I
11   don't recall it right now.
12   Q. Did you have head phones on or were
13   you listening to music or anything?
14   A. No. I just don't really remember him
15   saying that. I remember him saying kind of
16   something, but I didn't -- I didn't remember
17   what the words were.
18   Q. Okay. Were you listening to music at
19   the time?
20   A. Yeah, there was a CD in the CD player
21   and it was playing Rain Drops Falling on
22   Your Head by some guy. It was my mom's CD.
23   MR. DEGARIS: Bobby Goldsboro.

4  (Pages 13 to 16)

Exhibit G

# Report 07.036

Cordovan Tire Failure
Mercury Mountaineer Collision Sequence

### INTRODUCTION

According to a furnished copy of the police report of the incident, a 1997 Mercury Mountaineer was northbound on I-65 in Alabama at mile 106.1 under daylight conditions and rain when the driver of the Mountaineer lost control, crossing the median and entering the southbound lanes, where a collision occurred between the Mountaineer and a southbound Lincoln Town Car. Subsequently, the Mountaineer collided with a southbound Volvo V70. The loss of control of the Mountaineer was reportedly caused by a sudden deflation of the left (driver's side) rear tire of that vehicle.

In a letter dated June 19, 2007, the undersigned was asked to examine the tire reportedly removed from the left rear of the Mountaineer to determine, if possible, the cause of the reported sudden deflation of that tire. The undersigned was also asked to express opinions regarding whether or not the failure of that tire was likely to have been anticipated, the likelihood that a driver would lose control as a result of a deflation, and what steps might have been taken to avoid loss of control after a deflation. The tire was received without rim in a secure cardboard box at the business address of the undersigned on June 20, 2007. The tire was examined in detail on June 29, 2007, at which time the attached photographs were taken. An optical disc present in a plastic sleeve attached to the inside rear cover of this report contains all photographs taken on that date, the text of this report in Word 2007 format, and other digitized files pertaining to this investigation and report.

## TIRE EXAMINATION AND FINDINGS

The tire is shown as received in Photographs A, B, and C.  Although there was no rim provided with this tire, examination of the carcass did not reveal any indications of tire damage due to a size mismatch between tire and rim or to other improper mounting methods or techniques.  Similarly, although no valve stem was available for examination and testing, there was no evidence in the carcass that this tire had been operated in an overdeflected condition (which is almost universally caused by underinflation in passenger cars and light trucks), indicating that the valve stem had performed its function properly and that the tire had been maintained at a normal and proper pressure for most of its service life.

Selected tire markings are shown in Photographs D through H.  This was a Cordovan brand, size P235/75R15, standard load, tubeless, radial-ply tire.  Tire construction included two polyester cord body ("sidewall") plies and two steel tread plies (belts).  The serial number indicated that this tire was manufactured in the 27th week of 2000 at the Goodyear Tire and Rubber Company plant at Fayetteville, North Carolina.  Remaining tread groove depths were all 4/32 to 5/32 inch, indicating uniform wear of the tread ribs; uniform wear indicates that this tire was operated on properly aligned axle(s) and that the inflation pressure was satisfactory for its service life.

There were numerous mechanical damages to this tire, which will not be enumerated in detail in this report.  Examination of those damages revealed that all were the result of externally applied, abnormal forces acting on the tire body, including both beads.  Examination of the carcass did reveal the location of a penetration by an object which was no longer present with the tire (Photographs K through O).  Examination of the inter-ply surfaces of this penetration revealed wear; i.e., the object which made this penetration was carried by the tire for a

significant number of miles.  The absence of the penetrating object with the carcass strongly

suggests that it was discharged from this tire before the loss of vehicle control and subsequent

extensive mechanical damages to this tire.  Most probably, this object was dislodged/discharged

from this tire as the Mountaineer was traveling on the interstate highway.

Tubeless tires have an inner liner which is designed to seal around puncturing objects,

allowing a punctured tire to be driven a substantial distance before significant deflation occurs,

as long as the penetrating object stays with the tire.  If the penetrating object is lost, deflation

occurs very quickly.  It should also be noted that water is a lubricant for rubber and the objects

which are likely to penetrate a tire, and the Mountaineer was traveling on a wet road in the rain.

### DISCUSSION

It is common knowledge that tire traction is reduced when the road is wet.  In Chapter 5

of *Mechanics of Pneumatic Tires,* Samuel K. Clark, Editor, U.S. Department of Transportation,

National Highway Traffic Safety Administration, Washington, D.C., the authors of that chapter

wrote, "When fluid contaminants such as water, . . . are present on the pavement surface, contact

area between tire and pavement is reduced due to the persistence of a fluid film . . ."  "The reduc-

tion in traction that occurs on a fluid contaminated pavement is indirect evidence of this loss in

dry contact area."  Among other statements in that chapter were observations that higher speeds

and lower tread groove depths reduced the coefficient of friction available to resist sideward

travel of a vehicle operated on a wet road.  Those observations are best summarized by Figure

5.105 on page 339 of that reference.

In an article written by Rex Grogan and apparently published in England in the Journal of

the Forensic Science Society, 12, 285, 1972, entitled "The Effect of Tyre Deflation on Vehicle

Behavior," several tests and reviews of testing by others were summarized.   One of the

interesting outcomes of these activities was the observation that a deflated rear tire could cause a sudden oversteer configuration of a motor vehicle, one which could not be overcome even by an experienced driver who knew he was being tested for a failed rear tire. Mr. Grogan also referenced an article by W. J. Dobie of Uniroyal, published in 1969 in *Materials Research and Standards,* who had reportedly shown that a tire is six times more likely to sustain a puncture or other hazard-related failure during the second half of its life than during the first half and that a wet tire is much more likely to sustain a puncture than a dry one.

For that same article, many data sources in England had been collected for analysis regarding tire failures resulting in loss of vehicle control. From a detailed study of 61 such cases, 40 of the cases were the result of rear tire failures, while 21 were the result of front tire failures.

In a publication prepared by Dunlop in 1980 to assist police officers in England who were investigating tire failures as contributing factors to losses of vehicle control, page 18 contained the following: "It is often stated that a discerning driver should feel the drag produced by a deflating or flat tire; he should also be able to detect that the vehicle is lower on one corner. This is not true. With modern vehicles the suspension and general design of the vehicle completely masks many of the effects of deflation."

