**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MICHAEL ALLEN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| V. | ) | Case No. 2:06-cv-879-WKW |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WALLACE MONTGOMERY, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:06-cv-880-WKW |
| V. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT UNITED STATES' PRE-TRIAL BRIEF

The plaintiffs, Michael, Lou Ellen, and Lori Allen and Wallace and Phyllis Montgomery, have brought this negligence action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, et seq., alleging that they were injured in an automobile accident on August 29, 2003, when a vehicle driven by federal employee Mrs. Bertha Moore suffered a sudden and rapid left rear tire deflation, crossed the median of Interstate 65, and struck the plaintiffs' respective vehicles head on. This Court previously has ruled on the United States' motion for application of the sudden emergency doctrine.

The United States cannot be held liable to the plaintiffs because (1) Mrs. Moore did not negligently operate her vehicle and, therefore, breached no duty of care owed to the plaintiffs;

(2) Mrs. Moore was faced with a sudden emergency when her left rear tire suddenly and rapidly

deflated and her action in stepping on the brake was not negligent under the emergency

circumstances; and (3) the true proximate cause of the August 29, 2003, accident was the sudden,

rapid deflation of Mrs. Moore's left rear tire, not any alleged negligence of Mrs. Moore herself.

In addition, not all of the plaintiffs' injuries, the treatment rendered, or the expenses for that

treatment, was reasonable, necessary, or related to the August 29, 2003, accident.

## **BACKGROUND**

On August 29, 2003, Mrs. Bertha Gordon Moore, then and presently an administrative

assistant for the United States Attorney for the Middle District of Alabama, was driving her

Mercury Mountaineer sport-utility vehicle on Interstate 65 in the northbound lanes, returning

from a law enforcement conference in Perdido Beach.  Exhibit A, Moore Dep. 10:5-19, 14:23-

15:4, 19:2-20:8, Aug. 7, 2007.  Somewhere near Evergreen, Alabama, Mrs. Moore recalls driving

her vehicle at around 65 m.p.h. when she heard a loud bang.  Id. at 32:2-33:10.  She felt the left

rear side of her vehicle suddenly drop, hit her brakes, and at that point lost control of her vehicle.

Id. at 48:19-49:8.  She has no further recollection of what occurred and remembers briefly

waking up in a helicopter that was transporting her to a hospital.  Id. at 20:19-21:5.

After the vehicle lost control, it crossed the median and entered the southbound lanes of

Interstate 65 where the vehicle collided with the Lincoln Towncar driven by Michael Allen, with

front passenger Lori Allen and rear passenger Lou Ellen Allen, and also a Volvo S70 driven by

Phyllis Montgomery, with Wallace Montgomery as front passenger.

Subsequent analysis of the left rear tire on Mrs. Moore's vehicle revealed that a bolt or

screw had, at some point prior to the collision, fully penetrated the tire-wall and became lodged

-2-

in the tire on the side facing the wheel well. Exh. B, Report of Peter Flanner at 2, ¶ 3, No. 1; Exh. C. Report of Ralph Cunningham at 6, ¶ 1. The treads of the tire were evenly worn, indicating that the tire was not operated in an underdeflated or overdeflated manner. Exh. C, Report of Ralph Cunningham at 2, ¶¶ 1-2; Exh. B, Report of Peter Flanner at 2, ¶ 3, No. 8; Exh. D, Flanner Dep. 59:13-22, 73:5-15, 84:4-10, Nov. 13, 2007. While Mrs. Moore was driving, the screw or bolt was suddenly ejected, leaving a hole through which all of the remaining air in the tire escaped, completely deflating the tire in a matter of seconds. Exh. C., Report of Ralph Cunningham at 6-7; Exh. B, Report of Peter Flanner at 1. To date, only the plaintiffs' accident reconstructionist, Clifford Prosser, has suggested that Mrs. Moore contributed to the cause of this accident by stepping on her brake when her left rear tire suddenly and rapidly deflated. Exh. E, Report of Cliff Prosser at 1, ¶ 2.

## SUMMARY OF THE ARGUMENT

The United States has only waived its sovereign immunity for injuries caused by the negligent acts or omissions of its employees. In the present case, Mrs. Bertha Moore was an employee of the United States. However, Mrs. Moore did not cause the plaintiffs' injuries through any negligent act or omission. Under Alabama's ordinary principles of negligence and the sudden emergency doctrine, Mrs. Moore's act of stepping on her brakes when she became aware that her left rear tire had completely deflated was not negligent. Moreover, the sudden and rapid deflation of Mrs. Moore's left rear tire was the proximate cause of the accident and the plaintiffs' injuries. Accordingly, the United States is not liable for the plaintiffs' injuries.

To the extent the United States is found liable for the plaintiffs' injuries, the United States is entitled to a set-off for medical bills paid by the plaintiffs' insurance, as well as for any

-3-

settlements made with the plaintiffs' automobile insurance carrier, State Farm. The United States, furthermore, is not liable for all of the plaintiffs' injuries, as some of the alleged injuries are just as likely the result of aging as they are related to the automobile accident. Moreover, the United States is not liable for the unreasonable and unnecessary treatments and excessive charges claimed by Dr. Leon Campbell, the Allens' treating physician.

## DISCUSSION

I.    **Defenses**

A.    **The United States is not liable because its employee, Mrs. Moore, was not negligent in the operation of her vehicle.**

The Federal Tort Claims Act ("FTCA") waives sovereign immunity only for the acts or omissions of an "employee of the government while acting within the scope of his office or employment. . . ." 28 U.S.C. § 1346(b). The United States may only be held liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Id. The accident in this case occurred in Alabama and, therefore, Alabama's negligence law governs this action.

The plaintiffs, in the pre-trial order, allege two grounds of negligence: (1) negligent operation of the vehicle, in particular that she was traveling 83 m.p.h., and (2) negligent maintenance of the vehicle. Neither allegation can be proved. "In order to establish a negligence claim, a plaintiff must prove: '(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury.'" S.B. v. St. James School, 959 So. 2d 72, 97 (Ala. 2006) (citation omitted). In the context of motor vehicles, a driver is under a duty to use

reasonable care in the operation of her vehicle. <u>Jones v. Baltazar</u>, 658 So. 2d 420, 421 (Ala. 1995).

In the present case, the only sworn evidence of Mrs. Moore's speed comes from Mrs. Moore herself, who testified that she was traveling around 65 miles per hour -- within the posted speed limit -- immediately before losing control. Exh. A, Moore Dep. 32:16-33:10. The only evidence that Mrs. Moore's speed was excessive comes from the Alabama Uniform Traffic Accident Reports, which estimates her speed at 83 miles per hour. <u>See</u> Exhs. F and G, Alabama Uniform Traffic Accident Reports, Versions 1 and 2.[1] An affidavit from Trooper Robert Fisher, who was first to arrive on the scene of the accident, indicates that the basis for the estimated speed is solely a statement of an unknown, unidentified female witness who left the scene before Trooper Fisher could get a name or address. <u>See</u> Exh. H, Plaintiff's Exhibit K, Brief in Opposition to Application of the Sudden Emergency Doctrine. Trooper Fisher did not conduct his own investigation, did not use any scientific tests, and did not independently verify or otherwise interview Mrs. Moore to determine her speed. As such, the Accident Report's

---

[1] These accident reports also contain other erroneous and inaccurate information which indicates their unreliability as well as inadmissibility. For example, both reports list Michael Allen's insurance carrier as Alfa but it was, in fact, State Farm. Exhs. F and G, Alabama Uniform Traffic Accident Reports, Versions 1 and 2 at 1, "Liability Insurance Co." section for Driver Michael Allen. Furthermore, one version of the report lists Phyllis Montgomery as unemployed while the other lists her as employed at Georgia Perimeter College. <u>Compare</u> Exh. F, Version 1 at 2, "Place of Employment" section for Phyllis Montgomery with same section of Exh. G, Version 2 at 3. Upon close examination of the two reports, it is obvious that someone "whited out" the erroneous job information and then wrote in the college. The reports also inaccurately state that Mrs. Moore was taken to Evergreen Medical Center. <u>See</u> Exhs. F and G, "Victims" section for Bertha G. Moore on Version 1 at 4 and same section on Version 2 at 2. In fact, she was airlifted by helicopter to a trauma center in Pensacola, Florida. With the glaring inaccuracies of information, these reports are unreliable, inadmissible, and cannot be the basis upon which Plaintiffs establish Mrs. Moore's alleged excessive speed.

estimate of Mrs. Moore's speed is a witness statement and must be excluded as inadmissible

hearsay. See Jacobs v. City of Port Neches, 7 F.Supp.2d 829, 835 (E.D. Tex. 1998) (collecting

cases).

In the context of maintenance, "[t]he operator of a motor vehicle on public highways has

the duty to see that the automobile is in reasonably good condition so as not to present a source

of danger to others. To fulfill such a duty, the operator must exercise reasonable care in

inspection and operation." Prosser v. Glass, 481 So. 2d 365, 368 (Ala. 1985).

To support their allegation that Mrs. Moore negligently maintained her vehicle, the

plaintiffs rely on the expert report of Peter Flanner, who concluded that the tire tread on Mrs.

Moore's left rear tire was 80% worn. This assertion, however, is probative of nothing more than

Mrs. Moore's tire had enough tread to be used safely on a highway. Both the plaintiffs' and the

defendant's experts have stated that a tire is not worn to an unsafe condition until the tire tread is

at or less than 2/32". Exh. D, Flanner Dep. 72:6-73:15, Nov. 13, 2007; Exh. I, Cunningham Dep.

55:1-57:13, Nov. 9, 2007. The tire that suddenly deflated on Mrs. Moore still had between 2/32"

and 3/32" of safe, usable tread. Exh. D, Flanner Dep. at 72:1-73:15, Nov. 13, 2007; Exh. I,

Cunningham Dep. 55:9-57:13, Nov. 9, 2007. Put another way, Mrs. Moore's full tire tread was

at 4/32" to 5/32", above the minimum tread necessary to safely operate a vehicle. While the

plaintiffs' expert, Peter Flanner, opines that the tread on the tire was 80% worn, there was still

20% of usable, safe tread on the tire. Exh. B, Report of Peter Flanner, at 2, ¶3, No. 8; Exh. D,

Flanner Dep. 71:16-73:15, Nov. 13, 2007. Absent some other indication that the tire was

damaged in some way, Mrs. Moore was completely justified in continuing to operate her vehicle with a tire that had 20% of its remaining usable tread.[2]

In addition, both the plaintiffs' and the defendant's tire experts opine that the tread was evenly worn, indicating that the tire was properly aligned and was not over or underinflated during its service life. Exh. D, Flanner Dep. 59:13-22, 73:5-15, 84:4-10, Nov. 13, 2007; Exh. C, Report of Ralph Cunningham at 2, ¶¶ 1-2. The location of the screw or bolt that was ejected from the tire was on the side of the tire facing the wheel well and, thus, out of plain view. Id. at 6, ¶¶ 1-2. This means that, unless Mrs. Moore had a lift in her garage, she would never have known that the screw or bolt was lodged in her tire. Moreover, due to the construction of the tire, the screw or bolt would have prevented air from escaping the tire, thus preventing the driver from knowing that something was wrong with the tire in the first place. Id. at 6, ¶ 1; Exh. B, Report of Peter Flanner at 2, ¶ 1 (suggesting a puncture would result in only gradual loss of pressure). This is supported by the fact that the tire itself exhibited no evidence of having been operated in an overdeflected or underinflated manner. Exh. D, Flanner Dep. at 59:7-22, Nov. 13, 2007; Exh. C, Report of Ralph Cunningham at 2, ¶ 1.

In short, there is no evidence to suggest that Mrs. Moore operated her vehicle at unsafe speeds, nor is there evidence to suggest that Mrs. Moore failed to properly maintain her vehicle in a safe operating condition. To the contrary, the evidence shows that Mrs. Moore drove her vehicle at 65 m.p.h., below the posted speed limit. It further shows that Mrs. Moore could not have known, through ordinary inspection, that an object had penetrated her left rear tire, and she

---

[2] To draw an analogy, a full tank of fuel would be at 100% of its capacity for storing fuel. After burning 80% of that fuel, a driver still has 20% of his fuel remaining and does not yet have to refill the tank.

would not have been on notice of any problem because her tire gave no outward indication of having lost air.  Mrs. Moore was not negligent, and the United States is not liable.

**B.    The United States is not liable because Mrs. Moore's alleged negligent act of stepping on her brakes when she became aware of her sudden, rapid tire deflation must be judged against a lesser standard of care under Alabama's sudden emergency doctrine.**

Plaintiffs allege that Mrs. Moore acted negligently when she stepped on her brake after becoming aware that her left rear tire had completely deflated.  See Exh. E, Report of Clifford Prosser at 1 ¶ 1.  Mrs. Moore's actions, or, in this case, reactions, however, must be judged not against the conventional standard of reasonable care, but the standard of care applicable to one confronted with a sudden emergency.  Moreover, her instinctive response to a potentially dangerous situation involving the failure of her left rear tire—stepping on her brake—was not negligent under ordinary standards of reasonableness.

Under Alabama law, as was previously briefed for the Court, "a motorist, without fault of [her] own, confronted with a sudden emergency, is not required to exercise the same presence of mind as would a prudent person under more deliberate circumstances." Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala. 1985), quoting Williams v. Worthington, 386 So.2d 408 (Ala. 1980).  While not a defense, per se, to negligence, the "sudden emergency" doctrine "provides a qualified standard of care by which . . . a party's conduct can be measured." Burns v. Martin, 589 So.2d 147, 149 (Ala. 1991).

The United States previously briefed the court on the several cases it could find wherein a defendant was not liable for an accident caused by a tire failure.  Exh. J, United States' Brief In Support of Application of the Sudden Emergency Doctrine at 3-7.  While research revealed no

Alabama cases directly on point (i.e. involving a tire blow out), multiple jurisdictions have persuasively held that a defendant should not be liable when a tire blow-out is the cause of an accident. See, e.g., Huffman v. Mercer, 295 S.W.2d 27, 33 (Mo. 1956) ("If one be precipitated to the left of the road by virtue of circumstances [a blowout] over which he has no control, one is not negligent.") citing Seligman v. Orth, 236 N.W. 115, 116 (Wis. 1931); Lasseigne v. Kent, 142 So. 867, 868 (La. App. 1932) ("The puncture of an automobile tire by a large spike, causing the car to upset and fatally injuring a guest therein, will, under the evidence set out in the case, be considered an accident, which is a casualty which could not be prevented by ordinary care and diligence.") (citation omitted).

In a very similar case, the Nebraska Supreme Court upheld a verdict that the puncture of a tire and accompanying deflation was the proximate cause of a car swerving off the road and overturning and, therefore, the driver of the car was not liable for the injuries caused. See Bonacci v. Cerra, 279 N.W. 173, 176-77 (Neb. 1938); see also Kelly v. Gagnon, 236 N.W. 160, 164 (Neb. 1931) (holding that a driver who stepped on brake following a puncture of a tire did not act negligently even though the car "swayed and upset," causing the death of a passenger).

In the instant case, Mrs. Bertha Moore was confronted with a sudden emergency when her left rear tire ejected a screw or bolt that had been lodged in it, causing the tire to suddenly and rapidly deflate while she was operating her Mercury Mountaineer (a sports utility vehicle) on a highway at 65 miles per hour. This emergency was through no fault of Mrs. Moore's. There was no indication that the tire was in an unsafe condition. Both the plaintiffs' and the defendant's experts have stated that a tire is not worn to an unsafe condition until the tire tread is at or less than 2/32". Exh. D, Flanner Dep. 72:6-73:15, Nov. 13, 2007; Exh. I, Cunningham Dep. 55:1-

57:13, Nov. 9, 2007. The tire that suddenly deflated on Mrs. Moore still had between 2/32" and

3/32" of safe, usable tread. Exh. D, Flanner Dep. at 72:1-73:15, Nov. 13, 2007; Exh. I,

Cunningham Dep. 55:9-57:13, Nov. 9, 2007. Put another way, Mrs. Moore's full tire tread was

at 4/32" to 5/32", above the minimum tread necessary to safely operate a vehicle. While the

plaintiffs' expert, Peter Flanner, opines that the tread on the tire was 80% worn, there was still

20% of usable, safe tread on the tire. Exh. B, Report of Peter Flanner, at 2, ¶3, No. 8; Exh. D,

Flanner Dep. 71:16-73:15, Nov. 13, 2007. Absent some other indication that the tire was

damaged in some way, Mrs. Moore was completely justified in continuing to operate her vehicle

with a tire that had 20% of its remaining usable tread.[3]

    In addition, both the plaintiffs' and the defendant's tire experts opine that the tread was

evenly worn, indicating that the tire was properly aligned and was not over or underinflated

during its service life. Exh. D, Flanner Dep. 59:13-22, 73:5-15, 84:4-10, Nov. 13, 2007; Exh. C,

Report of Ralph Cunningham at 2, ¶¶ 1-2. The location of the screw or bolt that was ejected

from the tire was on the side of the tire facing the wheel well and, thus, out of plain view. Id. at

6, ¶¶ 1-2. This means that, unless Mrs. Moore had a lift in her garage, she would never have

known that the screw or bolt was lodged in her tire. Moreover, due to the construction of the tire,

the screw or bolt would have prevented air from escaping the tire, thus preventing the driver from

knowing that something was wrong with the tire in the first place. Id. at 6, ¶ 1; Exh. B, Report of

Peter Flanner at 2, ¶ 1 (suggesting a puncture would result in only gradual loss of pressure). This

is supported by the fact that the tire itself exhibited no evidence of having been operated in an

_____

    [3] To draw an analogy, a full tank of fuel would be at 100% of its capacity for storing fuel.
After burning 80% of that fuel, a driver still has 20% of his fuel remaining and does not yet have
to refill the tank.

overdeflected or underinflated manner.  Exh. D, Flanner Dep. at 59:7-22, Nov. 13, 2007; Exh. C, Report of Ralph Cunningham at 2, ¶ 1.

Mrs. Moore, faced with a sudden emergency when her tire suddenly and rapidly deflated at highway speeds of 65 miles per hour, applied her brakes.  Under the circumstances, it was not negligent to take this action as the move was clearly designed to slow her vehicle down in a response to the emergency situation.  According to the plaintiffs' expert, Clifford Prosser, the act of stepping on the brake was negligent.  Exh. E, Report of Clifford Prosser at 1, ¶ 2.  Given, however, the sudden emergency Ms. Moore faced, her instinctive reaction of stepping on the brake, even if not the best course of action, was not negligent.  See Crowe v. Crowe, 129 S.E.2d 585, 586 (N.C. 1963) (holding that the defendant's act of stepping on the brakes after a tire exploded was not negligent where the driver was faced with an emergency and there was no evidence he was aware of any defect in his tires); see also Pickett v. Cooper, 116 S.E.2d 48, 51 (Va. 1960) (holding that the sudden emergency doctrine was properly submitted to the fact finder where defendant alleged that a tire blow-out, and not his own negligence, resulted in his vehicle crossing onto the wrong side of the road).

In sum, even if Mrs. Moore knew, or should have known, that the proper way to handle a tire deflation is to ease off the accelerator and let the vehicle slow on its own—something that she does not claim to have known—her conduct must be measured against the circumstances that confronted her.  Based on all of the circumstances, it cannot, as a matter of Alabama law, be negligent for a driver of a vehicle faced with a tire blow out or sudden deflation at highway speed to instinctively hit the brakes.  Thus, under Alabama's sudden emergency doctrine, as well as ordinary standards of reasonableness, the United States is not liable for the plaintiffs' injuries.

**C.      The sudden tire deflation was an intervening or superseding cause and
alleged negligence of Mrs. Moore was not the proximate cause of the
accident.**

As previously noted, for the plaintiffs to succeed on a claim of negligence, they must also

prove causation. S.B. v. St. James School, 959 So. 2d at 97. Factual causation, or "but for"

causation, is that part of the causation analysis that asks if the complained-of injury or damage

would have occurred but for the act or omission of the defendant. Springer v. Jefferson County,

595 So. 2d 1381, 1383 (Ala. 1992). "Proximate or legal causation is that part of causation

analysis that asks if "the act for which the [defendant] is responsible [is] of such a nature that

courts of law will recognize it as the [cause] of the injury.'" Id. at 1383-84. "In Alabama, the

issue of proximate causation hinges on foreseeability and is intertwined, analytically, with the

concept of intervening cause." Id. at 1384.

"The requirement of foreseeability is imposed to preclude a finding of liability when the

defendant's conduct was part of the causal chain of events leading to the injury but the resulting

injury could not have been reasonably anticipated by the defendant." Thetford v. City of

Clanton, 605 So. 2d 835, 840 (Ala. 1992). Thus, "[i]t is settled law in Alabama that even if one

negligently creates a dangerous condition, he or she is not responsible for injury that results from

the intervention of another cause, if at the time of the original negligence, the intervening cause

cannot reasonably be foreseen." Adams v. Sanders, 811 So. 2d 542, 545 (Ala. Civ. App. 2001)

quoting Sims v. Crates, 789 So.2d 220 (Ala. 2000).

Applying the facts of this case, Mrs. Moore would not have lost control of her vehicle but

for the sudden loss of air in her left rear tire. Exh. I, Ralph Cunningham Dep. at 82:2-9, Nov. 9,

2007. Absent the completely unforeseeable, sudden tire deflation, Mrs. Moore would have

-12-

completed her trip without incident. In addition, any alleged negligence attributed to Mrs. Moore was superseded when her tire deflated. It was not reasonably foreseeable to her, or to anyone else, that her tire would fail catastrophically and cause her to lose control of her vehicle. The causal chain of events leading up to this accident could not have been anticipated. The United States is not responsible for an unforeseen chain of events giving rise to this unfortunate accident and to do so would be contrary to established principles of proximate and factual causation.

**II.    Not all of the plaintiffs' alleged injuries were caused by the August 29, 2003, accident, and not all of the medical expenses and treatment rendered necessary, reasonable, or related to the accident.**

As a preliminary matter, the United States concedes that all of the plaintiffs sustained injuries following the August 29, 2003, automobile accident. Immediately following the accident, Wallace Montgomery and Michael, Lou Ellen, and Lori Allen were attended to by medical personnel and transported to Evergreen Medical Center for treatment of their injuries. Phyllis Montgomery, while not specifically treated, did receive soft tissue injuries and bruising. The United States agrees with the reasonableness and the necessity of treatment rendered to the Montgomerys and Allens as described below.

**A.    The Allens**

As a result of the wreck, the United States agrees that Mr. Michael Allen suffered the following injuries: (1) a broken right fibula, (2) a deep laceration to his left foot, (3) numerous cuts and scratches, and (4) bruising and other soft tissue injuries. It agrees that Mrs. Lou Ellen Allen suffered several fractured ribs, as well as a possible compression fracture that went undetected until an orthopedist retained by the United States, Dr. Keith Weaver, discovered the injury on x-rays. Mrs. Allen also suffered soft tissue injuries, such as bruising from her seatbelt

restraint.  It is also agreed that Lori Allen suffered soft tissue injuries, including bruising to her

knee and breast, and had back and neck related aches and pains.

The treatment they received at Evergreen Medical Center following the accident was

reasonable and necessary.  See Exh. K, Pre-Trial Order dated Feb. 6, 2008, at 3.

The United States challenges the injuries allegedly diagnosed and treated by Dr. Leon

Campbell.  To a lesser extent, the United States also challenges the treatment Mr. Allen received

from Dr. Lyle Cain, as it is not clear that Mr. Allen's surgically repaired meniscal tear or

shoulder arthritis are related to the accident.  These injuries had late onset and are consistent with

Mr. Allen's age.  The United States also disputes that Mrs. Allen's surgically repaired hernia,

which was noted only twice by Dr. Campbell, months apart from each other, was accident

related.

The diagnoses of Dr. Campbell are troubling for many reasons, not the least of which is

the lack of documentation in the nearly illegible medical records.  While the Allens no doubt

suffered aches, pains, bruising, and other soft tissue injuries, Dr. Campbell goes to extreme

lengths to relate suspicious and unverified injuries and treatment to the accident.  In particular,

Dr. Campbell, despite having no board certification in pain management or malpractice

insurance, claims to have performed dozens of high-risk procedures such as intercostal nerve

blocks,[4] thoracic facet blocks,[5] occipital nerve blocks, and peripheral nerve blocks, at great

---

[4] An intercostal block is the injection of a local anesthetic (like Novocain) in the area
between two ribs where the intercostal nerve is located.  The proper procedure is as follows:
"The patient will be lying prone (face-down) for the procedure.  The area to be injected will be
cleansed with an antiseptic.  Using X-ray guidance, the doctor will place the needle into the
intercostal space below the ribs and then inject the local anesthetic.  The procedure will take up
to 20-60 minutes depending on how many levels need to be blocked.  Band-Aids will be placed
at the injection sites, and a nurse will monitor the blood pressure and pulse and will review the

expense. Exh. L, Leon Campbell Dep. 124:13-126:3, 132:12-134:2, 137:21-140:12; Exh. M,

Report of Dr. Weaver at 1 ¶ 4, 3 ¶ 2. While it is quite possible that Dr. Campbell gave trigger

injections for local pain under the surface of the skin, the nerve blocks he claims to have

performed are not likely to have been performed. Id. at 1 ¶ 4. Those types of blocks are

generally performed by anesthesiologists in hospital settings with crash carts, chest tubes, and

fluoroscopy due to the high risks involved. Id. The injections described by the plaintiffs are not

consistent with nerve blocks. Exh. N, Michael Allen Dep. 58:8-61:21, Dec. 28, 2007; Exh. O,

Lou Ellen Allen Dep. 59:19-64:16, Dec. 28, 2007; Exh. P, Lori Allen Dep. 62:22-64:7; Exh. M,

Report of Dr. Weaver at 1 ¶ 4. Of note, Dr. Campbell has never submitted a bill to any of the

Allens for services rendered, but managed to charge both interest and penalties because the

Allens failed to remit payment. Exh. L, Leon Campbell Dep. 147:4-10, Nov. 14, 2007; Exh. Q,

Leon Campbell 1st Dep. 139:18-140:14, Dec. 20, 2007; Exh. R, Leon Campbell 2nd Dep.

106:21-107:10, Dec. 20, 2007; see, e.g., Exh. S, Leon Campbell 2nd Dep., Plaintiffs' Exhibit 6-

Lori. Dr. Campbell, who readily stated that he could tie, if he so chose, any treatment he

---

discharge instructions with the patient before going home."
http://www.paincareproviders.com/Procedures/INTERCOSTALBLOCK.html

    [5] Thoracic facet joints are small joints about the size thumbnails located in pairs on the
back of the spine. The proper procedure for a thoracic facet block is as follows: "An IV
[intravenous tube] will be started so that relaxation medication can be given. The patient is
placed on the X-ray table, face down so the physician can best visualize these joints in the mid
back using x-ray guidance. The skin in the area of the mid back is scrubbed using 2 types of
sterile scrub (soap). Next, the physician numbs a small area of skin with numbing medicine.
This medicine stings for several seconds. After the numbing medicine has been given time to be
effective, the physician directs a very small needle, using x-ray guidance into the joint. A small
amount of contrast (dye) is injected to insure proper needle position inside the joint space. Then,
a small mixture of numbing medicine (anesthetic) and anti-inflammatory (cortisone/steroid) is
injected. One or several joints may be injected depending on location of the patients usual pain.
http://www.spineuniverse.com/displayarticle.php/article1182.html

rendered to the Allens to the accident, is not credible as to many of the treatments he allegedly rendered to the Allens. Exh. R, Leon Campbell 2nd Dep., 87:20-88:3, 107:2-10, Dec. 20, 2007. The United States, therefore, challenges many of his diagnoses, treatments, and charges.

Furthermore, the independent medical examinations revealed that the Allens, while they no doubt suffered painful injuries in the accident, are not presently limited in any meaningful way from pursuing their activities. See Exh. T, Independent Medical Reports of Dr. Weaver as to Michael Lou Ellen, and Lori Allen. Mrs. Allen appears to be the most impaired of the three, with a permanent impairment rating of 22%. Id.

### B.    The Montgomerys

Like the Allens, Wallace and Phyllis Montgomery suffered injuries in the accident. Mr. Montgomery, in particular, suffered a serious fracture of his right tibia that required surgical repair at Piedmont Hospital in Atlanta, Georgia. That treatment rendered was reasonable and necessary. Mr. Montgomery's knee replacement surgery was reasonable, necessary, and at least partially incident to the accident. The United States challenges any suggestion, however, that Mr. Montgomery will need future surgeries.

As to Phyllis Montgomery, she suffered bruising and other soft tissue injuries that no doubt led to aches and pains. However, the United States challenges Mrs. Montgomery's claims that traumatic breast calcifications, were discovered nearly two years post-accident, are caused or related to the accident. These calcifications were entirely consistent and common for Mrs. Montgomery's age, and the biopsy that she subsequently underwent was not accident-related. Exh. U, Richard Cummings Dep. 27:12-28:13, 40:16-19, 44:21-45:3. The United States further

-16-

challenges any alleged "fear of cancer" claim by Mrs. Montgomery, as there is no evidence that traumatic calcifications cause breast cancer, and, therefore, any such fear would be unreasonable. Id. at 27:23-28:7.

## III.    The United States is permitted to submit evidence showing that the plaintiffs' medical bills have been paid by insurance.

Alabama Code Section 12-21-45 makes evidence that a plaintiff's medical or hospital expenses have been paid or will be reimbursed admissible in civil tort cases. See Ala. Code § 12-21-45. The Eleventh Circuit, in an opinion that was later withdrawn on other grounds, stated that Section 12-21-45 "is Alabama's statutory modification of its common law collateral source rule," and went further to find that the collateral source rule "is as much substantive law as was the common law rule it modified." Bradford v. Bruno's, Inc., 41 F.3d 625, 626 (11th Cir. 1995) opinion withdrawn, 94 F.3d 621 (11th Cir. 1996). Notably, however, the Eleventh Circuit withdrew its opinion because, while the case pending on rehearing, an intervening Alabama Supreme Court decision ruled that Section 12-21-45 was unconstitutional under Alabama law, rendering the foregoing discussion irrelevant and moot since the Section could not apply anywhere. Bradford II, 94 F.3d 621, 622-23 (11th Cir. 1996) citing American Legion Post Number 57 v. Leahey, 681 So.2d 1337 (Ala. 1996).

At present, however, the Alabama Supreme Court, in a reverse of course, has reinstated Section 12-21-45, holding that the statute is constitutional. Marsh v. Green, 782 So. 2d 223, 232-33 (Ala. 2000). In a footnote, the Court left open the potential for defendants to argue for an offset due to the windfall a plaintiff might reap from double recovery. Id. at 233 n.2. With the reinstatement of the collateral source rule set forth in Section 12-21-45, the logic of the Eleventh

-17-

Circuit's original <u>Bradford</u> opinion holds sway: because the collateral source rule is a substantive one, it is applicable to federal courts sitting in diversity.

While the instant case does not lie in diversity, the FTCA was designed "to provide redress for ordinary torts recognized by state law." <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 478 (1994). Liability under the FTCA is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State—the source of *substantive liability* under the FTCA." <u>F.D.I.C.</u>, 510 U.S. at 478.

As the original <u>Bradford</u> decision made clear, Alabama's collateral source rule is substantive, and the United States may introduce evidence that the plaintiffs' medical bills have been or will be paid by insurance. <u>See also</u> <u>Tirey v. Boyte</u>, 2005 WL 2233068 at *4 (S.D. Ala. 2005) (unpublished) ("While it is true that the Eleventh Circuit has not revisited the issue since withdrawing the <u>Bradford I</u> opinion, and the case has no precedential value, it is persuasive and certainly the best indication of how the Eleventh Circuit would rule on this issue. Therefore, the undersigned finds that the more reasoned view supports the conclusion that the collateral source rule is a substantive rule . . . ."). The United States, therefore, is entitled to an off-set for those medical bills already paid.

