IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL ALLEN, et al.,         )
                            )
      Plaintiffs,        )
                            )
   v.                    )  Case No. 2:06-cv-879-WKW
                            )
UNITED STATES OF AMERICA,   )
                            )
      Defendant.      )

# PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Annesley H. DeGaris (ASB-9182-A63A)
CORY, WATSON, CROWDER & DEGARIS
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205

Elizabeth A. Ellis (ASB-3521-A63E)
CORY, WATSON, CROWDER & DEGARIS
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205

# TABLE OF CONTENTS

Page No.

I.    DISCUSSION…..........................................................................1

II.   PLAINTIFFS' DAMAGES……………………………………………..6

      A.    Medical Damages of the Allens…………………………….…..6

      B.    Medical Billing……………………….......………………......8

      C.    Disability & Impairment Ratings……………………………10

      D.    Lost Wages……………………………………………………11

      E.    Out of Pocket Expenses………………………………………12

      F.    Total Medical Billing, Lost Wages and Out of Pocket Expense for the
            Allens………………………………………………………13

      G.    Subrogation/Outstanding Bills…………………………………13

III.  CONCLUSIONS OF LAW………………………………………...14

      A.    Mrs. Moore was Negligent in the Operation of the Vehicle and Is Not
            Entitled to Application of the Sudden Emergency
            Doctrine..…………………………………………………14

      B.    The Preponderance of the Evidence Shows that Mrs. Moore was
            Traveling in Excess of the Posted Speed Limit..…………………16

      C.    Failure to Inspect and/or Maintain the Vehicle……………………21

      D.    The Tire Deflation Was Not an Intervening or Superseding Cause…….22

IV.   CONCLUSION……………………………………………………..23

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

MICHAEL ALLEN, et al.,          )
                                      )
       Plaintiffs,         )
                                      )
       v.                  )     **Case No. 2:06-cv-879-WKW**
                                      )
UNITED STATES OF AMERICA,   )
                                      )
       Defendant.        )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court on February 25, 26, and 27, 2008. Having heard the evidence and having considered the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## I. DISCUSSION

1.     At the trial of this matter the Court heard live testimony from: (1) Trooper Robert Fisher; (2) the parties: Michael Allen, Lou Ellen Allen, Lori Allen, Phyllis Montgomery, Wallace Montgomery, Bertha Moore; and (3) experts: Peter Flanner (tire expert), Clifford Prosser (accident reconstructionist), Ralph Cunningham (tire expert/accident reconstructionist), and Dr. Keith Weaver (Defendant's medical expert). The following is a discussion of the testimony as a well as a listing of the substantial amount of evidence stipulated to by the parties.

2.     This case involves a multiple vehicle accident that occurred on Interstate 65. On August 29, 2003, Wallace and Phyllis Montgomery were traveling south on Interstate 65 on their

way to the Mississippi Coast.   Michael, Lou Ellen, and Lori Allen were also traveling south on Interstate 65 on their way to Gulf Shores, Alabama.  (Allen/Montgomery testimony).

3.     At the same time, Bertha Moore was traveling north on Interstate 65 on her way to Montgomery, Alabama.  Mrs. Moore was returning from a law enforcement seminar in Gulf Shores. The United States has stipulated that Mrs. Moore was, at the time of this incident, working in the line and scope of her employment with the Department of Justice.  (Moore testimony).

4.     In the area where this wreck occurred, Interstate 65 consists of two northbound lanes, two southbound lanes, two emergency lanes, and a median separating the north and southbound traffic. The highway is straight and flat. (Fisher testimony; Exhibit 12).

5.     At or around mile marker 106, Mrs. Moore crossed the median, entered the southbound lanes and struck first the Allen and then the Montgomery vehicle. Apparently, Mrs. Moore had a left rear tire deflation prior to crossing the median.  (Moore/Allen/Montgomery testimony).

6.     Trooper Robert Fisher was dispatched from Evergreen, Alabama and arrived at the scene approximately 20 minutes after the wreck. When Trooper Fisher got out of his car, he was immediately approached by a white female, 20 - 30 years of age, who was very distraught and shaking. This eyewitness informed Trooper Fisher that she was behind Mrs. Moore as they traveled north on Interstate 65. The eyewitness stated that she and Mrs. Moore were in the left hand northbound lane when Mrs. Moore eased off the road and through the median. She told Trooper Fisher that she and Mrs. Moore had been "running together" and were traveling 83 miles per hour when Mrs. Moore left the roadway. (Fisher testimony).

7.     Pursuant to and in the course of his law enforcement duties, Trooper Fisher then followed the protocols for motor vehicle accident investigation; he walked the path traveled by Mrs. Moore's vehicle; he examined all three vehicles; and he determined the point of maximum engagement as well as where each vehicle came to rest. He inspected the northbound lanes and found no evidence or witness marks to indicate Mrs. Moore had experienced a "blow-out" or catastrophic failure of her tire. (Fisher testimony).

