## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL ALLEN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| V. | ) | Case No. 2:06-cv-879-WKW |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

## THE UNITED STATES' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Comes now the Defendant, United States of America, to submit the following proposed findings of fact and conclusions of law, pursuant to this Court's order following the bench trial of the above-captioned case.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROPOSED FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    CIRCUMSTANCES OF THE ACCIDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    The parties and the weather conditions at the time of the accident . . . . . . . . . . . 1

B.    Very little weight is given to the Accident Report's account of the accident and the speed of Mrs. Moore's vehicle at the time of the accident . . . . . . . . . . . . . . 3

C.    Mrs. Moore's tire failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.    Effect of the deflation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

E.    No prejudice from the failure to have Mrs. Moore's vehicle analyzed . . . . . . . . 12

II.   INJURIES TO THE ALLENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A.    Off-setting Amounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B.    Medical Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C.    Lost Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

D.    Other Economic Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E.    Non-economic damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

PROPOSED CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## INTRODUCTION

Plaintiffs Michael, Lou Ellen, and Lorie Allen claim that United States employee, Mrs. Bertha Gordon Moore, negligently operated her vehicle on August 29, 2003, and because of that negligent operation, actually and proximately caused her vehicle to cross the median of Interstate 65 and strike their vehicle. However, following a bench trial held February 25-27, 2008, the Plaintiffs failed to meet their burden of proving either that Mrs. Moore was negligent in operating her vehicle or that any alleged negligence was the actual and proximate cause of the accident and the resulting injuries. Because of this failure of proof, they cannot succeed on their claims. The Court concludes that this unfortunate accident was unavoidable, and accordingly, judgment must be entered in favor of the Defendant, United States of America.

## PROPOSED FINDINGS OF FACT

### I.    CIRCUMSTANCES OF THE ACCIDENT

#### A.    The parties and the weather conditions at the time of the accident.

1. On August 29, 2003, Mrs. Bertha Gordon Moore, then and now a paralegal administrative assistant to the United States Attorney for the Middle District of Alabama, was driving home from a law enforcement conference, heading northbound on Interstate 65. Testimony of Bertha Gordon Moore ("Mrs. Moore"). She was acting within the scope and course of her employment at all times relevant to the subject matter of these proceedings.

2. Mrs. Moore was driving a Mercury Mountaineer that had been purchased used in May 2003. There had been no maintenance issues with her tires or other equipment on the vehicle prior to August 29, 2003. Testimony of Mrs. Moore.

3. On August 29, 2003, Plaintiffs Michael, Lou Ellen, and Lorie Allen left their homes in Pell City, Alabama, and were driving southbound on Interstate 65 for a family gathering at the beach. Testimony of Michael Allen ("Mr. Allen"), Lou Ellen Allen ("Mrs. Allen"), and Lorie Allen ("Ms. Allen"). Mr. Allen was the driver, Ms. Lorie Allen was the front passenger, and Mrs. Allen was seated on the rear passenger-side backseat of a brand new Lincoln Towncar. All passengers were restrained by seatbelts. Id.

4. Somewhere near Evergreen, Alabama, Conecuh and Butler County lines, and mile marker 106 on Interstate 65, at or near 2:30 p.m., Mrs. Moore was making a lane change, heard a loud noise, felt the back of her vehicle drop, and, while she attempted to brake, lost control of her Mercury Mountaineer, which crossed the median and collided with the Allens' Lincoln Towncar. Exhibit 6, Alabama Uniform Traffic Accident Report ("Accident Report"); Testimony of Mrs. Moore, Mr. Allen, Mrs. Allen, Ms. Allen, Wallace Montgomery ("Mr. Montgomery") and Phyllis Montgomery ("Mrs. Montgomery"). Mrs. Moore's vehicle, after impacting the Allens' vehicle, then struck the Montgomerys' Volvo. Id.

5. The parties have offered inconsistent testimony about the weather conditions at the time of the accident. Mrs. Moore has stated that it was raining and the road was wet at the time of the accident. Testimony of Mrs. Moore. This account was substantiated by both the Accident Report and the testimony of then-Alabama State Trooper Robert Fisher, who responded to the scene of the accident and authored the Accident Report. Trooper Fisher testified that it was raining when he left his post at Evergreen, south of the accident, and it was raining up to and including his arrival on the scene. Testimony of Trooper Robert Fisher ("Trooper Fisher"). Trooper Fisher also stated that the median was wet and muddy and that tire tracks in the direction

of the northbound to southbound lanes were readily apparent. Id. The Allens and the

Montgomerys testified, however, that it was dry and sunny at the time of the accident, and rain

only came on the scene afterwards, while they were being treated for injuries and transported to

Evergreen Medical Center. Testimony of Mr. Allen, Mrs. Allen, and Ms. Allen; Testimony of

Mr. Montgomery and Mrs. Montgomery.

6. For purposes of this case, the issue of whether or not it was raining at the time of the

accident is not crucial, particularly regarding causation. The accident occurred more than four

years ago, and for purposes of the case, the Court will assume that all accounts have some truth

to them. Mrs. Moore likely drove through some rain prior to the accident, as did Trooper Fisher,

whose arrival at the scene was some 20 minutes after the accident had been reported. Testimony

of Mrs. Moore; Testimony of Trooper Fisher. There was testimony that the rain was moving

from the south to the north, and that is at least consistent with the Allens' and Montgomerys'

recollection that the rain arrived after the accident. Testimony of Mrs. Montgomery. The Court

credits all accounts of the conditions, and for reasons discussed more fully below, need not go

further in deciding what the road conditions were like at the time of the accident.

**B.**     **Very little weight is given to the Accident Report's account of the accident
and the speed of Mrs. Moore's vehicle at the time of the accident**

7. Prior to the commencement of trial, the Court overruled the Defendant's motion to

exclude the portion of the Accident Report estimating Mrs. Moore's vehicle speed at the time of

the accident as 83 miles per hour. The Court did so on the basis of testimony from the author of

the report, Trooper Robert Fisher. He testified that an unidentified female with shaking hands,

voluntarily approached him right after he had arrived on the scene and told him that she had been

traveling 83 miles per hour. The witness further stated that Mrs. Moore's vehicle, which was in front of hers, had been traveling the same speed. Testimony of Trooper Fisher. Notably, the witness left the scene of the accident in spite of his directions to stay so that her contact information could be recorded. The Court must determine what weight to afford this evidence.

8. Though this evidence was admitted, subsequent testimony and evidence have shown that the reliability of this estimate of speed is minimal, and the Court affords it little weight for the following reasons. See Fed.R.Evid. 104(a), (e) (rules governing admissibility and weight).

9. Trooper Fisher's report contains several errors, which he admitted during his testimony. These errors may not have been material to the cause of the accident, but do indicate that some contents of the accident report are not accurate.

10. Trooper Fisher's testimony included, at the Court's questioning, an identification of the location where the accident occurred. Trooper Fisher identified, through photographs admitted as evidence of the scene of the accident, an area of the median where, according to him, tire tracks from Mrs. Moore's vehicle indicating the path her vehicle took at the time of the accident were located. Testimony of Trooper Fisher; Exhibits 12A-12V, photos of Interstate 65.

11. Mrs. Montgomery, however, testified that the scene of the accident was not where Trooper Fisher remembered it. She, upon viewing the same photographs, identified the scene of the accident differently, so much so in fact, that none of the photographs clearly illustrate what the median looks like near the scene of the accident. Testimony of Mrs. Montgomery; Exhibits 12A-12V, photos of Interstate 65. For example, Mrs. Montgomery testified that the median was steep, and she chose not to turn onto it to avoid collision with Mrs. Moore's vehicle out of fear that her vehicle would roll over. Testimony of Mrs. Montgomery. The photos in exhibits 12A-

-4-

12V show a relatively flat median, and do not reflect the steepness that Mrs. Montgomery remembers. Exhibits 12A-12V, photos of Interstate 65.

12. Trooper Fisher testified that the 83 miles per hour estimate was corroborated by the wreckage caused to the vehicles at the scene and his investigation of the accident, which included a rough diagram contained in his accident report of the final resting point of each vehicle, the estimated points of impact based on gouge marks in the road, and the likely paths of each vehicle involved in the accident. Testimony of Trooper Fisher; Exhibit 6, Accident Report.