It is also intuitive and has been confirmed by testing that tire deflations do not necessarily result in loss of vehicle control. However, it has been well documented that deflations can cause loss of control in virtually any over-the-road vehicle.

During the days of the Ford Explorer/Firestone tire issues, the undersigned personally investigated a number of Firestone tire failures on Ford Explorers. In every case in which the undersigned was asked to investigate (which request would not have been made if not for a

serious extent of injury and/or property damage), it was a rear tire failure which was involved in the loss of control. In not one of the cases which the undersigned was asked to investigate was a front tire failure a factor in loss of vehicle control.

Rex Grogan and C. S. Murray published an undated paper on "The Rate of Deflation of Car Tyres." For a 6.70-15 tubeless tire (a common size in the time frame of that study), a one-quarter-inch hole would cause an essentially complete deflation in less than one second. A one-eighth-inch hole would cause an essentially complete deflation in less than five seconds.

A final point regards the effect of tread depth on wet-road control. In his book, "The Investigator's Guide to Tire Failures," Institute of Police Technology and Management, University of North Florida, Jacksonville: 1999, Rex Grogan includes a chart showing the effect of tread depth on wet braking grip as a function of speed. With approximately one-tenth of an inch of water on the road, the skid number at 60 mph falls from 65 with full tread depth to 38 at half of the original tread depth. There is a direct correlation between braking skid number and a tire's ability to resist side-slipping.

In that book, Mr. Grogan also wrote, referring to the oversteering event which might occur with a rear tire failure, ". . . it became apparent that loss of (vehicle) control (with a deflated tire) was so sudden and so violent that there was virtually no chance of modifying the loss of control . . ." In the next paragraph, he wrote, "All this suggests that loss of control is a fundamental consequence of a flat tire, yet this cannot be true. We know that many drivers . . . do not experience any loss of control."

## CONCLUSIONS

Examination of the remains of this tire did not reveal any indications that it had been mounted on a rim of improper size or type, nor was there any other indication of improper or

defective mounting methods or procedures. The overall condition of the carcass and the even tread wear indicated that this tire had been properly used and had been properly inflated for virtually all of it service life.

The vehicle on which this tire had been mounted experienced an out-of-control, expressway-median crossing followed by separate collisions with two oncoming vehicles. The tire exhibited numerous and extensive mechanical damages which obviously resulted after the driver lost control of the Mountaineer. However, the presence of an obvious puncture with wear indicated that an apparently round object of significant diameter had penetrated this tire and had been carried for an indeterminate period of time. The penetrating object was in the serial-side tread shoulder, which side was mounted inboard on the Mountaineer, based on review of furnished photographs. As such, this object would have gone unnoticed unless someone was making a detailed inspection of the tire. Since this is a tubeless tire, the object could have been (and probably was) carried for many miles with inconsequential loss of pressure while the object remained in the tire. Although there has been some limited tested to demonstrate wear on bolts and nails as penetrating objects as a function of driven miles, one would have to have the object to evaluate its wear, and no such object was presented to the undersigned.

The examination of the tire and the review of the police report indicate that the most probable loss of control of the Mountaineer was a rapid deflation of its left rear tire when the object which had earlier penetrated the tire and was being carried by it was shed, possibly as a result of the lubricating qualities of the rainwater. This deflation probably occurred in less than five seconds, but it may not have been evident to the driver of the Mountaineer until a lane change was begun or until some other lateral load was placed upon that vehicle, at which time

the absence of lateral stability at the left rear wheel position would likely have placed this Mountaineer into an oversteer configuration from which the driver could not recover.

Tire deflations do not always cause loss of vehicle control, but a rear tire deflation is more likely to create loss of vehicle control than a front tire deflation, due to understeer/oversteer effects. Once a vehicle with a deflated rear tire enters an oversteer configuration, vehicle control is virtually never regained until the vehicle comes to a complete stop. In the case of the Mountaineer, collisions quickly followed loss of vehicle control.

The location of the penetrating object in the left rear tire was such that it is unlikely to have been observed by anyone not conducting a detailed tire examination. There would not necessarily have been any notice of the presence of that object to the driver, nor would there have been any notice of impending failure. Once the tire deflated, loss of control would not necessarily have been immediate, but the overall condition of the carcass demonstrates that it did not travel very far (feet to hundreds of yards) after deflation. Many tire failures do not result in loss of vehicle control; some do. Even experienced test drivers have been surprised by vehicle behavior with a deflated rear tire and have lost control during staged, deflated-tire testing.

The provided tire will be returned to you by common carrier. Please call if you have any questions.

Respectfully submitted,


Ralph Cunningham

Enclosures

# FREEDOM COURT REPORTING

<table>
<tr><td colspan="2">

Page 89

</td><td colspan="2">

Page 91

</td></tr>
</table>

**Page 89**

1  from the carcass of the tire; correct?
2     A.   That's correct.
3     Q.   And it doesn't even necessarily
4  involve or include a deflation of the tire;
5  correct?
6     A.   Not necessarily, that's true.
7     Q.   I understand your point was that
8  they were all rear tire failures, but a tread
9  separation is completely different from the
10  situation that was involved in the incident in
11  this case; is that a fair statement?
12     A.   No, sir, it's not a fair statement
13  to say that it's completely different because
14  when the tread separates even if the tire
15  retains its inflation air, there is a
16  substantial difference in the traction
17  capabilities of a tire whose tread has been
18  stripped from it and the other three tires.
19     Q.   Is it the same as a tire that is
20  completely flat?
21     A.   Well, I don't know because I don't
22  know that anybody's ever done any tests to
23  compare a tire with no tread as opposed to a