## IV.     The United States is entitled to an off-set for any amounts settled with the plaintiffs' insurance providers.

The United States, to date, settled administrative claims filed by the Allens' automobile insurer at the time of the accident, State Farm, for $36,647.26 for payments made on behalf of the Allens to Ford Motor Co., presumably for property damage, as well as for equity and medical

payments. The United States is entitled for an offset for those amounts already settled with the plaintiffs' insurer.

As to the Montgomerys, the United States settled administrative claims filed by their insurer, also State Farm, for $24,000, covering payments to the Volvo Finance Co. and equity. The United States is entitled to an offset for those amounts already settled with the plaintiffs' insurer.

## CONCLUSION

For the foregoing reasons, the United States is not liable for any alleged injuries caused by the August 29, 2003, incident because Mrs. Moore committed no negligent act or omission in the operation of her vehicle. Second, even assuming Mrs. Moore did not choose the best course of action by stepping on her brake after learning of her deflated tire, she was not liable because, under ordinary standards of reasonableness or the sudden emergency doctrine, Mrs. Moore's actions were not unreasonable under the circumstances. Lastly, the United States cannot be liable because the tire failure, and not any alleged negligence, was the proximate cause of the accident.

Should the United States be found liable for the plaintiffs' injuries, the United States is entitled to a set-off for medical bills paid by insurance, as well as for all settlements made with the plaintiffs' automobile insurance carrier, State Farm. The United States is not liable for all of the plaintiffs' injuries, in particular those injuries diagnosed and treated by Dr. Leon Campbell,

//

//

//

-19-

whose charges are excessive. The United States, furthermore, is not liable for injuries that are just as likely the result of aging as they are related to the August 29, 2003, automobile accident.

Judgment should be entered in favor of the United States for all of the foregoing reasons.

Respectfully Submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
Civil Division

PHYLLIS J. PYLES
Director, Torts Branch
Civil Division

GAIL K. JOHNSON
Senior Trial Counsel, Torts Branch
Civil Division

/s/ Conor Kells
CONOR KELLS
Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
Post Office Box 888
Benjamin Franklin Station
Washington, DC 20044
Tel: (202) 616-4400
Fax: (202) 616-5200
Attorneys for Defendant United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date served a copy of the foregoing upon counsel for

Plaintiffs by electronic filing, CM/ECF:

> Annesley H. DeGaris
> Attorney for the Allen Plaintiffs
> Cory, Watson, Crowder & DeGaris, P.C.
> 2131 Magnolia Avenue, Suite 200
> Birmingham, Alabama  35205
>
> J. Callen Sparrow
> Attorney for the Montgomery Plaintiffs
> Heninger Garrison Davis, L.L.C.
> P.O. Box 11310 (35202)
> 2224 1st Avenue North
> Birmingham, Alabama  35203

Dated this 18th day of February, 2008.

> /s/ Conor Kells
> Trial Attorney, Torts Branch
> Civil Division

# Exhibit A

# FREEDOM COURT REPORTING

Page 9

1  Q.  Lee?
2  A.  Uh-huh.
3  Q.  And is Mr. Moore employed?
4  A.  Yes.
5  Q.  Where?
6  A.  Thermal Components.
7  Q.  What is --
8  A.  Here in Montgomery.
9  Q.  What is his job there?
10 A.  He is an A operator.  He
11 operates some machine.  I don't know.
12 Q.  That's fine.  How long has he
13 been at Thermal Components?
14 A.  Since about 1990.  I think
15 1990.
16 Q.  Working on twenty years, close
17 to it?
18 A.  I think.
19 Q.  Sometime in the early '90s
20 best recollection?
21 A.  Yes.
22 Q.  Where did he work before that?
23 A.  He worked at -- He had his own

Page 10

1  business.
2  Q.  And what kind of work did he
3  do?
4  A.  He had a pawn shop.
5  Q.  And as I understand it,
6  Ms. Moore, you are employed by the
7  Department of Justice here at the U.S.
8  Attorney's office?
9  A.  I am.
10 Q.  And how long have you been
11 here or in that job?
12 A.  I've been in this office since
13 April 1979.  So what is that?  Twenty-eight
14 years, I believe.
15 Q.  What is your job?  What do you
16 do at the U.S. Attorney's office?
17 A.  Right now my position is
18 administrative assistant to the U.S.
19 Attorney.
20 Q.  How long have you been in that
21 position?
22 A.  Since 2001.
23 Q.  Are you from Montgomery?

Page 11

1  A.  Lowndes County.
2  Q.  How long have you lived in
3  Montgomery?
4  A.  1978.
5  Q.  How about Mr. Moore, is he
6  from Montgomery or surrounding county?
7  A.  Surrounding county, Lowndes.
8  Q.  He's also from Lowndes County?
9  A.  Yes.
10 Q.  Where in Lowndes are y'all
11 from?
12 A.  Hayneville.
13 Q.  Both of you?
14 A.  Yes.
15 Q.  How many family members do you
16 have in Montgomery County?  Do you have any?
17 A.  In-laws.
18 Q.  Do you have any children?
19 A.  Yes.
20 Q.  How old?
21 A.  Thirty and twenty-seven.
22 Q.  Do they live around here?
23 A.  Yes.

Page 12

1  Q.  I don't need an address.  They
2  live in Montgomery County?
3  A.  Yes.
4  Q.  What are their names?
5  A.  Latrice Moore and Wynetta
6  Moore.
7  Q.  Are they employed?
8  A.  Yes.
9  Q.  Can you tell me at what
10 companies they work?
11 A.  Latrice is employed at Hyundai
12 plant; and Wynetta is employed at Daihan,
13 that's a Hyundai supplier.
14 Q.  Are they married?
15 A.  Latrice is divorced, Wynetta
16 is not married.
17 Q.  What is her former husband's
18 name?
19 A.  Marcus Quinn.
20 Q.  Quinn?
21 A.  Q-U-I-N-N.
22 Q.  Who are -- Are your in-laws
23 that are in this area all Moores?

3  (Pages 9 to 12)

## 367 VALLEY AVENUE

# FREEDOM COURT REPORTING

Page 13

1    A.    Yes.
2    Q.    How about over in Lowndes
3  County, do you have relatives that are still
4  living in Lowndes County?
5    A.    Yes.
6    Q.    A ton of them or just a
7  handful?
8    A.    Well, I've got four sisters
9  and a brother and my mother.
10    Q.    And they all still live in
11  Lowndes County?
12    A.    Yes.
13    Q.    What is your maiden name?
14    A.    Gordon.
15    Q.    Are your sisters that live in
16  Lowndes County married?
17    A.    Two are married.
18    Q.    What are their married names?
19    A.    One is Middleton, Geraldine
20  Middleton; and Alma Gordon, she married a
21  Gordon also.
22    Q.    And I don't want to take this
23  out any farther than I already have. But I

Page 14

1  do want to ask you where your relatives that
2  currently still live in Lowndes County work.
3    A.    Well, one of my sisters work
4  at a sewing factory; one work at -- one of
5  my sisters work at Thermal Components where
6  my husband work; one work at Mobis, which is
7  a Hyundai supplier; and my brother does like
8  construction work, I don't know who he works
9  for.
10    Q.    You know, Ms. Moore, I have
11  jumped into this line of questioning just by
12  habit. As you were giving me the names, I
13  realized this is not a jury case so I don't
14  need to know all of your relatives because
15  they won't be sitting on my jury so we can
16  move on.
17         As you know, we're here in
18  Montgomery to take your deposition --
19  shouldn't take too long, by the way --
20  regarding a car wreck that occurred on
21  August 29, 2003; right?
22    A.    Yes.
23    Q.    Where were you coming from at

Page 15

1  the time that car wreck occurred?
2    A.    I was coming from an LECC
3  conference in Perdido Beach, which is in
4  Orange Beach, Alabama.
5    Q.    Were y'all at Perdido Hilton
6  there, what used to be called Perdido Beach
7  Hilton right there on the point?
8    A.    It's called Perdido Beach
9  Resort. I don't know what it used to be
10  called.
11    Q.    Right by the bridge?
12    A.    Yes.
13    Q.    What is LECC?
14    A.    Law enforcement coordinator
15  committee.
16    Q.    You were down there doing
17  something connected with your job?
18    A.    Right.
19    Q.    Were other people from this
20  office attending the LECC seminar,
21  conference?
22    A.    Yes.
23    Q.    How many of y'all had gone

Page 16

1  down, do you know?
2    A.    I don't know.
3    Q.    Did you go by yourself? And
4  by that I mean, did your husband go with you
5  or anybody?
6    A.    I drove by myself.
7    Q.    All right. And you stayed
8  there at the Perdido Resort?
9    A.    Yes.
10    Q.    How long had y'all been at the
11  beach before you were coming back?
12    A.    Went there on Tuesday and was
13  returning on Friday.
14    Q.    This wreck happened on a
15  Friday?
16    A.    Yes.
17    Q.    About what time of day?
18    A.    About two-thirty.
19    Q.    Do you remember what the
20  weather was like?
21    A.    It was raining.
22    Q.    Hard?
23    A.    At times.

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1    Q.    The wreck report indicates
2  that the wreck happened about two-thirty, it
3  actually says 2:25. Is that consistent with
4  your memory about the time of day that this
5  occurred?
6    A.    Yes. It was about -- That was
7  about the time I last looked at the time,
8  yes.
9    Q.    All right. Had you stopped
10  since leaving Gulf Shores before the wreck
11  happened?
12    A.    No.
13    Q.    All right. So you had gassed
14  up while you were still down at the beach?
15    A.    Yes.
16    Q.    And were going to drive all
17  the way back to Montgomery?
18    A.    Yes.
19    Q.    And your plan, at least, was
20  to not stop anywhere between the two?
21    A.    Right.
22    Q.    Had you eaten lunch before
23  leaving the beach?

Page 18

1    A.    I don't remember.
2    Q.    Had you had anything alcoholic
3  to drink that day?
4    A.    No.
5    Q.    Do you drink --
6    A.    Occasionally.
7    Q.    -- socially?
8    A.    Yes.
9    Q.    As part of the conference at
10  the seminar, had there been a cocktail party
11  or anything the night before?
12    A.    There had been a dinner on the
13  balcony. And there was drinks available.
14  You purchased it.
15    Q.    Did you have any drinks at the
16  party the night before?
17    A.    No.
18    Q.    Did you have any drinks the
19  night before at all, whether it was at the
20  party or otherwise?
21    A.    No.
22    Q.    Do you remember about what
23  time you left the beach to head back?

Page 19

1    A.    I think it was around 12:30.
2    Q.    Was it your intention to go
3  home or were y'all -- or were you going to
4  come back and swing by the office on the way
5  home?
6    A.    I was going home.
7    Q.    You were done for the week and
8  headed home for the weekend?
9    A.    Right.
10    Q.    What happened?
11    A.    Well, I was driving, looking
12  ahead, my hands on the steering wheel, and
13  it was raining. And I was in the inside
14  lane coming around a car, and I heard this
15  noise like my tire blew. And I lost all
16  control of my car. I didn't have any
17  control after that.
18    Q.    All right. As I understand
19  what you said, you were driving north on
20  I-65; correct?
21    A.    Right.
22    Q.    And you had moved from the
23  right-hand lane -- it's a two-lane highway

Page 20

1  where you were?
2    A.    Right.
3    Q.    Or four, but two going north?
4    A.    Yes.
5    Q.    You had moved from the
6  right-hand lane to the left-hand lane to
7  pass someone?
8    A.    Yes.
9    Q.    And you heard a noise?
10    A.    I heard a popping sound -- A
11  pop like my tire blew, that's what it felt
12  like, because I didn't have control of it.
13    Q.    And all of a sudden you felt
14  like you lost control of your car?
15    A.    Yes.
16    Q.    And you have a memory of what
17  you just described?
18    A.    Yes.
19    Q.    Do you have a memory of the
20  wreck kind of unfolding after that?
21    A.    No. I remember hitting the
22  median. I don't remember anything after
23  that.

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1    Q.    Until when?
2    A.    Until I woke up in the
3  hospital pretty much. I kind of remember a
4  little bit in the airplane -- I mean the
5  helicopter.
6    Q.    And do you, sitting here
7  today, know when that was when you -- when
8  your memory recovers, if you will, and you
9  were in the hospital?
10    A.    The next morning.
11    Q.    All right. So if this
12  happened at about two-thirty on a Friday
13  afternoon, you don't remember anything from
14  entering the median until sometime Saturday
15  morning, except you have a vague memory of
16  being in the helicopter?
17    A.    Yes.
18    Q.    Is that correct?
19    A.    That's correct.
20    Q.    When y'all left the beach to
21  head back to Montgomery, were you
22  caravanning in any way? Was there some
23  coordinated effort among you and the other

Page 22

1  people in the office to let's head out, or
2  were you just heading back?
3    A.    I was just heading back.
4    Q.    So do you know, having talked
5  to the people in your office since the day
6  of the wreck, whether or not any of the
7  other employees from the U.S. Attorney's
8  office were behind you when this wreck
9  occurred?
10    A.    No. No one has said they were
11  behind me or saw me.
12    Q.    Has anyone indicated to you
13  that they came upon the wreck as they were
14  driving back to Montgomery?
15    A.    Yes.
16    Q.    Who?
17    A.    Well, my boss, for one. She
18  did not know it was me at the time.
19    Q.    So she just kept going?
20    A.    No. She got a call from the
21  office about the accident, and then she
22  realized it was me.
23    Q.    And who are we talking about,

Page 23

1  the U.S. Attorney, Ms. Canary?
2    A.    Yes.
3    Q.    Anyone else in the office
4  indicate to you that they saw a wreck,
5  whether they knew it was yours or not, as
6  they came up 65 on their way back to
7  Montgomery?
8    A.    Yes.
9    Q.    Who?
10    A.    Tommie Hardwick, she's an
11  attorney in the office.
12    Q.    Tommie Hardwick?
13    A.    Yes.
14    Q.    That's H-A-R-T?
15    A.    H-A-R-D.
16    Q.    Did she stop or do you know?
17    A.    I don't know.
18    Q.    Anybody else?
19    A.    No. No one that just actually
20  said they saw the wreck -- you know, saw the
21  accident. I think traffic was backed up so
22  some people were caught in that and they
23  didn't know what happened.

Page 24

1    Q.    Right. Did Ms. Canary, after
2  getting a call from the office, return to
3  the scene of the wreck?
4    A.    I don't know if she returned
5  to the scene, but she went to the place
6  where my car had been towed.
7    Q.    That day?
8    A.    Yes.
9    Q.    And where was that?
10    A.    I don't -- I don't know.
11    Q.    How long were you in the
12  hospital?
13    A.    From Friday until -- I think I
14  came home Tuesday -- Monday or Tuesday. I
15  don't remember.
16    Q.    Other than Ms. Canary and
17  Ms. Hardwick, are you aware of anybody,
18  whether it's someone in the office or
19  otherwise, that either witnessed the wreck
20  itself, as it was happening, or came upon it
21  after it had -- everything had come to a
22  stop?
23    A.    No.

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

| | |
|---|---|
| Page 29 | Page 31 |

Page 29

1    A.    No.
2    Q.    And at what point in this --
3    the day of the wreck is 2:30, Friday, the
4    29th of August. At what point did you speak
5    with the state trooper who was investigating
6    the wreck?
7    A.    I'm trying to remember if I
8    ever did talk to him.
9    Q.    And if you don't know an exact
10    day, that's fine. Do you remember ever
11    talking to the police officer?
12    A.    Let me see. I don't know
13    whether it was him. Someone called about my
14    license or something and said they had my
15    license or something.
16    Q.    And did you talk to them?
17    A.    I did. Whoever said they had
18    my license and they mailed it to me.
19    Q.    I see. Somebody had your
20    driver's license?
21    A.    Yes.
22    Q.    And you don't remember whether
23    or not that was the trooper or someone from

Page 31

1    A.    I don't recall.
2    Q.    Okay. Well, then, let me
3    follow up on that. Have you ever spoken
4    with Trooper Fisher about anything, this
5    wreck or anything else?
6    A.    What's the name?
7    Q.    Trooper Fisher?
8    A.    I don't remember.
9    Q.    I think Robert Fisher. Have
10    you ever seen a copy of the wreck report?
11    A.    Yes.
12    Q.    And do you remember when you
13    first saw that?
14    A.    I don't remember.
15    Q.    When you got it, did you look
16    at it to see what the state trooper had put
17    on it, what information was included on it?
18    A.    I scanned, yes.
19    Q.    Did you, when you scanned it,
20    see anything on there that you disagreed
21    with?
22        And I've got a copy here, I
23    don't want you to -- Do you remember?

Page 30

1    the trooper station?
2    A.    Right. I don't.
3    Q.    Other than that phone call, do
4    you remember any conversation that you
5    had -- ever had with the investigating
6    trooper into this wreck?
7        MR. DOYLE: Objection. She
8    didn't testify that she had spoken with the
9    trooper. And the form of your question
10    is --
11        MR. SPARROW: Fair enough.
12    Q.    Other than the conversation
13    about your license, do you remember ever
14    having a conversation with the state trooper
15    or anyone -- Let me just strike all of that
16    and ask you if you ever had a conversation
17    with the state trooper?
18    A.    I don't recall. I don't
19    recall.
20    Q.    And I mean ever, up to and
21    including today.
22    A.    Regarding that wreck?
23    Q.    Yes.

Page 32

1    A.    I don't recall what was on it.
2    Q.    One thing that is on it is he
3    has your estimated speed at eighty-three
4    miles per hour. Do you agree or disagree
5    with that?
6    A.    I disagree with that.
7        MR. KELLS: Objection. What
8    number did you quote for that?
9        MR. SPARROW: Eighty-three
10    miles per hour.
11        MR. KELLS: Can you show me
12    that for her speed?
13        MR. SPARROW: (Indicates.)
14        MR. KELLS: Okay. Thanks. I
15    just wanted to verify that.
16    Q.    Do you have a judgment,
17    Ms. Moore, as to how fast you were traveling
18    as you were passing the vehicle that you
19    described earlier just before this incident
20    occurred?
21    A.    Between sixty and sixty-five.
22    And when the tire blew, or whatever happened
23    to the tire, it picked up speed. And I

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

<table>
<tr><td colspan="2">Page 33</td></tr>
</table>

Page 33

1 couldn't do anything -- I couldn't stop it,
2 so.
3　Q.　And how is it that you know
4 you were going sixty to sixty-five as you
5 were passing that vehicle?
6　A.　Because I looked at my
7 speedometer.
8　Q.　As you were passing?
9　A.　Yeah. Just kind of looked
10 down.
11　Q.　Were you on cruise control or
12 just -- I just drove down, and I'm just
13 curious, did you have your car on cruise
14 control or were you just driving with your
15 foot?
16　A.　Driving with my foot.
17　Q.　Do you remember or can you
18 tell me, Ms. Moore, who, since the day of
19 this wreck, you have told that you had a
20 blowout?
21　A.　I told everybody that asked
22 me. I don't remember how many, I mean, or
23 who.

Page 34

1　Q.　Okay. Did you ever make an
2 effort to contact the state trooper to
3 inform him that it was your position that
4 there had been some problem with your tire
5 that contributed to the cause of this wreck?
6　A.　No, I did not. I didn't know
7 I could do that. No, I didn't.
8　Q.　Did you -- When you say you
9 looked at the wreck report, look at it
10 closely enough to see that it didn't include
11 anything about a problem with the tire or
12 anything else on your car?
13　A.　No, I did not.
14　Q.　I have a tire in my office
15 that Mr. Kells has provided me. Did you
16 provide that to him?
17　A.　No.
18　Q.　After this wreck, did you make
19 an effort to recover one or more of the
20 tires from the car that you were in at the
21 time of this wreck?
22　A.　No, I didn't.
23　Q.　Are you aware that someone

Page 35

1 else obtained one or more of the tires off
2 of the car that you were driving that was
3 involved in this wreck?
4　A.　Yes, I am.
5　Q.　All right. Who got the tires?
6　A.　Beasley, Wilson's attorneys.
7　Q.　And that would be because you
8 had contacted them about this issue?
9　A.　No.
10　Q.　Do you know why Beasley,
11 Wilson and them went and got one or more of
12 your tires from your car?
13　　　　(Off-the-Record discussion
14　　　　was held.)
15　Q.　Have you ever or did Beasley,
16 Wilson or Allen, whatever the firm name is
17 now, file any claim on your behalf as a
18 result of any investigation they made into
19 the tire on your car?
20　A.　No, they didn't.
21　Q.　Do you know how many tires
22 they recovered from your car?
23　A.　No, I don't.

Page 36

1　Q.　Do you know where on your car
2 the tire that Mr. Kells provided to me came
3 from?
4　A.　Well, the tire that -- I don't
5 know where it came from. But the tire that
6 I -- that felt like it blew on my car was
7 the tire on the left side, the driver's
8 side, the back tire.
9　Q.　Left, back tire?
10　A.　Yes.
11　Q.　What kind of car were you
12 driving?
13　A.　I was driving a Mountaineer.
14 It was an SUV. I don't remember exactly
15 what year or model.
16　Q.　Wreck report says '97 Mercury;
17 does that sound right?
18　A.　Mountaineer, yes.
19　Q.　Do you know if a determination
20 was ever made if that tire had blown out?
21　A.　No, I don't.
22　Q.　Were you told by the people at
23 Beasley, Wilson whether or not they thought

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 45

1           were marked for
2           identification.)
3      A.    They look like pictures of my
4  car.
5      Q.    Okay.  They look like pictures
6  of your car after this wreck?
7      A.    Uh-huh.
8      Q.    Do you see in Plaintiff's 1 --
9  Did you take these?
10     A.    No.  My husband did.
11     Q.    Do you have the ones that have
12  color to them?
13     A.    Yes.
14     Q.    I'm going to ask you if you
15  would, either have copies made and I'll pay
16  you for that if I need to, or provide those
17  to your lawyer?
18     A.    He just took them with the
19  Polaroid, with the sixty second camera.  He
20  just wanted to show it to me.  They are not
21  very good, but I have them.
22           MR. KELLS:  They are in color?
23           THE WITNESS:  Yes.

Page 46

1      Q.    Probably a little clearer than
2  these are?
3      A.    Yes.
4      Q.    Would you provide those to
5  Conor, and then I'll do what needs to be
6  done to get copies of those made and we'll
7  get the originals back to you.  Okay?
8      A.    Okay.
9      Q.    Do you know anything about the
10  circumstances of these pictures being taken?
11  I know your husband took them, do you know
12  when?
13     A.    He took them while I was still
14  in the hospital.  He went and took them so I
15  could look at it.
16     Q.    So just within a few days?
17     A.    Yes.
18     Q.    Do you know, in Plaintiff's 1,
19  why that tire is not still attached to the
20  car?
21     A.    No, I don't.
22     Q.    Okay.  Do you know who took it
23  off?

Page 47

1      A.    I don't.
2      Q.    You mentioned earlier that you
3  did have some kind of surgery in Pensacola.
4  Which of those injuries did you operate, you
5  mentioned shoulder and a lot in your pelvis?
6      A.    No.  The diaphragm.
7      Q.    Are you aware of any other
8  photographs of either your vehicle or the
9  tire in question that are not in that stack
10  of Plaintiff's 1 through 6?
11     A.    No.  I'm not aware of any
12  others.
13     Q.    And are those -- Did your
14  husband take six pictures?
15     A.    He took all of those, yes.
16     Q.    Did he take, for instance,
17  another thirty that aren't there?
18     A.    No.  That's all he took.
19     Q.    That's all he took.
20           MR. SPARROW:  Let me take a
21  short break.
22           (Recess taken.)
23     Q.    Ms. Moore, I just have a few

Page 48

1  more questions.
2           Just to clarify a few things.
3  You mentioned when you were telling us
4  earlier what happened at the wreck that you
5  heard -- and correct me if I'm wrong, I just
6  want to make sure I've got it right.  You
7  heard a noise, and I think you referred to
8  it as a pop; is that correct?
9      A.    Yes.
10     Q.    And then all of a sudden you
11  lost control?
12     A.    Yes.
13     Q.    You said that after hearing
14  the pop, your car accelerated?
15     A.    Yes.  Well, I tried to -- When
16  you put your foot on the brake to try to
17  stop it, it just seemed like it picked up
18  speed.
19     Q.    Did you put your foot on the
20  brake --
21     A.    Yes.
22     Q.    -- when you heard the noise?
23     A.    Yes.

12   (Pages 45 to 48)

## FREEDOM COURT REPORTING

Page 49

1    Q.    Was there any other sensation
2  that accompanied the noise?
3    A.    Yes.
4    Q.    What?
5    A.    Felt like the car dropped to
6  the side, kind of dropped down.
7    Q.    In the back?
8    A.    Yes.
9    Q.    Have you ever been driving
10 when you had a flat tire before this
11 happened?
12   A.    Yes.
13   Q.    Had you ever had that occur to
14 you on the interstate?
15   A.    No.
16       MR. KELLS: Just to clarify,
17 when you say that, you mean a flat tire?
18       MR. SPARROW: Yes. Flat tire,
19 blowout, whatever you want to call it.
20   Q.    Also, to clarify, you
21 mentioned that Ms. Canary and Ms. Hardwick
22 indicated to you that they had seen a wreck
23 as they went by; correct?

Page 50

1    A.    Came along after it happened,
2  yes.
3    Q.    That was my question.
4  Actually I think you mentioned that with
5  Canary. Did Hardwick see the wreck or just
6  come by and see that somebody had had a
7  wreck?
8    A.    Came by and saw that someone
9  had had a wreck.
10   Q.    And are you aware if
11 Ms. Hardwick stopped there at the scene?
12   A.    I'm not aware.
13   Q.    She never mentioned if she got
14 out of her car, for instance, to come check
15 on you and see what was going on?
16   A.    No. She did not know it was
17 me.
18   Q.    All right. As I understand
19 it, your memory drops off as you entered the
20 median; is that correct?
21   A.    Yes.
22   Q.    So maybe it's fortunate, but
23 you don't remember coming out of the median

Page 51

1  on the other side, or the impact with either
2  of the cars on the southbound lanes?
3    A.    No, I don't.
4    Q.    Do you remember either -- from
5  any standpoint in time, recognizing or
6  realizing that those cars were even coming
7  toward you in the southbound lane?
8    A.    No, sir, I did not.
9    Q.    Is it your contention,
10 Ms. Moore, that either the driver of the car
11 in which the Allens were --
12       MR. KELLS: I'm going to
13 object to the form. She's not a party to
14 the case, so it wouldn't be her contention.
15 Just that clarification.
16   Q.    With that objection you can
17 answer. Do you believe, or is it your
18 contention, that either the driver of the
19 Allen vehicle or the Montgomery vehicle did
20 anything to contribute to this wreck?
21   A.    Is it my opinion what? Can
22 you please repeat?
23   Q.    That either of the two cars in

Page 52

1  the southbound lane that were involved in
2  this accident or this wreck did anything
3  wrong?
4    A.    I don't know.
5    Q.    When you were in the hospital,
6  Ms. Moore, at any time during your stay,
7  were you asked by hospital staff to tell
8  them what had happened that led to you being
9  in the hospital?
10   A.    I don't remember. I was
11 heavily sedated. I don't know.
12   Q.    Pretty much the whole time you
13 were down there?
14   A.    Well, not the day I came home.
15 But I don't remember them asking me
16 anything.
17   Q.    Okay. When did you first
18 contact your insurance company about it?
19   A.    I don't remember that either.
20   Q.    Did you make the contact or
21 did your husband?
22   A.    I'm not sure whether I did or
23 he did. I don't remember that either.

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# Exhibit B

*TIRExpertise Inc*

# T I R E x p e r t i s e  I n c.

## Tire Consultancy and Tire  Failure Analysis
### PETER.L.FLANNER
### PRESIDENT.

104,Bluebelle Drive,
Madison,Al. 35758

Phone/Fax:  (256) 772-4971
Cell Phone:  (256) 655-3465
E-mail:  plflanner@AOL.com

<u>Wallace Montgomery et al & Michael Allen et al vs. United States of America.</u>

I have been retained by the plaintiffs in the above captioned case to review evidence & carry out a detailed inspection of the tire involved in an August,2003 accident on I-65 near mile marker 106 in Alabama.This report is submitted pursuant to Federal Rules of Civil Procedures 26(a)(2)(B).

<u>Identity of Expert Witness.</u>

PETER L.FLANNER

President,

TIRExpertise,Inc.

104,Bluebelle Drive,

Madison,

Alabama,35758

(256)772-4971.

<u>Summary Opinion.</u>

I have completed my examination of the incident tire installed on the Left Rear position on the 1997 Mercury Mountaineer involved in the above-captioned matter.After a detailed examination of the physical evidence & a review of the information provided,I have concluded that the incident tire suffered an air loss following the ejection of a large screw that had previously penetrated the tire structure.The massive damage to the tire detailed in my Inspection Report & Photographs occurred after the tire deflation,when the vehicle went out of control,crossed the median & impacted the vehicles being driven by Mr.Allen & Ms. Montgomery.



1

*TIRExpertise Inc*

<u>Complete Statement of All Opinions to be Expressed and the Basis and Reasons Therefore.</u>

I,Peter Flanner,will testify on behalf of the plaintiffs,Messrs Montgomery & Allen as an expert in the field of tire failure analysis and will address the issues regarding tire failure mode and effects.

My opinions & conclusions are based upon my training,experience & expertise in tire design/development,tire testing,the analysis & evaluation of failed tires,visual & tactile examination of the incident tire & review of file materials provided by counsel,especially Alabama Uniform Traffic Accident Report #3522163,Accident Scene Photographs & the deposition of Bertha M.Moore.

My opinion & conclusions will include the following:-

1. The incident tire was punctured by a large screw,which would have caused a gradual loss of inflation pressure.Approximate dimensions,1/8" diameter with a screw head of ~3/8" diameter.

2. The screw is no longer in the tire.

3. The screw completely penetrated the tire structure.

4. Although it is impossible to determine the length of time that the screw had been in the tire,the imprint of the screw head around the ingress point would suggest that it had been in the tire for some time & <u>did not penetrate the tire for the first time at the time of the accident.</u>

5. The massive damage to the tire occurred after the loss of control as the vehicle crossed the central grass median,which,from accident scene photographs,includes a concrete culvert,became airborne & crashed into the plaintiffs' vehicles traveling in the Southbound lanes of I-65.

6. There was no manufacturing defect in the P235/75R15 Cordovan XRT Wild Trac steel-belted radial tire mounted on the Left Rear position.Based upon the D.O.T. number,this tire was manufactured during the 27th. week of 2000 by Goodyear at their Fayetteville,N.C. Plant for T.B.C. Corporation-a large distributor of Private Brand tires.This tire is an appropriate fitment on a Mercury Mountaineer based upon size & load carrying capacity.

7. Ms.Moore purchased the 1997 Mercury Mountaineer vehicle (similar to the Ford Explorer) in May of 2003,less than 4 months before the accident.She stated in her deposition that the tires on the vehicle at the time of the accident were on the vehicle at the time of purchase.

8. The tire was approximately 80% worn with an average of 2/32" of usable tread remaining with relatively even tread wear.

<u>Background</u>

On August 29th.2003,according to deposition testimony of Ms.B. Moore,she was returning from a conference in Perdido Beach to her residence in Montgomery in her 1997 Mercury Mountaineer.She was traveling North on I-65 in rainy weather.She estimated her speed at 60 -65 m.p.h. & at 2:25 p.m. near the 106.1

2

*TIRExpertise Inc*

mile post,she experienced a rapid deflation of the Left Rear tire,lost control,crossed the median & impacted the plaintiffs' vehicles,which were traveling South-bound on I-65.Although accident scene photographs show the median as being largely grassy there are also regularly spaced concrete culverts located in the median.The Left rear tire suffered massive trauma resulting in multiple sidewall splits & 2 areas in the tread portion where the impacts had completely severed the tire structure in the tread area.