8.     The path taken by the Moore vehicle was visible in that it left two rows plowed through the median. Trooper Fisher walked the entire path covered by the Moore vehicle from north to southbound lanes ending in impacts with the two southbound vehicles. He determined that the Moore vehicle became airborne as it left the median and entered the southbound lanes. He inspected the damage to all three vehicles. (Fisher testimony; Exhibits 8-10).

9.     The Allen vehicle came to a stop on the right-hand side of the southbound lanes. The Moore vehicle came to rest on its side on the southbound side of Interstate 65, and the Montgomery vehicle had been spun 180 degrees and came to a rest in the middle of the median facing north. (Fisher testimony; Exhibit 13).

10.     Trooper Fisher determined that the physical evidence was consistent with the information he obtained from the witness traveling behind Mrs. Moore and he listed Mrs. Moore's speed as 83 miles per hour on the Alabama Uniform Traffic Accident Report. He based this determination on all of the evidence at the scene including his conversation with the eyewitness, the damage to the vehicles, the distance traveled by Mrs. Moore and the fact her vehicle became airborne as it exited the median. (Fisher testimony).

3

11.    The interstate is straight and flat where Mrs. Moore left the northbound lane and crossed the median. The median was grass and dirt and angled down toward the middle of the median from both the north and southbound lanes. (Fisher testimony; Scene Photos, Exhibit 12).

12.    At the time of the wreck it was dry and not raining. However, as the injured were being removed from the scene by emergency personnel, a storm moved in from the south and it began to rain. (Allen/Montgomery testimony).

13.    All of the occupants of both the Allen and Montgomery vehicles were taken by ambulance to Evergreen Hospital. Mrs. Moore was taken to Baptist Medical Center in Pensacola, Florida. (Moore/Montgomery/Allen testimony).

14.    It was determined by all the experts who examined the tire and who testified in this case that the deflation of Mrs. Moore's tire occurred through a hole left by a puncturing object after it was ejected. (Exhibit 30G(l), photograph of hole left by puncturing object; Flanner/Cunningham testimony).

15.    Sometime prior to the wreck, a puncturing object (probably a screw) became lodged in the left rear tire of Mrs. Moore's vehicle. The tire was a tubeless steel belted radial. Such tires can carry a puncturing object for up to several hundred miles before experiencing full deflation. In this instance, the testimony suggests the object was probably in the tire for some lengthy period of time in as it left a hexagonal imprint of the screw head in the rubber of the tread. In such a case, a small amount of air is released around the puncturing object with each revolution of the tire. Here, the testimony suggests that, full deflation occurred when the puncturing object was finally ejected from the tire. The time for deflation following ejection could have taken up to ten seconds. (Cunningham/Flanner testimony).

4

16.    Whether her tire was visibly deflated prior to beginning her trip to Montgomery is unknown, because Mrs. Moore failed to check her tires before leaving Gulf Shores. (Moore testimony).

17.    The obvious, massive damage to the tire was not caused by a catastrophic blowout. Rather, all experts agree that this damage was caused after the deflation and as a result of an impact between the deflated tire and some substantial object or objects during the accident sequence. (Flanner/Cunningham testimony; Exhibit 11). The amount of force required to so severely damage the tire including splitting of the tread circumferentially is consistent with, and indicative of, an impact at a high rate of speed. (Flanner testimony).

18.    A driver traveling straight at highway speeds who experiences a deflation such as that experienced by Mrs. Moore is not presented with an emergency situation. In fact, the testimony of both plaintiffs' and defendant's experts made clear that under these circumstances loss of control is extremely unlikely as the result of a tire deflation. Furthermore, R.J. Grogan, a researcher and expert in the field of tire deflation and its effects, who was relied upon by both parties' experts, determined through his testing that a tire deflation such as Mrs. Moore's does not cause a loss of control if experienced while traveling straight at highway speeds. This is consistent with the common knowledge that drivers all over the country experience tire deflations such as that experienced by Mrs. Moore without incident. (Prosser/Cunningham testimony).

19.    In order for a deflation such as that experienced by Mrs. Moore to lead to a loss of control, other factors must be present. Those factors can include driver input such as over-steering or braking too hard. Those factors can also include excessive speed making loss of

5

control more likely. Furthermore, the condition of the tires on a vehicle which experiences a deflation can contribute to a loss of control. (Prosser/Cunningham testimony).

20.    Mrs. Moore did not recognize that her tire was deflating until it was fully deflated. When she did recognize the deflation, she hit her brakes yet stated that she felt the car accelerate before she lost control. (Moore testimony).

21.    While all of the tires on Mrs. Moore's vehicle were not available for inspection, the subject tire was found to have 2/32 of an inch of usable tread remaining at the time this wreck occurred. 2/32 of an inch relates to the tire being approximately eighty percent (80%) worn and was described by the defendant's expert as "almost, but not completely worn out." (Cunningham/Flanner/Prosser testimony).