13. Notably, the accident report contained no measurements other than the width of the southbound roadway. Trooper Fisher's investigation did not include other measurements, in part because the procedure for filling out accident reports did not require them. He did not base his estimate of speed on crush factors, skidmarks, vector measurements, or any other scientific method that could have incorporated both the mass of the vehicles involved, their final resting points, the points of impact, and their directional headings at the time of the accident. Testimony of Trooper Fisher; Exhibit 6, Accident Report.

14. Trooper Fisher further admitted that he did not take any classes, nor was he an expert in accident reconstruction. Testimony of Trooper Fisher. The two experts in accident reconstruction in this case, Mr. Clifford Prosser and Mr. Ralph Cunningham, both testified that Trooper Fisher's report contained no information from which a calculation of the speed of any of the vehicles could be made. Testimony of Clifford Prosser ("Mr. Prosser"); Testimony of Ralph Cunningham ("Mr. Cunningham").

15. Trooper Fisher's conclusions as to why Mrs. Moore's vehicle crossed the median were also wrong. The plaintiff's expert, Mr. Prosser, testified that, years after the accident,

-5-

Trooper Fisher told him that he believed Mrs. Moore fell asleep behind the wheel of her car. Testimony of Mr. Prosser. This conclusion was not reflected in the accident report, nor was it accurate. Exhibit 6, Accident Report. Trooper Fisher never interviewed or spoke with Mrs. Moore following the accident. Testimony of Trooper Fisher. The Court finds that his investigation and, significantly, theory as to causation would have been different if he had, at a minimum, had the opportunity to speak with her.

16. It is also telling that Trooper Fisher never discovered, nor mentions in his testimony or report, that Mrs. Moore's vehicle suffered a tire deflation immediately preceding the accident. Testimony of Trooper Fisher; Exhibit 6, Traffic Accident Report.

17. In short, Trooper Fisher's estimate of speed was based on the statement of a singular witness, one whom he described as shaking, trembling, shaken up at the time, and his belief that this estimate was correct in light of the damage caused to the vehicles. Testimony of Trooper Fisher. The reliability of the witness's statement and the thoroughness and accuracy of Trooper Fisher's investigation has very clearly been called into question, and this Court affords the speed estimate of 83 miles per hour, based thereon, very little weight.

18. Mrs. Moore's testimony that she was traveling only 60 to 65 miles per hour when the accident occurred is credited as being more likely. She testified that she looked at her speedometer very near the time of the accident, before changing lanes, and her testimony in this regard is more plausible than an unidentified, unverified, unknown witness's statement that was later incorporated into an accident report. Testimony of Mrs. Moore; Exhibit 6, Traffic Accident Report.

19. In any event, the Court finds that Mrs. Moore's speed at the time of the accident did not contribute in any material way to the cause of the accident, as discussed below.

**C.    Mrs. Moore's tire failure.**

20. Central to this case was testimony and evidence that Mrs. Moore's left rear tire suffered a puncture, caused by an object that likely was a screw of some sort, and when this puncturing object was ejected from the tire, the air in the tire was expelled through the remaining hole, causing a deflation. Testimony of Peter Flanner ("Mr. Flanner"); Testimony of Mr. Prosser; Testimony of Mr. Cunningham.

21. It is clear from the testimony of both Mr. Flanner, the plaintiffs' tire expert, and Mr. Cunningham, the Defendant's tire expert, that there is no dispute concerning the events that led to the deflated tire. The majority of the damage to the tire was caused during the accident, with the puncture being the only evidence of damage to the tire preceding the accident. Testimony of Mr. Flanner; Testimony of Mr. Cunningham; Exhibit 28b, Report of Mr. Flanner; Exhibit 30d, Report of Mr. Cunningham.

22. Both tire experts agree, and the Court finds, that an object punctured the tire at some point prior to the accident. The exact amount of time the object was carried is unknown, but likely was no more than 300 or so miles, based on testimony and studies performed on tire

punctures.[1]  Testimony of Mr. Flanner; Testimony of Mr. Cunningham; Exhibit 30d, Report of

Mr. Cunningham.

23.  The location of this puncture was on the serial side of the tire, and the mounting of

the tire was such that the serial side faced inward, towards the wheel well.  The size of the hole

left by the puncturing object was somewhere between 1/8 of an inch and 3/16 of an inch.

Testimony of Mr. Flanner; Testimony of Mr. Cunningham; Exhibit 28b, Report of Mr. Flanner,

Exhibit 30d, Report of Mr. Cunningham.

24.  Both experts agree that there was no evidence that the tire had been operated in an

under-inflated condition prior to the accident.  Testimony of Mr. Flanner; Testimony of Mr.

Cunningham; Exhibit 30d, Report of Mr. Cunningham.

25.  Mrs. Moore did not know, and had no reason to know, that her tire had been

punctured before the accident.  The location of the puncture and the absence of any evidence that

the tire had been operated in an under-inflated condition indicate that a reasonable person would

not have known about any problem relating to the puncture or the inflation of the tire prior to the

accident.  Testimony of Mrs. Moore; Testimony of Mr. Flanner; Testimony of Mr. Cunningham.

---

[1] Indeed, the Court takes judicial notice that, according to maps, Montgomery, Alabama, and Perdido Beach are more than 150 miles apart, and the object was likely picked up during Mrs. Moore's travels. Fed.R.Evid. 201.  It rejects any notion, suggested by the plaintiffs, that the object had been carried for some "lengthy" period of time.  Plaintiffs' Proposed Findings of Fact and Conclusion of Law at 4.  It further notes that, although some air may have escaped the air while that object was in the tire, the experts agreed that there was no evidence that the tire had been operated in an under-inflated condition.  Had enough air in the tire deflated over this so-called "lengthy" period of time, some indication that the tire had been under-inflated during that period should have existed.  It did not.  The plaintiffs' suggestion that Mrs. Moore is somehow to be blamed for not checking her tires to see whether one was deflated before heading home is belied by the record.

26. There was no evidence that Mrs. Moore should have replaced her tires before the accident. The experts both testified that Mrs. Moore had 2/32 of an inch of remaining usable tread, and the "wear bars" that indicate it is time to replace a tire were neither visible nor imminently visible prior to the accident. Testimony of Mr. Flanner; Testimony of Mr. Cunningham.

27. There was some dispute in this case regarding how quickly Mrs. Moore's tire would have reached a fully or near-fully deflated state. Mr. Flanner, the plaintiffs' expert, conceded that the deflation of the air would have been a "violent" event, but did not characterize the failure as a "blow-out." Testimony of Mr. Flanner. Similarly, Mr. Cunningham called the event a deflation, not a blow-out, and the Court finds that the tire did not "blow-out," but rather deflated "violently." Testimony of Mr. Cunningham; Testimony of Mr. Flanner.

28. As to how quickly the tire deflated, Mr. Cunningham opined, and demonstrated by way of a study performed on tire deflations, that a 1/8 inch puncture hole in a tire will result in full deflation in approximately five seconds. The Court credits Mr. Cunningham's testimony, and finds that Mrs. Moore's tire reached full or near-full deflation in approximately five seconds. Testimony of Mr. Cunningham; Exhibit 30d, Report of Mr. Cunningham.

29. The Court further finds, however, based on testimony and research presented at trial, that Mrs. Moore more likely than not was unaware that her tire was in the process of deflating or had deflated until she changed lanes or heard a bang and felt the back of her car drop. This is because research has shown that modern vehicle designs and construction of tires are such that a driver can drive on a deflated tire without noticing a problem until some driver input alters the

load placed on that deflated tire, making the deflation apparent.  Testimony of Mr. Cunningham;

Exhibit 30d, Report of Mr. Cunningham.

      30.  The Court finds that the deflation most likely occurred in five seconds or less, as Mr.

Cunningham's report and testimony bear out.  Moreover, the Court finds that Mrs. Moore's

awareness of the deflation was sudden and without warning, and occurred while she was

changing lanes at highway speed.  Testimony of Mrs. Moore; Testimony of Mr. Flanner;

Testimony of Mr. Cunningham.

     **D.**     **Effect of the deflation**

      31.  The evidence presented at trial demonstrated that, in general, a deflated tire does not

ordinarily cause a driver to lose control of a vehicle.  Testimony of Mr. Prosser; Testimony of

Mr. Cunningham; Exhibit 29c, Report of Mr. Prosser; Exhibit 30d, Report of Mr. Cunningham.