**Page 90**

1  deflated tire. That would depend perhaps on
2  the involvement of the rim with the pavement,
3  the inflation pressure of the tire. I just
4  don't know. But it is obvious that a tire
5  from which the tread has been stripped would
6  have a lower -- significantly lower
7  coefficient of friction with the pavement than
8  one that's intact although it would probably
9  be higher than that of a deflated tire.
10     Q.   All right. Then you go on to talk
11  about the rate of deflation, and, in fact, you
12  have provided us with the article that you
13  cite in your report, which is called "The Rate
14  of Deflation of Car Tires," in which, not
15  surprisingly, is written by Mr. Grogan?
16     A.   Right.
17        (Whereupon Plaintiff's Exhibit
18        No. 11 was marked for identification
19        and is attached to the original of
20        the transcript.)
21     Q.   Now, later in your report, in your
22  conclusions, in fact, you state that this
23  deflation -- I'm looking now at page 6, bottom

**Page 91**

1  of the page. This deflation, quote, "probably
2  occurred in less than five seconds," close
3  quote. Now, I want to want to make sure I
4  understand that it's your opinion and your
5  testimony that in Mrs. Moore's case, the tire
6  probably deflated in less than five seconds
7  after the ejection of whatever the object was
8  in the tire?
9     A.   That's correct.
10     Q.   All right. And as I understand
11  your --
12     A.   Five seconds or less.
13     Q.   Right. And as I understand your
14  report, you are basing that, at least in some
15  significant part, on the data or information
16  as set forth in what is now marked as
17  Plaintiff's Exhibit 11 being Grogan's article
18  on the rate of deflation in car tires?
19     A.   Yes, sir.
20     Q.   All right. You mention in your
21  report that the tires used in that study were
22  6.70-15 tubeless tires; correct? It's in your
23  report if you want to look at it.

**Page 92**

1     A.   Where in my report did I reference
2  that?
3     Q.   Page 5, first full paragraph.
4     A.   Oh, okay. Yeah. Yes, sir.
5     Q.   Is it your understanding that that
6  tire is similar in its properties to the tire
7  involved in this case?
8     A.   It would have been a smaller tire
9  but not substantially smaller.
10     Q.   Is it a bias tire?
11     A.   Yes, sir, that's a bias ply tire.
12     Q.   All right. Is there a difference in
13  the deflation rate or the -- well, in your
14  opinion, a difference in the deflation rate of
15  a biased tire and a type of tire that is
16  involved in this wreck?
17     A.   Not for a given size hole, in my
18  opinion.
19     Q.   All right. Since we've identified
20  the tire used in Grogan's study as a biased
21  tire, what can we call the one in our case?
22     A.   It was a radial ply tire.
23     Q.   A radial ply tire.

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

| Page 81 | Page 83 |
|---|---|
| 1  think I can answer that without looking at it. | 1  case? |
| 2     Q.  (By Mr. Sparrow) Okay. | 2     Q.  That the deflation of the tire |
| 3     A.  This Mercury Mountaineer was not | 3  caused the loss of control? |
| 4  traveling at 30 miles an hour around a | 4     A.  Yeah, the deflation of the tire and |
| 5  200-foot radius curve -- | 5  then some driver response to it, either a lane |
| 6     Q.  Right? | 6  change or stepping on the brake or something |
| 7     A.  -- wet or dry. | 7  is what caused the loss of control, that that |
| 8     Q.  Right. | 8  control would not have been lost if the tire |
| 9     A.  It was being operated on an | 9  had retained its inflation air. |
| 10  interstate highway at a speed that was | 10     Q.  And we will get back to this, but |
| 11  probably at least twice that great. | 11  let me just -- farther down on page 4 in that |
| 12     Q.  Correct. | 12  first paragraph -- not first full but the |
| 13     A.  And therefore, the specific | 13  first paragraph on page 4, you mention that |
| 14  observations and conclusions that pertain to a | 14  it's more likely to sustain a puncture or |
| 15  200-foot radius curve taken at 30 miles an | 15  other hazard-related failure in the second |
| 16  hour would not necessarily apply to the | 16  half of the tire's life and that a wet tire is |
| 17  situation involving this Mercury Mountaineer. | 17  more likely.  Do either of those two |
| 18     Q.  Correct.  And I guess what I'm | 18  statements really have anything to do with |
| 19  asking is can you point me to any of Grogan's | 19  your opinions in this lawsuit? |
| 20  tests or anybody else's that were performed | 20     A.  Not as to the opinion about this |
| 21  under conditions similar to those faced by | 21  tire failure although they are consistent with |
| 22  Mrs. Moore in this case? | 22  the fact that this tire was in the second half |
| 23     A.  No, sir. | 23  of its life and it was a wet road -- |

| Page 82 | Page 84 |
|---|---|
| 1     Q.  All right. | 1     Q.  Okay. |
| 2     A.  Nobody would perform a test under | 2     A.  -- with a wet tire.  At least that's |
| 3  those circumstances.  That's why you have | 3  what's been reported to me. |
| 4  accidents. | 4     So, it would statistically be six |
| 5     Q.  Are the conclusions drawn from these | 5  times more likely to sustain a puncture or |
| 6  tests performed by Mr. Grogan that were | 6  other hazard-related failure. |
| 7  performed on the curve of whatever radius | 7     Q.  Are the -- strike that.  Does the |
| 8  similar enough to take the data learned from | 8  deflation -- is the deflation more likely to |
| 9  them and apply it to the situation in this | 9  cause a loss of control if the vehicle is |
| 10  case? | 10  being driven on a road around a bend or around |
| 11     A.  Only in the general sense that a | 11  a curve, is the loss of control more likely? |
| 12  sudden tire deflation can cause a loss of | 12     A.  Well, yes and no.  It depends on the |
| 13  control, but it does not necessarily always | 13  amount of the curve, the degree of curvature. |
| 14  result in a sudden loss of control. | 14  What typically causes -- what often happens |
| 15     Q.  In fact, it usually doesn't, does | 15  maybe is the best way to put it.  What often |
| 16  it? | 16  happens when there is a loss of control as a |
| 17     A.  It usually doesn't, that's correct. | 17  result of a rear tire failure or deflation is |
| 18  It usually does not. | 18  that the vehicle may continue normally as long |
| 19     Q.  As I understand your opinion in this | 19  as its traveling on a straight path.  Then |
| 20  case, you are testifying that, in your | 20  when something happens to change the dynamics |
| 21  opinion, more likely than not that is what | 21  such as trying to negotiate a curve or trying |
| 22  happened in this case? | 22  to make a lane change or stepping on the |
| 23     A.  That what is what happened in this | 23  brakes, then that one tire that's deflated |