Qualifications of P.L.Flanner.

I retired from Goodyear Dunlop Tires North America at the end of 2003 after a 45 year career in various Technical & Managerial capacities.My attached curriculum vitae lists the positions held over that period. I hold a Higher National Certificate in Applied Physics.

I joined Dunlop Tyres Ltd. at their World Technical Headquarters in Birmingham,England in 1958 as a Technical Trainee.After assignments in Quality Assurance,Tire Test Research & Radial Tire Technology transfer to Overseas plants,I was appointed to Dunlop U.S.A.'s HQ in Buffalo N.Y. in 1976. to continue with the transfer of Dunlop European Radial Tire Technology to the North American Plants.Additionally,I established relationships with the U.S. Offices of vehicle manufacturers fitting Dunlop tires & set-up a Field/Customer Service function to gather & analyse complaints on imported Dunlop tires.This model was adopted Company-wide & I headed up that Organization & also introduced the techniques for statistical analysis of product performance as a tool to continually improve the performance & acceptance of Dunlop tire products in the U.S.A.This also included the analysis & dissection of tires returned from the market & coordinating the adoption & evaluation of corrective countermeasures.Over that & subsequent periods I examined many thousands of tires-motorcycle,passenger car,light & medium truck,industrial & O.T.R. tires.

Other areas of expertise include design,development & testing of passenger car,light truck & medium truck radial tires for the U.S. market.At the time of my retirement I was Product Evaluation Manager at the Huntsville,Alabama facility charged with the testing & analysis of Dunlop products to Customer,Federal & stringent internal Dunlop requirements.

After my retirement I established TIRExpertise Inc.,specializing in Tire Consultancy & Tire Failure Analysis in Madison,Alabama.My business covers many types of tires ranging from Motorcycle,Passenger Car,Light Truck & Medium Truck tires to large Off-The-Road Earthmover tires.I accept commissions from both Plaintiffs & Defendants,where I & they feel my knowledge & experience would be beneficial.

This broad experience makes me qualified to deliver authoritative opinions in areas of my expertise in regard to the Moore tire.

Methodology;The Data or any Information Considered by the Witness in Forming His Opinion.

3

*TIRExpertise Inc*

The primary basis for opinions expressed in this Report was derived from detailed examination of the incident tire from the Moore vehicle utilizing visual,tactile & measurement techniques & methods well-known in the tire failure analysis community.

The examination notes from inspection of the incident tire are appended,as are copies of digital photographs.

Additionally,I have reviewed the following information sources:-

Deposition.

    1.  Moore,Bertha M. August 7,2007.

Accident Report.

    1.  Alabama Uniform Traffic Accident Report,August 29,2003 by Trooper Fisher.

Accident Scene Photographs.

    1.  Provided by J.C.Sparrow.

Other Documents.

    1.  "Who Makes It & Where"-a Bennett Garfield Publication.

    2.  "Tire Guide"-a Bennett Garfield Publication.

    3.  "The Tire & Rim Association Yearbook."

    4.  "The Investigator's Guides to Tire Failures.Chapter 6-'Penetrations & Punctures' " R.J.Grogan.Institute of Police Technology & Management.

Any Exhibit to be Used as a Summary or in Support of the Opinions.

    1.  Tire Report & Opinions.

    2.  Tire Examination Notes.

    3.  Incident Tire.

    4.  Wear Measurements.

    5.  Digital Photographs of Incident Tire.

    6.  Literature References denoted in the Report or Excerpts there from.

The Qualifications of the Witness including a List of Publications Authored by the Witness within the Preceding Ten(10) Years.

A curriculum vitae is attached hereto.All publications authored during the preceding ten(10) years were made during my employment with Dunlop & Goodyear & are subject to Confidentiality Agreements.

Compensation to be Paid for the Study & Testimony.

A copy of my Professional Services Agreement is Attached.

Listing of Other Cases the Witness has Testified in as an Expert Witness at Trial or Deposition within the Preceding Four(4) Years.

4

*TIRExpertise Inc*

A list reflecting the above-required information is included in my curriculum vitae.

I reserve the right to supplement this report should additional information become available.

Peter L. Flanner.
President,
*TIRExpertise Inc.*

Date: 9-17-2007

# Exhibit C

# Report 07.036

Cordovan Tire Failure
Mercury Mountaineer Collision Sequence

## INTRODUCTION

According to a furnished copy of the police report of the incident, a 1997 Mercury Mountaineer was northbound on I-65 in Alabama at mile 106.1 under daylight conditions and rain when the driver of the Mountaineer lost control, crossing the median and entering the southbound lanes, where a collision occurred between the Mountaineer and a southbound Lincoln Town Car. Subsequently, the Mountaineer collided with a southbound Volvo V70. The loss of control of the Mountaineer was reportedly caused by a sudden deflation of the left (driver's side) rear tire of that vehicle.

In a letter dated June 19, 2007, the undersigned was asked to examine the tire reportedly removed from the left rear of the Mountaineer to determine, if possible, the cause of the reported sudden deflation of that tire. The undersigned was also asked to express opinions regarding whether or not the failure of that tire was likely to have been anticipated, the likelihood that a driver would lose control as a result of a deflation, and what steps might have been taken to avoid loss of control after a deflation. The tire was received without rim in a secure cardboard box at the business address of the undersigned on June 20, 2007. The tire was examined in detail on June 29, 2007, at which time the attached photographs were taken. An optical disc present in a plastic sleeve attached to the inside rear cover of this report contains all photographs taken on that date, the text of this report in Word 2007 format, and other digitized files pertaining to this investigation and report.

## TIRE EXAMINATION AND FINDINGS

The tire is shown as received in Photographs A, B, and C. Although there was no rim provided with this tire, examination of the carcass did not reveal any indications of tire damage due to a size mismatch between tire and rim or to other improper mounting methods or techniques. Similarly, although no valve stem was available for examination and testing, there was no evidence in the carcass that this tire had been operated in an overdeflected condition (which is almost universally caused by underinflation in passenger cars and light trucks), indicating that the valve stem had performed its function properly and that the tire had been maintained at a normal and proper pressure for most of its service life.

Selected tire markings are shown in Photographs D through H. This was a Cordovan brand, size P235/75R15, standard load, tubeless, radial-ply tire. Tire construction included two polyester cord body ("sidewall") plies and two steel tread plies (belts). The serial number indicated that this tire was manufactured in the 27th week of 2000 at the Goodyear Tire and Rubber Company plant at Fayetteville, North Carolina. Remaining tread groove depths were all 4/32 to 5/32 inch, indicating uniform wear of the tread ribs; uniform wear indicates that this tire was operated on properly aligned axle(s) and that the inflation pressure was satisfactory for its service life.

There were numerous mechanical damages to this tire, which will not be enumerated in detail in this report. Examination of those damages revealed that all were the result of externally applied, abnormal forces acting on the tire body, including both beads. Examination of the carcass did reveal the location of a penetration by an object which was no longer present with the tire (Photographs K through O). Examination of the inter-ply surfaces of this penetration revealed wear; i.e., the object which made this penetration was carried by the tire for a

significant number of miles.  The absence of the penetrating object with the carcass strongly

suggests that it was discharged from this tire before the loss of vehicle control and subsequent

extensive mechanical damages to this tire.  Most probably, this object was dislodged/discharged

from this tire as the Mountaineer was traveling on the interstate highway.

Tubeless tires have an inner liner which is designed to seal around puncturing objects,

allowing a punctured tire to be driven a substantial distance before significant deflation occurs,

as long as the penetrating object stays with the tire.  If the penetrating object is lost, deflation

occurs very quickly.  It should also be noted that water is a lubricant for rubber and the objects

which are likely to penetrate a tire, and the Mountaineer was traveling on a wet road in the rain.

### DISCUSSION

It is common knowledge that tire traction is reduced when the road is wet.  In Chapter 5

of *Mechanics of Pneumatic Tires,* Samuel K. Clark, Editor, U.S. Department of Transportation,

National Highway Traffic Safety Administration, Washington, D.C., the authors of that chapter

wrote, "When fluid contaminants such as water, . . . are present on the pavement surface, contact

area between tire and pavement is reduced due to the persistence of a fluid film . . ."  "The reduc-

tion in traction that occurs on a fluid contaminated pavement is indirect evidence of this loss in

dry contact area."  Among other statements in that chapter were observations that higher speeds

and lower tread groove depths reduced the coefficient of friction available to resist sideward

travel of a vehicle operated on a wet road.  Those observations are best summarized by Figure

5.105 on page 339 of that reference.

In an article written by Rex Grogan and apparently published in England in the Journal of

the Forensic Science Society, 12, 285, 1972, entitled "The Effect of Tyre Deflation on Vehicle

Behavior," several tests and reviews of testing by others were summarized.  One of the

interesting outcomes of these activities was the observation that a deflated rear tire could cause a sudden oversteer configuration of a motor vehicle, one which could not be overcome even by an experienced driver who knew he was being tested for a failed rear tire. Mr. Grogan also referenced an article by W. J. Dobie of Uniroyal, published in 1969 in *Materials Research and Standards,* who had reportedly shown that a tire is six times more likely to sustain a puncture or other hazard-related failure during the second half of its life than during the first half and that a wet tire is much more likely to sustain a puncture than a dry one.

For that same article, many data sources in England had been collected for analysis regarding tire failures resulting in loss of vehicle control. From a detailed study of 61 such cases, 40 of the cases were the result of rear tire failures, while 21 were the result of front tire failures.

In a publication prepared by Dunlop in 1980 to assist police officers in England who were investigating tire failures as contributing factors to losses of vehicle control, page 18 contained the following: "It is often stated that a discerning driver should feel the drag produced by a deflating or flat tire; he should also be able to detect that the vehicle is lower on one corner. This is not true. With modern vehicles the suspension and general design of the vehicle completely masks many of the effects of deflation."

It is also intuitive and has been confirmed by testing that tire deflations do not necessarily result in loss of vehicle control. However, it has been well documented that deflations can cause loss of control in virtually any over-the-road vehicle.

During the days of the Ford Explorer/Firestone tire issues, the undersigned personally investigated a number of Firestone tire failures on Ford Explorers. In every case in which the undersigned was asked to investigate (which request would not have been made if not for a

serious extent of injury and/or property damage), it was a rear tire failure which was involved in the loss of control. In not one of the cases which the undersigned was asked to investigate was a front tire failure a factor in loss of vehicle control.

Rex Grogan and C. S. Murray published an undated paper on "The Rate of Deflation of Car Tyres." For a 6.70-15 tubeless tire (a common size in the time frame of that study), a one-quarter-inch hole would cause an essentially complete deflation in less than one second. A one-eighth-inch hole would cause an essentially complete deflation in less than five seconds.

A final point regards the effect of tread depth on wet-road control. In his book, "The Investigator's Guide to Tire Failures," Institute of Police Technology and Management, University of North Florida, Jacksonville: 1999, Rex Grogan includes a chart showing the effect of tread depth on wet braking grip as a function of speed. With approximately one-tenth of an inch of water on the road, the skid number at 60 mph falls from 65 with full tread depth to 38 at half of the original tread depth. There is a direct correlation between braking skid number and a tire's ability to resist side-slipping.

In that book, Mr. Grogan also wrote, referring to the oversteering event which might occur with a rear tire failure, ". . . it became apparent that loss of (vehicle) control (with a deflated tire) was so sudden and so violent that there was virtually no chance of modifying the loss of control . . ." In the next paragraph, he wrote, "All this suggests that loss of control is a fundamental consequence of a flat tire, yet this cannot be true. We know that many drivers . . . do not experience any loss of control."

## CONCLUSIONS

Examination of the remains of this tire did not reveal any indications that it had been mounted on a rim of improper size or type, nor was there any other indication of improper or

defective mounting methods or procedures.  The overall condition of the carcass and the even

tread wear indicated that this tire had been properly used and had been properly inflated for

virtually all of it service life.

The vehicle on which this tire had been mounted experienced an out-of-control,

expressway-median crossing followed by separate collisions with two oncoming vehicles.  The

tire exhibited numerous and extensive mechanical damages which obviously resulted after the

driver lost control of the Mountaineer.  However, the presence of an obvious puncture with wear

indicated that an apparently round object of significant diameter had penetrated this tire and had

been carried for an indeterminate period of time.  The penetrating object was in the serial-side

tread shoulder, which side was mounted inboard on the Mountaineer, based on review of

furnished photographs.  As such, this object would have gone unnoticed unless someone was

making a detailed inspection of the tire.  Since this is a tubeless tire, the object could have been

(and probably was) carried for many miles with inconsequential loss of pressure while the object

remained in the tire.  Although there has been some limited tested to demonstrate wear on bolts

and nails as penetrating objects as a function of driven miles, one would have to have the object

to evaluate its wear, and no such object was presented to the undersigned.

The examination of the tire and the review of the police report indicate that the most

probable loss of control of the Mountaineer was a rapid deflation of its left rear tire when the

object which had earlier penetrated the tire and was being carried by it was shed, possibly as a

result of the lubricating qualities of the rainwater.  This deflation probably occurred in less than

five seconds, but it may not have been evident to the driver of the Mountaineer until a lane

change was begun or until some other lateral load was placed upon that vehicle, at which time

the absence of lateral stability at the left rear wheel position would likely have placed this Mountaineer into an oversteer configuration from which the driver could not recover.

Tire deflations do not always cause loss of vehicle control, but a rear tire deflation is more likely to create loss of vehicle control than a front tire deflation, due to understeer/oversteer effects. Once a vehicle with a deflated rear tire enters an oversteer configuration, vehicle control is virtually never regained until the vehicle comes to a complete stop. In the case of the Mountaineer, collisions quickly followed loss of vehicle control.

The location of the penetrating object in the left rear tire was such that it is unlikely to have been observed by anyone not conducting a detailed tire examination. There would not necessarily have been any notice of the presence of that object to the driver, nor would there have been any notice of impending failure. Once the tire deflated, loss of control would not necessarily have been immediate, but the overall condition of the carcass demonstrates that it did not travel very far (feet to hundreds of yards) after deflation. Many tire failures do not result in loss of vehicle control; some do. Even experienced test drivers been surprised by vehicle behavior with a deflated rear tire and have lost control during staged, deflated-tire testing.

The provided tire will be returned to you by common carrier. Please call if you have any questions.

Respectfully submitted,

Ralph Cunningham

Enclosures

**Exhibit D**

58

1  something you can say to show statistically or
2  otherwise that that part of his opinion is
3  wrong?
4  A      I think it's just common sense that
5  he's wrong.  He makes -- because he makes no
6  comment here that there is an ongoing loss of
7  inflation pressure in the tire.
8         What he's saying, I think, here is,
9  the only way a tire is going to lose pressure is
10 if it gets punctured and that's not true.  And
11 everybody in the tire business knows that that's
12 not true.
13        So the -- any puncturing object would
14 potentially give you an additional loss of
15 pressure -- pressure over and above what the
16 tire would see anyway.  And then it becomes --
17 then it becomes really consequential.
18 Q      Now, I don't see anything in your
19 findings and opinions and basis of reasons
20 therefore.
21        But if you look at page 2 of Mr.
22 Cunningham's report, Defendant's Exhibit 5 --
23 A      Let me just go back one point.  You

59

1  said you didn't see any reference.
2         Point 1 of mine, it says, (Reading)
3  The incident tire was punctured by large screw
4  which would have caused a gradual loss of
5  inflation pressure.
6  Q      Correct.
7         And I just wanted to ask you about one
8  -- one portion of Mr. Cunningham's report --
9  A      Sure.
10 Q      -- which was that page 2 in the first
11 paragraph there, right around the middle of the
12 -- that paragraph.
13        (Reading)  There was no evidence in
14 the carcass that this tire had been operated in
15 an overdeflected condition, which is almost
16 universally caused by underinflation in
17 passenger cars and light trucks.
18        Would you agree that when you looked
19 at the tire there was no evidence of an
20 overdeflected condition?
21 A      Yes, I would agree with that
22 statement.
23 Q      Let's move on to number 5 on

60

1  Defendant's Exhibit 2, which is your report.
2         (Reading)  The massive damage to the
3  tire occurred after the loss of control as the
4  vehicle crossed the central grass median, which
5  from accident scene photographs includes a
6  concrete culvert, became airborne and crashed
7  into the plaintiff's vehicle traveling in the
8  southbound lanes of I-65.
9  A      Yes.
10 Q      What was the basis for that particular
11 opinion regarding the damage to the tire
12 occurring after loss of control?
13 A      Well, I've looked at a lot of failed
14 tires and I've never seen a tire with more
15 massive damage than this one ever.  This really
16 did take a hit.
17        So this sort of damage that we're
18 looking at can only have occurred in my view at
19 relatively high rate of speed and the vehicle
20 impacting something other than a grass median
21 had to be something really substantial because
22 it actually split the tire down the tread, down
23 the center of the tread.  And that's shown on --

61

1  in some of my photographs.  And that's very,
2  very difficult.
3  Q      If you could, just identify one of
4  those photographs and we'll mark it as a
5  Defendant's Exhibit.
6  A      It's very difficult to split a tire
7  tread down the center.  And in the tire testing
8  business we've been trying to do it for years
9  unsuccessfully because it's very difficult to
10 do.  And it requires so much force it becomes a
11 little bit of a hazard for anybody performing
12 the test.
13        And, so, that said, I've never seen a
14 tire with this much damage, particularly in the
15 tread area.  And my -- it can only be
16 supposition, is that the vehicle hit a part of a
17 concrete culvert, which was probably raised,
18 particularly over the grass median, such that
19 all of the weight of the tire fell onto that
20 area of the tire and it just destroyed it.
21        And let me just find that photograph.
22        MR. DEGARIS:  Is that the one?
23        THE WITNESS:  That's the one.

70

1  in the -- in service of some problems and it's
2  exactly what happened.
3  Q        Well, you don't have an opinion as to
4  whether or not the tire was in any sort of poor
5  condition or poor maintenance at the time that
6  she was driving on August 29, 2003, do you?
7  A        All I can say is that we know that it
8  had a puncturing object in it.  Nowhere in her
9  deposition did she make any comment about doing
0  any maintenance on the tire.
1  Q        You don't know whether or not she did
2  or did not?
3  A        She didn't make any comment about it
4  at all.
5  Q        Did she make any comment about having
6  not done maintenance as opposed to having done
7  maintenance?
8  A        Well, I think one would probably make
9  a statement you had done maintenance rather than
0  I didn't do any maintenance, don't you agree?
1  Q        I'm asking if you know.
2  A        No, I don't know.  Nothing was said in
3  her deposition along those lines.

71

1  Q        And once, again, do you have any
2  reason to believe that -- any basis for
3  believing that her tire was underdeflated at the
4  time she got in her vehicle on that day?
5  A        Well, only based, again, upon my long
6  experience in looking at tires and their
7  operation in the market.  All tires lose air,
8  all tires lose air.
9  Q        Let me put it to you this way:  Did
0  you measure the air pressure of her tire before
1  she got in her vehicle on August 29, 2003?
2  A        How could I have done that?
3  Q        Did you visually see the tire before
4  she got in her car on August 29, 2003?
5  A        Of course I didn't.
6  Q        Let's move on to your last opinion in
7  Defendant's Exhibit 2.  And that number 8 is,
8  (Reading)  The tire was approximately 80% worn
9  with an average of 2/32's of an inch of usable
0  tread remaining with relatively even tread wear.
1  A        Uh-huh (affirmative response.)
2  Q        You briefly explained -- what does
3  usable tread refer to?

72

1  A        Yes.  Well, all tires come with a
2  specified tread depth, usually maximum of 32nd's
3  of an inch.  And it can vary by manufacturer to
4  manufacturer and by tire size and tread life, et
5  cetera.
6          But the one thing that's constant is
7  that 2/32's remaining, there's a wear bar, which
8  by law, has to be in the tires.  All tires are
9  worn out when that wear bar is exposed.
10         So in terms of usable tread depth, if
11 you look at what the original specification was
12 and subtract two; then that's what your usable
13 tread depth is.
14         So what I'm saying here is that there
15 were 2/32 usable tread remaining and I think
16 Cunningham says four because he's -- he doesn't
17 make the differentiation between tread depth and
18 usable tread depth.
19 Q        Let me ask you this:  If you have
20 2/32's of an inch of usable tread remaining --
21 A        Uh-huh (affirmative response.)
22 Q        -- and at 2/32's of an inch is when
23 the tread is completely worn and should be

73

1  replaced, does that mean that you would have
2  4/32's of an inch of total tread depth
3  remaining?
4  A        Yes, that's correct.
5  Q        So just taking a look at Mr.
6  Cunningham's report, which you referenced
7  earlier --
8  A        Yes.
9  Q        -- which is Defendant's Exhibit 5,
10 when Mr. Cunningham states, (Reading)  The
11 remaining groove depth were all 4/32's to 5/32's
12 of an inch with uniform wear of the tread ribs.
13         Is that at least consistent with your
14 finding of number 8?
15 A        Oh, yes, it is.  Yes.
16 Q        Thank you.
17         MR. KELLS:  Could I just take a two
18 minute break, two or three maybe, and take a
19 quick break.  And go off the record and let me
20 confer with Gail quickly.
21         MR. DEGARIS:  Sure.
22         (Whereupon, the taking of the
23         deposition was recessed from

82

1    THE WITNESS: -- degrees what -- what
2  time is that, you know.
3        So, in my view, it just sort of
4  indicates that somebody really wasn't trained
5  scientifically, if you like, to --
6    MR. KELLS:  I'm going to object again
7  as non-responsive.  There wasn't a question
8  pending.
9    THE WITNESS:  So, anyway, given the --
10 put down exactly the areas of damage and various
11 other indications that I see, I can indicate the
12 direction of rotation of the tire.
13       Knowing, for example, this was the
14 left rear and the serial side was fitted on the
15 inside facing in.  So, therefore, it was
16 rotating that direction (indicating.)
17       That can be helpful sometimes in
18 looking at -- particularly when you have a tire
19 of structural failure, not so much in this case
20 because all of the things that you see are
21 accident damage, all of this is accident damage
22 (indicating.)  That's on the serial side.
23       Similar on the outline, raised outline

83

1  white letter.
2  Q       (By Mr. Kells)  If I could just
3  interject for -- for one moment.
4        I've noticed that on both page 3A and
5  3B of Defendant's Exhibit 2 Subsection G, you
6  have a left rear in both instances?
7  A       Yes.
8  Q       So are you in agreement that this is
9  the left rear tire from that vehicle?
10 A       Yes, I am.
11       So this -- again, this is the raised
12 outline, white letter side.  And shows it again
13 some damages that we see -- that I saw and
14 notated in that fashion.
15       Sheet 3C would be wheel information
16 except no wheel was provided.  So that's
17 obviously blank.
18 Q       What is number 4?
19 A       Sheet 4 is tread depth information
20 using a tread depth gauge, a calibrated tread
21 depth gauge.  And I go around the tire in this
22 particular case in four positions and measure
23 the tread depth to the bottom of the grooves at

84

1  each of these positions so that I've got a good
2  idea at 90 degree intervals going around the
3  tire the relative wear regularity.
4        So I can look in two directions.  I
5  can look across the tire from one shoulder to
6  the other shoulder or I can look circumventally
7  around the tire to see if there's areas with
8  excessively heavy wear in certain areas.
9        The -- the tread wear was relatively
10 even as one would expect.
11       The shoulder area is a little bit more
12 worn, but they start off with less tread anyway.
13       So, you know, just saying I expect the
14 point relatively even wear, some choppy shoulder
15 wear on the serial side shoulder.
16       Tread hardness was rated 85 to 88
17 degrees, which is pretty hard.
18 Q       And these results are reflected in
19 your report?
20 A       Yea.  Where I talk about an average
21 remaining tread depth of 2/32's of useable.
22       I've actually got the full tread
23 depths as much as Cunningham has there, but from

85

1  those just subtract two.
2        Then sheet 5A is observations, the
3  major observations that I saw.
4        And then, of course --
5  Q       That looks like most of that is
6  reflected in your report.
7        Is there anything in there that is
8  not?
9  A       No, I don't believe so.  And, of
10 course, it's also shown in more detail, in
11 graphic detail in the various photographs that
12 were attached.
13 Q       Sure.
14 A       So no need to go through that.
15       And then one can refer back from those
16 photographs to those schematics if you ever have
17 any need.
18       So that -- well, the -- so you've got
19 the clock markings on the photograph and also on
20 the schematics and one could go back and look at
21 the severity of the damage.  You can see from my
22 annotations here, but you can also see more
23 directly on the photograph.

# Exhibit E

Clifford A. Prosser

Traffic Accident Consulting Services
4248 Fieldstone Drive
Birmingham, Alabama 35215
Clifford A. Prosser, Senior Consulting Reconstructionist

Phone (205) 681-6869
Fax (205) 681-4761
e-mail: cprosser6869@charter.net

September 17, 2007

To:    **Mr. Annesley DeGaris**
Cory, Watson, Crowder & DeGaris
2031 Magnolia Avenue South
Birmingham, Alabama 35205

RE:    ***Michael P. Allen, et al. vs. United States of America***
**Civil Action No.: 06-cv-879-WKW**

Dear **Mr. DeGaris** ,

As you requested, I have examined the currently available evidence that you provided pertaining to the above referenced motor vehicle accident. Please allow this correspondence to constitute a brief report of my findings and opinions to date.

### Items Examined, Reviewed or Considered

- Alabama Uniform Traffic Accident Report
- Deposition of Bertha Moore
- Photographs of involved 2003 Lincoln Town Car
- Copies of photographs of involved 1997 Mercury Mountaineer
- Copies of photographs of reported accident scene area (not immediately post accident)
- Expert report of tire examination by Peter L. Flanner
- SAE technical paper 970954
- Michelin passenger car and light truck owner's manual
- Telephone interview of Alabama State Trooper Fisher

### Findings and Opinions

The tire deflation alleged to have occurred on the Mercury Mountaineer should not have resulted in a catastrophic loss of control. Mrs. Moore, in my opinion, contributed to the control loss of her vehicle by braking, as per her deposition testimony, when she perceived the tire deflation. As it appears that the deflation was not explosive in nature, the driver of the vehicle, Bertha Moore, should have been able to maintain control of the vehicle in the north bound lane of the roadway and the reported lateral excursion into the south bound traffic lanes should not have occurred. It is most likely, in my opinion, that the driver, Bertha Moore, contributed to the control difficulty by improper braking of the vehicle. This reported loss of control event would



be consistent with the effects of hard braking during the effects of unequal drag. As stated previously, Bertha Moore testified during her deposition that she applied her brakes after feeling the disablement, and this likely contributed to the control loss.

The submitted report of tire expert Peter L. Flanner opines that the onset of the deflation of the subject tire was a result of the ejection of a screw that had punctured the tire previously, and there is no opinion rendered by Mr. Flanner that the deflation would have been explosive or even particularly sudden. This is a normal driving occurrence, on dry roads and on wet roads, and should not lead to catastrophic loss of control. If a driver reacts by slowly decreasing vehicle speed without hard braking and holds the vehicle straight with minimal corrective steering, he or she should be able to stop the vehicle without significant lateral movement or severe control difficulty. There is no published information or test results that I am aware of that would suggest that gradual, or even rapid, non-explosive deflation of a tire on a passenger vehicle, in the absence of additional factors, would be expected to cause catastrophic loss of control.

*Reference SAE paper 970954 by Robinette, Deering and Fay, "Drag and Steering Effects of Under Inflated and Deflated Tires".*
*Also reference Michelin passenger vehicle and light truck product manual, page 7*

The cited technical paper reports the effects of testing on vehicles with deflated single front and rear tires on a variety of vehicles. The specific resultant drag coefficients, lateral acceleration factors and distances are given for various distances for each vehicle tested, and the tests were conducted with hands-off roll out. In other words, the drag effect of a flat tire was evaluated initially without corrective steering. The paper reports that there was some lateral movement of a vehicle with a flat tire as an effect of the drag introduced if the vehicle was allowed to proceed and roll out without corrective steering. The paper concludes that in all of the tests conducted control of the vehicle was easily maintained with moderate appropriate steering input. The two test conditions that were not representative of the subject accident are:
1. The pavement during testing was dry asphalt
2. The test speeds were somewhat lower than the reported speed, 45 mph or below.

I am not aware of any published sources of test results at present that suggest that a non-explosive deflation of a tire at highway speeds on a wet roadway would be expected to cause loss of control with a lateral excursion distance evident in this accident situation. The fact that the road surface was wet would indicate the likelihood that the overall friction coefficient was lower, but the resultant drag effect of one flat tire should be proportionately the same as on a dry surface. Once again, a tire deflation while operating a vehicle on wet roads is an expected, normal occurrence from time to time, and should not be a control compromising event if reacted to properly.

The dynamic effect of a single tire deflating while a vehicle is in motion is a relatively simple concept. As the tire deflates, additional drag is introduced to the side of the vehicle that the deflating or deflated tire is on. This gives the driver the feeling of the vehicle being pulled and the heading of the vehicle possibly being changed. This effect is validated by the SAE technical paper cited above. If the driver's response is to brake hard, the vehicle is likely then dedicated to a new heading in the direction of the "pull". Braking, and in particular hard braking, is not the safe and effective response to a tire deflation while in motion. *(See Michelin manual, page 7)*

There is no reported evidence or mention of hydroplaning in the accident report, or in Mrs. Moore's deposition. The expert report of Mr. Flanner indicates that the tread depth on the subject tire was approximately 2/32 inch and was evenly worn. It further indicated that the wear life of the tire was approximately 80% expended. I have no way of knowing whether the remaining three tires on the vehicle were of the same wear and tread depth. As a hypothetical, if a hydroplane event occurred, it would most likely be as a result of a combination of low average tread depth, water depth and driver braking. It would not be directly related to the tire deflation, in my opinion.

This report is true and correct to the best of my knowledge, training and experience, and is based upon my understanding of evidence available to me at present. As with any investigation or reconstruction effort, I reserve the right to add, withdraw, or modify any opinions rendered based upon the import of evidence made available to me at a later time.

Respectfully submitted,

Clifford A. Prosser

Attachments:    *Current CV*
*Testimony history (Of particular reference:*
    *Nichols & Metivier vs. United States of America*
    *United States District Court*
    *Middle District of Alabama*
    *Judge Allbritton*
    *2004*
    *For: William Horsley, Opelika, Alabama)*
*Fee and expense schedule*
*SAE technical paper 970954*
*Michelin passenger vehicle and light truck manual*

# Exhibit F

10-10-2003

IST-27
REV. 1/91

SEP 3 0 2003

## ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

Local Case No. 3522163

Sheet 1 of 1 Sheet(s)    Microfilm No.    Local Case No.

**LOCATION AND TIME**

Date 08/29/2003    Time 2:25 AM/PM    Day of Week M T W TH F S    County    City    Rural X

On Street, Road or Highway: I-65    At Intersection of or Between (Node 1): Butler Co Line    And (Node 2): Co Rd 1220

Street or Road Case #: I065    7631    Control Code: 7620    Node 0010 : 110    From Node / Node Case #

Intersection Related: Node 1 / Node 2 / Not Int. Related    1:01:110

First Harmful Event: 20    Event Location: NA    Distance to Fixed Object: FT.

Highway Classification: Interstate / State / US / County    Other: 00

NON-COLLISION EVENT:
01 - Overturned
02 - Fire/Explosion
03 - Immersion
04 - Gas Inhalation

COLLISION EVENT:
10 - Pedestrian
11 - Non-Contact Vehicle
12 - Parked Vehicle
13 - Animal
14 - Train
15 - Guardrail
16 - Utility Pole

**UNIT NO 1 — DRIVER**

Driver Full Name: Beetha Gordon Moore    Street Address: 4731 Queensbury Ct    City and State: Montgomery Al    Telephone No.