22.    If the remaining three tires on Mrs. Moore's vehicle were in a condition similar to that of the subject tire which was available for inspection, then the worn tires could have contributed to Mrs. Moore's loss of control. (Cunningham/Prosser testimony).

## II. PLAINTIFFS' DAMAGES

### A.    MEDICAL DAMAGES OF THE ALLENS

The United States and the Allen Plaintiffs have stipulated to the following injuries as being caused by the wreck.

**(i.)    Michael Allen**
Right shoulder AC joint arthrosis and rotator cuff impingement
Left shoulder AC joint arthrosis and rotator cuff impingement
Right knee contusions, medial meniscus tear, chondromalacia of femoral trochlea
    and right medial femoral condyle
Concussion/traumatic brain injury
Multiple facial and scalp lacerations
Cervical strain/neck strain with significant pain
Chest and rib contusions with intercostal nerve injury and intercostal neuralgia
Upper and mid back pain

6

Anterior chest strains and pain
Left suprascapular nerve (posterior shoulder) pain
Right fibula fracture
Bilateral lower leg abrasions
Right leg lateral sural nerve, peroneal nerve and saphenous nerve pain with limp
Sleep disorder
Possible future surgery to both shoulders and right knee

(ii.)     **Lou Ellen Allen**
Multiple chest and thoracic injuries including fractures of ribs 5,6,7,8,9,10 and 11
Compression fracture 1st lumbar vertebrae
Concussion/traumatic brain injury
Right periorbital hematoma (black eye)
Severe cervical strain/whiplash
Occipital nerve injury with headache
Abdominal pain and pelvic contusions
Pulmonary contusion with pleural effusion
Chest wall hematomas and contusions with intercostal nerve neuralgias/pain
Upper and mid back pain
Chest wall pain
Right shoulder inflammation and pain
Right leg, left knee and left foot bruising and pain
Left saphenous nerve sensory deficit
Sleep disorder

(iii).     **Lorie S. Allen**
Compression fracture 12th thoracic vertebrae
Concussion/traumatic brain injury
Breast hematoma from seatbelt
Rib and chest contusions
Upper and mid back pain
Chest sprains and pain
Right posterior shoulder pain
Bilateral shoulder inflammation
Abdominal contusions, bruising and pain
Lumbar back pain
Right knee and leg contusions
Right leg sensory loss around the knee
Sleep disorder

(Stipulation of the Parties)

In addition to these stipulated injuries, the Allen plaintiffs each testified to their
injuries, treatment and mental anguish resulting from the wreck.

7

B.    **MEDICAL TREATMENT AND BILLING**

   The United States and the Allen Plaintiffs have stipulated to the following treatment and resulting bills as being both reasonable and necessary:

   **(i).    Michael Allen**

      Medical records and billing from Conecuh County Emergency Medical Services (Exhibit 36(a) - $467.00)

      Medical records and billing from Evergreen Medical Center in Evergreen, AL (Exhibit 36(b) - $1,606.00)

      Medical billing from Tri-County Medical Center (Emergency Room Physician) (Exhibit 36(c) - $65.00)

      Medical records and billing from Birmingham Baptist Medical Center Montclair, Birmingham, AL (Exhibit 36(d) - $1,514.00)

      Medical records and billing from The Kirklin Clinic (Dr. Kenneth Moore) (Exhibit 36(e) - $804.00)

      Medical records and billing from Physiotherapy Associates in Pell City, AL (Exhibit 36(f) - $2,636.00)

      Medical records and billing from the Birmingham Radiological Group (Exhibit 36(g) - $126.00)

      Medical records and billing from Alabama Sports Medicine and Orthopaedic Center (Dr. E. Lyle Cain) (Exhibit 36(h) - $3,182.00)

      Medical records from Highlands Diagnostic (Exhibit 36(i) - $2,855.00)

      Medical records and billing from HealthSouth Sports Medicine and Rehabilitation Center in Birmingham, AL (Exhibit 36(j) - $6,870.03)

      Medical records and billing from Anesthesiology & Pain Medicine (Dr. Lucy Chapman) (Exhibit 36(k) - $702.00)

      Billing from Pro-Fit, Inc. (Exhibit 36(l) - $46.20)

      Medical records and billing from the Southern Medical Group (Drs. Ayers and Cannon) (Exhibit 36(m) - $283.00)

8

Medical records and billing from Dr. Leon Campbell, Tuscaloosa, AL (Exhibit 36(n) - $15,773.00) (bill still pending)

Medical records and billing from The Radiology Clinic/Tuscaloosa Radiology, Tuscaloosa, AL (Exhibit 36(o) - $2,135.00)

**TOTAL MEDICAL BILLS OF MICHAEL ALLEN $39,064.23**

(ii).    **Lou Ellen Allen**

Medical records and billing from Conecuh County Emergency Medical Services (Exhibit 38(a) - $517.00)

Medical records and billing from Evergreen Medical Center in Evergreen, AL (Exhibit 38(b) - $3,135.00)