      32.  The research presented on tire blow-outs and tire deflations also demonstrate, as does

common sense, that most tire deflation events do not result in loss of vehicular control or

accidents.  Testimony of Mr. Prosser; Testimony of Mr. Cunningham; Exhibit 29c, Report of Mr.

Prosser; Exhibit 30d, Report of Mr. Cunningham.  Mrs. Moore herself testified that she had

suffered a "blow-out" or failure many years ago and did not lose control of her vehicle.

Testimony of Mrs. Moore.

      33.  The Court finds, however, that although tire blow-outs and deflations do not

ordinarily cause loss of vehicular control, sometimes they do.  The testimony of Mr. Prosser and

Mr. Cunningham on this point differs somewhat, but both are in agreement that a tire deflation

followed by a driver response or driver input can cause loss of control.  Testimony of Mr.

Cunningham; Testimony of Mr. Prosser; Exhibit30d, Report of Mr. Cunningham; Exhibit 29c,

Report of Mr. Cunningham. Mr. Cunningham opines that, even without driver input, in a small and statistically insignificant number of cases a tire deflation alone can cause a loss of control event. Testimony of Mr. Cunningham.

34. The Court finds, based on Mrs. Moore's testimony, that she did step on her brake when she became aware of the deflated tire. Testimony of Mrs. Moore.

35. The Plaintiffs' expert, Mr. Prosser, testified that at speeds in excess of 50 miles per hour, vehicles traveling in a straight line will not suffer loss of control from a tire deflation or blow out, but rather will continue to travel straight. He, therefore, concluded that Mrs. Moore, by stepping on her brake when the deflation occurred, contributed to the loss of control of her vehicle. Testimony of Mr. Prosser. Mr. Prosser further testified that manuals, such as one published by tire manufacturer, Michelin, state that braking is not the proper response to a tire blow-out or deflation event. Id.; Exhibit 29c, Report of Mr. Prosser. The Court takes as true that manuals, such as the Michelin Manual, indicate that braking is not the best response to a tire blow-out or deflation. There was no evidence, however, that Mrs. Moore owned such a manual or, for that matter, had ever been told or educated that braking is not the safest response to a tire blow-out or deflation. Testimony of Mr. Prosser; Testimony of Mrs. Moore.

36. The Court finds that Mrs. Moore, while traveling at highway speeds of around 65 miles per hour, was in the process of changing from the right to the left lane of travel when she suddenly heard a loud noise, described as a pop or bang, and suddenly felt the back of her vehicle drop in the direction of the driver's side. Testimony of Mrs. Moore. That moment was the first she knew that her left rear tire had failed. Mrs. Moore instinctively stepped on the brake to slow her vehicle. Her vehicle, however, continued in the direction of her lane change following the

-11-

deflation, and she was unable to regain control of her vehicle in spite of her attempts to brake. Testimony of Mrs. Moore. The plaintiffs' attempt to discredit Mrs. Moore's testimony because they believed her deposition testimony on changing lanes differed from her account at trial is not accurate. Mrs. Moore explained what she meant in her deposition testimony, and drew a diagram consistent with her account to clarify the point. The Court does not find that her account differed in any substantial way and credits her testimony concerning the accident. Testimony of Mrs. Moore.

37. Therefore, the Court finds that the combination of the lane change, sudden and unexpected tire failure felt for the first time during that lane change, and attempt to brake caused Mrs. Moore to lose control of her vehicle, which then struck the vehicles driven by the Allens and the Montgomerys. The deflation would have occurred in wet or dry conditions, and Mrs. Moore's speed did not contribute to the loss of control of her vehicle. Testimony of Mrs. Moore; Testimony of Mr. Prosser; Testimony of Mr. Cunningham. The tire failure, in this case a sudden deflation caused by the ejection of a puncturing object, was an unforeseeable event and was not caused by any act or omission by Mrs. Moore relating to maintenance or operation of her vehicle. The question left for the Court is whether Mrs. Moore's act of stepping on her brake in response to the sudden tire failure was an unreasonable or negligent act. For the reasons stated in the Court's conclusions of law, the Court concludes that it was not.

**E.      No prejudice from the failure to have Mrs. Moore's entire vehicle analyzed**

38. The Court finds that Mrs. Moore's vehicle was destroyed or sent to salvage at some point between August 29, 2003, and the date of this trial. Mrs. Moore's husband took into his possession the left rear tire that failed and deflated, and that tire managed to remain in existence

for the years post-dating the accident. Testimony of Mrs. Moore. The plaintiffs were told by Mrs. Moore herself that her tire had blown out. Id. Neither they, nor their attorneys, ever conducted an investigation into the cause of the accident as a result of the tire failure until the United States discovered the existence of the tire and brought it to their attention.

39. The Court further finds that the destruction of Mrs. Moore's vehicle and the inability to analyze any parts or equipment of her vehicle is not the fault of the Defendant. The government, like the Plaintiffs, was unable to analyze Mrs. Moore's vehicle, and by the time this case reached full litigation status in federal district court, several years had elapsed. The United States was not, nor was it ever, the owner of the vehicle, nor was it a party to the case until several years later. In spite of the passage of time, the United States was able to obtain the left rear tire and disclosed its existence to the Plaintiffs. Analysis of that tire revealed what caused the tire to fail, and both the United States and the Plaintiffs were able to present evidence regarding what occurred and a theory as to what caused this accident. There is no evidence that the Plaintiffs were prejudiced and, in any event, if they were prejudiced, it was through their own failure to conduct a thorough investigation of the accident's cause.

**II.    Injuries to the Allens**

40. The Court finds that Mr. Allen suffered a proximal fibula fracture in his right leg following the accident. Other injuries suffered, as stipulated by the parties, included a concussion, many cuts, scratches, and bruising, soft tissue injuries to the chest, rib area, and back, and impingement of both shoulders, with the right more sore than the left. Testimony of Mr. Allen; Exhibits 36a-o, Medical Records of Mr. Allen; Testimony of Dr. Keith Weaver ("Dr. Weaver"); Exhibit 45, Dr. Weaver's report on Mr. Allen's examination; Stipulation of the

-13-

Parties. He also suffered a bad cut on his right foot that he did not notice at Evergreen Medical Center and later discovered in a hotel room. Testimony of Mr. Allen. More than a year and half following the accident, Mr. Allen required surgery to repair a partially torn meniscus in his right knee. Mr. Allen has a whole person impairment rating of 11%, based on the examination by Dr. Weaver. Testimony of Dr. Weaver; Exhibit 45, Dr. Weaver's report on Mr. Allen's Examination; Stipulation of the Parties. Contrary to the Plaintiff's assertion that Dr. Weaver's report failed to take into account all of Mr. Allen's injuries, Dr. Weaver testified that he gave Mr. Allen the benefit of the doubt for all injuries, including the meniscal tear and the shoulder impingement which were once the subject of dispute, but later resolved by stipulation of the parties. Plaintiff's Findings of Fact and Conclusions of Law at 11; Testimony of Dr. Weaver; Stipulation of the Parties.

41. The Court finds that Mrs. Allen suffered seven fractured ribs in the accident, as well as a 25% compression fracture to the L-1 vertebrae, diagnosed and discovered for the first time by the Defendant's medical expert and orthopedic surgeon, Dr. Weaver. Testimony of Mrs. Allen; Testimony of Dr. Weaver; Exhibit 46, Dr. Weaver's report on Mrs. Allen's examination. Mrs. Allen never received treatment for the compression fracture. Testimony of Mrs. Allen. In addition, Mrs. Allen suffered a concussion, numerous cuts, scratches, bruising, soreness and pain in her chest, back, and shoulders. Testimony of Mrs. Allen; Testimony of Dr. Weaver; Exhibit 46, Dr. Weaver's report on Mrs. Allen's examination; Exhibits 38a-o, Medical Records of Mrs. Allen. Mrs. Allen has a whole person impairment rating of 22%, based on the examination by Dr. Weaver. Testimony of Dr. Weaver; Exhibit 46, Dr. Weaver's report on Mrs. Allen's examination. Dr. Weaver's impairment rating gave Mrs. Allen the benefit of the doubt on all of

-14-

her injuries, and as his report notes, Mrs. Allen told Dr. Weaver that she does not have limitations of her activities, although she does still suffer from occasional pain. Testimony of Dr. Weaver; Exhibit 46, Dr. Weaver's report on Mrs. Allen's examination.