21  (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit I

# FREEDOM COURT REPORTING

| Page 17 |
|---|

```
1      Q.    The wreck report indicates
2   that the wreck happened about two-thirty, it
3   actually says 2:25. Is that consistent with
4   your memory about the time of day that this
5   occurred?
6      A.    Yes. It was about -- That was
7   about the time I last looked at the time,
8   yes.
9      Q.    All right. Had you stopped
10  since leaving Gulf Shores before the wreck
11  happened?
12     A.    No.
13     Q.    All right. So you had gassed
14  up while you were still down at the beach?
15     A.    Yes.
16     Q.    And were going to drive all
17  the way back to Montgomery?
18     A.    Yes.
19     Q.    And your plan, at least, was
20  to not stop anywhere between the two?
21     A.    Right.
22     Q.    Had you eaten lunch before
23  leaving the beach?
```

| Page 18 |
|---|

```
1      A.    I don't remember.
2      Q.    Had you had anything alcoholic
3   to drink that day?
4      A.    No.
5      Q.    Do you drink --
6      A.    Occasionally.
7      Q.    -- socially?
8      A.    Yes.
9      Q.    As part of the conference at
10  the seminar, had there been a cocktail party
11  or anything the night before?
12     A.    There had been a dinner on the
13  balcony. And there was drinks available.
14  You purchased it.
15     Q.    Did you have any drinks at the
16  party the night before?
17     A.    No.
18     Q.    Did you have any drinks the
19  night before at all, whether it was at the
20  party or otherwise?
21     A.    No.
22     Q.    Do you remember about what
23  time you left the beach to head back?
```

| Page 19 |
|---|

```
1      A.    I think it was around 12:30.
2      Q.    Was it your intention to go
3   home or were y'all -- or were you going to
4   come back and swing by the office on the way
5   home?
6      A.    I was going home.
7      Q.    You were done for the week and
8   headed home for the weekend?
9      A.    Right.
10     Q.    What happened?
11     A.    Well, I was driving, looking
12  ahead, my hands on the steering wheel, and
13  it was raining. And I was in the inside
14  lane coming around a car, and I heard this
15  noise like my tire blew. And I lost all
16  control of my car. I didn't have any
17  control after that.
18     Q.    All right. As I understand
19  what you said, you were driving north on
20  I-65; correct?
21     A.    Right.
22     Q.    And you had moved from the
23  right-hand lane -- it's a two-lane highway
```

| Page 20 |
|---|

```
1   where you were?
2      A.    Right.
3      Q.    Or four, but two going north?
4      A.    Yes.
5      Q.    You had moved from the
6   right-hand lane to the left-hand lane to
7   pass someone?
8      A.    Yes.
9      Q.    And you heard a noise?
10     A.    I heard a popping sound -- A
11  pop like my tire blew, that's what it felt
12  like, because I didn't have control of it.
13     Q.    And all of a sudden you felt
14  like you lost control of your car?
15     A.    Yes.
16     Q.    And you have a memory of what
17  you just described?
18     A.    Yes.
19     Q.    Do you have a memory of the
20  wreck kind of unfolding after that?
21     A.    No. I remember hitting the
22  median. I don't remember anything after
23  that.
```

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

| Page 25 |
|---|

1   Q.   So those are the only two?
2   A.   That I know of.
3   Q.   Nobody -- You hadn't heard of
4   a name?
5   A.   No.
6   Q.   Okay.  How long -- If I asked
7   you this, I'm sorry.  How long were you in
8   the hospital?
9   A.   From Friday until Monday or
10  Tuesday.  I think it was Tuesday.  I'm not
11  -- I can't remember whether it was Monday or
12  Tuesday.
13  Q.   And it's my understanding that
14  that was in Pensacola?
15  A.   Yes.
16  Q.   You were -- You were taken by
17  helicopter from the scene of the accident;
18  is that correct?
19  A.   Yes.
20  Q.   To a hospital in Pensacola?
21  A.   Yes.
22  Q.   Which hospital?
23  A.   Baptist Medical Center.

| Page 26 |
|---|

1   Q.   At any time since this wreck
2   have you -- whether you know their name or
3   not, have you spoken with anyone who was
4   involved in the wreck?
5   A.   Yes.
6   Q.   Who?
7   A.   I called the Allen -- one of
8   the Allens.  I don't know which one I talked
9   to, one of the ladies, and I talk to
10  Mr. Montgomery.
11  Q.   Mr. or Mrs.?
12  A.   Mr.
13  Q.   Can you tell me first about
14  your conversation with whichever of the
15  Allens it was that you spoke with?
16  A.   I just called to check on her
17  and ask her how she was doing.  She said she
18  was okay and had returned to work.
19  Q.   Anything else that you
20  remember about that conversation?
21  A.   No.
22  Q.   Was there ever an additional
23  conversation with either that same Allen or

| Page 27 |
|---|

1   one of the other Allens?
2   A.   I don't recall that.
3   Q.   And Mr. Montgomery, do you
4   remember or will you tell me about your
5   conversation with him?
6   A.   Well, I asked him how he was
7   doing and he said -- he told me, and he just
8   tried to figure out what happened or
9   something.  So I told him the only thing I
10  know is that my tire blew.  And then he
11  called the office one time.
12  Q.   Here?
13  A.   Yes.
14  Q.   Did y'all speak on that
15  occasion?
16  A.   Yes.  He wanted to know how to
17  file his claim.
18  Q.   Do you mean with your
19  insurance company, is that what you
20  understood him to mean?
21  A.   No.  He meant with the office.
22  Q.   His federal court claim?
23  A.   Yes.  He wanted a form.

| Page 28 |
|---|

1   Q.   All right.  Other than -- Let
2   me back up to your conversation with
3   Mr. Montgomery.
4        You said you asked him how he
5   was doing?
6   A.   Yes.
7   Q.   And do you remember what he
8   told you?
9   A.   I think he said his wife's
10  knee was hurt and his leg was broke or
11  something.
12  Q.   Do you remember anything else
13  about that part of your conversation?
14  A.   No.
15  Q.   Do you remember talking to him
16  about you thought you had a blowout?
17  A.   Yes.
18  Q.   Do you remember anything else
19  about y'all's conversation?
20  A.   No.
21  Q.   And did you ever talk to
22  either of the Montgomeries other than those
23  two occasions?