01/22/1959    Race B    Sex F    DL State Al    Driver License No. 4627606    DMV C    None

Place of Employment: Dept of Justice (Montgomery Al)    Liability Insurance Co: Alfa    Social Security No. 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

Maneuver 01    Travel Road Name I-65    Road Code I065    Travel Direction 01    Prime Harm Event 20

Veh Year 1997    Make Merc    Model Mou    Body NA    V.I.N. 4M2DU52P7VUJ01642    License Tag Number 3A6707M    State Al    Year 2004

Owner's Name: Same

Posted Speed Limit 70 MPH    Est. Speed 83 MPH    Citation Offense Charged: NONE    A+ (Rotation)    To Where: A+ (Evergreen Al)

Enter Point of Initial Impact 4

**UNIT NO 2 — DRIVER**

Driver/Pedestrian Full Name: Michael Phillip Allen    Street Address: 107 Paradise Isle    City and State: Riverside Al    35135    Telephone No. 205 338-1803

03/26/1948    Race W    Sex M    DL State Al    Driver License No. 2451775    DMV V    None

Place of Employment: IMI (Birmingham Al)    Liability Insurance Co: Alfa ERROR#    Social Security No. 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

Maneuver/Action 01    Travel Road Name I-65    Road Code    Travel Direction 20    Prime Harm Event 20

Veh Year 2003    Make Line    Model Tow    Body 40    V.I.N. 1LNHM82W53Y618276    License Tag Number 59G431H    State Al    Year 2004

Owner's Name: Same

Posted Speed Limit 70 MPH    Est. Speed 75 MPH    Citation Offense Charged: None    Windom (Rotation)    To Where: Windom (Evergreen Al)

Enter Point of Initial Impact 8

**CODES**

Exhibit G- page 1

State Farm insures Allen

## ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

**Date** 08 29 2003  **Time** 3:35 AM

**On Street, Road or Highway** I-65
**At Intersection of or Between (Node 1)** Butler Co Line
**And (Node 2)** Co Rd 1220

I065  Strip# 7631  Node Code 7620

**Driver Full Name** Phyllis Daulton Montgomery 5005 With Ginger Cir. Norcross
**ZIP** 30092  **Telephone No.** NONE

**DOB** 03 14 1943  **Race/Sex** W F/GA  **DL State** GA  **Driver License No.** 053628642
**DL Class** C  **DL Status** C

**Place of Employment** Georgia Perimeter College (Atlanta GA)
**Liability Insurance Co.** State Farm
**Social Security No.** 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

**Maneuver** 01  **Travel Road Name** I-65  **Road Code** I065  **Prime Harm Event** 20

**Veh Year** 2001  **Make** Volv  **Model** V70  **Body** NA  **V.I.N.** YV1SW53DX12114722
**License Tag Number** 759 NTO  **State** GA  **Year** 2003

**Owner's Name** Same

**Speed Limit** 70 MPH  **Est. Speed** 70 MPH  **Citation Offense Charged** NONE

**Vehicle Owned By Whom** Interstate (Rotation)  **To Whom** Interstate (Evergreen Al)

Exhibit G- page 2

## ALABAMA
## UNIFORM TRAFFIC ACCIDENT REPORT

3522163

LOCAL CASE NO.

SHEET **3** OF **3** SHEET(S)

AST No. 34 Rev. 4/86    **SUPPLEMENTAL SHEET**

| | Name / Address / Taken to / Taken by | Unit No. | Seat Pos. | Injury Type | Age | Sex | Ejection | First Aid By |
|---|---|---|---|---|---|---|---|---|
| 3 | Ellen Allen  107 Paedise Isle  Riverside Al 35135 | 2 | 6 | A | 49 | F | N | O |
| | Taken to: Evergreen Medical Center    Taken by: Conecuh County EMS | | | | | | | |
| 4 | Phyllis Chulton Montgomery  5005 will Gigee Pl. Maxness | 3 | 1 | A | 60 | F | N | O |
| | Taken to: Evergreen Medical Center    Taken by: Conecuh County EMS | | | | | | | |
| 5 | Name / Address / Taken to / Taken by | | | | | | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |

**ADDITIONAL ACCIDENT VICTIMS**

**DESCRIBE WHAT HAPPENED (Refer to vehicles by number)**

U1 left the road onto the left shoulder. U1 crossed the median and went airborn. U1 struck U2 with the right rear of the vehicle. U2 came to rest on the left shoulder of the south bound lanes. U1 rotated counterclock wise and struck U3 with the drivers side. U3 then rotated clockwise into the median. U1 overturned onto the driver's side.

**ADDITIONAL NARRATIVE SPACE**

| | |
|---|---|
| **SEATING** | Other Involved Unit (Circle One): 12 - Pedestrian, 13 - Rider of Domestic Animal, 14 - Occ. of Non-Motorized Vehicle, 15 - Victim of Other Circumstance/Codes Not Applicable. Other Involved Safety Equipment. | **CODES** / SAFETY EQUIPMENT |

**VICTIMS**

| Name | Address | Unit No. | Seat Pos | Injury Type | Age | Sex | Ejec-tion | |
|---|---|---|---|---|---|---|---|---|
| Beatha Gordon Moore | 4731 Queensbury Ct Monty Al 36116 | 1 | | A | 51 | F | N | D |
| Taken To: Evergreen Medical Centre | Taken By: Conecuh County EMS | | | | | | | |
| Michael Phillip Allen | 107 Pardise Isle Riverside Al 35135 | 2 | 1 | A | 55 | M | N | D |
| Taken To: Evergreen Medical Center | Taken By: Conecuh County EMS | | | | | | | |

**CODES**
Injury Type: K - Killed, A - Visible or Carried from Scene, B - Bruise/Abrasion/Swelling, C - Not Visible—Has Pain/Faint. Ejected: N - Not, F - Fully, P - Partially, T - Trapped. Ambulance Attended / Doctor. First Aid By: M - Paramedic, O - Other, P - Police, U - Unknown, N - None.

**NARRATIVE AND DIAGRAM**

SEE PAGE 3of3

Officer's Opinion of What Happened:    SEE PAGE 3 of 3

**ROADWAY ENVIRONMENT**

Time Police Notified: 2:30 AM    Time Police Arrived: 2:50 AM    Time EMS Applied: 2:40 AM    Name of Photographer: TPR. FISHER

**INVESTIGATION**

Light: 1 Daylight, Weather: 1 Clear, Locale: Open Country, Non-Vehicular Property Damage: None Visible    Description: NA

Owner:    NA

Witness Full Name:    Address:    Telephone:

Name of Investigating Officer:    Officer ID:    Agency ORI: AST2100    Supervisor Reviewed:

Signature of Investigating Officer: _____ 1067    Date 8-31-03

Exhibit G- page 4

**SEATING**

| 3 | 41 | 41 |
|---|----|----|

Other Involved Unit (Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Vision of Other Circumstance/
     Codes Not Applicable

Unit 2 — [X]

Driver Involved Unit (Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Vision of Other Circumstance/
     Codes Not Applicable

Other Involved Safety Equipment

CODES
SAFETY EQUIPMENT

**VICTIMS**

| Name | Address | Unit No | Seat Pos | Injury Type | Age | Sex | Ejection | Eject Type |
|------|---------|---------|----------|-------------|-----|-----|----------|-----------|
| Wallace Montgomery 5005 Wild Eagle Cv. Norcross GA | | 3 | 3 | A | 58 | M | N | D |
| Evergreen Medical Center | Taken To Conecuh County EMS | | | | | | | |
| Lori Allen 167 Pardise Isle Riverside Al 35135 | | 2 | 3 | A | 21 | F | N | D |
| Evergreen Medical Center | Taken To Conecuh County EMS | | | | | | | |

**CODES**

Injury Type
K - Killed
B - Bruise/Abrasion/Swelling

A - Visible or Carried from Scene
C - Not Visible — Has Pain/Faint

Ejected
N - Not
1 - Partially

1 - Prepared
2 - Not Applicable

A - Ambulance Attended
B - Doctor

Taken Away By
N - Parametric
O - Other

P - Police
R - Fire

**NARRATIVE AND DIAGRAM**

SEE PAGE 3 of 3

Officer's Opinion of What Happened:    SEE PAGE 3 of 3

**ROADWAY ENVIRONMENT**

For Each Roadway Environment Field, Circle One Entry for Each Involved Unit

Unit 1 — [ ] N/A
Unit 2 — [X] N/A

Contributing Road Defense
4 - None
1 - Shoulders Low
2 - Shoulder High
4 - Blowing Sand/Sand
8 - Other

Surface Construction
1 - Asphalt
2 - Concrete
3 - Brick
4 - Unpaved
8 - Other

Condition
1 - Dry
2 - Wet
3 - Ice
4 - Snowy/Slushy
5 - Muddy
8 - Other

Accident In Or Related To Road Construction Zone?
Yes   No

Material In Roadway (Contributing)
1 - None    5 - Gravel
2 - Rocks   6 - Oil/Petrol
3 - Trees/Limps  8 - Other
4 - Dirt

Material Source
1 - Not Applicable
2 - Natural Environment
3 - Dropped From Vehicle
4 - Already in Road, But Fell From Vehicle
8 - Other
9 - Unknown

Character
1 - Straight—Level    5 - Curve—Down Grade
2 - Straight—Down Grade  6 - Curve—Up Grade
3 - Straight—Up Grade  7 - Curve
4 - Straight—Hillcrest
8 - Curve—Level

Vision Obscured By:
97 - Not Observed
1 - Buildings
2 - Signboard
3 - Trees, Crops, Bushes
4 - Blowing Snow/Sand
5 - Hillcrest
6 - Curve in Road
7 - Fog
8 - Parked Vehicle
9 - Moving Vehicle(s)

10 - Blinded by Sunlight
11 - Fire/Smoke
12 - Dust
13 - Blinded by Headlamps
14 - Embankment
15 - Rain on Windshield
16 - Snow on Windshield
98 - Other
99 - Unknown

Traffic Control
1 - Police Officer
2 - R.R Crossing Gates
3 - R.R. Flushing Lights
4 - R.R. Cross Bucks/Pave Mark
5 - Pedestrian Control
6 - Traffic Signal
7 - Flashing Beacon
8 - Stop Sign
9 - Yield Sign
10 - Other Control Device

11 - Flagger
12 - No Passing Zone
97 - None
98 - Other

Traffic Control Functioning
Yes   No
N/A

DOT Railroad Crossing No.
N/A

Opposing Lanes Separated By:
97 - None
1 - Paved Surface
2 - Unpaved Surface
3 - Broken Painted Line
4 - Solid Painted Line
5 - Concrete Barrier
6 - Metal Guard Rail
7 - Fence
98 - Other Barrier

Traffic-way Lanes
1 - One Lane
2 - Two Lanes
3 - Three Lanes
4 - Four Lanes
5 - Five Lanes
6 - Six Lanes or More

One-Way Street
Yes   No

**INVESTIGATION**

Light
1 - Daylight   4 - Darkness—Road Not Lit
2 - Dawn   5 - Darkness—Road Lit
3 - Dusk

Weather
1 - Clear   6 - Sleet/Hail
2 - Cloudy   6 - Crosswind
3 - Rain   7 - Fog
4 - Snow   8 - Other

Locale
1 - Open Country   5 - School
2 - Residential   6 - Playground
3 - Shop'g or Business  8 - Other
4 - Mfg. or Industrial

Non-Vehicular Property Damage
1 - None Visible   3 - Moderate
2 - Light   4 - Severe

Description

Property Damage Description:
N/A

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer | | |
|---------------------|---------------------|------------------|---------------------|---|---|
| 2130 | 2:50 | 2140 | Tpr. Fisher | | |

Witness Full Name          Address          Telephone

Witness Full Name          Address          Telephone

Name of Investigating Officer: Tpr. Fisher     Officer ID: 1067     Agency ORI: AL AST2100     Supervisor Reviewed

Name of Other Investigating Officer(s) if Same     Officer ID     Agency ORI

The data on this report reflects my best knowledge and understanding of this accident, that we warrant in truth as to the factual accuracy thereof.

Signature of Investigating Officer: _Robt Fisher 1067_     Date 8-31-03

Exhibit G- page 6

**Exhibit G**

REV 1/91

## ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

DPS Accident No.

Shaded Areas To Be Used By Data Processing Only

Sheet _1_ of _3_ Sheets    Microfilm No. ___    Local Case No. ___

**LOCATION AND TIME**

| Date | Time | Day of Week | County | Cov. | Rural ☒ | Highway Classification | NONCOLLISION EVENT | COLLISION EVENT |
|---|---|---|---|---|---|---|---|---|

Date: Month 08 Day 29 Year 2005

Time: 2:25 AM/PM

Day of Week: S M T W T F S 7

County: 21

Highway Classification: M—Municipal, S—State, C—County, O—Other; 1—Interstate, 5—State, 3—U.S., 2—County

On Street, Road or Highway: **I-65** At Intersection of or Between (Node 1): **Butler Co Line** And (Node 2): **Co Rd 1220**

Street or Road Code: **7631**   Node Code: **7620**   Milepost: _____ 101 _____

Intersection Related: 1—Node 1  2—Node 2 ☒ Not At Intersection

Mile Post

Control Access: 1—Main Rd  2—Frontage Rd  3—Entrance-Ramp  4—Exit Ramp  5—Prime Ramp

Prime Cont Code / Unit No: 76

First Harmful Event: **20**   Event Location: **NA** FT.

Distance to First Direct: **NA** FT.

No. of Vehicles: _1_   No. Pedestrians: _0_   No. Injured: _1_   No. Fatalities: _0_   Unit 1 Type: _____   Unit 2 Type: _____

---

**UNIT NO 1 / LEFT SCENE / COM VEH**

**DRIVER**

Driver Full Name: **Bertha Gordon Moore**   Street Address: **4731 Queensbury Ct**   City and State: **Montgomery, Al**   ZIP: **36116**   Telephone No: **NONE**

Date of Birth: Month 01 Day 22 Year 1953   Race B   Sex F   DL State Al   Driver License No. **4627606**

DL Class **O M**   DL Stencil **C**   List Restrictions Not Complied With   CDL Status   List Endorsements Not Complied With   Residence Less Than 25 Miles: Yes ☒ No

Place of Employment: **Dept of Justice (Montgomery Al)**   Liability Insurance Co: **State Farm**   Social Security No. **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**

Driver/Ped Condition: 1—No Defect ☒  2—Apparently Asleep  3—Fatigued  4—Other  5—Unknown

Officer's Opinion: Alcohol Yes/No ☒   Drugs Yes/No   Type Test Given: No Test ☒   Blood Test / Urine Test / Breath Test: Unable to Administer / Refused Test / Test Results **NA**

Maneuver: **01**   Travel Road Name: **I-65**   Road Code: **I065**   Travel Direction: N S ☒ W A-Not on Rd U-Unk **016**   Other Cont Circumstance   Prime Harm Event **016**   Event Loc

**VEHICLE**

Veh Year **1997**   Make **Merc**   Model **Mou**   Body   V.I.N. **4M2DU52P7VUJ01642**   License Tag No. **3A6707M**   State **AL**   Year **2004**

Owner's Name: **Same**   Street or R.F.D.   City   State   ZIP

Type: 1—Auto ☒  2—StaWagon  3—Pick Up  4—Van  5—Truck Tractor  6—Other Truck  7—Comm. Bus  8—School Bus  9—Other Bus  10—Motorcycle  11—Moped  12—M. Scooter  13—Pedal Cycle  14—Farm Mach.  15—Train  16—Road Equip.  17—Ridden Animal  18—M. Home (R.V.)  19—ATV  20—Other

Usage: 10—Personal ☒  11—M. Scooter  12—Driver Trng.  13—Construction  14—Ambulance/Paramedical  15—Military  16—Taxi  17—Transport Prop.  18—Agriculture  19—Wrecker/Tow

Hazardous Cargo: 0—None ☒  1—Explosive  2—Gas  4—Flam/Combust Liq.  5—Flammable Solids  6—Oxidizer/Peroxide  7—Poison  8—Radioactive Mat.  9—Corrosive Material  98—Other

Attachment: 0—None ☒  4—Camper Trailer  5—Mobile Home  6—Semi Trailer  7—Towed Vehicle  8—Tanker  10—Pole Trailer  11—Utility Trailer  12—4-Wheel Trailer  13—Double Trailers  14—Boat Trailer  98—Other

Oversized Load (Reg. Permit)   If Yes, Did Owner Have Permit? Yes No NA

Contributing Defect: 97—None ☒  1—Brakes  2—Steering  3—Power Plant  4—Suspension  5—Tires  6—Exhaust  7—Lights  8—Turn Signal  9—Windows/W. Shield  10—Restraint Sys.  11—Wheels  12—Truck Coupling  13—Cargo  14—Fuel System  98—Other  99—Unknown

Circle areas Damaged On Diagram   Under Carriage   **Totaled**   N/A

Speed Limit **70** MPH   Est. Speed **83** MPH   Citation Offense Charged: **NONE**   Damage Severity: 1—None Visible  2—Not Disabled ☒ Disabled   Vehicle Towed Away? Yes ☒ No   Occupants in Unit: _____   Total Injuries in Unit: **4**   Enter Point of Initial Impact   Attachment

Vehicle Towed by Whom: **A+ (Rotation)**   To Where: **A+ (Evergreen Al)**

---

**UNIT NO 2 / LEFT SCENE / COM VEH**

**DRIVER**

Driver/Pedestrian Name: **Michael Phillip Allen**   Street Address: **107 Paradise Isle**   City and State: **Riverside Al**   ZIP: **35135**   Telephone No: **905 338-1803**

Date of Birth: Month 03 Day 26 Year 1948   Race W   Sex M   DL State Al   Driver License No. **2451775**

DL Class **DAV**   DL Stencil **C**   DL Status   List Restrictions Not Complied With **N**   CDL Status   List Endorsements Not Complied With   Residence Less Than 25 Miles: Yes ☒ No

Place of Employment: **IMI (Birmingham Al)**   Liability Insurance Co: **AIFA**   Social Security No. **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**

Driver/Ped Condition: 1—No Defect ☒  2—Apparently Asleep  3—Fatigued  8—Other  9—Unknown

Officer's Opinion: Alcohol Yes/No ☒   Drugs Yes/No   Type Test Given: No Test ☒   Blood Test / Urine Test / Breath Test: Unable to Administer / Refused Test / Test Results **NA**

Maneuver/Action: _____   Travel Road Name: **I-65**   Road Code: **I065**   Travel Direction: N S ☒ W A-Not on Rd U-Unk **97**   Other Cont Circumstance   Prime Harm Event **20**   Event Loc

**VEHICLE**

Veh Year **2003**   Make **Linc**   Model **Tow**   Body **4D**   V.I.N. **1LNHM82W53Y618276**   License Tag Number **59G431H**   State **AL**   Year **2004**

Owner's Name: **Same**   Street or R.F.D.   City   ZIP

Type: 1—Auto ☒  2—StaWagon  3—Pick Up  4—Van  5—Truck Tractor  6—Other Truck  7—Comm. Bus  8—School Bus  9—Other Bus  10—Motorcycle  11—Moped  12—M. Scooter  13—Pedal Cycle  14—Farm Mach.  15—Train  16—Road Equip.  17—Ridden Animal  18—M. Home (R.V.)  19—ATV  20—Other

Usage: 10—Personal ☒  11—Police  12—Driver Trng.  13—Other Business  14—Ambulance/Paramedical  12—Bus/Pass. Transport.  15—Military  16—Taxi  17—Transport Prop.  18—Agriculture  19—Wrecker/Tow

Hazardous Cargo: 0—None ☒  1—Explosive  3—Gas  4—Flam/Combust Liq.  5—Flammable Solids  6—Oxidizer/Peroxide  7—Poison  8—Radioactive Mat.  9—Corrosive Material  98—Other

Attachment: 0—None ☒  4—Camper Trailer  5—Mobile Home  6—Semi Trailer  7—Towed Vehicle  8—Tanker  10—Pole Trailer  11—Utility Trailer  12—4-Wheel Trailer  13—Double Trailers  14—Boat Trailer  98—Other

Oversized Load (Reg. Permit)   If Yes, Did Owner Have Permit? Yes No NA

Contributing Defect: 97—None ☒  1—Brakes  2—Steering  3—Power Plant  4—Suspension  5—Tires  6—Exhaust  7—Lights  8—Turn Signal  9—Windows/W. Shield  10—Restraint Sys.  11—Wheels  12—Truck Coupling  13—Cargo  14—Fuel System  98—Other  99—Unknown

Circle areas Damaged On Diagram   Under Carriage   **Totaled**   N/A

Speed Limit **70** MPH   Est. Speed **75** MPH   Citation Offense Charged: **NONE**   Damage Severity: 1—None Visible  2—Not Disabled ☒ Disabled   Vehicle Towed Away? Yes ☒ No   Occupants in Unit: **3**   Total Injuries in Unit   Enter Point of Initial Impact **8**   Attachment

Vehicle Towed by Whom: **Windom (Rotation)**   To Where: **Windom (Evergreen Al)**

---

**CODES**

Contributing Circumstances / Other Movements / Pedestrian Action / Event Loc (various coded lists)

Exhibit H- page 1

Page 1 of 6

CODES

SAFETY EQUIPMENT

Other Involved Unit
(Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstances
     Codes Not Applicable

Other Involved
Safety Equipment

**VICTIMS**

| Name | Address | Unit No | Seat Pos | Injury Type | Age | Sex | Ejection | First Aid By |
|------|---------|---------|----------|-------------|-----|-----|----------|--------------|
| Bertha Gordon Mouse · 4731 Queensbury Ct Monty Al 36116 | | 1 | 1 | A | 51 | F | N | D |
| Taken To: Evergreen Medical Center | Taken By: Conecuh County EMS | | | | | | | |
| Michael Phillip Allen 107 Paradise Isle Riverside Al 35135 | | 2 | 1 | A | 55 | M | N | D |
| Taken To: Evergreen Medical Center | Taken By: Conecuh County EMS | | | | | | | |

**CODES**

Injury Type
N - Killed
B - Bruise / Abrasion / Swollen

A - Visible or Carried from Scene
C - Not Visible - Has Pain / Limp

Ejected
N - Not
F - Fully
P - Partially

T - Trapped
U - Unknown
X - Not Applicable

First Aid By
J - Ambulance Attended
D - Doctor

M - Paramedic
O - Other

P - Police
X - None

**NARRATIVE AND DIAGRAM**

SEE PAGE 3 of 3

Officer's Opinion of What Happened: SEE PAGE 3 of 3

**ROADWAY ENVIRONMENT**

For Each Roadway Environment Field, Circle One Entry for Each Involved Unit.

| Unit 1 | Contributing Road Defects | Surface Construction | Condition | Accident In Or Related To Road Construction Zone? | Material In Roadway (Contributing) | Material Beyond | Obstacles |
|--------|---------------------------|----------------------|-----------|--------------------------------------------------|-----------------------------------|-----------------|-----------|
| Unit 2 | 1 - None | 1 - Asphalt | 1 - Dry | | | | |

DOI Removed Lumisome Nr.

NA

**INVESTIGATION**

| Light | Weather | Locale | Non-Vehicular Property Damage | Property Damage Description |
|-------|---------|--------|-------------------------------|------------------------------|
| Daylight | 1 - Clear | Open Country | None Visible | |

Destination

Owner

NA

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer |
|----------------------|---------------------|------------------|----------------------|
| 2:30 | 2:50 | 2:70 | TPR. FISHER |

Witness Full Name                          Address                          Telephone
Witness Full Name                          Address                          Telephone
Name of Investigating Officer
Name of Other Investigating Officer(s) at Scene

The data on this report reflects my best knowledge, opinion and belief covering the accident, but no warrant is made as to the factual accuracy thereof.

Signature of Investigating Officer: _____ 1067                Date 8-31-03

Exhibit H- page 2

Page 7 of 6

## ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

Sheet 2 of 3 Sheets

| 2003 | Time 2:35 | Day of Week M T W T F S S (1) | County 21 |
|------|-----------|---------|--------|

Highway Classification: Interstate

**At Intersection of or Between (Node 1):** I-65

**And Node 2:** Butler Co Line — Co Rd 1220

| Street or Road Code | I065 7631 | Street or Road Code 7620 | Nodes 0 0 0 1 0 | Span from 1 of 3 |

Test Performed: 20    Event Location: 1    Distance to Fixed Object: NA FT.

No. of Vehicles: Unit 1    No. Pedestrians    No. Injured    No. Fatalities    Unit 1 Type    Unit 2 Type

### DRIVER

**Driver Full Name:** Phyllis Deulton Montgomery 5005 Wild Ginger CV, Norcross GA  ZIP 30092

| DOB 03 14 1943 | Race W | Sex F | DL State GA | Driver License No. 053628642 | DL Class C | DL Status C | CDL Status N |

Place of Employment: Unemployed

Liability Insurance Co: State Farm    Social Security No.: Unknown

### VEHICLE (UNIT 1)

| Veh Year 20ci | Make Volv | Model V70 | Body NA | V.I.N. YV1SW53DX12114722 |

License Tag Number: 759 NTO    State GA    Year 2003

Owner's Name: Same

**Type:** (2) StaWagon
**Usage:** (2) Driver Trng.
**Hazardous Cargo:** (1) None
**Contributing Defect:** (97) None

Speed Limit 30 MPH    Est. Speed 70 MPH

Citation Offense Charges: NONE

Vehicle Towed? Yes    Occupants in Unit 2

Vehicle Towed By Whom: Intrestate (Rotation)    To Where: Intrestate (Evergreen Al)

Exhibit H- page 3

| | | | | | | | | | | Unit Nbr | Seat Pos | Injury Type | Age | Sex | Ejec- tion | First Aid By |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**VICTIMS**

| Name | Address | Unit Nbr | Seat Pos | Injury Type | Age | Sex | Ejection | First Aid By |
|---|---|---|---|---|---|---|---|---|
| Wallace Montgomery 5005 Wilh Ginger Cv. Necrness GA | | 3 | 3 | A | 58 | M | N | D |
| Evergreen Medical Center | Conecuh County. EMS | | | | | | | |
| Lori Allen 167 Paradise Isle Riverside Al 35135 | | 2 | 3 | A | 21 | F | N | D |
| Evergreen Medical Center | Conecuh County. EMS | | | | | | | |

**CODES**

Injury Type: K - Killed  A - Visible or Carried from Scene  N - Not  T - Trapped  E - Ambulance Attended  P - Police
B - Bruise/Abrasion/Swelling  C - Not Visible—Has Pain/Faint  P - Partially  U - Unknown  D - Doctor  O - Other  U - Unknown  N - None

**NARRATIVE AND DIAGRAM**

SEE PAGE 3 of 3

Officer's Opinion of What Happened:  SEE PAGE 3 of 3

**ROADWAY ENVIRONMENT**

Unit 1: 3    Unit 2: 7

Contributing Road Defects: 4 - None

Time Police Notified: 2:30 PM
Time Police Arrived: 2:50 PM
Time EMS Arrived: 2:40 PM
Name of Photographer: Tpr. Fisher

Property Damage: N/A
Owner: N/A

Name of Investigating Officer: Tpr. Fisher
Officer ID: 1067
Agency ORI: ALAST2100

Signature of Investigating Officer: Robert [signature] 1067
Date: 8-31-03

Exhibit H- page 4

# ALABAMA
## UNIFORM TRAFFIC ACCIDENT REPORT

LOCAL CASE NO. _____

AT No. 34 Rev. 4/86

### SUPPLEMENTAL SHEET

SHEET 3 OF 3 SHEET(S)

| | Name / Taken to / Address / Taken by | Unit No. | Seat Pos. | Injury Type | Age | Sex | Ejec- tion | First Aid By |
|---|---|---|---|---|---|---|---|---|
| 3 | Ellen Allen 107 Paedise Isle Riverside Al 35135 | 2 | 6 | A | 49 | F | N | O |
| | Evergreen Medical Center    Conecuh County EMS | | | | | | | |
| 4 | Phyllis Dhulton Montgomery 5005 Wild Ginger CV Maveas 6A | 3 | 1 | A | 60 | F | N | O |
| | Evergreen Medical Center    Conecuh County EMS | | | | | | | |
| 5 | Name / Taken to / Address / Taken by | | | | | | | |
| 6 | Name / Taken to / Address / Taken by | | | | | | | |
| 7 | Name / Taken to / Address / Taken by | | | | | | | |
| 8 | Name / Taken to / Address / Taken by | | | | | | | |
| 9 | Name / Taken to / Address / Taken by | | | | | | | |
| 10 | Name / Taken to / Address / Taken by | | | | | | | |
| 11 | Name / Taken to / Address / Taken by | | | | | | | |
| 12 | Name / Taken to / Address / Taken by | | | | | | | |

ADDITIONAL ACCIDENT VICTIMS

### DESCRIBE WHAT HAPPENED (Refer to vehicles by number)

U1 left the road onto the left shoulder. U1 crossed the mediaairborn. U1 struck U2 with the right ___ of the ___
to rest on the left shoulder of the ___
counterclockwise and struck U3 ___
rotated clockwise into the median. U1 overturned ___
side.

Exhibit H- page 5

Page 5 of 6

2nd A.O.I

1st A.O.I

Median

N

I-65

Road Width 27.3ft

NOT TO SCALE

| Not to Scale | | |
|---|---|---|
| Diagram Scale 1 inch | = | (20 feet) |
| | | (10 feet) |
| Signature of Reporting Officer(s) | | |
| Robert John | | |

| Location | | |
|---|---|---|
| I-65 | 106 mm | |
| Officer ID | Reporting Police Agency ORI | |
| 1067 | AST | |

| Time | A.M. |
|---|---|
| 2:25 | P.M. |
| DATE | |

| Month | Day | Year |
|---|---|---|
| 08 | 24 | 2003 |

# Exhibit H

### AFFIDAVIT

STATE OF ALABAMA )

CREHSHAW COUNTY )

1.      My name is Robert Fisher. I am over the age of 19 and a resident of the State of Alabama.

2.      On August 29, 2003, I was an Alabama State Trooper working in the vicinity of Butler County.

3.      I received a call to an accident that occurred on I-65 near the Butler County line and County Road 1220.

4.      I came upon the scene of a multi-car accident and began my investigation.

5.      In the course of my investigation, I was informed by a female witness that the 1997 Mercury Mountaineer driven by Bertha Moore was traveling at approximately 83 MPH at the time of this accident. The witness left before I was able to get her statement and contact information.

Robert Fisher

Sworn and subscribed to before me on this

the 4th day of February, 2008.