Medical billing from Tri-County Medical Center (Emergency Room Physician) (Exhibit 38(c) - $65.00)

Medical billing from Tri-County Medical Center (Dr. Stephen Teplick) Exhibit 38(d) - $99.00)

Medical records and billing from Birmingham Baptist Medical Center Montclair, Birmingham, AL (Exhibit 38(e) - $4,860.00)

Medical records and billing from Birmingham Radiological Group (Exhibit 38(f) - $299.00)

Medical records and billing from the Southern Medical Group (Dr. John Burke) (Exhibit 38(g) - $217.00)

Medical records and billing from Physiotherapy Associates in Pell City, AL (Exhibit 38(h) - $2,984.00)

Medical records and billing from Dr. Dianne Barnard (Exhibit 38(j) - $15.00)

Medical records and billing from Lajuana Logan (Exhibit 38(k) - $576.00)

Medical records and billing from Dr. Leon Campbell, Tuscaloosa, AL (Exhibit 38(m) - $13,072.00)

Medical records and billing from The Radiology Clinic/Tuscaloosa Radiology, Tuscaloosa, AL (Exhibit 38(n) $519.00)

Insurance claims relating to services provided by Laboratory Corporation of America (Exhibit 38(o) - $15.00)

**TOTAL MEDICAL BILLS OF LOU ELLEN ALLEN $26,373.00**

(iii).    **Lorie S. Allen**

Medical records and billing from Butler County Emergency Medical Services (Exhibit 41(a) - $467.00)

Medical records and billing from Evergreen Medical Center (Dr. Jeffrey Brandon) in Evergreen, AL (Exhibit 41(b) - $1,919.00)

Medical records and billing from Tri-County Medical Center (Dr. Yearwood) in Evergreen, AL (Exhibit 41(c) - $65.00)

Medical records and billing from the Roberts Clinic (Dr. Cumagun) in Evergreen, AL (Exhibit 41(d) - $185.00)

Medical records and billing from Baptist Medical Center Montclair in Birmingham, AL (Exhibit 41(e) - $1,043.00)

Medical records and billing from the Birmingham Radiological Group in Birmingham, AL (Exhibit 41(f) - $90.00)

Medical records and billing from the Southern Medical Group (Dr. Gregory Ayers) (Exhibit 41(g) - $217.00

Medical records and billing from the Women's Care Specialists (Dr. Maddox) in Birmingham, AL (Exhibit 41(h) - $110.00)

Medical records and billing from the Chabot Chiropractic Clinic (Dr. Chabot) (Exhibit (41(i) - $2,475.00)

Medical records and billing from Physiotherapy Associates in Pell City, AL (Exhibit 41(j) - $2,989.00)

Medical records and billing from Dr. Leon Campbell, Tuscaloosa, AL (Exhibit 41(k) - $9,846.00)

Medical records and billing from The Radiology Clinic/Tuscaloosa Radiology, Tuscaloosa, AL (Exhibit 41(l) - $2,205.00)

**TOTAL MEDICAL BILLS OF LORIE ALLEN $21,611.00**

## C.    DISABILITY AND IMPAIRMENT RATINGS

The Allen Plaintiffs were examined by Defendant's expert, Dr. Keith Weaver, and by their treating physician, Dr. Leon Campbell. The respective ratings for each Plaintiff are as follows:

    **(i).    Michael Allen**

        (i)    Impairment Rating by Dr. Keith Weaver (Exhibit 45) on 12/18/07 was 11%. However, Dr. Weaver's rating does not include all of Mr. Allen's injuries stipulated to by the parties.

        (ii)    Disability Rating by Dr. Leon Campbell (Exhibit 36(n)) on 6/25/05 was 25%.

    **(ii).    Lou Ellen Allen**

        (i)    Impairment Rating by Dr. Keith Weaver (Exhibit 46) on 11/26/07 was 22%.

        (ii)    Disability Rating by Dr. Leon Campbell (Exhibit 38(m)) on 6/25/05 was 26%.

    **(iii).    Lorie S. Allen**

        (i)    Impairment Rating by Dr. Keith Weaver (Exhibit 47) on 11/26/07 was 4%.

        (ii)    Disability Rating by Dr. Leon Campbell (Exhibit 41(k)) on 6/25/05 was 8-10%.

**D.    <u>LOST WAGES</u>**

As a result of this accident the Allen Plaintiffs suffered the following lost wages:

    **(i).    Michael Allen**

    Michael Allen did not make a claim for lost wages.