42. The Court finds that Ms. Allen suffered a concussion, as well as a bruised knee, and numerous other scratches, bruises, and soreness. Ms. Allen further suffered whiplash and associated pain in her neck, back, and shoulders, including a possible minimal compression fracture of a vertebra. Testimony of Ms. Allen; Testimony of Dr. Weaver; Exhibit 47, Dr. Weaver's report on Ms. Allen's examination; Exhibit 41a-l, Ms. Allen's medical records; Stipulation of the Parties. Ms. Allen has a whole person impairment rating of 4%, based on the examination by Dr. Weaver. Testimony of Dr. Weaver; Exhibit 47, Dr. Weaver's report on Ms. Allen's examination.

43. The Court further finds that, while each of the Allens suffered from some anxiety and stress related to the accident, their emotional and psychological states did not rise to the level of post-traumatic stress disorder. Testimony of Mr. Allen, Mrs. Allen, and Ms. Allen. None of the Allens were referred for any type of therapy or counseling, and all were back driving or riding in vehicles shortly after the accident. Id.

44. Additionally, Dr. Weaver's impairment ratings are not indicative of disability. Dr. Weaver's explained the difference between an "impairment" and a "disability" as follows: a car with a broken window is impaired, but you can still drive it because it is not disabled. The Allens no doubt suffered serious injuries in the accident, some of which may continue to cause them pain today. Testimony of Mr. Allen, Mrs. Allen, and Ms. Allen. However, Dr. Weaver testified that the plaintiffs should not be limited in their day-to-day activities. Testimony of Dr.

-15-

Weaver. The Court credits Dr. Weaver's testimony as to the Allens' respective impairment ratings as well as their prognosis regarding day-to-day activities and adopts his findings.

### III.    Damages

45.  The United States does not believe that the plaintiffs are entitled to any damages in this case.  Pursuant to the Court's order, however, the United States submits findings as to the following "special damages," as derived from testimony and exhibits admitted during trial.

#### A.    Off-setting Amounts

46.  The Defendant has argued that it is entitled to off-setting amounts for payments made by insurance, and that the plaintiffs are entitled to be made whole, not put in a better position than they were in before the accident.  The Court agrees, for the reasons stated in its conclusions of law, and has awarded Mr. Allen, Mrs. Allen, and Ms. Allen only those medical charges for which they owe a subrogation interest.

#### B.    Medical Bills

47.  Mr. Allen claims that his medical bills relating to the accident were $39,064.23, $15,773 of which are owed to Dr. Campbell.  Plaintiff's Proposed Findings of Fact and Conclusions of Law at 8-9; Exhibits 36a-o, Mr. Allen's medical records; Stipulation of the Parties.[2]  Blue Cross/Blue Shield claims a subrogation interest of $8,455.27.  Exhibit 63A.  There

---

[2] The billing records referenced are as follows: (1) Emergency Medical Services-8/29/03; (2) Evergreen Medical Center-8/29/03 to 9/30/03; (3) Tri-County Medical Center Emergency Room-8/29/03; (4) Birmingham Baptist Medical Center Montclair-8/31/03; (4) Kirklin Clinic-9/16/03; (5) Physiotherapy Associates-3/16/04 to 6/25/04; (6) Birmingham Radiological Group-8/31/03; (7) Alabama Sports Medicine and Orthopedics-2/11/04 to 12/20/05; (8) Highland Diagnostic Center-2/03/04 to 4/24/04; (9) Healthsouth Sports Medicine and Rehabilitation-5/27/04 to 6/16/04; (10) Anesthesiology & Pain Medicine-5/27/04 to 06/10/04; (11) Pro-Fit, Inc.-6/01/04; (12) Southern Medical Group-8/31/03; and (13) Radiology Clinic-9/08/03 to 2/19/04. Dr. Campbell's billing was stipulated to by the parties.

was no evidence or testimony that Mr. Allen paid anything out of pocket for his medical

treatment, nor do his medical records indicate to the contrary. The Court, therefore, finds that

Mr. Allen's medical expenses should be identical to his subrogation obligations, which include

$8,455.27 to Blue Cross/Blue Shield of Alabama and $15,773 to Dr. Campbell. A higher award

would, contrary to the law of remedies as discussed in the conclusions of law, place Mr. Allen in

a better position than he was in before the accident. The Court, therefore, finds that Mr. Allen's

medical damages are $24,228.87.

In sum:

| | |
|---|---|
| **Claimed medical expenses** | **$39,064** |
| **Subrogation duty** | **$24,228.87** |
| **Total award** | **$24,228.87** |

The Court, therefore, will award Mr. Allen $24,228.87 to ensure that he fulfil his

subrogation duties, which are his only outstanding obligations related to any medical expenses.

48. Mrs. Allen claims medical expenses totaling $26,373.00, $13,072 of which are owed

to Dr. Campbell. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 9-10; Exhibits

38a-o, Mrs. Allen's medical records; Stipulation of the Parties.[3] Blue Cross/Blue Shield claims a

subrogation interest of $4,471.20. Exhibit 64A. There was no evidence or testimony that Mrs.

Allen paid anything out of pocket for her medical treatment, nor do her medical records indicate

to the contrary. The Court, therefore, finds that Mrs. Allen's medical expenses should be

---

[3] Records reviewed included: (1) Conecuh County Emergency Medical-8/29/03;
(2) Evergreen Medical Center-8/29/03 to 8/31/03; (3) Tri-County Medical Center-8/29/03;
(4) another, separate record from Evergreen Medical Center-8/29/03 to 8/31/03; (5) Birmingham
Baptist Medical Center Montclair-8/31/03; (6) Birmingham Radiological Group-8/31/03;
(7) Southern Medical Group-8/31/03; (8) Physiotherapy Associates-3/11/04 to 3/30/04;
(9) Radiology Clinic-9/08/03 to 11/04/03; and (10) Laboratory Corporation of America-6/16/05.
Dr. Campbell's billing is taken by stipulation of the parties.

identical to her subrogation obligations, which include $4,471.20 to Blue Cross/Blue Shield of

Alabama and $13,072 to Dr. Campbell. A higher award would, contrary to law of remedies as

discussed in the conclusions of law, place Mrs. Allen in a better position than she was in before

the accident. The Court, therefore, finds that Mrs. Allen's medical damages are $17,543.20.

In sum:

| | |
|---|---|
| **Claimed medical expenses** | **$26,373** |
| **Subrogation duty** | **$17,543.20** |
| **Total award** | **$17,543.20** |

The Court, therefore, will award Mrs. Allen $17,543.20 to ensure that she fulfil her

subrogation duties, which are her only outstanding obligations related to any medical expenses.

49. Ms. Allen claims total medical bills of $21,611.00, $9,846 of which are owed to Dr.

Campbell. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 10; Exhibits 41a-1,

Ms. Allen's medical records; Stipulation of the Parties.[4] Blue Cross/Blue Shield claims a

subrogation interest of only $4,742.43. Exhibit 65A. There was no evidence or testimony that

Ms. Allen paid anything out of pocket for her medical treatment, nor do her medical records

indicate to the contrary. The Court, therefore, finds that Ms. Allen's medical expenses should be

identical to her subrogation obligations, which include $4,742.43 to Blue Cross/Blue Shield of

Alabama and $9,846 to Dr. Campbell. A higher award would, contrary to law of remedies as

---

[4] Records reviewed included: (1) Butler County EMS-8/29/03; (2) Evergreen Medical Center-8/29/03; (3) Tri-County Medical Center-8/29/03; (4) Emergency Room, Dr. Maria Cumagen-8/30/03; (5) Birmingham Baptist Medical Center Montclair-8/31/03; (6) Birmingham Radiological Group-8/31/03; (7) Southern Medical Group-8/31/03; (8) Women's Care Specialists, P.C.-9/10/03; (9) Chabot Chiropractic Clinic; (10) Physiotherapy Associates-2/20/04 to 4/29/04; and (11) Radiology Clinic-9/06/03 to 11/04/03. Dr. Campbell's billing is taken by stipulation of the parties.

discussed in the conclusions of law, place Ms. Allen in a better position than she was in before the accident. The Court, therefore, finds that Ms. Allen's medical damages are $14,656.58.