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 33 | Page 35 |
|---|---|
| 1  couldn't do anything -- I couldn't stop it,<br>2  so.<br>3      Q.   And how is it that you know<br>4  you were going sixty to sixty-five as you<br>5  were passing that vehicle?<br>6      A.   Because I looked at my<br>7  speedometer.<br>8      Q.   As you were passing?<br>9      A.   Yeah.  Just kind of looked<br>10 down.<br>11     Q.   Were you on cruise control or<br>12 just -- I just drove down, and I'm just<br>13 curious, did you have your car on cruise<br>14 control or were you just driving with your<br>15 foot?<br>16     A.   Driving with my foot.<br>17     Q.   Do you remember or can you<br>18 tell me, Ms. Moore, who, since the day of<br>19 this wreck, you have told that you had a<br>20 blowout?<br>21     A.   I told everybody that asked<br>22 me.  I don't remember how many, I mean, or<br>23 who. | 1  else obtained one or more of the tires off<br>2  of the car that you were driving that was<br>3  involved in this wreck?<br>4      A.   Yes, I am.<br>5      Q.   All right.  Who got the tires?<br>6      A.   Beasley, Wilson's attorneys.<br>7      Q.   And that would be because you<br>8  had contacted them about this issue?<br>9      A.   No.<br>10     Q.   Do you know why Beasley,<br>11 Wilson and them went and got one or more of<br>12 your tires from your car?<br>13         (Off-the-Record discussion<br>14         was held.)<br>15     Q.   Have you ever or did Beasley,<br>16 Wilson or Allen, whatever the firm name is<br>17 now, file any claim on your behalf as a<br>18 result of any investigation they made into<br>19 the tire on your car?<br>20     A.   No, they didn't.<br>21     Q.   Do you know how many tires<br>22 they recovered from your car?<br>23     A.   No, I don't. |

| Page 34 | Page 36 |
|---|---|
| 1      Q.   Okay.  Did you ever make an<br>2  effort to contact the state trooper to<br>3  inform him that it was your position that<br>4  there had been some problem with your tire<br>5  that contributed to the cause of this wreck?<br>6      A.   No, I did not.  I didn't know<br>7  I could do that.  No, I didn't.<br>8      Q.   Did you -- When you say you<br>9  looked at the wreck report, look at it<br>10 closely enough to see that it didn't include<br>11 anything about a problem with the tire or<br>12 anything else on your car?<br>13     A.   No, I did not.<br>14     Q.   I have a tire in my office<br>15 that Mr. Kells has provided me.  Did you<br>16 provide that to him?<br>17     A.   No.<br>18     Q.   After this wreck, did you make<br>19 an effort to recover one or more of the<br>20 tires from the car that you were in at the<br>21 time of this wreck?<br>22     A.   No, I didn't.<br>23     Q.   Are you aware that someone | 1      Q.   Do you know where on your car<br>2  the tire that Mr. Kells provided to me came<br>3  from?<br>4      A.   Well, the tire that -- I don't<br>5  know where it came from.  But the tire that<br>6  I -- that felt like it blew on my car was<br>7  the tire on the left side, the driver's<br>8  side, the back tire.<br>9      Q.   Left, back tire?<br>10     A.   Yes.<br>11     Q.   What kind of car were you<br>12 driving?<br>13     A.   I was driving a Mountaineer.<br>14 It was an SUV.  I don't remember exactly<br>15 what year or model.<br>16     Q.   Wreck report says '97 Mercury;<br>17 does that sound right?<br>18     A.   Mountaineer, yes.<br>19     Q.   Do you know if a determination<br>20 was ever made if that tire had blown out?<br>21     A.   No, I don't.<br>22     Q.   Were you told by the people at<br>23 Beasley, Wilson whether or not they thought |

9  (Pages 33 to 36)

Page 37

1   that tire had blown out?
2       A.   They told me that --
3           MR. KELLS:  I'm just going to
4   object to the extent that it's
5   attorney-client privilege.
6           MR. SPARROW:  I understand
7   that.  You can certainly claim that
8   privilege.  It's your privilege to claim.
9   So if you want to talk to me about it,
10  you're certainly welcome to.  If you choose
11  not to, I guess at this point, at least, you
12  can also choose not to.
13      A.   It's up to me?
14          MR. DOYLE:  It's your
15  privilege.
16      Q.   I'll just tell you what we're
17  talking about.  You have a privilege between
18  you and a lawyer that represents you.  I
19  don't know if that's true of --
20      A.   I'll tell what you they told
21  me.  I don't mind.
22      Q.   Let me tell you this first,
23  because I don't want it to be an issue down

Page 38

1   the road.  It is your privilege, so anything
2   that you and your attorney talk about, if
3   you don't want to talk about it, then you
4   don't have to, at least unless until I get a
5   Judge to make you.
6           If you don't have a problem
7   with it, then you can waive that privilege
8   and we can go forward.
9       A.   I don't have a problem with
10  it.
11      Q.   All right.  Go ahead.
12      A.   They told me that the tire was
13  so torn up that they could not determine.
14      Q.   Do you know -- and I may have
15  asked you this a minute ago, but I want to
16  make sure I have it.
17          Do you know if the people from
18  the Beasley firm at any time had more than
19  the one tire that I'm assuming is the one
20  that I have now?
21      A.   I do not know.
22      Q.   What happened to your car, do
23  you know?