Notary Public

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Sept 20, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

My Commission Expires: _____

# Exhibit I

# FREEDOM COURT REPORTING

### Page 53

1  high-traction situation. And when you get to
2  the point where you have 2/32" of an inch or
3  less remaining depth of tread, it becomes a
4  serious safety hazard on any wet road.
5      Q.  Is there anything that you could
6  tell from the photographs of the vehicle about
7  the other tires that either help support or in
8  any fashion influence your opinion?
9      A.  No, sir.
10     Q.  All right. So, as a practical
11 matter we don't know and you didn't know what
12 the condition or what type of tires were on
13 the rest of this vehicle or were on the other
14 three positions of this vehicle?
15     A.  I don't recall that anyone has
16 provided me with that information, no, sir.
17     Q.  All right. And in any event, it
18 didn't play any part in your opinions?
19     A.  Not in the opinions I've expressed
20 in this report.
21     Q.  Yes, sir, that's what I mean.
22     And the opinions in your report are
23 the ones you're going to offer at trial if we

### Page 54

1  try this case or when we try this case?
2      A.  Well, if I'm asked, yes, sir.
3      Q.  I understand.
4      A.  I offer opinions in response to
5  questions that I'm asked.
6      Q.  I understand that.
7      All right. Now, we've got the
8  letter, and we can read that. But based upon
9  the letter and the other phone conversation
10 that you had with Mr. Kells, it's my
11 understanding from your report that you were
12 asked to express your opinions regarding the
13 failure of the tire, whether or not it was
14 likely to have been anticipated, and the
15 likelihood that a driver would lose control as
16 a result of that deflation, and what steps
17 might have been taken to avoid loss of control
18 after deflation. Is that a correct recitation
19 of what you were asked to do when you first
20 got into this case?
21     A.  Yes, sir.
22     Q.  And you performed your inspection.
23 Your report sets out where the tire came from

### Page 55

1  and when it was made as well as the remaining
2  tread groove depth. What were the tread
3  groove depths that you determined on this
4  tire?
5      A.  4/32" to 5/32" in an inch.
6      Q.  Is that the entire tread depth?
7      A.  Yes, sir. Not the useful, that's
8  the entire tread depth.
9      Q.  All right. Is that good tread, bad
10 tread, or somewhere in between as far as
11 you're concerned?
12     A.  Well, as I previously stated, a
13 tread depth of 2/32" of an inch is considered
14 unsafe on roads. So, basically this tire had
15 2/32" of an inch of what you might call
16 useful depth left, which is almost, but not
17 completely worn out.
18     Q.  I'm sorry. I did not hear you say
19 that earlier. How deep are the treads on this
20 tire when it's brand new just to give me
21 some --
22     A.  On car tires new tread depths are
23 typically 11/32" of an inch. There may be

### Page 56

1  some exceptions to that, but that's a typical
2  new tire tread depth.
3      Q.  Is it -- or do you know -- I guess
4  should be the question -- required under the
5  laws of Alabama that a tread depth be at least
6  a certain amount?
7      A.  I don't know.
8      Q.  All right. So, this had more than
9  what you're telling us is considered a
10 dangerous depth but not a lot more; is that
11 fair?
12     A.  That's correct.
13     Q.  All right. So, while --
14     A.  And, again, dangerous on a wet road.
15     Q.  I understand.
16     A.  A dry road doesn't matter. But on a
17 wet road, 2/32" in an inch or less is
18 hazardous.
19     Q.  Help me out. If I were looking at a
20 tire, not this one, not the one in this case,
21 just a tire that had 2/32" of tread depth or
22 less, would it be obvious -- is that a tire
23 that I'm looking at thinking it doesn't have

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1   much tread left?
2      A.   Well, obviously, yes, sir, you
3   would.  And all tire manufacturers for car --
4   passenger car tire manufacturers are required
5   to install tread wear bars that are 2/32" of
6   an inch deep such that when the tread wears
7   down to 2/32" of an inch of depth, you can
8   see a bar continuously across at various
9   points around the periphery of the tire.  So,
10  if you ever see a tire where the tread bars --
11  where the tread is worn down to the bars, that
12  means you better go immediately to the tire
13  store and buy another tire.
14     Q.   Buy new tires.  Okay.
15          All right.  So, you examined the
16  tire, and it's my understanding that you
17  determined that the tire was punctured by some
18  kind of object; correct?
19     A.   A bolt of some type, yes, sir.  A
20  bolt or a screw.  It had a hex head bolt,
21  screw.  I don't know exactly what it was
22  because it was gone, but it was a hex head
23  fastener of some type.

Pa

1   will, "the discussion," in your report.  A
2   it starts off, the first sentence.  "It is
3   common knowledge that tire traction is
4   when the road is wet."  And then you go
5   that and site somewhere in "Mechanics o
6   Pneumatic Tyres" to support that positio
7   it fair to say, Mr. Cunningham, that your
8   opinions in this case are based upon and
9   assume that Highway 65 was wet at the t
10  this incident occurred, the road surface?
11  happened on 635.
12     A.   I understand that it happened on
13  I-65.  And it's my understanding that the ro
14  was wet, and probably the best way I could
15  answer that question is that the fact that it
16  was wet would have reduced the ability of a
17  tire to maintain traction --
18     Q.   All right.
19     A.   -- and that, therefore, may have
20  been a contributing factor to the loss of
21  vehicle control and was not necessarily the
22  cause.
23     Q.   Correct.  Okay.  I understand.

Page 58

1      Q.   All right.  And you determined it
2   was a hex head fastener how?
3      A.   By the pattern on the tire.
4      Q.   All right.
5      A.   The wear pattern on the surface.
6      Q.   It's your opinion that prior to this
7   incident occurring, that object was ejected
8   from the tire, as a result, the tire then
9   deflated over some period of time, and then in
10  it's deflated condition, in your opinion,
11  caused the loss of control; is that a fair
12  thumbnail sketch?
13     A.   I believe that's an
14  oversimplification.
15     Q.   Okay.  I'll give you plenty of
16  opportunity to complicate it.
17     A.   Do you want me to complicate at this

Pa

1      Is it your -- strike that.
2      Does your opinion assume that it
3   raining at the time that this incident
4   occurred?
5      A.   It does not assume that.  It's show
6   as rain in the police report, but whether it
7   raining at that time or not as long as the
8   road is wet, the traction capabilities -- the
9   traction limitations are there.  If it's not
10  raining at that instant but the road is
11  sufficiently wet, then you still have the sa
12  traction limitations.
13     Q.   And that was my next question.
14  is sufficiently wet?
15     A.   Basically standing water.
16     Q.   All right.
17     A.   It may also be

Page 81

1  think I can answer that without looking at it.
2      Q.   (By Mr. Sparrow) Okay.
3      A.   This Mercury Mountaineer was not
4  traveling at 30 miles an hour around a
5  200-foot radius curve --
6      Q.   Right?
7      A.   -- wet or dry.
8      Q.   Right.
9      A.   It was being operated on an
10  interstate highway at a speed that was
11  probably at least twice that great.
12     Q.   Correct.
13     A.   And therefore, the specific
14  observations and conclusions that pertain to a
15  200-foot radius curve taken at 30 miles an
16  hour would not necessarily apply to the
17  situation involving this Mercury Mountaineer.
18     Q.   Correct. And I guess what I'm
19  asking is can you point me to any of Grogan's
20  tests or anybody else's that were performed
21  under conditions similar to those faced by
22  Mrs. Moore in this case?
23     A.   No, sir.

Page 82

1      Q.   All right.
2      A.   Nobody would perform a test under
3  those circumstances. That's why you have
4  accidents.
5      Q.   Are the conclusions drawn from these
6  tests performed by Mr. Grogan that were
7  performed on the curve of whatever radius
8  similar enough to take the data learned from
9  them and apply it to the situation in this
10  case?
11     A.   Only in the general sense that a
12  sudden tire deflation can cause a loss of
13  control, but it does not necessarily always
14  result in a sudden loss of control.
15     Q.   In fact, it usually doesn't, does
16  it?
17     A.   It usually doesn't, that's correct.
18  It usually does not.
19     Q.   As I understand your opinion in this
20  case, you are testifying that, in your
21  opinion, more likely than not that is what
22  happened in this case?
23     A.   That what is what happened in this

Page 83

1  case?
2      Q.   That the deflation of the tire
3  caused the loss of control?
4      A.   Yeah, the deflation of the tire and
5  then some driver response to it, either a lane
6  change or stepping on the brake or something
7  is what caused the loss of control, that that
8  control would not have been lost if the tire
9  had retained its inflation air.
10     Q.   And we will get back to this, but
11  let me just -- farther down on page 4 in that
12  first paragraph -- not first full but the
13  first paragraph on page 4, you mention that
14  it's more likely to sustain a puncture or
15  other hazard-related failure in the second
16  half of the tire's life and that a wet tire is
17  more likely. Do either of those two
18  statements really have anything to do with
19  your opinions in this lawsuit?
20     A.   Not as to the opinion about this
21  tire failure although they are consistent with
22  the fact that this tire was in the second half
23  of its life and it was a wet road --

Page 84

1      Q.   Okay.
2      A.   -- with a wet tire. At least that's
3  what's been reported to me.
4          So, it would statistically be six
5  times more likely to sustain a puncture or
6  other hazard-related failure.
7      Q.   Are the -- strike that. Does the
8  deflation -- is the deflation more likely to
9  cause a loss of control if the vehicle is
10  being driven on a road around a bend or around
11  a curve, is the loss of control more likely?
12     A.   Well, yes and no. It depends on the
13  amount of the curve, the degree of curvature.
14  What typically causes -- what often happens
15  maybe is the best way to put it. What often
16  happens when there is a loss of control as a
17  result of a rear tire failure or deflation is
18  that the vehicle may continue normally as long
19  as its traveling on a straight path. Then
20  when something happens to change the dynamics
21  such as trying to negotiate a curve or trying
22  to make a lane change or stepping on the
23  brakes, then that one tire that's deflated

21 (Pages 81 to 84)

**Exhibit J**

**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

MICHAEL ALLEN, et al.                    )
                                         )
                      Plaintiffs,        )
                                         )
V.                                       )        Case No. 2:06-cv-879-WKW
                                         )
UNITED STATES OF AMERICA                 )
                                         )
                      Defendant.         )

---

WALLACE MONTGOMERY, et al.               )
                                         )
                      Plaintiffs,        )
                                         )        Case No. 2:06-cv-880-WKW
                                         )
V.                                       )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
                      Defendant.         )

**DEFENDANT UNITED STATES' BRIEF IN SUPPORT OF**
**APPLICATION OF THE SUDDEN EMERGENCY DOCTRINE**

Comes now the Defendant, United States of America, to brief the applicability of

Alabama's sudden emergency doctrine, pursuant to this Court's order dated January 23, 2008.

**FACTS**

On August 29, 2003, Mrs. Bertha Gordon Moore, then and presently an administrative

assistant for the United States Attorney for the Middle District of Alabama, was driving her

Mercury Mountaineer sport-utility vehicle on Interstate 65 in the northbound lanes, returning

from a law enforcement conference in Perdido Beach. Exhibit A, Moore Dep. 10:5-19, 14:23-

15:4, 19:2-20:8, Aug. 7, 2007. Somewhere near Evergreen, Alabama, Mrs. Moore recalls driving

her vehicle at around 65 m.p.h. when she heard a loud bang. Id. at 32:2-33:10. She felt the left

rear side of her vehicle suddenly drop, hit her brakes, and at that point lost control of her vehicle. Id. at 48:19-49:8. She has no further recollection of what occurred and remembers briefly waking up in a helicopter that was transporting her to a hospital. Id. at 20:19-21:5.

After the vehicle lost control, it crossed the median and entered the southbound lanes of Interstate 65 where the vehicle collided with the Lincoln Towncar driven by Michael Allen, with front passenger Lori Allen and rear passenger Lou Ellen Allen, and also a Volvo S70 driven by Phyllis Montgomery, with Wallace Montgomery as front passenger.

Subsequent analysis of the left rear tire on Mrs. Moore's vehicle revealed that a bolt or screw had, at some point prior to the collision, fully penetrated the tire-wall and became lodged in the tire on the side facing the wheel well. Exhibit B, Report of Peter Flanner at 2, ¶ 3, No. 1; Exhibit C, Report of Ralph Cunningham at 6, ¶ 1. The treads of the tire were evenly worn, indicating that the tire was not operated in an underdeflated or overdeflated manner. Exhibit C, Report of Ralph Cunningham at 2, ¶¶ 1-2; Exhibit B, Report of Peter Flanner at 2, ¶3, No. 8; Exhibit D, Flanner Dep. 59:13-22, 73:5-15, 84:4-10, Nov. 13, 2007. While Mrs. Moore was driving, the screw or bolt was suddenly ejected, leaving a hole through which all of the remaining air in the tire escaped, completely deflating the tire in a matter of seconds. Exhibit C, Report of Ralph Cunningham at 6-7; Exhibit B, Report of Peter Flanner at 1. To date, only the plaintiffs' accident reconstructionist, Clifford Prosser, has suggested that Mrs. Moore contributed to the cause of this accident by stepping on her brake when her left rear tire suddenly and rapidly deflated on her. Exhibit E, Report of Cliff Prosser at 1, ¶2.

## THE SUDDEN EMERGENCY DOCTRINE IN ALABAMA

Under Alabama law, "a motorist, without fault of [her] own, confronted with a sudden emergency, is not required to exercise the same presence of mind as would a prudent person under more deliberate circumstances." Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala. 1985), quoting Williams v. Worthington, 386 So.2d 408 (Ala. 1980). While not a defense, per se, to negligence, the "sudden emergency" doctrine "provides a qualified standard of care by which . . . a party's conduct can be measured." Burns v. Martin, 589 So.2d 147, 149 (Ala. 1991). For the doctrine to apply, a party must show that (1) there was a sudden emergency, and (2) the emergency was not the fault of the party invoking the rule. Friedlander v. Hall, 514 So.2d 914, 915 (Ala. 1987).

Alabama continues to recognize the sudden emergency doctrine. See Mitchell v. Johnson, 641 So.2d 238, 239 (Ala. 1994) (rejecting request to abolish the sudden emergency doctrine). Alabama courts have applied the sudden emergency doctrine to cases where a third-party's intervening action of swerving into a defendant's lane caused an accident, see State Farm Mutual Automobile Insurance Co. v. Outlaw, 578 So.2d 1369, 1370 (Ala. Ct. App. 1991), as well as to situations when the driver of a motor vehicle suddenly finds himself rapidly approaching the rear of another vehicle traveling at a much slower speed. Gleichert v. Stephens, 280 So.2d 776, 777 (Ala. 1973).

While research revealed no Alabama cases directly on point (i.e. involving a tire blow out), multiple jurisdictions have persuasively held that a defendant should not be liable when a tire blow-out is the cause of an accident. See, e.g., Huffman v. Mercer, 295 S.W.2d 27, 33 (Mo. 1956) ("If one be precipitated to the left of the road by virtue of circumstances [a blowout] over

-3-

which he has no control, one is not negligent.") citing Seligman v. Orth, 236 N.W. 115, 116 (Wis. 1931); Lasseigne v. Kent, 142 So. 867, 868 (La. App. 1932) ("The puncture of an automobile tire by a large spike, causing the car to upset and fatally injuring a guest therein, will, under the evidence set out in the case, be considered an accident, which is a casualty which could not be prevented by ordinary care and diligence.") (citation omitted).

In a very similar case, the Nebraska Supreme Court upheld a verdict that the puncture of a tire and accompanying deflation was the proximate cause of a car swerving off the road and overturning and, therefore, the driver of the car was not liable for the injuries caused. See Bonacci v. Cerra, 279 N.W. 173, 176-77 (Neb. 1938); see also Kelly v. Gagnon, 236 N.W. 160, 164 (Neb. 1931) (holding that a driver who stepped on brake following a puncture of a tire did not act negligently even though the car "swayed and upset," causing the death of a passenger).

In the instant case, Mrs. Bertha Moore was confronted with a sudden emergency when her left rear tire ejected a screw or bolt that had been lodged in it, causing the tire to suddenly and rapidly deflate while she was operating her Mercury Mountaineer (a sports utility vehicle) on a highway at 65 miles per hour. This emergency was through no fault of Mrs. Moore's. There was no indication that the tire was in an unsafe condition. Both the plaintiffs' and the defendant's experts have stated that a tire is not worn to an unsafe condition until the tire tread is at or less than 2/32". Exhibit D, Flanner Dep. 72:6-73:15, Nov. 13, 2007; Exhibit F, Cunningham Dep. 55:1-57:13, Nov. 9, 2007. The tire that suddenly deflated on Mrs. Moore still had between 2/32" and 3/32" of safe, usable tread. Exhibit D, Flanner Dep. at 72:1-73:15, Nov. 13, 2007; Exhibit F, Cunningham Dep. 55:9-57:13, Nov. 9, 2007. Put another way, Mrs. Moore's full tire tread was at 4/32" to 5/32", above the minimum tread necessary to safely operate a vehicle. While the

-4-

plaintiffs' expert, Peter Flanner, opines that the tread on the tire was 80% worn, there was still

20% of usable, safe tread on the tire.  Exhibit B, Report of Peter Flanner, at 2, ¶3, No. 8; Exhibit

D, Flanner Dep. 71:16-73:15, Nov. 13, 2007.  Absent some other indication that the tire was

damaged in some way, Mrs. Moore was completely justified in continuing to operate her vehicle

with a tire that had 20% of its remaining usable tread.[1]

In addition, both the plaintiffs' and the defendant's tire experts opine that the tread was

evenly worn, indicating that the tire was properly aligned and was not over or underinflated

during its service life.  Exhibit D, Flanner Dep. 59:13-22, 73:5-15, 84:4-10, Nov. 13, 2007;

Exhibit C, Report of Ralph Cunningham at 2, ¶¶ 1-2.  The location of the screw or bolt that was

ejected from the tire was on the side of the tire facing the wheel well and, thus, out of plain view.

Id. at 6, ¶¶ 1-2.  This means that, unless Mrs. Moore had a lift in her garage, she would never

have known that the screw or bolt was lodged in her tire.  Moreover, due to the construction of

the tire, the screw or bolt would have prevented air from escaping the tire, thus preventing the

driver from knowing that something was wrong with the tire in the first place.  Id. at 6, ¶ 1;

Exhibit B, Report of Peter Flanner at 2, ¶ 1 (suggesting a puncture would result in only gradual

loss of pressure).  This is supported by the fact that the tire itself exhibited no evidence of having

been operated in an overdeflected or underinflated manner.[2]  Exhibit D, Flanner Dep. at 59:7-22,

---

[1] To draw an analogy, a full tank of fuel would be at 100% of its capacity for storing fuel. After burning 80% of that fuel, a driver still has 20% of his fuel remaining and does not yet have to refill the tank.

[2] Plaintiffs may suggest that Mrs. Moore's speed was excessive and, therefore, per se negligent under Alabama law, thus preventing the application of the sudden emergency doctrine. To date, however, no expert has testified that Mrs. Moore's speed caused the tire to suddenly deflate or her loss of control of the vehicle following the sudden tire deflation.  Moreover, the only sworn evidence of Mrs. Moore's speed comes from Mrs. Moore herself, who testified that

Nov. 13, 2007; Exhibit C, Report of Ralph Cunningham at 2, ¶ 1.

Mrs. Moore, faced with a sudden emergency when her tire suddenly and rapidly deflated at highway speeds of 65 miles per hour, applied her brakes. Under the circumstances, it was not negligent to take this action as the move was clearly designed to slow her vehicle down in a response to the emergency situation. According to the plaintiffs' expert, Clifford Prosser, the act of stepping on the brake was negligent. Exhibit E, Report of Clifford Prosser at 1, ¶ 2. Given, however, the sudden emergency Ms. Moore faced, her instinctive reaction of stepping on the brake, even if not the best course of action, was not negligent. See Crowe v. Crowe, 129 S.E.2d 585, 586 (N.C. 1963) (holding that the defendant's act of stepping on the brakes after a tire exploded was not negligent where the driver was faced with an emergency and there was no evidence he was aware of any defect in his tires); see also Pickett v. Cooper, 116 S.E.2d 48, 51

---

she was traveling around 65 miles per hour -- within the posted speed limit -- immediately before losing control. Exhibit A, Moore Dep. 32:16-33:10.

The only evidence that Mrs. Moore's speed was excessive comes from the Alabama Uniform Traffic Accident Reports, which estimates her speed at 83 miles per hour. See Exhibits G and H, Alabama Uniform Traffic Accident Reports. These accident reports, however, contain erroneous and inaccurate information which indicates their unreliability as well as inadmissibility. For example, both reports list Michael Allen's insurance carrier as Alfa but it was, in fact, State Farm. Id. at 1, "Liability Insurance Co." section for Driver Michael Allen. Furthermore, one version of the report lists Phyllis Montgomery as unemployed while the other lists her as employed at Georgia Perimeter College. Compare Exhibit G at 2, "Place of Employment" section for Phyllis Montgomery with same section of Exhibit H at 3. Upon close examination of the two reports, it is obvious that someone "whited out" the erroneous job information and then wrote in the college. The reports also inaccurately state that Mrs. Moore was taken to Evergreen Medical Center. See "Victims" section for Bertha G. Moore on Exhibit G at 4 and same section on Exhibit H at 2. In fact, she was airlifted by helicopter to a trauma center in Pensacola, Florida. Neither set of reports has been authenticated nor has a foundational basis for the calculation of the speed estimate been established. With the glaring inaccuracies of information, these reports are unreliable, inadmissible, and cannot be the basis upon which Plaintiffs establish Mrs. Moore's alleged excessive speed.

-6-

(Va. 1960) (holding that the sudden emergency doctrine was properly submitted to the fact finder where defendant alleged that a tire blow-out, and not his own negligence, resulted in his vehicle crossing onto the wrong side of the road).

In sum, the sudden emergency doctrine properly applies to the facts of this case. Mrs. Moore did not act in a negligent manner while operating her car on August 29, 2003. Moreover, the tire deflation, and not Mrs. Moore's actions, was the proximate cause of the accident and, consequently, the plaintiffs' injuries. Despite the unfortunate facts of this matter, the United States is not liable for those injuries.

Respectfully submitted this 28th day of January, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
Civil Division

PHYLLIS J. PYLES
Director, Torts Branch
Civil Division

GAIL K. JOHNSON
Senior Trial Counsel, Torts Branch
Civil Division


/s/ Conor Kells
CONOR KELLS
Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
Post Office Box 888
Benjamin Franklin Station
Washington, DC 20044
Tel: (202) 616-4400
Fax: (202) 616-5200
Attorneys for Defendant United States

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon counsel for

Plaintiffs by electronic filing, CM/ECF:

> Annesley H. DeGaris
> Attorney for the Allen Plaintiffs
> Cory, Watson, Crowder & DeGaris, P.C.
> 2131 Magnolia Avenue, Suite 200
> Birmingham, Alabama  35205
>
> J. Callen Sparrow
> Attorney for the Montgomery Plaintiffs
> Heninger Garrison Davis, L.L.C.
> P.O. Box 11310 (35202)
> 2224 1st Avenue North
> Birmingham, Alabama  35203

Dated this 28th day of January, 2008.

> /s/ Conor Kells
> Trial Attorney, Torts Branch
> Civil Division

# Exhibit K

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL P. ALLEN, et al.,          )
                                   )
          Plaintiffs,              )
                                   )
     v.                            ) CIVIL ACTION NO.: CV 2:06-cv-879-WKW
                                   )
UNITED STATES OF AMERICA,          )
                                   )
          Defendants.              )

_____

WALLACE MONTGOMERY, et al.,        )
                                   )
          Plaintiffs,              )
                                   )
v.                                 ) CIVIL ACTION NO.: CV 2:06-cv-880-WKW
                                   )
UNITED STATES OF AMERICA,          )
                                   )
          Defendant.               )

## ORDER ON PRETRIAL HEARING

A pretrial hearing was held in this case on January 31, 2008, wherein the following

proceedings were held and actions taken:

1.     PARTIES AND TRIAL COUNSEL:

       J. Callen Sparrow, Esquire
       *Attorney for the Montgomery Plaintiffs*

       Annesley H. DeGaris, Esquire
       *Attorney for the Allen Plaintiffs*

       Conor Kells, Esquire

Gail K. Johnson, Esquire
*Attorneys for the United States of America Defendant*

COUNSEL APPEARING AT PRETRIAL HEARING: J. Callen Sparrow,

Annesley H. DeGaris, Conor Kells and Gail K. Johnson.

2.     JURISDICTION AND VENUE:

28 USC § 1346; 28 USC § 2671 et. seq.

3.     PLEADINGS:

Complaint, Answer, Pre-Trial Motion for a Ruling on the Applicability of the Sudden

Emergency Doctrine, and any Motions in Limine which the parties may file in advance of

trial.

4.     CONTENTIONS OF THE PARTIES:

(a)     The Plaintiff(s) – it is the contention of the plaintiffs that Bertha Moore, as an

employee of the defendant while in the line and scope of her employment, was negligent

and/or wanton in the operation and maintenance of her automobile.  As a proximate

consequence of said negligence and/or wantonness, the plaintiffs were injured when Ms.

Moore's vehicle crossed the median on Interstate 65 striking the vehicles occupied by the

plaintiffs.  Plaintiffs' injuries are permanent.

(b)     The Defendant – the defendant denies that either it or its employee, Mrs. Bertha

Moore, was negligent and/or wanton in the operation of her motor vehicle on August 29,

2003. The defendant further contends that its employee, Mrs. Moore, was faced with a

sudden emergency when her left rear tire rapidly and suddenly deflated while driving on

2

Interstate 65 and her actions in responding to that sudden emergency were not negligent under Alabama's sudden emergency doctrine. The defendant also denies that any acts or omissions of its employee, Mrs. Moore, were the cause, proximate or otherwise, of the motor vehicle accident forming the basis of this litigation.

As to damages, the defendant contends that it is entitled to a set-off of any damages paid as the result of administrative claim settlements, as well as for any insurance payments made on behalf of the plaintiffs for medical treatment rendered. The defendant denies that all of the injuries claimed by the plaintiffs were sustained or related to the motor vehicle accident of August 29, 2003. The defendant further denies that all of the treatment rendered to the plaintiffs, as well as the associated costs and bills, were reasonable or necessary.

5.    STIPULATIONS BY AND BETWEEN THE PARTIES:

(a)    Bertha Moore was an employee of the United States of America and was in the line and scope of her employment at the time of the incident made the basis of this suit.

(b)    This wreck occurred on August 29, 2003, on Interstate 65 at or near mile marker No. 106.

(c)    Medical bills incurred by each of the plaintiffs for treatment at Evergreen Medical Center, where they were taken by ambulance immediately following the August 29, 2003 accident, were reasonable and necessary. The records from Evergreen Medical Center for treatment rendered from August 29 to August 30, 2003, have been properly authenticated.

3

(d)    Wallace Montgomery's medical records from Piedmont Hospital dated September 1, 2003 through September 6, 2003, are authentic.

It is ORDERED that:

1.    The trial of this case, which is to last for 3-4 days, is set for **February 25, 2008**, at 10:00 a.m. in Courtroom 2-E of the Frank M. Johnson, Jr., United States Courthouse Complex, One Church Street, Montgomery, Alabama.

2.    The parties shall file any motions in limine fully briefed **on or before February 18, 2008.**

3.    The parties are not required to file trial briefs, but if they choose to do so, the briefs shall be filed **on or before February 18, 2008.**

4.    The parties will be required to file post-trial briefs, which shall include proposed findings of fact and conclusions of law. Deadlines for post-trial briefs will be set at the conclusion of the trial.

5.    Each party shall submit at the time of trial, for use by the court, **four** copies of the witness list, exhibit list, and notebook of pre-marked exhibits.

6.    Each party shall submit a sufficient number of copies of exhibits for opposing counsel. The parties are encouraged to compile a single set of pre-marked exhibits rather than separate sets for each party.

7.    The parties shall review and comply with the Middle District of Alabama's Order on the E-Government Act.

4

8.    All deadlines not otherwise affected by this order will remain as set forth in the scheduling orders (Doc. # 12 and # 19) entered by the court.

9.    The parties have indicated that there are no other disputes at this time.  All understandings, agreements, deadlines, and stipulations contained in this order shall be binding on  all parties unless modified by the court.

DONE this 6th day of February, 2008.

                              /s/   W. Keith Watkins
                        UNITED STATES DISTRICT JUDGE

5

**Exhibit L**

**FREEDOM COURT REPORTING**

Page 121

1    MR. KELLS: What's the date?
2    MR. DeGARIS: Yeah. The
3  patient ledger printed on 11/11/07.
4    MR. KELLS: I don't have a
5  copy of that.
6    MR. DeGARIS: Yeah. I gave
7  you one when we got started. Let's go
8  off the record for a second.
9
10    (Discussion off the record.)
11
12    Q. (BY MR. DeGARIS:) Doctor,
13  what were your total charges for the
14  treatment of Mike Allen? Referring to
15  the last page of Plaintiff's Exhibit
16  Number 11.
17    A. 33,653.76.
18    Q. Was the treatment you provided
19  to Mr. Allen necessary?
20    A. Yes.
21    Q. Were the charges for that
22  treatment reasonable?
23    A. Oh, yeah.

Page 122

1    Q. Were the charges for that
2  treatment you rendered comparable with
3  what other physicians in the applicable
4  area charge?
5    A. I have no earthly idea.
6    Q. As far as you know, are they
7  similar to what other physicians would
8  charge?
9    A. I would think so. But some of
10  the things I do, there is really no one
11  to compare to.
12    Q. Let me go over this. Are the
13  charges reasonable?
14    A. Yes.
15    Q. And they were necessary?
16    A. Yeah.
17    Q. Okay. The radiology bills
18  that are also in there, were the
19  radiological exams performed at your
20  direction necessary?
21    A. Yes, sir.
22    Q. Were the charges for those,
23  which are not reflected in your bills,

Page 123

1  to the best of your knowledge,
2  reasonable charges in the area?
3    A. I would guess so.
4    Q. Okay.
5    A. 90 percent of the radiology
6  business is that one claim, yeah.
7    MR. DeGARIS: Okay. Just give
8  me 30 seconds to go through and make
9  sure I've got all of the exhibits in
10  order.
11    Q. (BY MR. DeGARIS:) Plaintiff's
12  Exhibit 11 does not include any bill
13  for radiological services?
14    A. Or any other outside work.
15  Just strictly what we have done, yeah.
16    MR. DeGARIS: Okay.
17
18  EXAMINATION BY MR. KELLS:
19    Q. Mr. DeGaris got to ask you
20  some introductory questions and I would
21  like to throw a few in of my own, if
22  you don't mind.
23    A. Yeah.

Page 124

1    Q. Is your present license to
2  practice here in Alabama current?
3    A. Yes, sir.
4    Q. When was it last recertified
5  or reupped or relicensed?
6    A. Just recently. Just within
7  the last few weeks, we got the one for
8  the next year.
9    Q. Has your license to practice
10  in Tennessee or Alabama ever been
11  revoked or suspended?
12    A. No.
13    Q. Have you ever practiced as an
14  orthopedist?
15    A. No.
16    Q. Have you ever practiced as an
17  anesthesiologist?
18    A. No, sir.
19    Q. Have you ever specialized in
20  anything other than internal medicine
21  or general practice?
22    A. Well, we do pain management
23  here.

31 (Pages 121 to 124)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 125

1  Q. Could you describe what that
2  means?
3     A. Well, that means assisting
4  patients with the diagnosis and
5  management of pain problems. Could be
6  done with oral medication, could be
7  done by referral for physical therapy,
8  referral for surgery, could be done by
9  injections.
10    Q. Are you certified as a pain
11 medicine doctor, pain medication
12 administering doctor?
13    A. Uh-uh.
14    Q. Have you ever testified in
15 court before?
16    A. No.
17    Q. Have you ever been deposed
18 before?
19    A. I have, yes.
20    Q. How many times?
21    A. Maybe twice.
22    Q. Who is your current medical
23 malpractice insurer?