    **(ii).    Lou Ellen Allen**

Lost wage information from Warren, Averett, Kimbrough & Marino, LLC, Certified Public Accountants for International Medical Innovations, Inc. (Exhibit 40(a) - $9,520.00)

**(iii).    Lorie S. Allen**

Lost wage information from Warren, Averett, Kimbrough & Marino, LLC, Certified Public Accountants for International Medical Innovations, Inc. (Exhibit 43(a) - $2,908.22)

**E.    OUT OF POCKET EXPENSES**

As a result of this accident the Allen Plaintiffs have suffered the following out of pocket expenses:

**(i).    Michael Allen**

Out of pocket expenses with various accompanying receipts (Exhibit 37(a) - $4,004.09)

Billing from pharmacies (Exhibit 37(b) - $1,128.63)

Total: $5,132.72

**(ii).    Lou Ellen Allen**

Billing from pharmacies (Exhibit 37(a) - $563.71)

Prescription and out of pocket expenses with various accompanying receipts (Exhibit 37(b) - $349.46)

Total: $913.17

**(iii).    Lorie S. Allen**

Billing from pharmacies (Exhibit 42(a) - $603.60)

Prescription and out of pocket expenses with various accompanying receipts (Exhibit 42(b) - $565.60)

12

Total: $116.92

F.    **TOTAL MEDICAL BILLING, LOST WAGES AND OUT OF POCKET EXPENSES FOR THE ALLENS**

The total monetary damages suffered by the Allen Plaintiffs are summarized as follows:

(i).    **Michael Allen**

| | |
|---|---|
| **Medical Billing** | $39,064.23 |
| **Billing from pharmacies** | 1,128.63 |
| **Out of Pocket Expenses** | 4,004.09 |
| **TOTAL** | $44,196.95 |

(ii).    **Lou Ellen Allen**

| | |
|---|---|
| **Medical Billing** | 26,373.00 |
| **Lost Wages** | 9,520.00 |
| **Billing from pharmacies** | 563.71 |
| **Out of Pocket Expenses** | 349.46 |
| **TOTAL** | $36,806.17 |

(iii).    **Lorie S. Allen**

| | |
|---|---|
| **Medical Billing** | $21,611.00 |
| **Lost Wages** | 2,908.22 |
| **Billing from pharmacies** | 603.60 |
| **Out of Pocket Expenses** | 565.60 |
| **TOTAL** | $25,688.42 |

G.    **SUBROGATION/OUTSTANDING BILLS**

Blue Cross Blue Shield of Alabama has asserted a subrogation interest for bills paid on behalf of the Allens as follows: Michael Allen $8,455.27, Lou Ellen Allen $4,471.20, and Lori Allen $4,742.43. (Exhibits 63(a), 64(a) and 65(a)). Additionally, the medical bills of Dr. Leon Campbell, stipulated to as reasonable and necessary by the United States, are outstanding in the

13

following amounts: Michael Allen $15,773.00, Lou Ellen Allen $13,072.00, and Lori Allen $9,846.00.

### III.  CONCLUSIONS OF LAW

This case is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq. The plaintiffs in this case are claiming injuries as the result of negligence on behalf of the defendant's employee, Mrs. Bertha Moore. There is no dispute that at the time of the incident made the basis of this suit Mrs. Moore was working in the line and scope of her employment with the United States as an employee of the Department of Justice.

This is a negligence case. As such, the plaintiffs have the burden of proving each of the elements of their negligence claim including the existence of a duty, breach of that duty, and proximate causation. *S.B. v. Saint James School*, 959 So.2nd 72 (Ala. 2006). *Lynn Strickland Sales and Service, Inc. v. Aero-Lane Fabricators, Inc.*, 510 So.2nd 142 (Ala. 1987), APJI 28.1. In this case, the duty at issue is Mrs. Moore's duty to exercise reasonable care in the operation of her vehicle so as to avoid injuring others who may be lawfully using the same public highway. Reasonable care means such care as a reasonably prudent person would exercise under the same or similar circumstances. See  APJI 26.00, *Jones v. Baltazar,* 658 So.2nd 420 (Ala. 1995).

### A.    MRS. MOORE WAS NEGLIGENT IN THE OPERATION OF HER VEHICLE AND IS NOT ENTITLED TO APPLICATION OF THE SUDDEN EMERGENCY DOCTRINE.

Based upon the evidence admitted in the trial of this case, Mrs. Moore was negligent in the operation of her vehicle, and her negligence was the proximate cause of the injuries received by the Allens and Wallace Montgomery.

14

The Defendant has raised the issue of the Sudden Emergency Doctrine asking this Court, in essence, to lower the standard of care to which Mrs. Moore should be held accountable under the circumstances of this accident.  In order for the Sudden Emergency Doctrine to apply, "there must be (1) a Sudden Emergency; and (2) the Sudden Emergency must not be the fault of the one seeking to invoke the rule." *Friedlander v. Hall*, 514 So.2nd 914 (Ala. 1987).  Application of the Sudden Emergency Doctrine is a question for the fact finder.  Id.  As noted by this court in its earlier Order, the Alabama Supreme Court has questioned whether the Sudden Emergency Doctrine has any real application.  The ordinary negligence standard requires a person to act as a reasonably prudent person would under all circumstances, including those of a sudden emergency.  *Merritt v. Simonson*, 630 So.2nd 428 (Ala. 1993).  For the reasons discussed below, the Court finds the Sudden Emergency Doctrine does not apply in this case.