In sum:

| | |
|---|---|
| **Claimed medical expenses** | **$21,611.60** |
| **Subrogation** | **$14,656.58** |
| **Total award** | **$14,656.58** |

The Court, therefore, awards Ms. Allen $14,656.58 in medical expenses so that she may fulfil her subrogation duties, which are her only outstanding obligations related to any medical expenses.

50. The plaintiffs produced no evidence of the cost of any future medical treatments, or even that future medical treatments are probable. There was also no evidence as to the discount rate needed to reduce any future medical costs to present value, pursuant to Alabama case law. As a result, the Court has no basis for finding any future medical costs for any of the Allens. The Allens, therefore, have no rights to future damages, and the Court awards none.

**C.    Lost Wages**

51. Mr. Allen has not claimed, and there is no evidence of, any lost wages resulting from the accident. The Court, therefore, finds no lost wages for Mr. Allen.

52. Mrs. Allen testified that she had to take time off from work following the accident and for follow-up treatment relating to the accident. Testimony of Mrs. Allen. Her testimony was that she lost wages of $9,520. Id. The Court finds that Mrs. Allen lost wages in the amount of $9,520. By operation of law, however, Mrs. Allen's wages must, in the Court's computation, be reduced by any taxes she would be obligated to pay. Using information provided by Mrs. Allen's tax returns from the year 2003 and 2004, the Court finds that Mrs. Allen's wages were

taxed an average rate of 21%.[5]  Exhibit 40B, Mr. and Mrs. Allen's tax returns from 1999 to 2006.

Mrs. Allen's lost wages, therefore, are $7,520.80.

53. Ms. Allen also testified that she had to take time off from work following the

accident and for follow-up treatment relating to the accident.  She testified that she lost wages in

the amount of $3,006.06.  Testimony of Ms. Allen.  The Court credits Ms. Allen's testimony and

finds that Ms. Allen lost $3,006.06 in wages due to the accident.  By operation of law, however,

Ms. Allen's wages must be reduced by any taxes she would be obligated to pay.  Using

information provided by Ms. Allen's tax returns from the year 2003 and 2004, the Court finds

that Mrs. Allen's effective tax rate was 4.70%.[6]  Exhibits 40B, Mr. and Mrs. Allen's tax returns

from 1999 to 2006, 43B, Ms. Allen's tax returns from 1999 to 2006.  Ms. Allen's lost wages,

therefore, are $2,894.86.  As to any value of leave that Ms. Allen would have been entitled to

when she stopped working at International Medical Innovations, the Court would have to

speculate as to both the value of that leave and whether Ms. Allen would, in fact, have had any

leave remaining but for this accident.  Thus, the Court is not left with sufficient evidence to find

that Ms. Allen is entitled to anything for the leave she took.  Additionally, plaintiffs failed to

provide the discount rate required to determine the present value of that leave.

---

[5] The Court looked at Mrs. Allen's W-2 wage reports in 2003 and 2004, which contained information on both her reported wages and the amount of money withheld for tax purposes.  The Court divided Mrs. Allen's withheld income from taxes by her total wages, and found that Mrs. Allen was taxed, based on the best evidence available to the Court, at an average rate of 21%.  Exhibit 40B, Mr. Allen's and Mrs. Allen's tax returns from 1999 to 2006.

[6] Unlike with Mrs. Allen, Ms. Allen's tax returns included a document from tax preparer H&R Block indicating that Mrs. Allen's effective tax rate for fiscal year 2003 was 4.70%.  The document was discovered while searching through Exhibit 40B, Mr. and Mrs. Allen's tax returns.  The Court will consider that the appropriate tax rate and not perform any independent calculations based upon Ms. Allen's W-2 forms.

54. There was no evidence that any of the Allens have lost future wages, nor was there any evidence of any potential future wage losses. Neither was any evidence presented as to the discount rate required to reduce any future lost wages to present value. The Court, therefore, has no competent evidence before it on future lost wages and, accordingly, finds no further lost wages.

**D.    Other Economic Damages**

55. Mr. Allen testified that he lost $4,012 dollars in out-of-pocket expenses. Testimony of Mr. Allen. An exhibit shows that he lost $4,004.09, much of which is claimed mileage for various visits to doctors and the pharmacy. Exhibit 37A. In particular, this expense includes visits to Dr. Campbell in Tuscaloosa, each of which resulted in a travel distance of 190 miles. Since Mr. Allen testified that he lost $4,012 dollars, the Court credits his testimony and finds that Mr. Allen is entitled to $4,012 in out-of-pocket expenses.

56. Mr. Allen now claims an additional $1,128.63 in out-of-pocket expenses from pharmacy-related bills. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 12. The Court notes that there was no testimony regarding any additional out-of-pocket expenses due to pharmacy bills. Testimony of Mr. Allen. There having been no testimony as to these expenses at trial, the Court finds that he is not entitled to the additional $1,128.63.

57. Mrs. Allen testified that she lost $349.46 in out-of-pocket expenses. Testimony of Mrs. Allen. The Court, therefore, finds that Mrs. Allen is entitled to $349.46 in out-of-pocket expenses.

58. Mrs. Allen now claims an additional $563.71 in out-of-pocket expenses from pharmacy-related bills. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 12. The

Court notes that there was no testimony regarding any additional out-of-pocket expenses due to pharmacy bills. Testimony of Mrs. Allen. Mrs. Allen, in fact, testified that her pharmacy bills were included in her recitation of her medical damages. Id. There having been no testimony regarding these expenses at trial, the Court finds that Mrs. Allen is not entitled to the additional $563.71.

59. Ms. Allen testified that she lost $565.60 in out-of-pocket expenses. Testimony of Ms. Allen. The Court, therefore, finds that Ms. Allen is entitled to $565.60 in out-of-pocket expenses.

60. Ms. Allen now claims an additional $603.60 in out-of-pocket expenses from pharmacy-related bills. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 12. The Court notes that there was no testimony regarding any additional out-of-pocket expenses due to pharmacy bills. Testimony of Ms. Allen. There having been no testimony regarding these expenses at trial, the Court finds that she is not entitled to the additional $603.60.

**E.    Non-Economic Damages[7]**

61. The Court finds that Mr. Allen is entitled to reasonable compensation for his pain and suffering following the accident. His injuries were painful, even if not immediately so following the accident, and he is impaired from his injuries sustained in the accident. There was, however, little evidence of any future pain and suffering. Moreover, Mr. Allen's impairments, based on the testimony of Dr. Weaver, will not greatly impact his daily living. Testimony of Dr.

---

[7] The United States submits these non-economic damages figures in response to the Court's request for itemized damages. These figures are not an admission as to the degree of any pain and suffering experienced by the plaintiffs, nor are they an admission of what a reasonable verdict in the plaintiffs' favor should be.

Weaver; Exhibit 45, Report of Dr. Weaver. The Defendant suggests a range of somewhere between $40,000 and $55,000 for pain and suffering.

62. The Court finds that Mrs. Allen is entitled to reasonable compensation for her pain and suffering following the accident. Her injuries were painful, and in the Court's opinion, probably the most painful of the Allens, based on Dr. Weaver's report and testimony and that of Mrs. Allen herself. She is impaired as a result of injuries sustained in the accident. There was, however, little evidence of any future pain and suffering. Moreover, Mrs. Allen's impairments, in her own words, do not limit her in any way. Testimony of Dr. Weaver; Exhibit 46, Report of Dr. Weaver. The Defendant suggests a range of somewhere between $50,000 and $75,000 for her pain and suffering.

63. The Court finds that Ms. Allen is entitled to reasonable compensation for her pain and suffering following the accident. Her injuries were painful, even if not immediately so following the accident, and she is minimally impaired from her injuries sustained in the accident. There was, however, little evidence of any future pain and suffering, and Ms. Allen's impairments, based on the testimony of Dr. Weaver, will not greatly impact her daily living. Testimony of Dr. Weaver; Exhibit 47, Report of Dr. Weaver. The Defendant suggests a range of somewhere between $25,000 and $30,000 for her pain and suffering.