Page 39

1       A.   I don't.  We never did get it
2   from the wrecker place.  I don't know
3   whether the insurance company got it or
4   what.  I don't know.
5       Q.   Did you tell your insurance
6   company after this wreck that -- this
7   business about the tire and the blowout?
8       A.   Yes.
9       Q.   All right.  When had you
10  purchased the tire -- Strike that.
11          Were all four of the tires
12  that were on your car at the time of this
13  wreck purchased at the same time?
14      A.   Well, we purchased the car in
15  May of 2003 and the tires were on the car.
16      Q.   All right.  So you'd only had
17  the car three or four months?
18      A.   Yes.
19      Q.   And this was the set of tires
20  that came on it when you bought it?
21      A.   Yes.
22      Q.   In that three or four months,
23  had you had an occasion to have to perform

Page 40

1   any kind of maintenance on the tire?
2       A.   No.
3       Q.   For instance, had you had a
4   flat and had to have it plugged or patched
5   or anything of that nature?
6       A.   No.
7       Q.   Had you had any trouble with
8   this car between the time you bought it --
9   did you say May?
10      A.   Yes.
11      Q.   -- and when this wreck
12  happened in August?
13      A.   Not that I can recall.
14      Q.   Did you or can you tell me or
15  lend any information to where Trooper Fisher
16  got the estimated speed of eighty-three
17  miles per hour?
18      A.   I have no idea.
19      Q.   When you looked at the wreck
20  report, did you notice that it had your
21  speed as eighty-three miles per hour?
22      A.   I did not.
23      Q.   And I asked this, I think, in

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

```
1           were marked for
2           identification.)
3      A.    They look like pictures of my
4  car.
5      Q.    Okay.  They look like pictures
6  of your car after this wreck?
7      A.    Uh-huh.
8      Q.    Do you see in Plaintiff's 1 --
9  Did you take these?
10     A.    No.  My husband did.
11     Q.    Do you have the ones that have
12 color to them?
13     A.    Yes.
14     Q.    I'm going to ask you if you
15 would, either have copies made and I'll pay
16 you for that if I need to, or provide those
17 to your lawyer?
18     A.    He just took them with the
19 Polaroid, with the sixty second camera.  He
20 just wanted to show it to me.  They are not
21 very good, but I have them.
22          MR. KELLS:  They are in color?
23          THE WITNESS:  Yes.
```

Page 46

```
1      Q.    Probably a little clearer than
2  these are?
3      A.    Yes.
4      Q.    Would you provide those to
5  Conor, and then I'll do what needs to be
6  done to get copies of those made and we'll
7  get the originals back to you.  Okay?
8      A.    Okay.
9      Q.    Do you know anything about the
10 circumstances of these pictures being taken?
11 I know your husband took them, do you know
12 when?
13     A.    He took them while I was still
14 in the hospital.  He went and took them so I
15 could look at it.
16     Q.    So just within a few days?
17     A.    Yes.
18     Q.    Do you know, in Plaintiff's 1,
19 why that tire is not still attached to the
20 car?
21     A.    No, I don't.
22     Q.    Okay.  Do you know who took it
23 off?
```

Page 47

```
1      A.    I don't.
2      Q.    You mentioned earlier that you
3  did have some kind of surgery in Pensacola.
4  Which of those injuries did you operate, you
5  mentioned shoulder and a lot in your pelvis?
6      A.    No.  The diaphragm.
7      Q.    Are you aware of any other
8  photographs of either your vehicle or the
9  tire in question that are not in that stack
10 of Plaintiff's 1 through 6?
11     A.    No.  I'm not aware of any
12 others.
13     Q.    And are those -- Did your
14 husband take six pictures?
15     A.    He took all of those, yes.
16     Q.    Did he take, for instance,
17 another thirty that aren't there?
18     A.    No.  That's all he took.
19     Q.    That's all he took.
20          MR. SPARROW:  Let me take a
21 short break.
22          (Recess taken.)
23     Q.    Ms. Moore, I just have a few
```

Page 48

```
1  more questions.
2          Just to clarify a few things.
3  You mentioned when you were telling us
4  earlier what happened at the wreck that you
5  heard -- and correct me if I'm wrong, I just
6  want to make sure I've got it right.  You
7  heard a noise, and I think you referred to
8  it as a pop; is that correct?
9      A.    Yes.
10     Q.    And then all of a sudden you
11 lost control?
12     A.    Yes.
13     Q.    You said that after hearing
14 the pop, your car accelerated?
15     A.    Yes.  Well, I tried to -- When
16 you put your foot on the brake to try to
17 stop it, it just seemed like it picked up
18 speed.
19     Q.    Did you put your foot on the
20 brake --
21     A.    Yes.
22     Q.    -- when you heard the noise?
23     A.    Yes.
```

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

| Page 49 | Page 51 |
|---|---|
| 1     Q.    Was there any other sensation<br>2 that accompanied the noise?<br>3     A.    Yes.<br>4     Q.    What?<br>5     A.    Felt like the car dropped to<br>6 the side, kind of dropped down.<br>7     Q.    In the back?<br>8     A.    Yes.<br>9     Q.    Have you ever been driving<br>10 when you had a flat tire before this<br>11 happened?<br>12     A.    Yes.<br>13     Q.    Had you ever had that occur to<br>14 you on the interstate?<br>15     A.    No.<br>16         MR. KELLS:  Just to clarify,<br>17 when you say that, you mean a flat tire?<br>18         MR. SPARROW:  Yes.  Flat tire,<br>19 blowout, whatever you want to call it.<br>20     Q.    Also, to clarify, you<br>21 mentioned that Ms. Canary and Ms. Hardwick<br>22 indicated to you that they had seen a wreck<br>23 as they went by; correct? | 1 on the other side, or the impact with either<br>2 of the cars on the southbound lanes?<br>3     A.    No, I don't.<br>4     Q.    Do you remember either -- from<br>5 any standpoint in time, recognizing or<br>6 realizing that those cars were even coming<br>7 toward you in the southbound lane?<br>8     A.    No, sir, I did not.<br>9     Q.    Is it your contention,<br>10 Ms. Moore, that either the driver of the car<br>11 in which the Allens were --<br>12         MR. KELLS:  I'm going to<br>13 object to the form.  She's not a party to<br>14 the case, so it wouldn't be her contention.<br>15 Just that clarification.<br>16     Q.    With that objection you can<br>17 answer.  Do you believe, or is it your<br>18 contention, that either the driver of the<br>19 Allen vehicle or the Montgomery vehicle did<br>20 anything to contribute to this wreck?<br>21     A.    Is it my opinion what?  Can<br>22 you please repeat?<br>23     Q.    That either of the two cars in |