Page 126

1     A. No one.
2     Q. Are you self-insured?
3     A. Right.
4     Q. Could you describe your
5  medical record keeping process for me?
6  Do you put a chart number on each and
7  every medical record that you have?
8     A. We put the patient's name on
9  the chart.
10    Q. Do you have like a reference
11 number for each visit, so that if a
12 document gets misplaced, it can be
13 replaced right back in with the chart
14 number or anything along those lines?
15    A. No. Everything is dated.
16 It's done by date. And for each visit,
17 there are two pages. So if there's not
18 two pages, you know, it kind of calls a
19 question.
20    Q. What I'm getting at is: If
21 you had two patients named Michael
22 Allen and you had a misplaced document
23 and you went to try to replace it back

Page 127

1  into the file, is there any check or
2  balance or way to track it back based
3  on a reference number or code?
4     A. Social Security number, date
5  of birth, address, phone numbers,
6  things like that.
7     Q. Do you keep your records
8  computerized?
9     A. No. Well, only to the extent
10 of the medication list. The medication
11 lists are computerized.
12    Q. When a patient comes in, do
13 you put down in your medical record all
14 of the complaints that they have?
15    A. All of the relevant
16 complaints, yeah.
17    Q. What would be an irrelevant
18 complaint?
19    A. Pardon?
20    Q. What would be an irrelevant
21 complaint?
22    A. It gets back to the kind of
23 thing I was telling you before. That I

Page 128

1  don't have somebody in there, you know,
2  as a stenographer getting every word
3  and every pause and that sort of thing.
4  I have to put down as much as I have
5  time to put down and detail I have time
6  to put down and try to stick to the
7  important stuff.
8     Q. Do you keep any records of
9  noncomplaints as in complaints of pain
10 in the ankle, but not in the knee?
11    A. Could you repeat that
12 question?
13    MR. DeGARIS: Object to the
14 form.
15    Q. (BY MR. KELLS:) Do you ever
16 mark down in your records
17 noncomplaints, you know, if they
18 complain of leg pain, but it's ankle,
19 not knee, for example?
20    MR. DeGARIS: Object to the
21 form.
22    A. I don't think I understand the
23 question. You mean like I put down

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1   there's no -- for example, abdominally,
2   it's pretty common to put down no
3   peritoneal signs. Is that what you
4   mean?
5       Q.  (BY MR. KELLS:) If a patient
6   comes in complaining about one thing,
7   but not complaining of something else,
8   do you ever mark down the fact that
9   they aren't complaining about something
10  that could be related to what they are
11  complaining about?
12      A.  Yeah. Yes. Yeah.
13      Q.  Do you keep in your records a
14  list of all of the procedures that you
15  perform during a patient visit?
16      A.  Yes.
17      Q.  Do you keep a record of all
18  diagnoses that you make during that
19  visit?
20      A.  Yes.
21      Q.  Do you list the reasons for
22  making those diagnoses in your records?
23      A.  It's not really practical to

Page 130

1   do that. A diagnosis is made as kind
2   of a gestalt summary and processing of
3   data, which is history and physical
4   examination, laboratory data, EKG,
5   whatever data, chest x-ray, and so
6   forth. To put down that process of
7   putting those things together and then
8   distilling it into a diagnosis would be
9   onerous and unnecessary.
10      Q.  So you don't necessarily mark
11  the reason? You just let the symptoms
12  and the tests speak for themselves and
13  you give your conclusion as the
14  diagnosis?
15      A.  Yes. Yeah.
16      Q.  Do you keep in your records
17  the recommended course of treatment for
18  whatever diagnosis you make?
19      A.  Yes.
20      Q.  In your practice, do you make
21  referrals to neurologists?
22      A.  Yes.
23      Q.  Do you make referrals to

Page 131

1   orthopedists?
2       A.  Yes.
3       Q.  Do you make referrals to
4   thoracic surgeons?
5       A.  Well, yes. How do you define
6   a thoracic surgeon? Well, just say
7   yes, because I refer patients freely to
8   specialists and subspecialists.
9       Q.  Do you ever make referrals to
10  anesthesiologists?
11      A.  Occasionally, yeah.
12      Q.  Do you make referrals to
13  psychologists or psychiatrists?
14      A.  Yes.
15      Q.  I noticed that in your records
16  when we were going through them and
17  also in the notes that were marked
18  previously as an exhibit and these were
19  the two-page handwritten notes that you
20  used in connection with the letter. I
21  forget which exhibit it was marked as.
22      A.  Those aren't really part of
23  the chart.

Page 132

1       Q.  I realize that.
2       A.  I was just trying to instill
3   something down for a report.
4       Q.  I realize that. But the only
5   reason I bring it up is that I noticed
6   in the records that we reviewed for
7   Michael Allen that there are a number
8   of -- Exhibit 9, for the record, that's
9   the handwritten notes.
10      A.  I've got my copy here. All
11  right. Yeah.
12      Q.  Looking at some of the records
13  that we have and looking at some of the
14  notes over here, you made reference to
15  some injections that you made at
16  numerous points. I understand these
17  are nerve block injections.
18      A.  Some are.
19      Q.  For example, an INCB be the
20  intercostal nerve block?
21      A.  That's exactly right.
22      Q.  I understand that's an
23  injection to ease pain by blocking the

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1 nerve off?
2    A.   That's right.
3    Q.   For example, a TFB, is that a
4 thoracic facet block?
5    A.   Yeah.
6    Q.   Is that also a type of nerve
7 block?
8    A.   Yeah.  It's a dual purpose
9 injection.  It's a little joint and it
10 also has a nerve.  So you're injecting
11 near the joint and you're injecting to
12 block the nerve, yeah.
13    Q.   Things like an ONB is an
14 occipital nerve block?
15    A.   That's correct.
16    Q.   It's also another type of
17 nerve block injection?
18    A.   Uh-huh.
19    Q.   One of the other ones, I think
20 there was an ANB, is that an ancillary
21 nerve block?
22    A.   Yeah.
23    Q.   That's another type of

Page 134

1 injection that you would make?
2    A.   Uh-huh.
3    Q.   I noticed in your records
4 there are code numbers same as they are
5 in Exhibit 9.  Just for reference
6 purposes, are those numbers taken from
7 the current procedural terminology put
8 out by the American Medical
9 Association?
10    A.   Could you point to the numbers
11 you're referring to?
12    Q.   For example, on Michael
13 Allen's record from September 8th?
14    A.   You're talking about ledger
15 now.  You're talking about this sheet,
16 just to clarify?
17    Q.   That ledger.  And also in your
18 records, for example, on September
19 24th, 2003 --
20    A.   Okay.
21    Q.   -- you have two parentheses,
22 20605.  I believe CP is chest pain?
23    A.   Yeah.

Page 135

1    Q.   Does that number refer to a
2 code in the current procedural
3 terminology as to the type of
4 injection?
5    A.   Yes, sir.
6    Q.   And is that taken from the
7 current procedural terminology put out
8 by the American Medical Association?
9    A.   That's what we use, yeah.
10    Q.   For example, 20605 would be an
11 injection into an intermediate joint or
12 bursa, for example, the
13 temporomandibular, the
14 acromioclavicular, wrist, elbow or
15 ankle, et cetera, something along those
16 lines?
17    A.   Yeah.
18    Q.   What are your procedures for
19 administering these nerve blocks and
20 injections?
21    A.   What are the procedures?
22    Q.   Yeah.
23    A.   Well, first, to identify the

Page 136

1 problem and then based on the
2 perception of the problem, the
3 intensity of the problem is to mix a
4 cocktail of drugs aimed at relieving
5 the pain.
6    Q.   Is that the whole procedure?
7    A.   Well, we mix it and then we
8 administer the injection.
9    Q.   Okay.
10    A.   And we do that with a needle
11 and a syringe.
12    Q.   Okay.  Have you received any
13 kind of specialized training for
14 administering nerve blocks and
15 injections, such as the ones you have
16 administered to Michael, Lou Ellen, and
17 Laurie Allen?
18    A.   I have.  On-the-job training,
19 so to speak, like CME.  We're primarily
20 working with another doctor who did
21 these things that trained me.
22    Q.   What kind of doctor was the
23 doctor you worked with?

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

Page 137

1    A.  He was a -- he was another
2    general practice internal medicine type
3    doctor.
4        Q.  Do you use any safety
5    precautions when administering these
6    injections?
7        A.  Yeah.
8        Q.  What kind of safety
9    precautions do you use?
10       A.  Well, sterility is a key part
11   of the process.  Sterility is not
12   really a process.  It's really what's
13   called a septic technique.  In other
14   words, we don't want to introduce any
15   infective organisms.  You know, use
16   sterile, branding needles, disposal
17   needles, syringes, that sort of thing.
18   We prep the site.  We prep it with
19   Betadine and alcohol and give it time
20   to clean the area before we inject.
21       Q.  Do you inform your patients
22   about any of the attendant risks in
23   administering a nerve block?

Page 138

1        A.  Yeah.  We -- yeah.
2        Q.  What sorts of risks do you
3    warn them about?
4        A.  Depends on where the block is
5    given, what the risks are.  There's
6    always a risk of bleeding, for example.
7    There is a risk of infection.  There is
8    a risk of -- if a -- for example, in
9    terms of an intercostal block, there is
10   a risk of puncturing a lung and causing
11   a pneumothorax, that sort of thing.  Is
12   that what you're --
13       Q.  That's actually a perfect
14   example.  You warn them of the risks
15   that can occur?
16       A.  Yes.
17       Q.  Do you get them to sign
18   informed consent forms before you
19   perform the procedure?
20       A.  No.
21       Q.  For example, when you perform
22   an intercostal nerve block --
23       A.  Uh-huh.

Page 139

1        Q.  -- because of the risks of a
2    pneumothorax or a lung collapse, do you
3    keep chest tubes nearby to incubate?
4        A.  We do have, yes.
5        Q.  When you perform the
6    injection, do you use any kind of
7    fluoroscopy?
8        A.  No.
9        Q.  Do you use any kind of x-rays
10   whatsoever to help guide the needles so
11   you know where you're injecting?
12       A.  No.
13       Q.  Do you use any mechanism
14   whatsoever to help you guide the needle
15   into the proper location for the
16   injection?
17       A.  Just knowing the anatomy.
18   Understanding the anatomy.  Some of the
19   things you'll do, for example, when you
20   do an intercostal nerve block is you
21   always use the shortest needle possible
22   so that you don't -- you greatly reduce
23   or minimize or alleviate the

Page 140

1    possibility of puncturing the lung.
2        Q.  Do you administer
3    intravenous -- anything during the
4    intercostal nerve block?
5        A.  Do you mean anesthesia?
6        Q.  Any kind of IV whatsoever.
7        A.  No.
8        Q.  Do your medical records
9    reflect any of the operative procedures
10   that you have just described to me when
11   performing these nerve blocks?
12       A.  Generally not, no.
13       Q.  Are you a member of the
14   American Medical Association?
15       A.  No.
16       Q.  Okay.  I guess I'd like to
17   start with the recent billing chart
18   that was just provided to me.
19           MR. KELLS:  Which exhibit is
20   that?
21           MR. DeGARIS:  Exhibit 11.
22           THE WITNESS:  I've got it
23   right here.

35 (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 145

1  the Allens, per se.
2  **Q. So you are charging $1,440 for**
3  **these records and reports that you**
4  **generated?**
5  A. That's correct.
6  MR. DeGARIS: Was there a
7  debit when I paid it? Was there a
8  debit entry?
9  THE WITNESS: An entry to
10 credit this?
11 MR. DeGARIS: Yeah.
12 THE WITNESS: This is one of
13 the things I told you about before the
14 deposition today.
15 MR. DeGARIS: Okay.
16 THE WITNESS: This was printed
17 to include that and if you needed it to
18 be a separate bill, it could be.
19 MR. DeGARIS: I didn't
20 understand that.
21 THE WITNESS: We just included
22 that in here to show the total costs,
23 to include your cost. If we took it

Page 146

1  out of there as paid, you wouldn't be
2  aware of the costs. I don't know if
3  that makes sense or not.
4  MR. DeGARIS: I see what
5  you're trying to do. Doctor, what he's
6  trying to get at is: We need to
7  subtract out any costs of -- like you
8  sent me a bill for the deposition --
9  THE WITNESS: Right.
10 MR. DeGARIS: -- you need to
11 subtract out the deposition costs and
12 you need to subtract that.
13 THE WITNESS: Deposition costs
14 are not in here.
15 MR. DeGARIS: You need to
16 subtract that out in arriving at your
17 total medical bills because your
18 medical bills only reflect your
19 treatment and charges.
20 THE WITNESS: Okay. Okay.
21 MR. DeGARIS: Just to speed
22 things along. Off the record for a
23 second.

Page 147

1
2  (Discussion off the record.)
3
4  **Q. (BY MR. KELLS:) Dr. Campbell,**
5  **if you could, explain to me why all of**
6  **these penalties and interest fees are**
7  **being added to the bill. Is it because**
8  **the Allens aren't paying for their**
9  **medical bills?**
10 A. That's correct.
11 **Q. They haven't paid any one of**
12 **them?**
13 A. No.
14 **Q. Is it your testimony that's**
15 **the responsibility of someone other**
16 **than the Allens to pay that interest**
17 **and penalty?**
18 A. I have no idea.
19 **Q. In your experience billing**
20 **patients, are the penalties and**
21 **interests ordinarily the responsibility**
22 **of the patient?**
23 A. Yeah.

Page 148

1  **Q. I think you testified earlier**
2  **that it was Mr. Allen's brother who put**
3  **Mr. Allen in contact with you; is that**
4  **correct?**
5  A. Uh-huh. Yes, sir.
6  **Q. Had you had any prior**
7  **treatment of any of the Allens before**
8  **the motor vehicle accident of August**
9  **29th, 2003; just Michael, Lou Ellen,**
10 **and Laurie Allen?**
11 A. Not that I recall. What you
12 want to understand is that -- and I'm
13 sure you get this as an attorney. I
14 give away a lot of free medical advice
15 in social situations that I don't even
16 think about. Do you know what I mean?
17 On the record kind of stuff, no,
18 nothing.
19 MR. KELLS: Off the record.
20
21 (Discussion off the record.)
22
23 **Q. (BY MR. KELLS:) Prior to the**

37 (Pages 145 to 148)

# Exhibit M

The following medical records were reviewed and taken into consideration for additional opinions in the matter of Michael P. Allen, Lou Ellen Allen and Lorie Suzanne Allen v United States: (1) Butler County Emergency Medical Services, LLC, (2) Evergreen Medical Center - Dr. Maria R. Cumagun and Dr. Steven Teplick (3) Baptist Medical Center-Montclair - Dr. Gregory W. Ayers, (4) The Downtown Clinic - Dr. Leon Campbell, Jr., (5) The Radiology Clinic, LLC, (6) Birmingham Radiology Group, (7) Women's Care Specialists, PC - Dr. Jennifer Maddox, (8) Chabot Chiropractic Clinic - Dr. Jeanne Chabot, (9) Physiotherapy Associates of Alabama, PC, (10) Conecuh County Emergency Medical Services, LLC, (11) The Kirklin Clinic - Dr. K. David Moore, (12) Michael Laser Vision - Alabama Eye & Cataract Center, (13) Alabama Sports Medicine and Orthopaedic Center - Dr. E. Lyle Cain, Jr., (14) Highland Diagnostic Center, (15) HealthSouth Medical Center, (16) Brookwood Medical Center - Dr. Charles R. Shumate and (17) Anesthesiology & Pain Medicine - Dr. Lucy Chapman.

Each of these records was entirely legible except for those of Dr. Leon Campbell. The only typed documents contained in his records were letters to Mr. Annesley H. DeGaris. All others were hand written and contained numerous abbreviations, sketches, circles, arrows and CPT codes. It is likely that typed records were not included for review since many of the opinions contained in the narrative summaries to Mr. DeGaris are not identified in the hand written office records.

The services rendered by the practitioners identified by number in the first paragraph: 1, 2, 3, 5, 6, 8, 9, 10, 11, 14, 15, and 17 were medically reasonable and necessary for the diagnosis and treatment of the Allen's accidental injuries.

The services rendered by (4) Dr. Leon Campbell are concerning not only for medical necessity but potentially for patient safety as well. Dr. Campbell's specialty is not identified on his letterhead or with the Alabama Board of Medical Examiners. The poor handwriting compromises the full understanding of these records. Various abbreviations for nerve blocks are the extent of procedure documentation including ICNB - intercostal nerve block, ONB - occipital nerve block, TFB - thoracic facet block, and PNB - peripheral nerve block. It would be highly unusual for a thoracic facet block to be performed without the aid of a fluoroscope (live x-ray). It would be highly unusual for an intercostal nerve block to be performed anywhere but in a general hospital by an anesthesiologist where resuscitation measures for inadvertent intravascular injection or pneumothorax are readily available. More likely than not, Dr. Campbell actually performed trigger point and subacromial bursal injections in an office setting.

Many of the diagnoses listed in the letters to Mr. DeGaris are not identified in Campbell's hand written notes or contained in the records of practitioners listed in the first paragraph. Specifically for Mr. Michael Allen these include: (A) the diagnoses of traumatic brain injury and loss of consciousness, (B) tinnitus, and (C) cardiac contusion. Specifically for Mrs. Lou Ellen Allen these include: (A) traumatic brain injury and loss of consciousness, (B) liver contusion, (C) diaphragmatic hernia -even though not

filed 2/7/09  12 27 pm

1-202-616-5200

Page 2

demonstrated on a 9/8/03 chest x-ray or a 2/3/04 CT chest, (D) pulmonary contusions with a bloody pleural effusion - even though this same 9/8/03 chest x-ray noted left costophrenic blunting  "suggesting a small pleural effusion,..., no pneumonia, *contusion*, or mass lesion is seen", (E) cardiac contusion, and (F) post-traumatic stress disorder. Specifically for Miss Lorie Allen this included:  traumatic brain injury with loss of consciousness.

The services rendered by (7) Women's Care Specialist, PC - Dr. Jennifer Maddox to Lori Allen was in part due to the results of the 8/29/03 car accident. They were reasonable and medically necessary. Ms. Allen was seen on 9/10/03 to follow up on an abnormal test and she asked Dr. Maddox to check her bruised right breast.

The services rendered to Mr. Michael Allen by (12) Michael Laser Vision - Alabama Eye & Cataract Center were not medically necessary for conditions resulting from the 8/29/03 car accident.

The services rendered to Mr. Michael Allen by (13) Alabama Sports Medicine & Orthopaedic Center - Dr. E. Lyle Cain, Jr., although medically necessary, may not be entirely related to the conditions resulting from the 8/29/03 car accident. The following diagnoses are clearly related: proximal right fibular fracture and chondral lesions of the right patella. Diagnoses that are degenerative conditions that are not clearly associated with this accident are: right medial meniscal tear, chondromalacia of the weight-bearing surface of the right medial femoral condyle, degenerative left acomio-clavicular joint with shoulder impingment, and degenerative right acromio-clavicular joint with shoulder impingment. On 2/11/04 Dr. Cain's noted "During the past 4 weeks the patient has experienced knee locking and catching". These are symptoms of meniscal pathology that were noted 5 1/2 months post injury. The 10/29/03 MRI scan noted "Signal abnormality is present within the medial meniscus which is mostly *degenerative*". Chondromalacia of the weight bearing portion of the medial femoral condyle is a common finding in a 55 year old man with degenerative meniscal pathology. Acromio-clavicular arthritis with impingment is also a common finding someone 55 years old. The 2/3/04 MRI of the right shoulder noted "mild proliferative disease of the AC joint producing local mass effect on the supraspinatus tendon. No rotator cuff tear". The 2/3/04 MRI of the left shoulder showed "AC joint degenerative disease ....similar in degree to the right side. No rotator cuff tear".  On  9/16/03  Dr. K. David Moore noted a proximal fibular fracture and that Mr. Allen's stated that his "pain on the posterolateral aspect of his knee which was sharp in nature" had resolved.  Dr. Moore made no mention of mechanical symptoms - i.e. catching, locking, giving way - with the right knee, no mention of right shoulder pain and no mention of left shoulder pain.

The services rendered to Lou Ellen Allen by (16) Brookwood Medical Center - Dr. Charles R. Shumate, although medically necessary to treat an abdominal hernia, are not clearly related to the trauma of 8/29/03. Dr. Shumate's records of 6/22/05 and 6/23/05 do not state a cause for the hernia. Dr. Leon Campbell's records do mention a 7+ centimeter

Page 3

mass (larger in diameter than a tennis ball) on 5/27/05 with a diagram and the comment "same as 10-29-03 exam, needs surgical evaluation & management". The evaluations between these two dates - 12/3/03, 2/5/04, 4/1/04, 5/5/04, 10/8/04, 1/31/05 each have 'supple' checked as present, 'NT' (? non-tender) checked as present, and hand written 'soft'. There is no mention of this large mass.

The charges for services rendered by Dr. Campbell are unusually high. As an example, the Patient Ledger for Lou Ellen Allen printed on 8/16/04, contain the total charges for 9/8/03 as $2850, 9/24/03 as $2270, and 10/8/03 as $2174. There may be facility fees incorporated into these examples to explain the high charges. Most of the charges were for injections. Lou Ellen Allen's 9/8/03 charges included: 64470, a CPT code for a cervical or thoracic facet block ($425); 64405, a CPT code for a greater occipital nerve block ($250), 64420, a CPT code for a *single* intercostal nerve block ($1300), 64418, a CPT code for a suprascapular nerve block ($310). Despite this being an unusual number/ type of injections, the coding for these services does not seem accurate. For example, the CPT for an *intercostal nerve, single* is 64420. CPT for *intercostal nerves, multiple, regional block* is 64421. If there is consistency in Dr. Campbell's billing, using the 12/3/03 charge of $325 for code 64420, the 9/8/03 charge of $1300 ($325 x 4) is actually for *four* blocks. The proper code should have been 64421. Icon, an anesthesia billing company for the 18 anesthesiologists at BMC Princeton, Trinity, and BMC Shelby have charges of $385 for 64420 and $400 for 64421. This entire group of board certified anesthiologists, seven of whom also have pain board certification, have performed a total of **four** intercostal nerve blocks (CPT 64420), **three** (CPT 64421) and **zero** suprascapular nerve (64418) blocks for this same year. Dr. Campbell has performed a similar number of intercostals nerve blocks just on Lou Ellen Allen.

# Exhibit N

Page 58

1    MR. DEGARIS:  Cowboy boots.

2    A. Oh, yeah.  I remember cowboy boots,

3    yeah.

4    Q. (BY MR. KELLS) Do you recall ever

5    purchasing the cowboy boots?

6    A. I did not.  I couldn't find any, and I

7    never had cowboy boots before.

8    Q. Me either.  Let me talk a little -- or

9    ask you a few questions about these

10   injections that you received in your back

11   and shoulders.  Do you recall what the

12   procedure was that he followed for giving

13   you those injections?

14   A. I don't really understand that

15   question.

16   Q. Did he ever inform you of any of the

17   risks involved in receiving one of those

18   injections?

19   A. No, huh-uh.

20   Q. Did he ever have you sign a form

21   indicating what the procedure was that he

22   was going to follow in giving that

23   injection?

## FREEDOM COURT REPORTING

Page 59

1    A. No forms, no, that I'm aware of.

2    Q. Do you recall whether or not he used

3    any local anesthetic in the area of the

4    injection?

5    A. No, I don't remember.

6    Q. Do you recall whether he prepped the

7    injection site with iodine or some sort of

8    alcohol cleanser?

9    A. It was mostly on my back, and I didn't

10   see him do the procedure, so I don't know.

11   Q. Do you recall whether or not he used

12   any type of machine to ensure the location

13   of the needle when performing the injection?

14   A. Like I say, I couldn't see him give

15   the injections because they were all on the

16   back of my shoulders and my back.

17   Q. What do you recall feeling in the area

18   of the injection immediately following the

19   injection?

20   A. Immediately following the injection,

21   it was pain, it hurt.

22   Q. What was the effect?

23   A. It hurt like hell, in fact.

## FREEDOM COURT REPORTING

Page 60

1     Q. What was the effect when that initial

2     pain wore off? What kind of relief did it

3     give you?

4     A. It gave a good bit of relief for

5     awhile.

6     Q. How long, for example?

7     A. We had so many all along this shoulder

8     (indicating) and the other shoulder

9     (indicating), and then a few on down the

10     back. But I would say that at least

11     outright after the injections, 80 percent of

12     the discomfort would go away for awhile.

13     Q. Do you ever recall receiving what Dr.

14     Campbell called an intercostal nerve block?

15     Have you ever heard that term used before?

16     A. I have heard the term used, but I

17     don't recall him doing it on me.

18     Q. Did Dr. Campbell ever indicate to you

19     that he was going to do an axiliary nerve

20     block?

21     A. No.

22     Q. How about an occipital nerve block?

23     A. Huh-uh, no.

## FREEDOM COURT REPORTING

Page 61

1    Q. A peripheral nerve block?

2    A. No.

3    Q. Did he ever describe or indicate to

4    you that he was going to give you any kind

5    of nerve block?

6    A. No, huh-uh.

7    MR. DEGARIS: No, you don't recall or

8    no, he didn't?

9    THE WITNESS: No, I don't recall.

10   Q. (BY MR. KELLS) Did he ever indicate

11   what type of injection he was giving you at

12   all?

13   A. I just assumed it was cortisone or

14   hydrocortisone and lidocaine because back

15   then, we were in a good bit of pain. We

16   couldn't move, sleeping in a chair for four

17   months. So, you know, he could have done a

18   nerve block and I didn't know it, because in

19   the beginning, some of the visits that we

20   went down there, I couldn't remember them

21   after we left.

22   Q. How many prescriptions did he give you

23   that first visit, do you recall?

# Exhibit O

## FREEDOM COURT REPORTING

Page 59

1    Evergreen?

2        A. I don't know.

3        Q. Did he order an MRI to be done?

4        A. No.

5        Q. Do you know whether if he had x-rays?

6        A. A lot of my chest and back.  I was

7    taking pain medicine, and I nearly passed

8    out at the x-ray department.

9        Q. Who drove y'all to Dr. Campbell?

10       A. My husband drove us to Tuscaloosa, but

11   my brother-in-law was the one that took me

12   to the radiology clinic to get the x-rays.

13       Q. Do you know if Dr. Campbell had any

14   different diagnosis that day other than what

15   Baptist Montclair and Evergreen had

16   diagnosed you with?

17       A. I really don't remember much about it,

18   I was taking pain medicine.

19       Q. Do you recall whether Dr. Campbell

20   provided you injections on that first visit?

21       A. I don't know about the first visit.

22       Q. Do you know whether he gave you

23   injections on subsequent visits?

# FREEDOM COURT REPORTING

Page 60

1    A. Yes, he did.

2    Q. Did he tell what you kind of

3    injections he was giving you?

4    A. I believe he said it was a steroid or

5    some type of steroid that had some Xylocaine

6    or something in it.

7    Q. Did he ever mention an intercostal

8    nerve block?

9    A. I don't remember anything like that.

10   Q. Did he ever perform injections that

11   went into your rib cage?

12   A. Not through the ribs, but he gave me

13   injections all down through here

14   (indicating), all down my back and under my

15   shoulder blade; up in my neck, and all down

16   through here (indicating).

17   Q. But you never heard him use the term

18   intercostal nerve blocks?

19   A. I remember talking about intercostal,

20   but I don't remember the term block.

21   Q. Do you remember him using a term

22   peripheral nerve block?

23   A. I really don't remember anything about

# FREEDOM COURT REPORTING

Page 61

1    a block.  I don't remember the terminology a

2    block.

3        Q. No block being used or --

4        A. The word.

5        Q. Did you ever fill out any informed

6    consent papers when he performed these

7    injections?

8        A. I don't remember.

9        Q. Do you recall whether or not he used a

10   machine called a Flura machine or another

11   type of machine that would show the location

12   of where the needle was being injected into

13   your back?

14       A. No, he didn't use any machine.

15       Q. Do you recall whether or not Dr.

16   Campbell warned you that injections near the

17   rib cage can cause a pneumothorax or a

18   collapsed lung?

19       A. I was in so much pain that I really

20   don't remember the first time I was down

21   there.

22       Q. What did the relief feel like when the

23   injection started to take effect?

# FREEDOM COURT REPORTING

Page 62

1     A. I don't really remember any relief.

2     Q. So the injections did no good?

3     A. I'm not saying they didn't do any

4  good, but when you are in -- I was in so

5  much pain and couldn't breathe, like I said,

6  that -- and I was taking pain medication,

7  and that would ease me up some.  But it was,

8  you know, months before I could -- before I

9  could really say -- I know they helped

10  because I wasn't -- say two weeks down the

11  road, I was better but still having a lot of

12  discomfort, but I don't know exactly when I

13  could say it started helping.

14     Q. Did you tell Dr. Campbell what effect

15  the injections were having on you, if at

16  all?

17     A. They were helping, but I can't swear

18  that it was the injections or if it was the

19  pain medicine, but I was able to breathe

20  better.

21     Q. How long after the accident did the

22  pain in your rib area start to subside?

23     A. I guess it was slowly and gradually.

# FREEDOM COURT REPORTING

Page 63

1    I remember around Thanksgiving of that year

2    I could breathe better.  It was just a slow,

3    gradual process, I guess you would say.  I

4    can't give a definite timeline on it.

5        Q. Do you know roughly how many

6    injections Dr. Campbell has given you during

7    the course of these treatments?

8        A. I have no idea.

9        Q. Was it roughly every visit?

10       A. Yes.

11       Q. Where would you say the major of the

12   injections were given?

13       A. Down the left side of my back -- well,

14   I guess you would say the right side of my

15   back, down through here (indicating); all

16   down in this area (indicating), all down in

17   the left side of my rib cage, under my right

18   shoulder blade; a lot was up in my neck area

19   on both sides.  The first time he gave me

20   the injections, he would give them to me in

21   the front also of my rib area.

22       Q. For those front rib area injections,

23   what was his procedure for prepping and

# FREEDOM COURT REPORTING

Page 64

1    administering the injections?

2        A. He would use alcohol prep pads and

3    clean the area real good.

4        Q. Did he use any local anesthetic?

5        A. No, that was mixed in with the

6    medication.  So he would push a little bit

7    in and then he would wait and push a little

8    bit more.

9        Q. Do you know whether he -- based only

10   on your B.S. in nursing, do you know whether

11   you had a chest tube nearby in case

12   something went wrong during the injection

13   and you needed intubating?

14       A. I don't remember seeing any equipment

15   sitting out in the examining room that I was

16   in.

17       Q. Has the pain in your shoulders

18   resolved?

19       A. No.

20       Q. How about the pain in the back?

21       A. No, not completely.

22       Q. Are you still seeking treatment from

23   Dr. Campbell for that?

**Exhibit P**

# FREEDOM COURT REPORTING

Page 62

1    A. Yes, he did.

2    Q. Did he order an MRI?

3    A. I can't remember.

4    Q. What did he order x-rays of?

5    A. I'm not 100 percent sure, but knees

6    and back.

7    Q. Do you know if he diagnosed anything

8    with your knees and your back?

9    A. Not to my knowledge.

10    Q. What treatment did he prescribe for

11    the symptoms and complaints that you had

12    back then?

13    A. I don't remember exactly on that first

14    day because I was kind of in a -- I was in a

15    daze. But after that, he eventually

16    prescribed physical therapy. I did physical

17    therapy, I did the chiropractor,

18    acupuncture. I've been there, done it all.

19    I've done medication. He gave us the

20    anti-inflammatories again trying to help out

21    with that.

22    Q. Did Dr. Campbell give you injections

23    on that first visit?

# FREEDOM COURT REPORTING

Page 63

1      A. I do not remember.

2      Q. Do you recall him giving you

3    injections on some of the visits that you

4    had with him?

5      A. Yes, I do.

6      Q. Where was he giving you injections?

7      A. In my back and my neck and in the base

8    of my skull.

9      Q. Did he tell you what kind of

10   injections you were receiving?

11     A. I assumed they were cortisone

12   injections. I heard that from somewhere,

13   and I just kind of stuck with it.

14     Q. So you don't actually know what he was

15   injecting?

16     A. I'm questioning it now, but, no,

17   whatever it was, it did work, and it made it

18   a lot better. I think he had told me it was

19   cortisone injections.

20     Q. Did he ever have you to sign any

21   informed consent documents?

22     A. Not that I remember.

23     Q. Did he ever advise you of any of the

# FREEDOM COURT REPORTING

Page 64

1  risks associated with performing these

2  injections?

3      A. Not that I remember.

4      Q. Do you recall him using any kind of

5  equipment to make sure he inject the spot

6  that he intended to inject?

7      A. Not to my knowledge.

8      Q. Describe the relief that the

9  injections gave you.

10      A. It hurt in the beginning for about

11  three days.  I was irritable.  But after

12  that, it started really feeling a lot

13  better, and it lasted for maybe about a

14  month.  It helped ease up the pain a lot,

15  but the pain has not gone away completely.

16      Q. Did Dr. Campbell ever refer you to an

17  orthopedist about your back?

18      A. Not that I remember.

19      Q. How long did the relief, even if

20  partial, from the injections last?