The situation in which Mrs. Moore found herself does not constitute a "Sudden Emergency."  In reading this conclusion, all of the circumstances and evidence must be considered.  Both Peter Flanner, the Plaintiffs' expert, and Ralph Cunningham, the Defendant's expert, testified that Mrs. Moore did not experience a "blowout" or a catastrophic tire failure.  Instead, it is undisputed that the deflation was the result of a puncturing object - probably a screw or bolt.  This object was in the tread of the tire towards the serial side and probably had been carried for a fairly long period of time.  The object had been in the tire long enough to leave a hexagonal imprint on the rubber of the tread.  The deflation occurred when this object was finally ejected from the tire and the air escaped through the puncturing hole.  The defendant's expert testified that the time for deflation from the instant of ejection of the object could have been up to 10 seconds.  This full loss of air pressure would have followed some measure of deflation which would have occurred as the tire carried the puncturing object for as much as

15

several hundred miles. While the ejection of the object resulted in a total loss of air pressure, it was not explosive nor was it sudden.

Perhaps most telling is the evidence as to whether this puncture and/or deflation caused Mrs. Moore to lose control of her vehicle. All experts agreed and all evidence supports the proposition that traveling straight at highway speeds (above 50 mph) a puncture/ deflation does not and will not cause a loss of control absent driver input. This is especially true on a dry road surface such as in this case. Clearly, Mrs. Moore was traveling at highway speeds, and while she testified to various and inconsistent scenarios, the great weight of the evidence is that she was traveling straight in the left-hand northbound lane. Under this scenario a deflation should not result in loss of control. This conclusion is supported by the testimony of both defendant's and plaintiffs' experts as well as by the studies, tests, and the articles by R.J. Grogan and others. Mr. Grogan is a pre-eminent researcher in the area of tire deflation and its effects and his research was relied upon by all experts in this trial. All of the evidence in the case indicates that following a deflation with loss of control there is some negative input or response by the driver. That input could include braking too hard, over-steering, or excessive speed. The speed issue is discussed below. Here, Mrs. Moore's testimony is that when she finally recognized that her tire had deflated, she applied her brakes yet, curiously, she felt her car accelerate. It was at this time that she lost control.

## B.    THE PREPONDERANCE OF THE EVIDENCE INDICATES THAT MRS. MOORE WAS TRAVELING IN EXCESS OF THE POSTED SPEED LIMIT.

Even assuming that the tire deflation was a "sudden" event, the preponderance of the evidence shows that Mrs. Moore "contributed to the emergency" by speeding at the time of the accident. See *Waters v. Williams*, 821 So.2nd 1000 (Ala. Civ. App. 2001). The Alabama courts

have recognized that speeding is a factor properly considered by the finder of fact in deciding whether the defendant contributed to an "emergency" arising in the context of an automobile accident.  See *McKinney v. Alabama Power Company*, 414 So.2d 938, 939 (Ala. 1982); *Moore v. Horton, 694 So.2nd 21, 22 (Ala. Civ. App. 1997).*  Although the juries in *McKinney* and *Moore* found in favor of the defendant, speed was a factor they were allowed to consider.  In the context of this case, through the expert testimony of both Cliff Prosser and Ralph Cunningham, it has been made clear that speed is a contributing factor to loss of control following a deflation such as that experienced by Mrs. Moore.  Both experts testified that excessive speed makes loss of control more likely.

Mrs. Moore's excessive speed is substantiated by the physical evidence as well as by expert testimony and the testimony of Trooper Robert Fisher.  Mrs. Moore's vehicle was traveling fast enough to cross the median which was angled downward from both the north and southbound lanes and emerged with enough momentum to become airborne as it entered the southbound lanes.  After striking the Allen vehicle, Mrs. Moore again became at least partially airborne again prior to striking the Montgomery vehicle.  All three vehicles were severely damaged and were totaled as a result of the catastrophic collisions.

Plaintiff's expert, Peter Flanner, testified that in his almost fifty years in the tire industry he has never seen a tire damaged as severely from external forces as the one involved in this case.  All experts in this case agree that following deflation of the tire through the puncturing hole, the tire was damaged as a result of impacts with a substantial object or objects during the accident sequence.  Mr. Flanner testified that the circumferential damage to the steel-belt area of the tread is remarkably difficult to achieve because of the strength of that component of the tire.

He also testified that the damage was consistent with the vehicle traveling at excessive speeds at impact.

Moreover, Trooper Fisher, who investigated the accident, also concluded that Mrs. Moore was traveling at an excessive rate of speed - **83 mph**.  In this regard, the United States filed a "Motion in Limine to Exclude or Strike Any Testimony or Reference to the Alabama Uniform Traffic Report's 83 M.P.H. Estimate of Mrs. Moore's Speed."