## PROPOSED CONCLUSIONS OF LAW

I.    **Alabama law on negligence actions and damages.**

1. Jurisdiction for this Federal Tort Claims Act case is based upon 28 U.S.C. § 1346(b).

Under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq., liability is determined in

accordance with the substantiative law of the place where the alleged negligent act or omission

occurred. 28 U.S.C. § 1346(b)(1); see also Ochran v. United States, 273 F.3d 1315, 1317 (11th

Cir. 2001). In Richards v. United States, 369 U.S. 1, 11 (1962), the Supreme Court held that 28

U.S.C. § 1346(b) "requires application of the whole law of the State where the act or omission

occurred." Here, the alleged negligent acts committed by the United States occurred in Alabama.

2. For Plaintiffs to recover under a negligence theory in Alabama, they must prove:

"'(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and

(4) damage or injury.'" S.B. v. St. James School, 959 So. 2d 72, 97 (Ala. 2006) (citation

omitted). In the context of motor vehicles, a driver is under a duty to use reasonable care in the

operation of her vehicle. Jones v. Baltazar, 658 So. 2d 420, 421 (Ala. 1995). Where, as in this

case, the defendant's vehicle suffered a tire failure, the trier of fact must decide whether "that

mechanical failure, or some negligence of the defendant, was the proximate cause of plaintiffs'

injuries." Kinard v. Carter, 518 So. 2d 1248, 1251 (Ala. 1987).

3. If liability is proven, the plaintiffs are entitled to an amount of damages at least as high

as the uncontradicted special damages, as well as an amount sufficient to compensate the plaintiff

for any pain and suffering. Romans v. J.P. Mills, Inc., 844 So. 2d 1239, 1241 (Ala. Civ. App.

2002). The necessity and reasonableness of any medical expenses is a question to be decided by

the factfinder, and it is the factfinder's duty to determine whether the medical expenses were

proximately caused by the factfinder's negligence. <u>Nix v. Key</u>, 682 So. 2d 1371, 1372-73 (Ala.. Civ. App. 1996). "Although the party seeking damages is not required to prove damages to a mathematical certainty, an award of damages may not be based on speculation or conjecture." <u>Bergob v. Scrushy</u>, 855 So. 2d 523, 529 (Ala. Civ. App. 2002). The burden of proof rests with the party claiming damages. <u>Id.</u>

### A.    Alabama's Collateral Source rule

4.  Alabama Code Section 12-21-45 makes evidence that a plaintiff's medical or hospital expenses have been paid or will be reimbursed admissible in civil tort cases. <u>See</u> Ala. Code § 12-21-45. The Eleventh Circuit, in an opinion that was later withdrawn on other grounds, stated that Section 12-21-45 "is Alabama's statutory modification of its common law collateral source rule," and went further to find that the collateral source rule "is as much substantive law as was the common law rule it modified." <u>Bradford v. Bruno's, Inc.</u>, 41 F.3d 625, 626 (11th Cir. 1995) *opinion withdrawn*, 94 F.3d 621 (11th Cir. 1996). Notably, however, the Eleventh Circuit withdrew its opinion because, while the case pending on rehearing, an intervening Alabama Supreme Court decision ruled that Section 12-21-45 was unconstitutional under Alabama law, rendering the foregoing discussion irrelevant and moot since the Section could not apply anywhere. <u>Bradford II</u>, 94 F.3d 621, 622-23 (11th Cir. 1996) *citing* <u>American Legion Post Number 57 v. Leahey</u>, 681 So.2d 1337 (Ala. 1996).

5.  At present, however, the Alabama Supreme Court, in a reverse of course, has reinstated Section 12-21-45, holding that the statute is constitutional. <u>Marsh v. Green</u>, 782 So. 2d 223, 232-33 (Ala. 2000). In a footnote, the Court left open the potential for defendants to argue for an offset due to the windfall a plaintiff might reap from double recovery. <u>Id.</u> at 233 n.2.

With the reinstatement of the collateral source rule set forth in Section 12-21-45, the logic of the Eleventh Circuit's original <u>Bradford</u> opinion holds sway: because the collateral source rule is a substantive one, it is applicable to federal courts sitting in diversity.

6.    While the instant case does not lie in diversity, the FTCA was designed "to provide redress for ordinary torts recognized by state law." <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 478 (1994). Liability under the FTCA is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State—the source of *substantive liability* under the FTCA." <u>F.D.I.C.</u>, 510 U.S. at 478.

7.    As the original <u>Bradford</u> decision made clear, Alabama's collateral source rule is substantive, and the United States may, and did, introduce evidence that the plaintiffs' medical bills have been or will be paid by insurance. <u>See also</u> <u>Tirey v. Boyte</u>, 2005 WL 2233068 at *4 (S.D. Ala. 2005) (unpublished) ("While it is true that the Eleventh Circuit has not revisited the issue since withdrawing the <u>Bradford I</u> opinion, and the case has no precedential value, it is persuasive and certainly the best indication of how the Eleventh Circuit would rule on this issue. Therefore, the undersigned finds that the more reasoned view supports the conclusion that the collateral source rule is a substantive rule . . . ."). The United States, therefore, is entitled to an off-set for those medical bills already paid by insurance. The Court notes that the plaintiffs do not argue to the contrary in their proposed findings and have not objected to any evidence at trial introduced regarding insurance payments. In fact, they provided evidence of the off-set amounts through subrogation documents. Exhibit 33, subrogation letter for Mr. Montgomery; Exhibit 63a, subrogation letter for Mr. Allen; Exhibit 64a, subrogation letter for Mrs. Allen; Exhibit 65a,

-26-

subrogation letter for Ms. Allen.  The Eleventh Circuit has noted that it is the general principle of

remedies that "an aggrieved party should be put in as good a position as he was in before the

wrong, but not better."  Alabama Power Co. v. F.C.C., 311 F.3d 1357, 1369 (11th Cir. 2002).

8.  In addition, the Court concludes that the plaintiffs failed to put competent evidence in

the record as to any future costs, medical, wage-related, or otherwise.  No evidence was

presented as to life expectancies or even the proper discount rate to be applied to reduce future

costs to present value.  The lack of evidence in this regard prevents the Court from finding any

future damages.  Cf. Martinez v. Puerto Rico Marine Management, Inc., 755 F. Supp. 1001,

1007-08 (S.D. Ala. 1990) abrogation recognized on other grounds Purdy v. Belcher Refining Co.,

781 F.Supp. 1559 (S.D. Ala. 1992) (declining to award damages for lost services, nurture,

guidance, instruction and financial support where no evidence was offered on the value of such

services, nor was the life expectancy of the plaintiffs provided during trial).

**B.     Mrs. Moore's speed was not excessive or grounds for a finding of negligence.**

9.  The plaintiffs have suggested that Mrs. Moore is per se negligent because she was

traveling in excess of the statutory speed limit.  Plaintiffs' Proposed Findings of Fact and

Conclusions of Law at 14-21.  Under Alabama law, exceeding the statutory speed limit does not,

by and of itself, establish actionable negligence.  Odom v. Schofield, 480 So. 2d 1217, 1218

(Ala. 1985).  The plaintiffs also must prove that violation of the speed limit proximately caused

their injuries.  Id.; Fox, 374 So. 2d at 296.

10.  The plaintiffs have argued that the United States failed to timely object to Trooper

Fisher's testimony that Mrs. Moore's vehicle was traveling 83 miles per hour.  Plaintiffs'

Proposed Findings of Fact and Conclusions of Law at 19.  The United States filed a motion to

exclude that very testimony. Docket No. 55, dated Feb. 12, 2008. The Court permitted Trooper Fisher to testify before ruling on that motion. The United States did not need to offer an objection to that testimony—the Court had ruled that it would hear the testimony. Indeed, the evidence's admissibility was one thing. The weight to be afforded it was another. See Fed.R.Evid. 104(a) (governing questions of admissibility) and Fed.R.Evid. 104(e) (permitting a party to introduce evidence relevant to weight).