| Page 50 | Page 52 |
|---|---|
| 1     A.    Came along after it happened,<br>2 yes.<br>3     Q.    That was my question.<br>4 Actually I think you mentioned that with<br>5 Canary.  Did Hardwick see the wreck or just<br>6 come by and see that somebody had had a<br>7 wreck?<br>8     A.    Came by and saw that someone<br>9 had had a wreck.<br>10     Q.    And are you aware if<br>11 Ms. Hardwick stopped there at the scene?<br>12     A.    I'm not aware.<br>13     Q.    She never mentioned if she got<br>14 out of her car, for instance, to come check<br>15 on you and see what was going on?<br>16     A.    No.  She did not know it was<br>17 me.<br>18     Q.    All right.  As I understand<br>19 it, your memory drops off as you entered the<br>20 median; is that correct?<br>21     A.    Yes.<br>22     Q.    So maybe it's fortunate, but<br>23 you don't remember coming out of the median | 1 the southbound lane that were involved in<br>2 this accident or this wreck did anything<br>3 wrong?<br>4     A.    I don't know.<br>5     Q.    When you were in the hospital,<br>6 Ms. Moore, at any time during your stay,<br>7 were you asked by hospital staff to tell<br>8 them what had happened that led to you being<br>9 in the hospital?<br>10     A.    I don't remember.  I was<br>11 heavily sedated.  I don't know.<br>12     Q.    Pretty much the whole time you<br>13 were down there?<br>14     A.    Well, not the day I came home.<br>15 But I don't remember them asking me<br>16 anything.<br>17     Q.    Okay.  When did you first<br>18 contact your insurance company about it?<br>19     A.    I don't remember that either.<br>20     Q.    Did you make the contact or<br>21 did your husband?<br>22     A.    I'm not sure whether I did or<br>23 he did.  I don't remember that either. |

13 (Pages 49 to 52)

Exhibit J



**U.S. Department of Justice**

*Civil Division, Torts Branch*
*Federal Tort Claims Act Staff*

---

| | | |
|---|---|---|
| *Conor Kells*<br>*Trial Attorney* | *Post Office Box 888*<br>*Benjamin Franklin Station*<br>*Washington, D.C. 20044* | *Telephone: (202) 616-4273*<br>*Facsimile: (202) 616-5200* |

GKJ:CKells

July 3, 2007

<u>VIA FIRST CLASS MAIL</u>
J. Callen Sparrow, Esq.
Heninger Garrison Davis L.L.C.
P.O. Box 11310 (35202)
2224 First Avenue North
Birmingham, AL 35203

Re:     *Allen, et al. v. United States*, Civil Action No. 06-cv-879-WKW (M.D. Ala.)
        <u>*Montgomery, et al. v. United States*, Civil Action No. 06-cv-880-WKW (M.D.</u>
        <u>Ala.)</u>

Dear Mr. Sparrow:

I am writing to inform you that I have in my possession the rear drivers' side tire from the

vehicle Ms. Bertha Moore was driving on August 29, 2003, when the accident giving rise to this

litigation occurred.  I will make the tire available to you upon request.

Very truly yours,



Conor Kells
Trial Attorney
Civil Division, Torts Branch

cc:     Annesley H. DeGaris, Esq.
        Cory, Watson, Crowder & DeGaris, P.C.
        2131 Magnolia Avenue, Suite 200
        Birmingham, AL  35205



**U.S. Department of Justice**

*Civil Division, Torts Branch*
*Federal Tort Claims Act Staff*

---

| | | |
|---|---|---|
| Conor Kells | Post Office Box 888 | Telephone: (202) 616-4273 |
| Trial Attorney | Benjamin Franklin Station | Facsimile: (202) 616-5200 |
| | Washington, D.C. 20044 | |

GKJ:CKells

July 3, 2007

<u>VIA FIRST CLASS MAIL</u>
Annesley H. DeGaris, Esq.
Cory, Watson, Crowder & DeGaris, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205

  Re: *Allen, et al. v. United States*, Civil Action No. 06-cv-879-WKW (M.D. Ala.)
     <u>*Montgomery, et al. v. United States*, Civil Action No. 06-cv-880-WKW (M.D.</u>
     <u>Ala.)</u>

Dear Mr. DeGaris:

  I am writing to inform you that I have in my possession the rear drivers' side tire from the

vehicle Ms. Bertha Moore was driving on August 29, 2003, when the accident giving rise to this

litigation occurred.  I will make the tire available to you upon request.

       Very truly yours,


       Conor Kells
       Trial Attorney
       Civil Division, Torts Branch

cc: J. Callen Sparrow, Esq.
   Heninger Garrison Davis L.L.C.
   P.O. Box 11310 (35202)
   2224 First Avenue North
   Birmingham, AL 35203

Exhibit K



**U.S. Department of Justice**

*Civil Division, Torts Branch*
*Federal Tort Claims Act Staff*

| | | |
|---|---|---|
| *Conor Kells*<br>*Trial Attorney* | *Post Office Box 888*<br>*Benjamin Franklin Station*<br>*Washington, D.C. 20044* | *Telephone: (202) 616-4273*<br>*Facsimile: (202) 616-5200* |

GKJ:CKells

July 27, 2007

VIA FEDERAL EXPRESS
J. Callen Sparrow, Esq.
Heninger Garrison Davis L.L.C.
P.O. Box 11310 (35202)
2224 First Avenue North
Birmingham, AL  35203

Re:  *Allen, et al. v. United States*, Civil Action No. 06-cv-879-WKW (M.D. Ala.)
     *Montgomery, et al. v. United States*, Civil Action No. 06-cv-880-WKW (M.D. Ala.)

Dear Mr. Sparrow:

Per our telephone conversation on July 27, 2007, please find the tire that was mounted on the rear driver's side of Ms. Bertha Moore's vehicle the day of the August 29, 2003, accident involving Ms. Moore, Wallace and Phyllis Montgomery, and Michael, Lou Ellen, and Lorie Allen.  Please ensure that Mr. DeGaris is provided the opportunity to examine the tire as well.