21      A. I'd say three weeks, four weeks.

22      Q. During that time, were you also

23  prescribed pain medication?

# Exhibit Q

# FREEDOM COURT REPORTING

Page 137

1  out.
2  Q.  You note here at the end of that last
3  page that Mr. Allen's cardiovascular status is
4  being evaluated vis-à-vis the likelihood of a
5  cardiac contusion due to the mechanism of his
6  injury. Has that evaluation been done? Are
7  there more EKGs that aren't in the record?
8  A.  I've got to run to the bank here in a
9  few minutes. Today is payday.
10      Let's see, where were we?
11  Q.  I was asking about the sentence that
12  said Mr. Allen's status is being evaluated.
13  What evaluations were done? Were there EKGs
14  that were in the record that I overlooked?
15  A.  No. There was nothing else done that
16  way. Just the overall well-being of Mr. Allen
17  in terms of checking vital signs when he came
18  in, taking history, that sort of thing. And
19  we have pretty much -- we pretty much put that
20  possibility to rest, yeah.
21  Q.  Did you do a stress test or anything
22  like that?
23  A.  No.

Page 138

1  Q.  And as far as the likelihood of
2  Mr. Allen suffering seizures, as long as he's
3  on his Dilantin, what would suggest that he
4  would be at higher risk of seizures at this
5  point?
6  A.  Well, the brain injury. You've always
7  got to think about that.
8  Q.  Okay. Unspoken objection.
9  A.  If you were in his shoes, you would want
10  me to be considering that all the time.
11  Q.  I don't think that's motor vehicle
12  related.
13  A.  And he's also, may I add this, too, it
14  may help you a little bit. He's also on a
15  relatively low dose of Dilantin anyway.
16  Q.  I know I've been through all this, but
17  it's been a month, at least, since we've been
18  through it. Do you have an updated billing
19  ledger that should have been taken out of the
20  charges the first time around, doctor?
21  A.  We took out the -- I just didn't realize
22  that you guys didn't want the charges for that
23  letter in there, that disability thing.

Page 139

1      MR. DeGARIS:    All those things that
2  I did for the government to get the case
3  settled, those aren't --
4      THE WITNESS:    I didn't realize --
5      MR. DeGARIS:    That was, just for the
6  record, that was Plaintiff's Exhibit Number
7  11, and when I got my copy of the deposition,
8  I didn't have an Exhibit 11. Did you have it,
9  Conor? Did you have 11?
10      MR. KELLS:    I didn't bring the big
11  one with me, so I don't have all the exhibits.
12      MR. DeGARIS:    I'm going to mark this
13  as 14. I'll mark it as Plaintiff's Exhibit
14  14.
15      (Whereupon, Plaintiff's Exhibit 14
16      was marked for identification)
17  BY MR. KELLS:
18  Q.  And these charges are only with
19  reference to Michael Allen, doctor, the
20  charges listed in here are only with regards
21  to Michael Allen and the charges that you
22  believe related to the motor vehicle accident?
23  A.  Yes, sir, the charges related to his

Page 140

1  care, Michael Allen's care.
2  Q.  And it's your testimony that the penalty
3  in interest that you're charging is also
4  related to the treatment that you rendered as
5  part of the motor vehicle accident?
6  A.  Yes, sir.
7  Q.  And that's because Michael Allen has not
8  paid his bills?
9  A.  That's right, because the bill has not
10  been paid. It's taken well over four years.
11  Q.  Has this been covered by insurance?
12  A.  We don't file this to that. We don't
13  deal with that. That's just the way we do it
14  here.
15      MR. DeGARIS:    Asked and answered.
16  We covered that. I mean, you can cover it
17  again, but a friendly reminder.
18      THE WITNESS:    Yeah.
19  BY MR. KELLS:
20  Q.  I'm curious, I don't recall the answer.
21  But why is it that you don't?
22  A.  We just don't do it that way.
23  Q.  No insurance at all? You don't submit a

35  (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# Exhibit R

# FREEDOM COURT REPORTING

Page 85

1 might be missing a tear, and that was really
2 why I did that. And they did say there was
3 some impingement -- let's see, is it on that
4 same side? Is that the right -- yeah, said
5 there was no tear and that's the main thing I
6 was concerned with.
7     MR. DeGARIS:    Impingement was on the
8 other one, right?
9 A.   Right. This kind of goes with what I
10 said before. The x-rays don't always agree
11 with the patient or vice versa.
12 Q.   And maybe statements the patient doesn't
13 make always agree with the x-rays?
14 A.   Right.
15 Q.   Would it be fair to say that sometimes
16 the doctor doesn't agree with the x-rays, too?
17 Isn't that the reason for second opinions or
18 having a second set of eyes?
19 A.   Sometimes, yeah.
20 Q.   I take it for the injection that you
21 gave on, I guess it was April 1, 2004, I don't
22 see the little formula thing that you had on
23 the previous record.

Page 86

1     MR. DeGARIS:    He had a sticky note
2 that day.
3 A.   Yeah, the nurse snatched it off of
4 there.
5 Q.   So the procedural note, then, is the
6 diagram of the back area?
7 A.   Yeah, it's the physical exam, you know,
8 and then I would use that as a basis, but --
9 Q.   Did you do a peripheral nerve block on
10 that date, too?
11 A.   Let's see -- no. I think that's the day
12 I wanted to do the shoulder and she didn't
13 want me the do the shoulder, but I did the
14 scapula bursa.
15 Q.   Okay.
16 A.   And, you know, again, a patient's right
17 to refuse.
18 Q.   Absolutely.
19 A.   And I'm just here to help.
20 Q.   Okay. The May 5, 2004 visit, looks like
21 you are continuing with the left shoulder
22 tendinosis?
23 A.   Uh-huh.

Page 87

1 Q.   Did you have another MRI done to confirm
2 that?
3 A.   No. No. Not really often going to be
4 able to confirm that with an MRI anyway. An
5 MRI is really more like you're looking for a
6 tear, more like a rotator cuff tear, that kind
7 of thing. Something that needs surgically
8 fixing, you know.
9 Q.   Even though the impression of the MRI
10 that was done showed no significant
11 abnormality whatsoever in the left shoulder?
12 A.   The MRI is not the final word.
13 Q.   I noticed you used tendinosis instead of
14 tendonitis?
15 A.   Yeah.
16 Q.   What's your reason for using tendonosis
17 rather than tendonitis?
18 A.   I just thought that was more
19 appropriate.
20 Q.   What does the SAR reference mean right
21 next to the left shoulder tendinosis?
22 A.   That's a seasonal allergic rhinitis.
23 Q.   I assume that's not motor vehicle-

Page 88

1 related?
2 A.   I could make it.
3 Q.   I guess you could.
4     MR. DeGARIS:    Move to strike.
5 Unresponsive.
6 BY MR. KELLS:
7 Q.   I'm on to the November 9, 2004 record.
8 A.   September 9th. Okay.
9 Q.   I noticed you diagnosed her with having
10 the flu here, is that correct, with having
11 some sort of flu?
12 A.   Oh, you went to November?
13 Q.   Yeah.
14 A.   Wait a minute.
15 Q.   I was just on the May 5, 2004 one, then
16 I just moved on to the next one in line.
17 A.   Okay.
18     MR. DeGARIS:    11/11/05? That one,
19 he said, wasn't related.
20     MR. KELLS:    Which one? The
21 9/9/04?
22     MR. DeGARIS:    No. I thought you
23 said you were going over 11/11/05.

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 105

1  Q.  64775, these are the lumbar sacral
2  injections?
3  A.  64475 is the lumbar facet block.
4  Q.  And $450 is a reasonable amount to pay
5  for one facet block?
6  A.  Yeah, I think so.  That actually may be
7  two as well.
8  Q.  Okay.  Doctor, looking at the medical
9  record for October 8, 2003, looks like you did
10  perform two separate 20550 injections.  So I'm
11  taking it that even though it doesn't
12  necessarily refer to two separate injections,
13  you are dividing that by two and that
14  represents two different charges?
15  A.  Right.  That's two injections, right.
16  And the same thing for the --
17  Q.  For the 4775 injection?
18  A.  That's two, also.
19  Q.  I'm not even sure I see that one on
20  here.
21  A.  On the office sheet?
22  Q.  This is the lumbar facet block?
23  A.  Yeah, LFB.

Page 106

1  Q.  So there is no code on that one, but
2  that's what that code represents on the bill?
3  A.  Yeah.
4  Q.  All right.  Doctor, how about on
5  February 4, 2005 scapular shoulder, 20610 for
6  $1,068.  Is that a reasonable cost to have
7  incurred from a motor vehicle accident almost
8  a year and a half after the accident occurred?
9  A.  Yeah, because that represents, I
10  believe, six injections.  Let's see, yeah,
11  that's -- that's one, two -- six.  Yeah,
12  that's six injections.
13  Q.  So each one is how much?  Is it 267 from
14  the front page?
15  A.  My bad.  I'm sorry, that's four.  Right
16  below it is two more.
17  Q.  The interest and the late payments that
18  you've added onto this bill, do you know how
19  much that represents of the total bill?
20  A.  No; I do not.
21  Q.  Are the penalties and interests being
22  added to the bill because Lori Allen has not
23  paid any of her medical bills?

Page 107

1  A.  That's correct.
2  Q.  Is there a reason why you haven't sought
3  collection?
4  A.  Well, we were hoping, actually, that a
5  settlement would be reached sooner.  And
6  basically, nothing happened for over four
7  years.  We're no longer adding -- we haven't
8  added any more interest or penalties since the
9  end of September when things started moving
10  again.
11  MR. KELLS:    I don't think I have
12  any other questions at this point.
13  MR. DeGARIS:    I'm going to ask three
14  or four.
15  EXAMINATION
16  BY MR. DeGARIS:
17  Q.  The post-traumatic stress disorder that
18  we discussed earlier, doctor, there is no
19  indication to you and she never indicated that
20  it was a completely debilitating condition, is
21  that a fair characterization?
22  A.  Yeah.
23  Q.  On her 9/9/04 visit, she did continue to

Page 108

1  complain of -- let's look at my record --
2  shoulder pain constant; correct?
3  A.  Yes; that is correct.
4  Q.  On December 3, 2003, she also continued
5  to complain of back pain and knee pain, felt
6  like it was bruised; is that correct?
7  A.  Yes; it is.
8  Q.  And on 10/29/03, even though she was
9  feeling better, her right shoulder still pops
10  and her back still aches; is that correct?
11  A.  Right, both shoulders were popping,
12  that's correct.
13  MR. DeGARIS:    I have no further
14  questions.
15  * * * * * * * * * *
16  FURTHER THE DEPONENT SAITH NOT
17  * * * * * * * * * *

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**Exhibit S**

PATIENT LEDGER printed on 12-20-07

ALLLO000  Allen, Lori [MVA]              DOB: 04-26-1982        (205) 338-1803
=================================================================================
   0 Cedar Lane                                                    30:    3,166.46
Pell City, AL 35128                    **PLAINTIFF'S**             60:        0.00
                                        **EXHIBIT**               90:        0.00
*Family Member ID                        6  Lori

ENTRY  *   DATE   PR DOCUMENT LOC DIAGNOSIS               PROCEDURE      AMOUNT
=================================================================================
46753  0 09-08-03 1  B030908A 3  E819.1,850.0,721.3,923.0 A99204        368.00
                                                 Document Total         368.00

46754  0 10-08-03 1  B031008A 3  E819.1,719.41,724.2,721. A99214        295.00
                                                 Document Total         295.00

46755  0 10-08-03 1  B031008B 3  E819.1,923.01,726.10     A20610        267.00
                                                 Document Total         267.00

46756  0 10-08-03 1  B031008C 3  E819.1,923.01,726.10,721 A20550        308.00
                                                 Document Total         308.00

46757  0 10-08-03 1  B031008D 3  E819.1,923.01,726.10,724 A64475        750.00
                                                 Document Total         750.00

46758  0 10-08-03 1  B031008E 3  E819.1,923.00,716.11     A20610        267.00
                                                 Document Total         267.00

46759  0 10-29-03 1  B031029A 3  E819.1,724.2,721.3,850.0 A99213        210.00
                                                 Document Total         210.00

46760  0 12-03-03 1  B031203A 3  E819.1,724.2,721.3,850.0 A99213        210.00
NOTE   0 05-23-06 1  B031203B Accident(with Attorney)inclMVA was billed.
                                                 Document Total         210.00

46761  0 12-03-03 1  B031203C 3  E819.1,724.2             A20550        308.00
                                                 Document Total         308.00

46762  0 12-03-03 1  B031203D 3  E819.1,726.10,786.52     A20610        267.00
                                                 Document Total         267.00

46763  0 12-03-03 1  B031203E 3  E819.1,720.2             A20610        267.00
                                                 Document Total         267.00

46764  0 12-31-03 1  B031231A 3  INTEREST 2003            INTEREST      278.46
                                                 Document Total         278.46

44780  0 01-31-04 1  B040131     late charge January 2004 PENALTY        25.00
                                                 Document Total          25.00

376    0 02-05-04 1  B040205A 3  E819.1,724.2,721.3,850.0 A99214        295.00
                                                 Document Total         295.00

377    0 02-05-04 1  B040205B 3  E819.1,726.10 SCAPULAR-S A20610        267.00
                                                 Document Total         267.00

378    0 02-05-04 1  B040205C 3  E819.1,840.0 AC joint ar A20605        540.00

```
ALLLO000  Allen, Lori [MVA]                    (continued)              Page  2

ENTRY   *   DATE    PR DOCUMENT LOC DIAGNOSIS              PROCEDURE      AMOUNT
==================================================================================
   'E   0 05-23-06 1  B040205C Accident(with Attorney)inclMVA was billed.
                                                          Document Total    540.00

  379   0 02-05-04 1  B040205D 3  355.8 Neuritis,Neuralgia A64450          710.00
                                                          Document Total    710.00

44774   0 03-30-04 1  B040330  3   interest 1st qtr 2004   INTEREST        191.99
                                                          Document Total    191.99

  405   0 03-31-04 1  B040331A 3  Late Charges For March   PENALTY          25.00
                                                          Document Total     25.00

  380   0 04-01-04 1  B040401A 3  E819.1, 726.10            A99214         295.00
                                                          Document Total    295.00

  381   0 04-01-04 1  B040401B 3  E819.1, 726.10            A20610         534.00
 NOTE   0 05-23-06 1  B040401B Accident(with Attorney)inclMVA was billed.
                                                          Document Total    534.00

  406   0 04-30-04 1  B040430A 3  Late Charges For April   PENALTY          25.00
                                                          Document Total     25.00

  382   0 05-05-04 1  B040505A 3  E819.1,724.2,721.3,850.0 A99214         295.00
 NOTE   0 05-23-06 1  B040505A Accident(with Attorney)inclMVA was billed.
                                                          Document Total    295.00

    /   0 05-31-04 1  B040531  3  Late Charges For May     PENALTY          25.00
44778   0 05-31-04 1  B040531  11 interest 2nd qtr 2004    INTEREST        237.76
                                                          Document Total    262.76

  398   0 06-30-04 1  B040630A 3  Late Charges For June    PENALTY          25.00
                                                          Document Total     25.00

  399   0 07-31-04 1  B040731A 3  Late Charges For July    PENALTY          25.00
                                                          Document Total     25.00

  400   0 08-31-04 1  B040831A 3  Late Charges for August  PENALTY          25.00
                                                          Document Total     25.00

  383   0 09-09-04 1  B040909C 3  E819.1,724.2,721.3,726.1 A99213         210.00
 NOTE   0 05-23-06 1  B040909C Accident(with Attorney)inclMVA was billed.
                                                          Document Total    210.00

44779   0 09-30-04 1  B040930  3   interest 3rd qtr 2004   INTEREST        260.83
                                                          Document Total    260.83

  401   0 09-30-04 1  B040930A 3  Late Charges For Septemb PENALTY          25.00
                                                          Document Total     25.00

  402   0 10-31-04 1  B041031A 3  Late Charges For October PENALTY          25.00
                                                          Document Total     25.00

  4υ3   0 11-30-04 1  B041130A 3  Late Charges For Novembe PENALTY          25.00
                                                          Document Total     25.00
```

ALLLO000  Allen, Lori [MVA]                    (continued)                  Page  3

| ENTRY | * | DATE | PR | DOCUMENT | LOC | DIAGNOSIS | PROCEDURE | AMOUNT |
|-------|---|------|----|----------|-----|-----------|-----------|--------|
|       | 0 | 12-31-04 | 1 | B041231A | 3 | Late Charges For Decembe | PENALTY | 25.00 |
|       |   |          |   |          |   | Document Total |  | 25.00 |
| 395 | 0 | 12-31-04 | 1 | B041231B | 3 | Interest 4th qtr 2004 | INTEREST | 275.95 |
|     |   |          |   |          |   | Document Total |  | 275.95 |
| 411 | 0 | 01-31-05 | 1 | B050131A | 3 | Late Charges For January | PENALTY | 25.00 |
|     |   |          |   |          |   | Document Total |  | 25.00 |
| 384 | 0 | 02-04-05 | 1 | B050204A | 3 | 724.2 LUMBALGIA | A99214 | 295.00 |
|     |   |          |   |          |   | Document Total |  | 295.00 |
| 385 | 0 | 02-04-05 | 1 | B050204C | 3 | 355.9 UE, Mononeuritis N | A64450 | 710.00 |
|     |   |          |   |          |   | Document Total |  | 710.00 |
| 386 | 0 | 02-04-05 | 1 | B050204D | 3 | 726.10 SCAPULAR-SHOULDER | A20610 | 1,068.00 |
|     |   |          |   |          |   | Document Total |  | 1,068.00 |
| 387 | 0 | 02-04-05 | 1 | B050204E | 3 | 720.2 SACROILIITIS | A20610 | 534.00 |
| NOTE | 0 | 05-23-06 | 1 | B050204E |  | Accident(with Attorney)inclMVA was billed. |  |  |
|     |   |          |   |          |   | Document Total |  | 534.00 |
| 412 | 0 | 02-28-05 | 1 | B050228A | 3 | Late Charges For Februar | PENALTY | 25.00 |
|     |   |          |   |          |   | Document Total |  | 25.00 |
| `81 | 0 | 03-31-05 | 1 | B050331 | 3 | interest 1st qtr 2005 | INTEREST | 372.74 |
|     |   |          |   |          |   | Document Total |  | 372.74 |
| 413 | 0 | 03-31-05 | 1 | B050331A | 3 | Late Charges For March | PENALTY | 25.00 |
|     |   |          |   |          |   | Document Total |  | 25.00 |
| 414 | 0 | 04-30-05 | 1 | B050430A | 3 | Late Charges For April | PENALTY | 25.00 |
|     |   |          |   |          |   | Document Total |  | 25.00 |
| 415 | 0 | 05-31-05 | 1 | B050531A | 3 | Late Charges For May | PENALTY | 25.00 |
|     |   |          |   |          |   | Document Total |  | 25.00 |
| 388 | 0 | 06-28-05 | 1 | B050623A | 3 | E819.1,724.2,721.3,850.0 | RECORDS-I | 100.00 |
|     |   |          |   |          |   | Document Total |  | 100.00 |
| 389 | 0 | 06-28-05 | 1 | B050623B | 3 | E819.1,724.2,721.3,850.0 | RECORDS-EX | 300.00 |
|     |   |          |   |          |   | Document Total |  | 300.00 |
| 390 | 0 | 06-28-05 | 1 | B050623C | 3 | E819.1,724.2,721.3,850.0 | REPORT | 300.00 |
| NOTE | 0 | 05-23-06 | 1 | B050623C |  | Accident(with Attorney)inclMVA was billed. |  |  |
|     |   |          |   |          |   | Document Total |  | 300.00 |
| 391 | 0 | 06-27-05 | 1 | B050627A | 3 | E819.1,309.81,780.50 | A99213 | 210.00 |
| 392 | 0 | 06-27-05 | 1 | B050627A |  | 309.81 PTSD-Posttraumati | NOTE | 0.00 |
| 393 | 0 | 06-27-05 | 1 | B050627A |  | 780.50 Sleep disturbance | NOTE | 0.00 |
|     |   |          |   |          |   | Document Total |  | 210.00 |
| 4¡6 | 0 | 06-30-05 | 1 | B050630A | 3 | Late Charges For June | PENALTY | 25.00 |
|     |   |          |   |          |   | Document Total |  | 25.00 |

ALLLO000  Allen, Lori [MVA]                    (continued)                   Page  4

| ENTRY | * | DATE | PR | DOCUMENT | LOC | DIAGNOSIS | PROCEDURE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 82 | 0 | 06-30-05 | 1 | B050631 | 3 | interest 2nd qtr2005 | INTEREST | 431.14 |
| | | | | | | | Document Total | 431.14 |
| 417 | 0 | 07-31-05 | 1 | B050731A | 3 | Late Charges For July | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 418 | 0 | 08-31-05 | 1 | B050831A | 3 | Late Charges For August | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44783 | 0 | 09-30-05 | 1 | B050930 | 3 | interest 3rd qtr 2005 | INTEREST | 455.04 |
| | | | | | | | Document Total | 455.04 |
| 419 | 0 | 09-30-05 | 1 | B050930A | 3 | Late Charges For Septemb | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 420 | 0 | 10-31-05 | 1 | B051031A | 3 | Late Charges For October | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 421 | 0 | 11-30-05 | 1 | B051130A | 3 | Late Charges For Novembe | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 422 | 0 | 12-31-05 | 1 | B051231A | 3 | Late Charges For Decembe | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 396 | 0 | 12-31-05 | 1 | B051231B | 3 | Interest 4th qtr 2005 | INTEREST | 478.89 |
| E | 0 | 05-23-06 | 1 | B051231B | | Accident(with Attorney)inclMVA was billed. | | |
| | | | | | | | Document Total | 478.89 |
| 39915 | 0 | 01-05-06 | 1 | B060105A | 3 | E819.1,724.2,721.3,850.0 | A99214 | 295.00 |
| | | | | | | | Document Total | 295.00 |
| 39916 | 0 | 01-05-06 | 1 | B060105B | 3 | E819.1,353.8,724.1 | A64420 | 485.00 |
| | | | | | | | Document Total | 485.00 |
| 39917 | 0 | 01-05-06 | 1 | B060105C | 3 | E819.1,353.8,724.1 | A64420 | 485.00 |
| | | | | | | | Document Total | 485.00 |
| 39918 | 0 | 01-05-06 | 1 | B060105D | 3 | E819.1,724.2,721.3,850.0 | A20610 | 267.00 |
| | | | | | | | Document Total | 267.00 |
| 39919 | 0 | 01-05-06 | 1 | B060105E | 3 | E819.1,724.2,721.3,850.0 | A20610 | 267.00 |
| | | | | | | | Document Total | 267.00 |
| 407 | 0 | 01-31-06 | 1 | B060131A | 3 | Late Charges For January | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 408 | 0 | 02-28-06 | 1 | B060228A | 3 | Late Charges For Februar | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44784 | 0 | 03-31-06 | 1 | B060331 | 3 | interest 1st qtr 2006 | INTEREST | 567.94 |
| 44793 | 0 | 03-31-06 | 1 | B060331 | 3 | interest 2nd qtr 2006 | INTEREST | 595.75 |
| | | | | | | | Document Total | 1,163.69 |
| 409 | 0 | 03-31-06 | 1 | B060331A | 3 | Late Charges For March 2 | PENALTY | 25.00 |

ALLLO000  Allen, Lori [MVA]                    (continued)              Page  5

| ENTRY | * | DATE | PR | DOCUMENT | LOC | DIAGNOSIS | PROCEDURE | AMOUNT |
|-------|---|------|----|----------|-----|-----------|-----------|--------|
| E | 0 | 04-26-06 | 8 | B060426 | | | | |
| | | | | | | | Document Total | 25.00 |
| 410 | 0 | 04-27-06 | 1 | B060431 | 3 | Late Charges For April 2 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44785 | 0 | 05-31-06 | 1 | B060531 | | late charge May 2006 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44786 | 0 | 06-30-06 | 1 | B060630 | | late charge June 2006 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44794 | 0 | 06-30-06 | 1 | B060630A | 3 | interest 2nd qtr 2006 | INTEREST | 627.05 |
| | | | | | | | Document Total | 627.05 |
| 44787 | 0 | 07-31-06 | 1 | B060731 | | late charge July 2006 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44788 | 0 | 08-31-06 | 1 | B060831 | | late charge August 2006 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44789 | 0 | 09-30-06 | 1 | B060930 | | late charge September 20 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44795 | 0 | 09-30-06 | 1 | B060930A | 3 | interest 3rd qtr 2006 | INTEREST | 658.65 |
| | | | | | | | Document Total | 658.65 |
| 44790 | 0 | 10-31-06 | 1 | B061031 | | late charge October 2006 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44791 | 0 | 11-30-06 | 1 | B061130 | | late charge November 200 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44792 | 0 | 12-31-06 | 1 | B061231 | | late charge December 200 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 39923 | 0 | 12-31-06 | 1 | B061231A | | INTEREST 4th qtr 2006 | INTEREST | 688.29 |
| | | | | | | | Document Total | 688.29 |
| 44796 | 0 | 01-31-07 | 1 | B070131 | | late charge January 2007 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44797 | 0 | 02-28-07 | 1 | B070228 | | late charge February 200 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44798 | 0 | 03-31-07 | 1 | B070331 | | late charge March 2007 | PENALTY | 25.00 |
| 44805 | 0 | 03-31-07 | 1 | B070331 | 3 | interest 1st qtr 2007 | INTEREST | 722.64 |
| | | | | | | | Document Total | 747.64 |
| 44799 | 0 | 04-30-07 | 1 | B070430 | | late charge April 2007 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |
| 44800 | 0 | 05-31-07 | 1 | B070531 | | late charge May 2007 | PENALTY | 25.00 |
| | | | | | | | Document Total | 25.00 |

```
ALLLO000  Allen, Lori [MVA]                    (continued)           Page  6

ENTRY  *   DATE   PR DOCUMENT LOC DIAGNOSIS               PROCEDURE      AMOUNT
===============================================================================
   01  0 06-30-07 1  B070630       late charge June 2007   PENALTY         25.00
44806  0 06-30-07 1  B070630    3  interest 2nd qtr 2007   INTEREST       758.53
                                                    Document Total        783.53

44802  0 07-31-07 1  B070731       late charge July 2007   PENALTY         25.00
                                                    Document Total         25.00

44803  0 08-31-07 1  B070831       late charge August 2007 PENALTY         25.00
                                                    Document Total         25.00

44804  0 09-30-07 1  B070930       late charge September 20 PENALTY        25.00
44807  0 09-30-07 1  B070930       interest 3rd qtr 2007   INTEREST       796.04
                                                    Document Total        821.04

                                                             ----------
                                                    Ledger Total:    24,643.15
```

# Exhibit T

**Birmingham Bone and Joint Surgeons, P.C.**
924 Fulton Avenue, S. W.
Birmingham, AL 35211
Phone (205) 786-0315            Fax (205) 788-2663

Keith W. Weaver, M.D.                                            John R. Weaver, M.D.


**ALLEN, MICHAEL**                    **#37454-IME**                        **12-18-07**
Is a 59-year-old gentleman referred by Mr. Conor Kells, Esq., with the Department of
Labor for an independent medical evaluation in the matter of Michael Allen v. United
States.

Mr. Allen was the driver of a two-day-old Lincoln Town Car that was hit head-on by a
SUV while traveling south on I-65 near Evergreen, Alabama. He recalls going under a
series of bridges and surrounding the support pillars of the last one was a illiagnus
hedge. Out of nowhere, a red SUV crossed the median and hit them head-on. His
airbag deployed. He was able to get out of his vehicle under his own power. He noted
that his right leg was unstable and, as he tried to walk, he fell down a hill and was then
had to crawl back up it. The car was on fire and someone extinguished it. He was
taken by ambulance to Evergreen Hospital. He was evaluated, x-rayed and was told he
did not have a fracture of his right leg. He is uncertain if he was placed in a knee
immobilizer. He was not admitted to the hospital. His brother came up from Orange
Beach and they stayed in a local motel overnight. The next day he and his family were
taken back to his residence in Pell City. He contacted a long-time friend, Dr. Leon
Campbell in Tuscaloosa. Mr. Allen and his family were advised to go to Baptist
Montclair emergency room on 8/31/03. He was x-rayed again and noted to have no
fractures. He then followed up on 9/8/03 with Dr. Campbell and recalls receiving
several injections (shoulders and spine), some of which helped on a temporary basis.
He was then referred to Dr. Lyle Cain, since Dr. James Andrews did not treat car
accident cases. Dr. Cain performed an arthroscopic surgery on 5/27/04 (partial
posterior horn medial meniscectomy and a chondroplasty of a grade 3 chondral lesion
involving the trochlea and the medial femoral condyle). He still has occasional right
knee pain, but none of the dramatic falling episodes that he had prior to the surgery.
He has had some continued right-more-so-than-left shoulder pain and was told he may
need a shoulder procedure (acromioplasty possible rotator cuff repair right shoulder).
He has tried many different treatments in hopes to avoid surgery. These treatments
included multiple injections, physical theraphy, medications even including Oxycontin,
and most recently prolotherapy in Nashville. He is still uncertain if the prolotherapy will
help. He has a little numbness in the right deltoid for 30 to 45 minutes each morning,
but no pain radiating down the arm. Otherwise, he notes no other areas of numbness
or weakness in either arm. He has difficulty sleeping on the right shoulder and he has
had to forego golfing and fishing. He will have some posterior shoulder girdle pain
when he mixes drugs in his lab, prolonged typing and other activities that involve half to
full arm extension. He does experience headaches two to three times a week. These
will last three to four hours and they usually go away after he takes aspirin. He notes
some neck stiffness and he attributes some of this to the wreck and some to 'old age'.

(continued)
Michael Allen
12-18-07
Page 2

Rarely does he complain of left arm pain. He has had some right-more-so-than-left wrist pain for about a year to a year-and-a-half after the accident, but no pain in the wrist at this time. He has no significant thoracic spine pain, but he does have a little tenderness over the right superior angle of the scapula. He notes tenderness in the rhomboids, right more so than the left. He has some low-back pain at the lumbosacral junction and he states he cannot drive more than an hour without having to get out, stretch and walk around. He denies any right hip, left hip or pelvic pain. Regarding his left leg, he has rare soreness around the knee. Otherwise, no left leg complaints, including hip, ankle, or foot. With the right leg, he has no complaints in the right thigh. The right knee that has been operated has some mild crepitus. In the last three or four years he has had maybe one episode per year with the knee getting in an awkward position, but not locking up. It will swell occasionally, but he doesn't complain of swelling today. He has had to decrease his walking and dune buggy rides. The dune buggy really aggravates his right knee and his low back. The right lower leg and the right ankle have no difficulties.

**PAST MEDICAL HISTORY:** He has had LASIK eye surgery, which he states is not related to this accident. He has had a right knee arthroscopy, as noted above. He has had no other hospitalizations or surgeries. Dr. Leon Campbell is his primary care doctor.

**MEDICATIONS:** Klonopin, Ambien, and Naprosyn.

**ALLERGIES:** NKDA.

**SOCIAL HISTORY:** Smokes one pack per day. Occasional beer. I understand he was a respiratory therapist at Cooper Green in the early '70s and was an orthopedic equipment and casting salesperson early in his career. Now he does lab testing for drugs that cross the blood-brain barrier and for neuropathic diseases.