Former State Trooper and current Army Sergeant Robert Fisher testified at trial. At the time of the incident he was an Alabama State Trooper having previously investigated between 75 and 125 accidents.  Subsequent to his serving as a State Trooper, he entered the Alabama Army National Guard and served 14 months in Iraq.  Trooper Fisher testified that he received a call regarding the accident and was dispatched from the Evergreen Station to the scene.  Trooper Fisher testified in detail regarding his investigation and his completion of the Alabama Uniform Traffic Accident Report following the August 29, 2003 motor vehicle accident.

Specifically, Trooper Fisher testified that immediately upon his arrival on the scene he was approached by a very distraught white female, aged 20-30 years old.  This eyewitness stated that she was directly behind Bertha Moore's vehicle prior to it leaving the road.  Officer Fisher stated that the unidentified female approached him immediately upon arriving at the scene and was very upset, she was "shaking" and her hands were "shaking real bad".  She informed Officer Fisher that she and Mrs. Moore were both in the northbound lane and she saw Bertha Moore "ease" off the road.  She stated that she was behind Mrs. Moore and they were both "running together" at 83 mph prior to the wreck.  After instructing the witness to remain on the scene, Trooper Fisher testified that he followed his usual protocol in his investigation of the wreck.  His investigation included inspecting the Moore, Allen and Montgomery vehicles, and identifying

18

where they came to rest. Trooper Fisher also testified that he retraced the path of Bertha Moore's vehicle and saw no yaw marks, no squeegee marks, no scuff or no scallops, and that he walked the path of the vehicle where it plowed through the median prior to entering the southbound lane. Trooper Fisher testified that Mrs. Moore's vehicle dug up mud as it went through the median into the southbound lanes of I-65. Trooper Fisher also testified, without objection, that the Moore vehicle was traveling over 70 mph as it went through the median and this speed played a role in the vehicle becoming airborne. Furthermore, Trooper Fisher stated that the Moore vehicle became airborne apparently due to the ramping effect of the median. Upon leaving the median the Moore vehicle first struck the Allen vehicle and the Moore vehicle then spun and collided with the Montgomery vehicle.

Trooper Fisher specifically stated that the determination that Mrs. Moore's vehicle was traveling 83 mph immediately prior to impact was based on several factors including the distance the Moore vehicle traveled, the fact that it became airborne, damage to the vehicles, and the eyewitness statement.

The Court finds that the Government's objections to the testimony regarding Mrs. Moore's speed being 83 mph are unfounded and that no timely objection was made to the testimony regarding the Trooper's opinion that Mrs. Moore's speed was in excess of 70 mph as she entered the median and that this speed ultimately played a part in her vehicle becoming airborne. Additionally, there are several evidentiary grounds for finding that the Trooper's conclusion is trustworthy and admissible over any hearsay objection.

First, conclusions in public reports are not--nor can they be--limited to matters "personally observed" by the report's preparer under Rule 803(8):

> A public official usually does not have personal knowledge of all the facts reported in an investigative report. An official who investigates the cause of a car

accident . . . is not likely to have personal knowledge about how the cars looked and sounded at the time of the accident. Often the official must rely on information from bystanders and others with personal knowledge pertinent to the investigation. The question is whether this reliance renders the official's factual findings and opinions untrustworthy.

* * *

Yet it is fair to state that most Courts have considered the multiple hearsay problems somewhat flexibly under Rule 803(8), given the strong presumption that public reports are reliable. Thus, if the Court finds that the person with firsthand knowledge had no reason under the circumstances to misrepresent information to the public official, the report will probably be found admissible—even though there was, strictly speaking, no duty to report to the public agency or means of verification, and even though no specific hearsay exception or non-hearsay use is applicable.

4 S. Saltzburg, M. Martin & D. Capra, Federal Rules of Evidence Manual § 803.02[9][g], pp. 803-64 through -66 (9th ed. 2006). See Guess v. United States, 952 F. Supp. 1529, 1533, 1534 n.8 (M.D. Ala. 1996) (holding, in a case also arising under the Federal Tort Claims Act, that a report prepared by the Air Force's Office of Special Investigations into allegations that a medical technician had surreptitiously injected patients with dangerous drugs was either "not hearsay within the meaning of . . . [the] Federal Rules of Evidence, or . . . falls within the hearsay exception set out in Rule 803(8)(C)," despite the fact that the report's preparers based their conclusions, in part, on interviews of expert doctors who were contacted in the course of the investigation). Fed. Rules Evid. 803(8). See also Baker v. Elcona Homes Corp., 588 F.2d 551. (direct observation and recorded data of a police officer in the course of his investigation which were placed in an accident report were matters that were observed pursuant to a duty imposed by law to which there was a duty to report, and were not inadmissible under hearsay rule.)

Second, the Court also finds that the statements by the eyewitness immediately upon Trooper Fisher arriving at the accident was voluntarily, spontaneous, and made so near in time to the event as to be an excited utterance. Here, Trooper Fisher's physical description of the

20

eyewitness clearly indicates that she was still under the stress of the excitement caused by the accident event. Fed. Rules Evid. 803(2); Williams v. Melton, 733 F.2d 1492 (1984).