11. The Court concludes that the greater weight of the evidence in this case failed to prove that Mrs. Moore was traveling in excess of the speed limit preceding the accident. Trooper Fisher's accident report and testimony have, for reasons previously explained, very little weight. Moreover, the Court does not find persuasive Mr. Flanner's testimony that he had never before seen such a damaged tire. Given the nature of this accident, the multiple impacts, and the damage to the vehicles, the Court is not surprised that the tire was badly mangled. It further notes that Mr. Flanner's opinion that the tire struck concrete is not supported by *any* evidence. Any reliance on the photographs in Exhibit 12 is misplaced, since those photographs have been shown as inaccurately representing where the accident occurred. Testimony of Mrs. Montgomery. The plaintiffs have, therefore, failed to prove that Mrs. Moore's speed was excessive. In any event, the Court concludes that, even assuming Mrs. Moore violated the statutory speed limit, it was not that violation but the tire deflation event that caused the plaintiffs' injuries. Since that deflation would have occurred at any speed, Mrs. Moore's speed at the time of the accident was not the proximate cause of their injuries. Thus, negligence per se has not been demonstrated or proven.

-28-

12.  Indeed, the Court notes that the plaintiffs argue that, if Mrs. Moore were traveling straight in the left-hand northbound lane, at speeds greater than 50 miles per hour, a puncture or deflation will not cause loss of control absent driver input.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 16.  According to the plaintiffs, that driver input includes "excessive speed."  Id.  Their own expert, Mr. Prosser, however, testified that at speeds greater than 50 miles per hour, loss of control does not occur absent *some other driver input*, such as stepping on the brake.  Testimony of Mr. Prosser.  He opined that *stepping on the brake* was the negligent act in this case and not some other cause.  The plaintiffs cannot have it both ways.

**C.**    **The Plaintiffs have failed to prove that Mrs. Moore acted negligently.**

13.  The Court is, thus, left with the plaintiffs' remaining theory of liability: that Mrs. Moore was negligent and contributed to her vehicular loss of control by stepping on her brake when she became aware of the tire deflation.  Plaintiffs' evidence in this regard is Mrs. Moore's testimony that she stepped on her brake when she became aware of the tire deflation, the testimony of Mr. Prosser that braking is not the appropriate response to a tire deflation, and some studies that have found that ordinarily a vehicle driving in a straight line at speeds in excess of 50 miles per hour will continue in a straight line, even after a tire deflation or blow-out.  If Mrs. Moore's actions were negligent, and her negligence caused the loss of control of her vehicle, proximately causing this accident, the plaintiffs are entitled to recover.

14.  The Defendant has requested that Alabama's "Sudden Emergency" doctrine be applied to the facts of this case.

15.  Under Alabama law, "a motorist, without fault of [her] own, confronted with a sudden emergency, is not required to exercise the same presence of mind as would a prudent

-29-

person under more deliberate circumstances." <u>Jefferson County v. Sulzby</u>, 468 So.2d 112, 116

(Ala. 1985), <u>quoting</u> <u>Williams v. Worthington</u>, 386 So.2d 408 (Ala. 1980). While not a defense,

<u>per se</u>, to negligence, the "sudden emergency" doctrine "provides a qualified standard of care by

which . . . a party's conduct can be measured." <u>Burns v. Martin</u>, 589 So.2d 147, 149 (Ala. 1991).

For the doctrine to apply, a party must show that (1) there was a sudden emergency, and (2) the

emergency was not the fault of the party invoking the rule. <u>Friedlander v. Hall</u>, 514 So.2d 914,

915 (Ala. 1987).

     16. The Eleventh Circuit has noted Alabama's sudden emergency doctrine, and found

that it applies to alter the standard of care applicable to alleged negligent driver conduct "in the

face of unexpected circumstances." <u>Salter v. Westra</u>, 904 F.2d 1517, 1521 (11th Cir. 1990). The

doctrine is related to the "mechanical defect or failure" doctrine, which holds that, in cases of

alleged mechanical failure, it is up to the factfinder to determine whether mechanical failure or

driver negligence in response to that mechanical failure, was the proximate cause of a plaintiff's

injuries. <u>Id.</u> at 1521-22. In cases where the conduct of the defendant driver in the face of a

"sudden emergency" resulting from a "mechanical failure or defect" is alleged to have been

negligent, and the negligence alleged relates to a failure to maintain the vehicle or inspect for

reasonably foreseeable defects without regard to driver conduct <u>per se</u>, a lack of foreseeability of

the defect and the absence of negligence in maintaining the vehicle serve to negate liability. <u>Id.</u>

at 1522.

     17. Defendant argues that the "sudden emergency" was the tire deflation that occurred

when the object that had punctured the tire was ejected, releasing the air in a matter of seconds.

The Court concludes that, while the deflation occurred in five seconds or less, Mrs. Moore was

not aware of the deflation until she changed lanes, driving 65 miles per hour, and both heard a loud noise and felt the back of her car drop. This is because, as the expert testimony demonstrated, modern vehicle design and tire construction are such that a driver may not be aware that his tire is deflated until some input alters the load on the tire, in this case a lane change. Having the back of your vehicle drop because of a deflated tire at highway speeds is exactly the type of unexpected circumstance contemplated by the sudden emergency doctrine. The Court, therefore, concludes that the doctrine applies, and will hold Mrs. Moore's actions to the standard of care contemplated by the doctrine.

18. The Court concludes that Mrs. Moore's action in stepping on the brake was not an unreasonable action under the sudden emergency doctrine's lower standard of care, and cannot form the basis for proving negligence in this case. The average Alabama driver cannot reasonably be expected, in a sudden emergency like this, where a driver traveling at highway speeds of 65 miles per hour suddenly and unexpectedly hears a loud bang during a lane change and feels the rear of her vehicle drop out, to not instinctively react to danger by braking. This bears no resemblance to real life or common sense and, thus, cannot be the law or the basis for a finding of negligence here.

19. Moreover, even if the sudden emergency doctrine were not applied, the standard of care is still that of a reasonable person operating her vehicle. The Court concludes that, even under ordinary principles of negligence, it is not unreasonable to instinctively react to a loud bang during a lane change, while traveling at 65 miles per hour on a highway, and feeling the rear of her vehicle drop out, by braking. To hold otherwise would also bear no resemblance to real life or common sense and, thus, cannot be the law or the basis for a finding of negligence here.

-31-

20.  The Court concludes that Alabama law does not make negligent the act of braking on a highway in reaction to a tire failure, such as a deflation or blow-out.  While Alabama does not have any cases directly on point, other jurisdictions have held that a defendant should not be liable when a tire deflation is the cause of an accident.  See, e.g., Huffman v. Mercer, 295 S.W.2d 27, 33 (Mo. 1956) ("If one be precipitated to the left of the road by virtue of circumstances [a deflation] over which he has no control, one is not negligent.") citing Seligman v. Orth, 236 N.W. 115, 116 (Wis. 1931); Lasseigne v. Kent, 142 So. 867, 868 (La. App. 1932) ("The puncture of an automobile tire by a large spike, causing the car to upset and fatally injuring a guest therein, will, under the evidence set out in the case, be considered an accident, which is a casualty which could not be prevented by ordinary care and diligence.") (citation omitted).  While a deflation, such as the one in this case, is not equivalent to a blow-out, the evidence shows that Mrs. Moore's awareness of the deflation was sudden and similar to a blow-out.  Accordingly, the Court finds cases relating to blow-outs instructive.

21.  In a very similar case, the Nebraska Supreme Court upheld a verdict that the puncture of a tire and accompanying deflation was the proximate cause of a car swerving off the road and overturning and, therefore, the driver of the car was not liable for the injuries caused.  See Bonacci v. Cerra, 279 N.W. 173, 176-77 (Neb. 1938); see also Kelly v. Gagnon, 236 N.W. 160, 164 (Neb. 1931) (holding that a driver who stepped on brake following a puncture of a tire did not act negligently even though the car "swayed and upset," causing the death of a passenger).

22.  Indeed, the North Carolina Supreme Court persuasively recognized that, although stepping on the brake may not be most appropriate response to a tire blow-out, it certainly does

not amount to negligence when faced with an emergency and there was no evidence of a defect with the tire. Crowe v. Crowe, 129 S.E.2d 585, 586 (N.C. 1963).