Very truly yours,

Conor Kells
Trial Attorney
Civil Division, Torts Branch

cc:    VIA FIRST CLASS MAIL
       Annesley H. DeGaris, Esq.
       Cory, Watson, Crowder & DeGaris, P.C.
       2131 Magnolia Avenue, Suite 200
       Birmingham, AL  35205

Exhibit L

Clifford A. Prosser

Traffic Accident Consulting Services
4248 Fieldstone Drive
Birmingham, Alabama 35215
Clifford A. Prosser, Senior Consulting Reconstructionist

Phone (205) 681-6869
Fax (205) 681-4761
e-mail: cprosser6869@charter.net

September 17, 2007

To:   **Mr. Annesley DeGaris**
      Cory, Watson, Crowder & DeGaris
      2031 Magnolia Avenue South
      Birmingham, Alabama 35205

RE:   ***Michael P. Allen, et al. vs. United States of America***
      **Civil Action No.: 06-cv-879-WKW**

Dear **Mr. DeGaris** ,
      As you requested, I have examined the currently available evidence that you provided pertaining to the above referenced motor vehicle accident. Please allow this correspondence to constitute a brief report of my findings and opinions to date.

**Items Examined, Reviewed or Considered**

- Alabama Uniform Traffic Accident Report
- Deposition of Bertha Moore
- Photographs of involved 2003 Lincoln Town Car
- Copies of photographs of involved 1997 Mercury Mountaineer
- Copies of photographs of reported accident scene area (not immediately post accident)
- Expert report of tire examination by Peter L. Flanner
- SAE technical paper 970954
- Michelin passenger car and light truck owner's manual
- Telephone interview of Alabama State Trooper Fisher

**Findings and Opinions**

      The tire deflation alleged to have occurred on the Mercury Mountaineer should not have resulted in a catastrophic loss of control. Mrs. Moore, in my opinion, contributed to the control loss of her vehicle by braking, as per her deposition testimony, when she perceived the tire deflation. As it appears that the deflation was not explosive in nature, the driver of the vehicle, Bertha Moore, should have been able to maintain control of the vehicle in the north bound lane of the roadway and the reported lateral excursion into the south bound traffic lanes should not have occurred. It is most likely, in my opinion, that the driver, Bertha Moore, contributed to the control difficulty by improper braking of the vehicle. This reported loss of control event would



be consistent with the effects of hard braking during the effects of unequal drag. As stated previously, Bertha Moore testified during her deposition that she applied her brakes after feeling the disablement, and this likely contributed to the control loss.

The submitted report of tire expert Peter L. Flanner opines that the onset of the deflation of the subject tire was a result of the ejection of a screw that had punctured the tire previously, and there is no opinion rendered by Mr. Flanner that the deflation would have been explosive or even particularly sudden. This is a normal driving occurrence, on dry roads and on wet roads, and should not lead to catastrophic loss of control. If a driver reacts by slowly decreasing vehicle speed without hard braking and holds the vehicle straight with minimal corrective steering, he or she should be able to stop the vehicle without significant lateral movement or severe control difficulty. There is no published information or test results that I am aware of that would suggest that gradual, or even rapid, non-explosive deflation of a tire on a passenger vehicle, in the absence of additional factors, would be expected to cause catastrophic loss of control.

*Reference SAE paper 970954 by Robinette, Deering and Fay, "Drag and Steering Effects of Under Inflated and Deflated Tires".*
*Also reference Michelin passenger vehicle and light truck product manual, page 7*

The cited technical paper reports the effects of testing on vehicles with deflated single front and rear tires on a variety of vehicles. The specific resultant drag coefficients, lateral acceleration factors and distances are given for various distances for each vehicle tested, and the tests were conducted with hands-off roll out. In other words, the drag effect of a flat tire was evaluated initially without corrective steering. The paper reports that there was some lateral movement of a vehicle with a flat tire as an effect of the drag introduced if the vehicle was allowed to proceed and roll out without corrective steering. The paper concludes that in all of the tests conducted control of the vehicle was easily maintained with moderate appropriate steering input. The two test conditions that were not representative of the subject accident are:
1. The pavement during testing was dry asphalt.
2. The test speeds were somewhat lower than the reported speed, 45 mph or below.

I am not aware of any published sources of test results at present that suggest that a non-explosive deflation of a tire at highway speeds on a wet roadway would be expected to cause loss of control with a lateral excursion distance evident in this accident situation. The fact that the road surface was wet would indicate the likelihood that the overall friction coefficient was lower, but the resultant drag effect of one flat tire should be proportionately the same as on a dry surface. Once again, a tire deflation while operating a vehicle on wet roads is an expected, normal occurrence from time to time, and should not be a control compromising event if reacted to properly.

The dynamic effect of a single tire deflating while a vehicle is in motion is a relatively simple concept. As the tire deflates, additional drag is introduced to the side of the vehicle that the deflating or deflated tire is on. This gives the driver the feeling of the vehicle being pulled and the heading of the vehicle possibly being changed. This effect is validated by the SAE technical paper cited above. If the driver's response is to brake hard, the vehicle is likely then dedicated to a new heading in the direction of the "pull". Braking, and in particular hard braking, is not the safe and effective response to a tire deflation while in motion. *(See Michelin manual, page 7)*

There is no reported evidence or mention of hydroplaning in the accident report, or in Mrs. Moore's deposition. The expert report of Mr. Flanner indicates that the tread depth on the subject tire was approximately 2/32 inch and was evenly worn. It further indicated that the wear life of the tire was approximately 80% expended. I have no way of knowing whether the remaining three tires on the vehicle were of the same wear and tread depth. As a hypothetical, if a hydroplane event occurred, it would most likely be as a result of a combination of low average tread depth, water depth and driver braking. It would not be directly related to the tire deflation, in my opinion.

This report is true and correct to the best of my knowledge, training and experience, and is based upon my understanding of evidence available to me at present. As with any investigation or reconstruction effort, I reserve the right to add, withdraw, or modify any opinions rendered based upon the import of evidence made available to me at a later time.

Respectfully submitted,

Clifford A. Prosser

Attachments:    *Current CV*
                *Testimony history (Of particular reference:*
                          *Nichols & Metivier vs. United States of America*
                          *United States District Court*
                          *Middle District of Alabama*
                          *Judge Allbritton*
                          *2004*
                          *For: William Horsley, Opelika, Alabama)*
                *Fee and expense schedule*
                *SAE technical paper 970954*
                *Michelin passenger vehicle and light truck manual*