**FAMILY HISTORY:** No bleeding disorders.

**ROS:** Generally healthy. Denies weight change, heart, lung, abdominal, or GU dysfunction.

**EXAM:** Pleasant 59-year-old gentleman He is able to walk without a limp or assistive device. He can stand on his heels and toes. He can squat and arise fully. He can duck-walk a few steps however it is a bit painful in the right knee. He can jog in place. He can jump up and down. Regarding his lumbar spine, he can flex to within about 8" of touching

(continued)

Michael Allen
12-18-07
Page 3

## EXAM (continued):

his toes. His left lumbar lateral bend is 25 degrees, right lumbar lateral bend is 18 degrees. He has some tenderness in the muscles superior to the right iliac crest, 3" from the midline and does have tenderness in the upper right superior angle of the scapula/rhomboid region. There is no tenderness along the thoracic spine or thoracolumbar spine. No sciatic notch, no trochanteric tenderness. Straight leg raising is unequivocally negative while seated. Reflexes are 2 to 3+ at the KJ/AJ. Sensation reported as normal in the first web spaces, lateral border of the feet, and the infra-patella region. EHL 5/5. He has full motion of the hips and ankles. Regarding his knees, right knee has 0 to $132^0$ ROM; left knee has 0 to $142^0$ ROM. The right knee has portals from a knee scope that are well-healed. There is a trace effusion evident and questionable McMurray's in the medial joint. This maneuver is painful. His thigh circumference, measured 10" above the tibial tubercle, is 19 ¾" left, 20 $^3/_8$" right. Calf circumference, measured 3" below the tibial tubercle, is 14 ¾" left, 14 $^5/_8$" right. In the cervical spine, he has flexion chin-to-chest, minimal decreased extension. His cervical rotation, right, is $55^0$, left $62^0$. His cervical lateral bends are $16^0$ left and $14^0$ right. Sensation reported as normal in the digits, forearm, and upper arm. Negative Tinel's along the median and ulnar nerve, wrist/elbow. His forearm circumference at maximal diameter is 11 ¼" right, 11" left. His upper arm circumference is 12 $^7/_8$" both right and left arms. Right shoulder range of motion: 162 degrees-flexion, 32 degrees - extension, 153 degrees - abduction, 28 degrees - adduction, 43 degrees - internal rotation, 79 degrees - external rotation. Left shoulder range of motion: 170 degrees - flexion, 55 degrees - extension, 165 degrees - abduction, 32 degrees - adduction, 82 degrees - external rotation, 52 degrees - internal rotation. Postive impingement right. No tenderness AC joints. Excellent power both shoulders including abduction, adduction, internal rotation, external rotation, biceps and triceps.

**DATA:** Standing right knee x-ray shows well-maintained joint space. A fabella is present. I see no obvious fibular fracture, dislocation or other pathology. X-rays of the right shoulder show some AC joint arthritis and inferior spurring at the AC joint. Otherwise, I see no obvious fracture, dislocation or other pathology. X-rays of the left shoulder similarly show AC joint arthritis without fracture, dislocation or other pathology. X-rays of the lumbar spine show normal lumbar lordosis. There are some traction spurs anterosuperiorly at L3. There is slight wedging of the vertebral body of L1 and T12 and possibly T10. These do not appear to be compression fractures. On the A/P there is facet arthritis at L4-5 and L5-S1, lesser so L3-4. The rest of the pelvis is intact.

## IMPRESSION:

1. Healed right proximal fibula fracture without residual
2. Status post right knee arthroscopic surgery including partial medial meniscectomy and chondroplasty with mild residual (effusion and questionable McMurray's)

Michael Allen
12-18-07
Page 4

3. Right shoulder bursitis/tendinitis/ AC joint arthritis symptomatic
4. Left shoulder mild decreased range of motion
5. Neck pain with mild decrease range of motion and associated headaches
6. Impairment rating based on the AMA Guides to the Evaluation of Permanent
    Impairment 5th Edition is 11% whole person using Tables 15-13.
    15-14, 16-40, 16-43, 16-46, and 17-33.
KWW/ls

_Kutt Wilhensa_
12/28/07

**Birmingham Bone and Joint Surgeons, P.C.**
924 Fulton Avenue, S. W.
Birmingham, AL 35211
Phone (205) 786-0315          Fax (205) 788-2663

Keith W. Weaver, M.D.                                    John R. Weaver, M.D.

**ALLEN, LORIE S.**              **#37380-IME**              **11-26-07**

Miss Allen is a 25 YOF referred by Mr. Conor Kells, Esq., with the Department of Justice. On 8/29/03 Miss Allen was traveling with her family to the beach for Labor Day Weekend 2003 when her car was involved in a three vehicle collision. She was the passenger in her father's week-old Lincoln Town Car, heading south on I-65, near Evergreen, Alabama. She was listening to the radio and staring out the window. She recalls the car going underneath three consecutive bridges and that the last one had some bushes under it. Out of nowhere, a red vehicle crossed the interstate and hit them head-on. She doesn't remember the impact, but she recalls that the car was on fire and that she was able to get out of the vehicle under her own power. She recalled the car being "smushed in" and smoke. A bystander stopped and used his fire extinguisher on the fire. Her father got out to help. She also got out and tried to assist her mother who was in the backseat and was complaining of difficulty breathing. Police arrived. She was the third ambulance to leave the scene. The driver of the red vehicle that struck their car was air-evacuated. She remembers *Raindrops Falling on My Head* on the radio and she says, to this day, she can't listen to that song. After the impact, she recalls her father coasting the car to the left side of the median. She was taken to Evergreen with perhaps, Ms. Montgomery, a passenger from the other vehicle. She was admitted for observation. She recalls that her stomach was hurting badly. The next day she and her mother were both released. Her aunt carried them back to Pell City. She was instructed to go to Montclair Hospital by Dr. Campbell and did so on 8/31/03. She remembers not really experiencing pain immediately after the accident. Later that day and the following day the swelling increased and things begin to hurt. She remembers her right knee being swollen and her primary concern was the right knee. She was initially able to hobble around. She limped for two to three months before her gait returned to normal. Now she has a residual scar and some numbness. Occasionally this area tingles like "sticking your finger in ice". At Montclair, they x-rayed her back and her neck. She had a severe headache for about three weeks. It hurt if she turned her head, especially left to right – she would get dizzy and nauseated. All three family members saw Dr. Campbell on 9/8/03 and followed up with him intermittently for the next two to three years. Dr. Campbell would note tender spots and, in fact, would mark each spot with a ink dot prior to an injection. The effect of these injections would fade after a month and the ink dots would fade after a day or two. She received treatment from physical therapy as well as a chiropractor. There was no long-lasting benefit with these modalities. The anteromedial area of her right knee was also injected. This did not give significant relief either. She tried acupuncture (7 to 10 visits)

(continued)
Lorie S. Allen
11-26-07
Page 2


and  a chiropractor (7 to 12 visits).  She is right-hand dominant and her main complaints
are upper back,  radiating to both shoulders and in between her shoulder blades, right
more so than left.  This pain is aggravated with sitting in an office chair, extending her
arm, vacuuming, lifting.  Occasionally this pain will radiate to the right long finger and
sometimes she can't lift this arm very well.  These episodes last maybe two times a day
and when they are particularly severe, she takes medication.

She also complains of upper and lower back pain.  She describes these as just
continued soreness with occasional spasms.  This pain is aggravated with sitting, as
well as lying down.  Walking is somewhat limited, but no bowel or bladder incontinence.
She also complains of right leg pain around the knee which is tender to touch, has an
area of numbness, but no swelling and no giving way.  She also c/o occasional left arm
pain.  This occurs a third or a fourth as often as the right with occasional radiation to the
long finger as well.

**PAST MEDICAL HISTORY:** Para 0-0-0-0.  Her only admission was the overnight stay
noted above.

**MEDICATIONS:** She takes Baclofen about three times a week and an Advil OTC two
times a week.  She is on no other medications.

**ALLERGIES:** Sulfa.

**SOCIAL HISTORY:** Occasionally smokes tobacco.  Occasional alcohol.  She is a
secretary for her father's medical business.

**FAMILY HISTORY:** No bleeding disorders.

**ROS:** No bowel or bladder incontinence.  The contusion and bruising about her right
breast has resolved.  She did have an abscess on her buttock and also had to have a
recent root canal for an infection involving her right canine tooth.

**EXAM:** Very pleasant, cooperative, 25 YOF.  She is able to walk without a limp or
assistive device.  She can stand on her heels and toes.  She can flex to touch her toes.
Her right lumbar lateral bend is $36^0$; left lateral bend is $36^0$ as well.  Left lumbar rotations
are equal and unrestricted.  With her right arm extended, she does have some
tenderness in the rhomboid region medial to the scapula.  Her cervical ROM is right
rotation $76^0$, left rotation $73^0$, left lateral bend $38^0$, right lateral bend $35^0$.  Her reflexes

(continued)
Lorie S. Allen
11-26-07
Page 3

## EXAM (continued):

are 1 to 2+ and equal at the brachioradialis, biceps, and triceps. Sensation reported as normal in the digits, forearm, and upper arm, including long fingers. Her forearm circumference is 9", both right and left. Upper arm circumference is right $11\,^3/_8$" and left $10\,^7/_8$". Her right shoulder ROM is flexion $185^0$, extension $43^0$, abduction $165^0$, adduction $46^0$, external rotation $116^0$, internal rotation $52^0$. Left shoulder ROM is flexion $188^0$, extension $46^0$, abduction $163^0$, adduction $39^0$, external rotation $116^0$, and internal rotation $52^0$. There is slight tenderness over the right AC joint. She has full ROM of her hips, knees, ankles, and subtalar joints. Her reflexes are 2+ and equal KJ/AJ. In the tibial tubercle area, there is a ¾" x 1 ¼" superficial scar, well-healed. The calf circumference, measures 3" below the tibial tubercle, is right 14 ¼", left 14". Thigh circumference, measured 9" above the tibial tubercle, is 20 ¼" left, 20 $^1/_8$" right. There is a superficial abrasion over the right anterior ankle from a recent fall.

**DATA:** X-rays of the cervical spine show normal cervical lordosis without fractures, dislocations, or other pathology. She apparently has seen the dentist frequently, as every molar has amalgam. X-rays of the right shoulder show an oblique orientation of the AC joint, as compared with the left, but no fractures, dislocations, or other pathology. X-rays of the left shoulder show a more vertical orientation of the AC joint. There are no fractures, dislocations, or other pathology, left shoulder. X-rays of the thoracic spine show normal thoracic kyphosis without fractures, dislocations, or other pathology. X-rays of the lumbar spine show normal lumbar lordosis without obvious fractures, dislocations, or other pathology. There is very minimal wedging of T12 on the lateral. On the A/P, what I see of the hips and pelvis is intact. There are no transverse process fractures.

## IMPRESSION:

1. Thoracolumbar back pain – questionable minimal compression fracture of T12 versus normal variant.
2. Cervical spine pain with questionable radicular component radiating to right long finger, C7 distribution, right more so than left.
3. Right knee pain with area of numbness and residual superficial scarring.
4. Impairment rating – 4% whole person. Based on the AMA Guides to the

   Evaluation of Permanent Impairment, *Fifth Edition* using Tables 15-13, 15-14, Fig

   16-40, 16-43, 16-46, Table 15-7, Table 16-3 with the above range of motion data

   and X-ray findings.

**Birmingham Bone and Joint Surgeons, P.C.**
924 Fulton Avenue, S. W.
Birmingham, AL 35211
Phone (205) 786-0315      Fax (205) 788-2663

Keith W. Weaver, M.D.                                    John R. Weaver, M.D.

**ALLEN, LOU ELLEN**          **#37379-IME**          **11-26-07**

This is a 53-year-old lady referred by Mr. Conor Kells, Esq. with the Department of
Justice. She was involved in a multiple-vehicle collision on I-65 South, near Evergreen,
Alabama, on 8/29/03. I understand Mrs. Allen and her family were headed south to the
beach for Labor Day Weekend. Another vehicle was traveling north and had a blow-
out, lost control of the car, crossed the median, striking first the Allen car, and then a
second car. Ms. Allen was the restrained, rear-seat passenger of a week-old Lincoln
Town Car. She was behind her daughter who was a passenger in the front seat. Mrs.
Allen recalls being in the right lane of the four-lane, just forward of a car in the left lane
that was also heading south. There was a sudden impact and then she recalls spinning
and spinning and spinning. Following this she remembers seeing a guardrail and then,
in a daze, smelling and hearing everything. Her car did not overturn. Her husband and
her daughter, Lorie, got out of the car. The car was on fire, but she could not get out.
She remembers her left leg was wet, perhaps from the ice chest that was adjacent to
her in the back seat. She had trouble breathing. People opened the door and a
gentleman cut the seatbelt with a knife to help extricate her. She recalls a man getting
down on his knees and praying for her. Somebody stopped, a trauma nurse from
Vanderbilt, and she recalls them saying, "She didn't drop a lung". She remembered
people were all around and then it started raining. An ambulance arrived and placed
her on a backboard. She asked desperately to bend up her knees, but they would not
allow her to do so. She recalls it taking forever to be placed in the ambulance. While
on the backboard, the straps hurt so much that it felt like they were squeezing the
breath out of her. She talked the attendants into loosening the strap so she could bend
her knees and this helped. She remembers sights and sounds. She went to Evergreen
Medical Center and was admitted overnight for observation. She recalls them doing
arterial blood gasses. Her sister, also from Pell City, came down to Evergreen the next
day and took her home. She then called Dr. Campbell, whom her brother-in-law had
recommended. He instructed her and her family to go to the Montclair Hospital
Emergency Room and they did so on 8/31/03. She remembers she was quite swollen
in her lower abdomen and walked somewhat hunched over, not upright, for nearly six
months.

She then followed up with Dr. Campbell in early September. More x-rays were taken.
Her abdomen remained swollen and bruised. She was seen several times and Dr.
Campbell found tender spots and he would give her multiple injections. She noticed
that he would push different areas and, if she would start crying, that's where the shot

(continued)
Lou Ellen Allen
11-26-07
Page 2

went.  She had some epigastric pain that she described "like a knife sticking".  She doesn't know when the swelling in her abdomen went down.  Dr. Campbell noted on 10/29/03 a 7 to 8 cm reducible mass in her right lower quadrant.  This observation was not recorded for several visits until 5/27/05, when she was referred to Dr. Shumate at Brookwood Hospital.  He later performed an inguinal hernia repair.

At this time, she notes continued limitations with trouble lifting her grandchild.  Her primary complaint is neck pain.  Seventy-five percent of the pain she experiences is located from the base of her neck radiating to the right shoulder, occasionally down the forearm, to her thumb.  Occasionally there is numbness.  She cannot move her neck into a position that reproduces this pain into the right arm and forearm.

Her second complaint is right shoulder pain, which is 25% of the right upper extremity pain, as compared to her neck to shoulder pain being the other 75%.  This pain is aggravated with sleeping, vacuuming, and housework, as well as bringing in groceries.  She does not have limitations of her activities, but is painful.  Moving her right shoulder does not make her neck hurt.  She has rare numbness in the right upper extremity.

Lesser down the list of pains is her thoracic spine.  She has a tight feeling if she leans forward, does computer work.  Lifting groceries is not limited, but mildly painful.  There is no numbness in the chest area.  No breast pain.  She has no breathing difficulties at this time.

Further down this list of complaints is low-back pain.  This area also aches when she does housework or sits at a computer too long and, basically flares up along with the thoracic pain.  She notes some tenderness toward the right sacroiliac joint and this does not radiate anywhere.  She also has left knee pain.  The anterolateral knee has a palm-sized area of dysesthesia – it is not quite numb, but it doesn't feel normal either.

Lastly, she notes some swelling about 3" above her left ankle and she relates this to perhaps the ice chest hitting her leg in this location.

She denies any bowel or bladder incontinence.

**PAST MEDICAL HISTORY:**  Para 1-0-0-1 by C-section.  Hysterectomy, right inguinal hernia, right great toe surgery, melanoma of the inner knee, and lipoma excision.  Also, in 1975, she had another MVA with a right distal clavicle fracture.

(continued)
Lou Ellen Allen
11-26-07
Page 3


**MEDICATIONS:**  Currently include a cholesterol-lowering agent, blood pressure (BP) medicine, Motrin OTC 2 pills every three days, Lortab (she is uncertain of the strength, but only takes 1 or 2 per month).  She also takes potassium and Allopurinol.

**ALLERGIES:**  Penicillin – had reaction as a child and is uncertain what it was.

**SOCIAL HISTORY:**  Denies smoking.  No alcohol.  She is currently unemployed, although she did work for her husband's family medical business in the past.

**FAMILY HISTORY:**  Her father has had several medical conditions – she says everything from BP difficulties to cancer.

**ROS:**  Hypertension and gout.

**EXAM:**  Pleasant, cooperative, 53-year-old lady.  She is able to walk without a limp or assistive device.  She can stand on her heels and toes.  She can squat and arise.  She can flex to touch her toes.  Lumbar spine lateral bend is $36^0$, right lateral bend is $28^0$. There is mild decreased rotation in the lumbar spine, both right and left.  Deep tendon reflexes are 2 to 3+ and equal at the knee-jerk and ankle-jerk.  EHL is 5/5.  Sensation reported as normal in the first web spaces, lateral border of feet, and infra-patellar region.  There is an area of dysesthesia, about 3" x 4", on the anterolateral left knee. Her hip flexion on the right is $114^0$, on the left is $122^0$; otherwise, full abduction, internal/ external rotation.  Full ROM of the knees, ankles, and subtalar joints.  In the cervical spine, she has full flexion and extension.  Right rotation is $67^0$, left rotation is $60^0$.  Left lateral bend is $22^0$, right lateral bend is $23^0$.  Her left forearm circumference is 8 ¾"; right forearm circumference is $8\ ^7/_8$".  Her left upper arm circumference is 10 ¾"; right upper arm circumference is 11".  The right shoulder has flexion to $180^0$, extension $55^0$, abduction $180^0$, adduction $48^0$ with pain, internal rotation $70^0$, external rotation $110^0$. Left shoulder motion is flexion of $180^0$, extension $56^0$, abduction $180^0$, adduction $50^0$ with no pain, internal rotation $64^0$, external rotation $110^0$.  Reflexes are 2+ and equal at the brachioradialis, biceps, and triceps.  With the right arm fully extended and force placed downward, there is tenderness in the rhomboid region medial to the right scapula.  There is no cervical, thoracic, or paraspinal muscle tenderness.  Spinal alignment is normal.

**DATA:**  X-rays of the lumbar spine and pelvis show some degenerative changes at L5-S1 with spurring noted anteriorly.  There is also spurring noted anteriorly at L2, L3, and there also is approximately a 25% or less compression fracture of L1.  She was

(continued)
Lou Ellen Allen
11-26-07
Page 4

## DATA (continued):

unaware of this x-ray finding. X-rays of thoracic spine show a minimal thoracolumbar scoliosis that appears compensated. The technique is for the vertebrae and I cannot identify rib fractures that have been noted in the records. X-rays of the cervical spine show degenerative changes and narrowing of virtually every disc space. There is minimal posterior spur formation at 4, 5, 6 and lesser so the other levels. Otherwise, there is normal cervical lordosis without fractures, dislocation or other pathology. X-rays of the right shoulder show an old non-union of the distal clavicle fracture, approximately 1 cm medial to the AC joint. Shoulder joint proper shows no obvious fractures, dislocations, or other pathology. X-rays of the left shoulder show no fractures, dislocations or other pathology.

## IMPRESSION:

1. Healed L1 compression fracture, less than 25%.
2. Multiple rib fractures with records noting left 5th through 11th rib fractures.
3. Right shoulder pain/bursitic-type symptoms – S/P right distal clavicle fracture with non-union.
4. Cervical degenerative disc disease.
5. Normal neurologic exam, upper extremities.
6. Degenerative L5-S1 disc with normal neurologic exam of lower extremities, exclusive of the patchy numbness, anterolateral left leg.
7. Minimal thoracolumbar scoliosis
8. Impairment rating 22% whole person. AMA Guides to Permanent Impairment Fifth Edition Table 15-7 –compression fracture lumbar spine 0-25% is 5% whole person; although rib fractures are not addressed specifically – fracture of the posterior elements including transverse process – is a reasonable anatomic substitute. These rib fractures including any residual pain related impairment would be 2% per fracture. When using the combined value chart pages 604 and 605 yields 19% whole person. The decrease cervical ROM has a 3% whole person impairment per Table 15-13 and 15-14.

Keith W. Weaver, MD

KWW/ls

# Exhibit U

# FREEDOM COURT REPORTING

Page 25

1  seat belt strap would cross her left breast
2  and not her right breast when the accident
3  occurred?
4      A.   You usually get them both.
5          (Whereupon Defendant's Exhibit No. 1
6          was marked for identification and is
7          attached to the original of the
8          transcript.)
9      Q.   Let me show you a photograph I have,
10 and we can mark this as Defendant's Exhibit 1.
11         MR. SPARROW: That's not
12 Ms. Montgomery.
13         MR. KELLS: No, it's not. This is
14 for comparison only.
15         THE WITNESS: Actually, there is a
16 picture.
17         MR. SPARROW: I think I seen it too.
18 I think I provided it.
19         THE WITNESS: I think I gave it to
20 Phyllis. I think I took it.
21     Q.   (By Mr. Kells) You took it?
22     A.   Uh-huh.
23         MR. SPARROW: I think I -- I'll

Page 26

1  check again.
2      Q.   (By Mr. Kells) This is another
3  plaintiff in the case which was a passenger in
4  a vehicle. And it shows, I'm guessing, if you
5  would agree me, a pretty significant bruise on
6  her right breast because of the fact that the
7  seat belt crossed her right breast at the time
8  of the accident --
9      A.   She was a passenger.
10     Q.   -- but there's no significant
11 bruising -- passenger -- over her right
12 breast. Had she been the driver, wouldn't we
13 have expected to see one on her left breast
14 but not her right breast like this picture?
15     A.   Well, first of all, this woman --
16 God, don't let Phyllis ever read this. This
17 woman is not as big as Phyllis. And, so,
18 Phyllis' breasts are going to be right out
19 here (indicating). The strap's going to go
20 across the both of them. So, I would tell you
21 that I don't think that's a realistic
22 comparison.
23     Q.   Okay. And that's fair enough.

Page 27

1          MR. KELLS: But if I could get I
2  copy of that photo if it's in existence --
3          MR. SPARROW: Yeah.
4          MR. KELLS: -- because I haven't
5  seen it.
6          THE WITNESS: Yeah. And as a matter
7  of fact, I recall, there was one that had a
8  big bruise on her arm too.
9          MR. SPARROW: Yeah. Like I say, I
10 think I sent a copy. I will have Lisa do that
11 this afternoon.
12     Q.   (By Mr. Kells) Doctor, would it be
13 fair to say that breast calcifications are a
14 common occurrence?
15     A.   Very common.
16     Q.   And you would agree that women over
17 the age of 50 are more likely to have them?
18     A.   I agree with that.
19     Q.   Would you say almost 99 percent of
20 mammograms will show a calcification of some
21 kind?
22     A.   I would not agree with that.
23     Q.   Okay. Is it generally believed in

Page 28

1  the medical community trauma to a breast will
2  cause cancer?
3      A.   That's not true.
4      Q.   Well, it may cause calcifications,
5  but not cancer?
6      A.   No, it doesn't cause cancer. Causes
7  calcifications, but doesn't cause cancer.
8      Q.   Can you point me to a treatise or a
9  book or a reference that states that trauma to
10 the breast will cause calcifications?
11     A.   I would think any surgical textbook
12 would probably tell you that. Ask some more
13 questions, and I'll see if I can find it.
14     Q.   Did anyone tell Ms. Montgomery that
15 trauma to her breast would not cause cancer?
16     A.   Well, you'll have to ask that one
17 again. Did anyone tell Ms. Montgomery that
18 trauma to her breast would not cause cancer, I
19 don't know.
20     Q.   Do calcifications always require a
21 biopsy?
22     A.   It depends on who sees them first.
23 If you're a radiologist, the answer is yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  These were new according to when they were
2  compared to the previous film. New right
3  breast calcifications.
4      Q.  Is it medically significant that she
5  didn't get any calcifications in her left
6  breast?
7      A.  No. No. I mean, why do some people
8  get cancer on one side and not the other? I
9  mean, it just happens in one breast sometimes.
10     Q.  I'm just asking.
11     A.  This is probably the focus of the
12 most significant -- off the record just a
13 minute.
14        (A short break was taken.)
15     Q.  (By Mr. Kells) Please just tell the
16 court reporter what you're looking at.
17     A.  I now have a copy of
18 Phyllis D. Montgomery's surgical pathology
19 report from 8/2/2005. And this was read by
20 Dr. Paul F. Atkinson. And basically what he
21 describes here is: "There are scattered areas
22 of benign breast epithelium without remarkable
23 epithelial proliferation." That means that

Page 38

1  the underlying tissue is not fibrocystic.
2  "Both specimens show stromal fibrosis" -- that
3  means scar -- "mild chronic inflammation."
4  These are benign reactive changes consistent
5  with healing, changes of fat necrosis" --
6  that's what I was talking about with the
7  bruising -- "and would be consistent with
8  alterations from a trauma -- previous trauma."
9  So, the path report says they're traumatic.
10     Q.  It says they're consistent with, but
11 it doesn't say that it was caused by it, and I
12 think that's where my concern is.
13     A.  What is the meaning of the word
14 "is?" That's what I love about you guys.
15        MR. KELLS:  Objection.
16     Q.  I mean, I'm not arguing with you,
17 but I'm trying to --
18     A.  I think it's as plain as my nose on
19 the edge of my face that this is traumatic. I
20 mean, you can argue it any way you want,
21 but -- I mean, sure, it could be the fact that
22 Phyllis was 62 years old, but, I mean, for
23 goodness sake, they say it's fibrotic and

Page 39

1  consistent with trauma, and I think the
2  pathologist is probably better able to render
3  that opinion than you or I.
4      Q.  And, you know, that's why I asked
5  you earlier on whether there was some
6  documented evidence of trauma to that breast.
7      A.  There is.
8      Q.  And, you know, when I have that, you
9  know what, I'm -- that will be a very
10 significant thing, but, you know, I'm just
11 exploring what's out there.
12     A.  I understand.
13     Q.  I'm not arguing with you, Doctor.
14 Believe me, you make a very good point.
15 What's the relationship with Dr. Covall?
16     A.  Dr. Covall is the orthopedic surgeon
17 that took care of Mr. Montgomery's leg, the
18 second surgery he had, I believe. When I
19 brought them back over from Birmingham, I
20 tried to get David, but I believe he was out
21 of town. David is a fabulous orthopedic
22 surgeon when it comes to knees. And actually
23 the guy on call was a guy named John Henry as

Page 40

1  I recall. And he took one look at it, and
2  said, "I'm not handling this," and we shipped
3  him to Piedmont. It was a pretty significant
4  fracture, which I think is -- you know,
5  compared to that, this is -- that's the real
6  injury of that accident.
7      Q.  So, just so that I confirm this,
8  Mrs. Montgomery's prognosis for the future, I
9  mean, would you say that it's good?
10     A.  Oh, yeah.
11     Q.  And that she won't really require
12 much future care?
13     A.  From this, I doubt it.
14     Q.  And it was not a disabling issue?
15     A.  No. No.
16     Q.  I think that's all I've got for
17 right now. If you can point me to, you know,
18 a reference or a record on the trauma causing
19 calcifications, that will be helpful.
20
21 FURTHER EXAMINATION BY MR. SPARROW:
22     Q.  Let me do this real quick and then
23 I'll be through.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1    A.    Yeah, go ahead.
2    Q.    Since we've now talked about them,
3  let me go ahead and show you what I've marked
4  as Exhibit 4 and ask you if you can identify
5  that.
6    A.    This is a mammogram that was done in
7  July of '05. This is what we call
8  magnification views of the right breast
9  calcifications, suggested, I guess, from
10  the -- what was the date that they did the --
11    Q.    8/2?
12    A.    No. No. The one before that. What
13  this is a secondary magnification used that
14  was recommended from a previous mammogram.
15  So, there must have been one a couple days
16  earlier or a week or two earlier. But
17  basically what these are is magnification
18  views. And you use these specifically to look
19  at calcifications trying to help you decide
20  whether they look benign or whether they look
21  malignant or whether you really worry about
22  them. So, this would be --
23    Q.    Is that the document that led to the

Page 42

1  decision --
2    A.    Right. This is the document that
3  said, well, you have to biopsy. Even though
4  we knew she had had a trauma, we had to biopsy
5  these, not for the traumatic aspect of it,
6  but, rather, to make sure it was not an
7  underlying malignancy not related to the
8  trauma at all.
9        (Whereupon Plaintiff's Exhibit No. 5
10        was marked for identification and is
11        attached to the original of the
12        transcript.)
13    Q.    All right, sir. And then let me
14  show you what is marked as Defendant's Exhibit
15  5 finally.
16    A.    That is a copy of the pathology
17  report from the stereotactic biopsy done on
18  the 2nd of August of 2005.
19    Q.    The biopsy that you ordered?
20    A.    That's correct.
21    Q.    And is this a copy of a consult or a
22  path report that was sent to you?
23    A.    Right. This is a copy of the path

Page 43

1  report that was sent to me and Dr. Amerson.
2    Q.    All right. And this is the document
3  that you were referring to a minute ago?
4    A.    Right. This is the document that
5  tells us what is in the mind of the
6  pathologist and what he sees at the time of
7  this microscopic inspection. It's what he
8  thinks is the etiology of the calcifications,
9  and what he says here is he thinks it's
10  consistent with her trauma.
11    Q.    And maybe I should ask you this just
12  so this record is clear. Who was the
13  pathologist and what's he looking at?
14    A.    Well, the pathologist is the
15  gentleman, in this case, Dr. Paul Atkinson,
16  who is actually looking at the tissue under
17  the microscope and trying to decide what is
18  going on by --
19    Q.    What tissue?
20    A.    The breast tissue. And trying to
21  decide what is the basis for the
22  calcifications.
23        MR. SPARROW: That's all I have,

Page 44

1  Doctor.
2
3  FURTHER EXAMINATION BY MR. KELLS:
4    Q.    I just have one other question just
5  so -- in case it's out there, and I don't know
6  if it is. The mammogram itself, is there like
7  a hard film of that?
8    A.    Yes, there's a hard copy of it.
9    Q.    Is there a way to obtain that?
10    A.    Oh, certainly.
11    Q.    Just to possibly have someone else
12  take a look at it?
13    A.    Oh, sure.
14        MR. SPARROW: Probably not right now
15  like we've gotten there.
16        THE WITNESS: No. Sure, you can get
17  it from the hospital. No problem.
18        MR. KELLS: All right. I think
19  that's good.
20        THE WITNESS: They keep everything.
21        MR. KELLS: With your consent,
22  Callen, I'm just going to go ahead and
23  continue the deposition while Dr. Cummings

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  tracks down that reference to the trauma
2  causing calcifications. And if necessary, we
3  can --
4      MR. SPARROW: Do it by phone.
5      MR. KELLS: Do it by phone.
6      THE WITNESS: I'll get you one.
7  Just leave me the card, and I'll send you
8  several.
9      MR. KELLS: Will do. Okay. I think
10 we're done.
11     MR. SPARROW: Assuming, Dr. Cummings
12 sends Conor some reference points or whatever
13 it is and Conor does not feel it's necessary
14 to actually reopen the deposition for purposes
15 of the testimony, can you agree, Conor, that
16 we'll just attach whatever he sends you as
17 exhibits to the depo because it stands right
18 now on the record, they're your questions to
19 him, but he's not responding with any -- do
20 you see what I'm saying? But if we can agree
21 that what he sends you is okay, and we're not
22 going to fight that fight, then we can lay
23 that to rest.

Page 46

1      MR. KELLS: If you want to go ahead
2  and do it that way, I'm not going to object,
3  but I want to take a look at it before I
4  decide.
5      MR. SPARROW: Oh, I understand.
6      MR. CUMMINGS: I'll send it to both
7  of you.
8          ~~oOo~~
9      The deposition of
10     Richard Cummings, Jr., M.D.
11       concluded at 1:15 p.m.
12        on November 9, 2007
13         ~~oOo~~
14
15
16
17
18
19
20
21
22
23

12 (Pages 45 to 46)