Third, the circumstances here indicate that when the eyewitness was describing the event at issue, she had personally observed the event and her statement regarding speed was substantially contemporaneous with the event. Accordingly, the eyewitness' statement regarding speed qualifies the present sense impression. Fed. Rules Evid. 803(1); Miller v. Crown Amusements, 821 F. Supp. 703 (S.D. Ga. 1993).

Finally, the statement by the eyewitness that she and Mrs. Moore were "running together" at 83 mph is clearly a statement against interest providing yet another exception to the hearsay rule. It is clear that the statement was, at the time of its making, contrary to the eyewitness' interest and could have subjected her to criminal liability. Fed. Rules Evid. 804(B)(3).

Based on the foregoing it is clear that the evidence concerning Mrs. Moore's speed of 83 mph is admissible based on any of the aforementioned evidentiary grounds.


## C.    FAILURE TO INSPECT AND/OR MAINTAIN THE VEHICLE

The evidence is undisputed that Moore's tire was eighty percent (80%) worn with respect to Alabama's statutory requirements. See *Alabama Code*, § 32-5-210 (1975). The defendant's expert testified that the tire was "almost but not completely worn out." That same expert went on to say that if the other three tires on Mrs. Moore's vehicle were in the same or similar condition, then that condition could have been a contributing factor the loss of control. All experts agree that the puncturing object was probably in Moore's tire for many miles. Mrs. Moore failed to inspect her tires prior to leaving Gulf Shores to return to Montgomery; therefore,

she did not see the puncturing object in the tread of the tire nor did she see whether the tire had noticeably deflated as a result of the puncture – she did not look.

Unfortunately, Mrs. Moore's vehicle was unavailable for inspection in that it was salvaged along with the other three tires. However, both plaintiff's and defendant's accident reconstructionists testified that in addition to the tires and driver input, other systems or components can contribute to loss of control following a puncture/deflation such as that experienced by Mrs. Moore. These systems or components could include brakes, suspension, steering, and theoretically, other systems of the vehicle that Mrs. Moore had a duty to inspect.

## D. THE TIRE DEFLATION WAS NOT AN INTERVENING OR SUPERCEDING CAUSE

The defendant has raised the defense of the tire deflation being an intervening and superceding cause thereby absolving the defendant of any liability. The facts in this case do not support this defense. The law in Alabama clearly states "an act is superceding <u>only</u> if it is unforeseeable. A foreseeable intervening act <u>does not break</u> the causal relationship between the defendant's action and the plaintiff's injuries." *Kelly v. M. Trigg, Enterprises, Inc.*, 605 So.2d 1185, 1190 (Ala. 1992). (Emphasis added.) The Alabama Supreme Court has further stated in *General Motors Corp. v. Edwards*, 482 So.2d 1176 (Ala. 1985), that only if the intervening cause is unforeseeable will the causal chain be broken. For most of the reasons set forth above regarding the inapplicability of the sudden emergency doctrine, the "intervening or superceding cause" defense is not supported by the evidence in this case. First, flat tires are a foreseeable event. The expert testimony in this trial included accepted and recognized driver response to a tire deflation such as that experienced by Mrs. Moore. Such accepted standards can only be developed with regard to a foreseeable event.

22

In this case, the tire deflation, in and of itself, did not cause Mrs. Moore's loss of control. The loss of control was the result of some additional driver input (i.e., excessive speed, negligent maintenance of her tire, over-steering, or inappropriate braking.) It cannot be said that the tire deflation, standing alone, constitutes an intervening or superceding cause when the evidence makes clear that Mrs. Moore's negligence both before and after the tire deflation directly contributed to the causal chain of events leading to the injuries sustained by the plaintiff herein. It should also be noted that the Alabama Pattern Jury Instructions suggest that no "intervening or superceding causes" instruction be given at all, and the court in *Edwards* suggested that the defense only be charged in automobile crash worthiness cases.

## IV.  CONCLUSION

Based on the foregoing the Court finds in favor of the Plaintiffs Michael Allen, Lou Ellen Allen and Lori Allen and against the United States.

Respectfully submitted,

/s/ Annesley H. DeGaris
Annesley H. DeGaris (ASB-9182-A63A)
/s/ Elizabeth A. Ellis
Elizabeth A. Ellis (ASB-3521-A63E)
CORY, WATSON, CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, Alabama 35205
Telephone: 205-328-2200
Facsimile: 205-324-7896

Attorney for the Allen Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of March, 2008, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties:

Conor Kells
Gail K. Johnson
Trial Attorney, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station
Post Office Box 888
Washington, DC 20044

Attorney for Defendant, United States of America

J. Callen Sparrow
HENINGER GARRISON DAVIS, LLC
Post Office Box 11310
Birmingham, AL 35202

Attorney for the Montgomery Plaintiffs

/s/ Annesley H. DeGaris
Annesley H. DeGaris

24