23.    A Pennsylvania federal district court has also refused to find a person liable, even with evidence that the person was driving in excess of the speed limit, where a tire was deflated suddenly and the driver lost control of his vehicle, causing an accident. See Ward v. McDan Dav Leasing Corp., 340 F. Supp. 86, 94-95 (D.C. Pa. 1972). The plaintiffs themselves cite the Court to two Alabama cases, McKinney v. Alabama Power Co., 414 So. 2d 938, 939 (Ala. 1982) and Moore v. Horton, 694 So. 2d 21, 22 (Ala. Civ. App. 1997), in which the sudden emergency doctrine was applied and the factfinder found in favor of the Defendant in spite of evidence of excessive speed. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 17. While the Court concludes that there was no evidence that Mrs. Moore's speed was excessive, nor was her speed a contributing factor to her sudden emergency, it finds these cases instructive as well.

24.    The Court, thus, concludes that the plaintiffs have failed to prove that Mrs. Moore acted negligently. This accident was unfortunate as it was unavoidable, but an unavoidable accident does not give rise to liability under Alabama law. Senn v. Alabama Gas Co., 619 So. 2d 1320, 1324 (Ala. 1993) ("[evidence] of an unfortunate result does not in and of itself raise an inference of negligence. . . . The burden was upon the plaintiff, if he is to recover, to establish negligence to the reasonable satisfaction of the trier of fact. Under all the evidence it was within the province of the jury to find that injury to the plaintiff, if any, was the result of an unavoidable accident, in which case there would be no liability on the part of the defendant.") (citation omitted). As the United States can only be held liable in circumstances where a private person

-33-

would be held liable, judgment must be entered in favor of the United States. 28 U.S.C.
§ 1346(b)(1); 28 U.S.C. § 2674.

**D.    Mrs. Moore was not negligent in the maintenance of her vehicle**

25. The plaintiffs have also argued that Mrs. Moore was negligent in the maintenance of
her vehicle. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 21. First, they
argue that Mrs. Moore's left rear tire was 80% worn with respect to Alabama's statutory
requirements. Id. This ignores the fact that the tire still complied with the statutory
requirements, as testified to by their tire expert, Mr. Flanner. The Court is unpersuaded by the
plaintiffs' theory.

26. Next, they argue that if the other tires had been in a same or similar condition, that
condition could have been contributing factor. Plaintiffs' Proposed Findings of Fact and
Conclusions of Law at 21. Plaintiffs have offered no proof that the other tires in any way
contributed to the loss of control. As the plaintiffs accurately point out, there were numerous
other components and systems that, theoretically, Mrs. Moore could have had a duty to inspect.
Id. The plaintiffs had a burden of proving that she had such a duty with respect to other
components or systems, and they have not. Mrs. Moore testified that she had no mechanical
problems with her vehicle until the day of the accident. She told the plaintiffs that she had a
"blow-out" and it caused her to lose control of the vehicle when she contacted them after the
accident. The plaintiffs and their attorneys never sought to procure Mrs. Moore's vehicle for
inspection. Thus, their speculative theory of negligence due to some other component of the
vehicle is rejected by the Court since it lacks both substance and evidence.

27. Lastly, the plaintiffs fault Mrs. Moore for failing to inspect her tire on the day of the accident and seeing that she had a puncturing object. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 21-22. The location of the puncture was on the serial side of her tire. The testimony was that, for her to locate it, she would have needed a rack to lift her car off of the ground and *then* inspected the vehicle's tires. In light of the foregoing, the plaintiffs have failed to prove negligent maintenance of the vehicle or tires.

E.    **Alternatively, the Plaintiffs also failed to prove that any negligence proximately caused their injuries.**

28. As previously noted, for the plaintiffs to succeed on a claim of negligence, they must also prove causation. S.B. v. St. James School, 959 So. 2d at 97. Factual causation, or "but for" causation, is that part of the causation analysis that asks if the complained-of injury or damage would have occurred but for the act or omission of the defendant. Springer v. Jefferson County, 595 So. 2d 1381, 1383 (Ala. 1992). "Proximate or legal causation is that part of causation analysis that asks if "the act for which the [defendant] is responsible [is] of such a nature that courts of law will recognize it as the [cause] of the injury.'" Id. at 1383-84. "In Alabama, the issue of proximate causation hinges on foreseeability and is intertwined, analytically, with the concept of intervening cause." Id. at 1384.

29. "The requirement of foreseeability is imposed to preclude a finding of liability when the defendant's conduct was part of the causal chain of events leading to the injury but the resulting injury could not have been reasonably anticipated by the defendant." Thetford v. City of Clanton, 605 So. 2d 835, 840 (Ala. 1992). Thus, "[i]t is settled law in Alabama that even if one negligently creates a dangerous condition, he or she is not responsible for injury that results

-35-

from the intervention of another cause, if at the time of the original negligence, the intervening

cause cannot reasonably be foreseen." Adams v. Sanders, 811 So. 2d 542, 545 (Ala. Civ. App.

2001) quoting Sims v. Crates, 789 So.2d 220 (Ala. 2000).

     30. Mrs. Moore would not have lost control of her vehicle but for the sudden loss of air

in her left rear tire. Testimony of Mr. Cunningham. The location of the puncture was such that

Mrs. Moore had no way of knowing it existed. Testimony of Peter Flanner; Testimony of Mr.

Cunningham. There were no warning signs, such as under-inflation that could have been

noticed. Absent the completely unforeseeable tire deflation, Mrs. Moore would have completed

her trip without incident. In addition, any alleged negligence attributed to Mrs. Moore was

superseded when her tire deflated. It was not reasonably foreseeable to her, or to anyone else,

that her tire would fail catastrophically and cause her to lose control of her vehicle. The causal

chain of events leading up to this accident could not have been anticipated. The United States is

not responsible for the unforeseen chain of events giving rise to this unfortunate accident. Senn

v. Alabama Gas Co., 619 So. 2d 1320, 1324 (Ala. 1993) ("The burden was upon the plaintiff, if

he is to recover, to establish negligence to the reasonable satisfaction of the trier of fact. Under

all the evidence it was within the province of the jury to find that injury to the plaintiff, if any,

was the result of an unavoidable accident, in which case there would be no liability on the part of

the defendant."); Johnson v. Louisville & N.R. Co., 198 So 350, 355 (Ala. 1940) ("it is clear that

the finding by the jury was that plaintiff's injuries were the result of an unavoidable accident in so

far as the defendants were concerned, and this conclusion is supported by the great weight of the

evidence. It was not error, therefore, for the court to direct the jury to retire and put the verdict in

usual form as a verdict for the defendants."); cf. Carpenter v. City of Belle Fourche, 609 N.W.2d

751, 764 (S.D. 2000) (holding that a jury instruction on unavoidable accidents is appropriate where an "element of 'surprise' is present such as the sudden and unexpected presence of ice, the blow-out of a tire, the malfunction of brakes, or other mechanical failure.").

31. The Court, for the foregoing reasons, concludes that the chain of events that led to this accident could not reasonably have been anticipated by Mrs. Moore or the Defendant. The tire deflation was not a reasonably foreseeable event, nor was it reasonably foreseeable that loss of control would occur.

32. The Court's finding is bolstered by testimony, including that of both experts, that tire deflations themselves, or even tire blow-outs, rarely result in loss of control. The five plaintiffs in this case and Mrs. Moore were all unfortunate victims of a terrible accident. That the law does not provide anyone compensation for their injuries in this case does not render those injuries any less real or the lives any less affected. The circumstances of this case are a reminder that accidents happen, sometimes without fault.

//

//

//

//

//

//

//

//

//

-37-

33. Judgment is hereby entered in favor of the Defendant, United States of America, and against the Plaintiffs.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
Civil Division

PHYLLIS J. PYLES
Director
Torts Branch, Civil Division

GAIL K. JOHNSON
Senior Trial Counsel
Torts Branch, Civil Division


/s/ Conor Kells
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888, Benjamin Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4273
Facsimile: (202) 616-5200

Attorneys for the Defendant,
United States of America

Dated: March 21, 2008

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon counsel for

Plaintiffs by electronic filing, CM/ECF:

Annesley H. DeGaris
Elizabeth A. Ellis
Attorneys for the Allen Plaintiffs
Cory, Watson, Crowder & DeGaris, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, Alabama  35205

J. Callen Sparrow
Attorney for the Montgomery Plaintiffs
Heninger Garrison Davis, L.L.C.
P.O. Box 11310 (35202)
2224 1st Avenue North
Birmingham, Alabama  35203

Dated this 21st day of March, 2008.

/s/ Conor Kells
Trial Attorney, Torts Branch
Civil Division