UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL P. ALLEN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:06-cv-879-WKW |
| | ) | [wo] |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Michael Allen, Lou Ellen Allen, and Lori Allen (collectively, "the Allens")

bring this case under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, for injuries they

received in an automobile accident on Interstate 65 on August 29, 2003.  Bertha Moore

("Moore"), the driver of the vehicle that struck the Allens' vehicle, allegedly causing the

accident, is an employee of the United States Department of Justice.  This case was

consolidated with *Montgomery v. United States of America*, No. 2:06-cv-880 for trial,[1] as

each case arose out of the same automobile accident.  The matter was tried before the court

on February 25, 26, and 27, 2008.

## I.  JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question).  The parties do not contest personal jurisdiction or venue, and the court finds

allegations sufficient to support both.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard the evidence and considered the arguments of counsel, the court makes

---

[1]  For purposes of entering findings, conclusions and judgment, the cases will be severed.

the following findings of fact and conclusions of law.

A.    **Findings of Fact**

1.    **The Accident**

On August 29, 2003, the Allens were driving south on Interstate 65 on the way to a family reunion in Gulf Shores, Alabama.  Wallace Montgomery and his wife, Phyllis Montgomery, (collectively, "the Montgomerys") were also traveling south on Interstate 65 on the way to their property on the Mississippi Coast.  At the same time, Moore was traveling north on Interstate 65 on her way to Montgomery, Alabama.  Moore was returning from a law enforcement seminar in Gulf Shores.  The United States stipulates that Moore was, at the time of the accident, working in the line and scope of her employment with the Department of Justice.

In the area where this accident occurred, Interstate 65 consists of two northbound lanes, two southbound lanes, two emergency lanes, and a median separating the north and southbound traffic.  The accident occurred around mile marker 106 where the highway is generally straight and flat.  (*See* Ex. 12 (photographs of the area of the highway).)  The median in this area is grassy, and it angles down in a v-shape between the north and southbound lanes.  At the time of the accident, the weather was clear, it was not raining, and the road was dry.[2]

_____

[2]  Both Moore and Trooper Robert Fisher ("Trooper Fisher") traveled from the south where it was raining.  The Montgomerys and the Allens were driving from the north, where the weather was clear.  While Moore and Trooper Fisher testified it was raining at the time of the accident and the road was wet, the Montgomerys and the Allens uniformly and credibly stated the rain started soon after the accident.  Trooper Fisher arrived twenty minutes after the accident.  The Montgomerys and the Allens presented specific testimony about the weather being clear before the accident and seeing – and feeling – the rain begin to fall as they waited for ambulances to arrive.  The court finds that the rain started soon after the collision and that

The accident occurred when Moore lost control of her vehicle, crossed the median, entered the southbound lanes, struck the Allen vehicle first, and then the Montgomery vehicle. Prior to crossing the median, Moore's left rear tire deflated. The Montgomerys, the Allens, and Moore each required medical attention after the accident. A helicopter flew Moore to a hospital in Pensacola, Florida while ambulances transported the Montgomerys and the Allens to a hospital in Evergreen, Alabama.

### a.    Trooper Fisher's Investigation

Trooper Fisher was dispatched from Evergreen, Alabama and arrived at the scene approximately 20 minutes after the accident. When Trooper Fisher got out of his car, a woman who was distraught and visibly shaking approached him. She explained that she had been traveling behind Moore as they drove northbound, and the two cars were "running together" at a speed of 83 miles per hour. Trooper Fisher asked the eyewitness to remain at the scene, but by the time he finished investigating the accident she was gone.

Trooper Fisher then began to investigate the accident. He inspected the area of the accident, walked the path traveled by Moore's vehicle, examined the significant damage to all three vehicles, and determined the points of impact. His inspection of the northbound lane revealed no evidence, such as marks, indicative of a "blow-out" or catastrophic tire failure. Trooper Fisher was able to discern the path taken by Moore's vehicle because her tires left two rows plowed through the median. Trooper Fisher determined that Moore's vehicle became airborne as it exited the median and entered the southbound lanes. After

---

at the time of the collision the weather was clear and the road dry.

striking the Allens' vehicle, Moore's vehicle rotated 270 degrees and collided with the Montgomerys' vehicle. Moore's vehicle came to rest on its side in the southbound lane of traffic. The Montgomerys' vehicle spun 180 degrees and ended up in the median facing north. Trooper Fisher's conclusion that Moore's vehicle was airborne is consistent with the testimony of Michael Allen, Wallace Montgomery, and Phyllis Montgomery, all of whom observed Moore's vehicle in the air before impact.[3]

Trooper Fisher completed an accident report (Ex. 7) based on his inspection of the physical evidence and eyewitness statements. In the report, Trooper Fisher listed Moore's speed as 83 miles per hour. The court finds Trooper Fisher's testimony, including Moore's speed, credible.

### b.    The Tire

In addition to testimony about the scene of the accident, the parties entered the deflated tire into evidence and presented expert testimony about the tire and its deflation. Based on this testimony the court concludes that Moore's tire did rapidly (but not instantly or explosively) deflate, but that it was her failure to control her car that led to the collisions. The other three tires were unavailable. The deflated tire contained a puncture hole from which air escaped causing the deflation and had other massive damage.

The experts who examined the tire agreed that it deflated after an object that

---

[3] Michael Allen testified that he saw "something red or burgundy" that "looked like it was coming out of the air." Wallace Montgomery testified that he saw the bottom of Moore's vehicle "up in the air." Phyllis Montgomery testified that Moore's vehicle was "clearly airborne."

4

punctured the tire was ejected from it and created a hole.  (*See* Ex. 30G(l) (picture of the puncture hole).)  Sometime prior to the accident, a puncturing object (probably a screw or a bolt) became lodged in the left rear tire of Moore's vehicle.  The tire was a tubeless steel-belted radial, and this type of tire can carry a puncturing object for several hundred miles before experiencing full deflation.  The object was probably in the tire for a length of time before being ejected because imprinted on the rubber of the tread was a hexagonal screw head.  During the time the object was in the tire, each revolution of the tire released a small amount of air around the puncturing object.  Because Moore did not inspect her tire prior to leaving Gulf Shores, it is unknown if the tire was visibly deflated before she set out for Montgomery.

At the time the object was ejected, it could have taken up to ten seconds for the tire to deflate.  None of the expert or lay witnesses testified that Moore suffered a catastrophic blow-out.  The court concludes that prior to the accident an object punctured Moore's tire, and the ejection of the object caused the deflation.

The experts agreed that the massive damage to the tire was not the result of deflation but instead the consequence of the tire impacting one or more substantial objects during the accident.  An expert credibly testified that the massive damage, including the splitting of the tread circumferentially, was consistent with, and indicative of, an impact at a high rate of speed.

The parties also presented expert testimony on what could have caused the loss of

control that resulted in the collisions.  The testimony of the parties' experts established that loss of control is an unlikely direct result of a tire deflation.  Instead, R.J. Grogan, a researcher and expert whose written research the experts for both parties relied upon, conducted tests revealing that tire deflation alone does not cause a loss of control if experienced while traveling at highway speeds.  The government's expert, Ralph Cunningham, testified that after a tire has deflated, the most common cause of loss of control is post-deflation driver input.  The court finds this testimony credible, consistent with the evidence, and consonant with common experience.

The court concludes tire deflation did not cause the loss of control here.  Instead, the court finds that driver input factors were present and caused the loss of control.  Driver input factors that can cause a loss of control include:  excessive speed, over-steering, braking too hard, or a combination of these inputs.  Furthermore, the condition of the tires on a vehicle that experiences a deflation can contribute to a loss of control.

Moore did not recognize that her tire was deflating until it was fully deflated.  When she did recognize the deflation, she hit her brakes, yet stated that she felt the car accelerate before she lost control.  Additionally, other evidence establishes Moore was speeding prior to losing control.[4]  The court finds that Moore's driver input caused the accident.  The court

---

[4] Moore testified that she was not speeding at the time of the accident.  She stated that she was traveling at approximately 60 miles per hour before the accident when she changed lanes to pass a vehicle moving at a slower speed.  Given that the speed limit is 70 miles per hour, the court does not credit Moore's testimony that she was traveling ten miles per hour below the speed limit when she encountered a vehicle moving even slower.  Moreover, given the traumatic nature of Moore's injuries and that Moore has no recollection after losing control, the court does not credit Moore's testimony as to the speed.

reaches this finding of fact based upon the physical evidence, expert testimony, testimony of the parties, and testimony of Trooper Fisher.

2.    **Damages**

a.    **Michael Allen**

Michael Allen is the founder and president of a company that engages in pharmaceutical research and design.  He is currently sixty years old.  His damages arising out of the collision include:  medical bills; out-of-pocket expenses; past and future pain and suffering; and significant permanent injuries.

The parties stipulated to Michael Allen's physical injuries, and the Allens and Dr. Weaver testified about the extent of his injuries.  Michael Allen suffered the following:  AC joint arthrosis and rotator cuff impingement in both the left and right shoulders; right knee contusions, medial meniscus tear, chondromalacia of femoral trochlea, and right medial femoral condyle; concussion and traumatic brain injury; multiple facial and scalp lacerations; cervical strain with significant pain; chest and rib contusions with intercostal nerve injury and intercostal neuralgia; upper and mid back pain; anterior chest strains and pain; left suprascapular nerve pain; right fibula fracture; bilateral lower leg abrasions; right leg lateral sural nerve, peroneal nerve, and saphenous nerve pain with limp; and sleep disorder.  The parties also stipulated that Michael Allen may need surgery to both shoulders and his right knee in the future.  Michael Allen received a disability rating of twenty-five percent from his doctor, Dr. Leon Campbell, and an impairment rating of eleven percent from the

government's doctor, Dr. Keith Weaver.

Michael Allen also seeks reimbursement for his medical expenses. Under Alabama law, a plaintiff may recover reasonable and necessary medical expense incurred as a result of injury.[5] *See Stone v. Echols*, 351 So. 2d 902, 903 (Ala. 1977); Jenelle Mims Marsh & Charles W. Gamble, Alabama Law of Damages § 36:3 (5th ed. 2004). The defendant may present evidence that a collateral source paid for the plaintiff's medical expenses. Ala. Code § 6-5-545.

Michael Allen presented evidence of the following medical expenses:

| Michael Allen's Medical Bills | |
|---|---|
| Provider | Amount |
| Conecuh County Emergency Medical Services (Ex. 36(a)) | $467.00 |
| Evergreen Medical Center (Ex. 36(b)) | 1,606.00 |
| Tri-County Medical Center (Ex. 36(c)) | 65.00 |
| Birmingham Baptist Medical Center Montclair (Ex. 36(d)) | 1,514.00 |
| The Kirklin Clinic (Ex. 36(e)) | 804.00 |
| Physiotherapy Associates (Ex. 36(f)) | 2,636.00 |
| Birmingham Radiology Group (Ex. 36(g)) | 126.00 |
| Alabama Sports Medicine and Orthopaedic Center (Ex. 36(h)) | 3,182.00 |
| Highlands Diagnostic (Ex. 36(I)) | 2,855.00 |
| HealthSouth Sports Medicine and Rehabilitation (Ex. 36(j) | 6,870.03 |

---

[5] Alabama law governs the standard for damages here. *See Harden v. United States*, 688 F.2d 1025, 1029 (11th Cir. 1982) (stating that "the components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred") (internal quotation marks and citation omitted).

| | |
|---|---|
| Anesthesiology & Pain Medicine (Ex. 36(k)) | 702.00 |
| Pro-Fit, Inc. (Ex. (36(l)) | 46.20 |
| Southern Medical Group (Ex. 36(m)) | 283.00 |
| Dr. Leon Campbell (Ex. 36(n)) | 15,773.00 |
| The Radiology Clinic/ Tuscaloosa Radiology (Ex. 36(o)) | 2,135.00 |
| **TOTAL** | $39,064.23 |

The government challenges whether Michael Allen is entitled to reimbursement of the full amount because he has not shown that he paid for all these medical bills. Instead, the government argues that Michael Allen's medical bills should be limited to Blue Cross's subrogation interest of $8,455.27 and Dr. Campbell's bill of $15,773.00, for a total of $24,228.87. The government ignores entries in the medical bills that reveal that Michael Allen paid co-pays for some of these medical bills.

Michael Allen does not make a claim for lost wages. The parties agree that Michael Allen has damages of $4,012.00 for out-of-pocket expenses.[6] However, the government disputes Michael Allen's claim for $1,128.63 in pharmacy-related expenses because Michael Allen never testified as to these expenses. However, an exhibit regarding pharmacy expenses was entered into evidence by stipulation at the start of trial.

After reviewing the evidence, it is clear that Michael Allen sustained painful and long-lasting injuries. Indeed, the government concedes that he has experienced pain and suffering

---

[6] These expenses include items that were destroyed in the collision, a hotel room, mileage for driving to doctor's appointments, and a rental car for a month.

and has suggested that he receive $40,000 to $55,000 for his pain and suffering. After the accident he had pain in his shoulder and wrist, glass lodged in his foot, and experienced headaches. He was unable to sit to work, to fly on a plane, to cut his grass, to golf, or to ride in a dune buggy.[7] For six months after the accident, Michael Allen slept in the den, frequently on a recliner. After enduring knee pain, he had surgery on his knee. He still experiences shoulder pain two to three times per week. After one recent pain treatment, he testified that he experienced two weeks free of shoulder pain. Clearly Michael Allen has endured years of pain after this accident. While the level of pain has declined since the accident, it has not entirely subsided.

Based upon a preponderance of the evidence in this case, the court finds that Michael Allen's damages are $215,000.00, which includes compensation for pain and suffering; permanent impairment; reasonable and necessary medical expenses; and out-of-pocket expenses.

### b. Lou Ellen Allen

Lou Ellen Allen, Michael Allen's wife, is currently unemployed, but she worked for her husband at the time of the accident. She seeks damages for medical expenses; lost wages; out-of-pocket expenses; past and future pain and suffering; and significant permanent injuries.

As with Michael Allen's injuries, the parties stipulated to Lou Ellen Allen's physical

---

[7] Both Michael Allen and Lou Ellen Allen testified that they enjoyed dune buggy riding as a hobby prior to the accident.

injuries. Additionally, at trial, Lou Ellen Allen and Dr. Weaver testified about her injuries. The parties agree that as a result of the accident Lou Ellen Allen suffered the following: multiple chest and thoracic injuries including fractures of ribs 5,6,7,8,9,10 and 11; compression fracture of the first lumbar vertebrae; concussion and traumatic brain injury; a black eye; severe cervical strain and whiplash; occipital nerve injury with headache; abdominal pain and pelvic contusions; pulmonary contusion with pleural effusion; chest wall hematomas and contusions with intercostal nerve neuralgias and pain; upper back and mid back pain; chest wall pain; right shoulder inflammation and pain; right leg, left knee, and left foot bruising and pain; left saphenous nerve sensory deficit; and sleep disorder. Lou Ellen Allen received a twenty-six percent disability rating from Dr. Campbell and a twenty-two percent impairment rating from Dr. Weaver.

Lou Ellen Allen presented evidence about her medical expenses arising out of the accident.

| Lou Ellen Allen's Medical Bills | |
|---|---|
| Provider | Amount |
| Conecuh County Emergency Medical Services (Ex. 38(a)) | $517.00 |
| Evergreen Medical Center (Ex. 38(b)) | 3,135.00 |
| Tri County Medical Center (Ex. 38(c)) | 65.00 |
| Tri-County Medical Center (Ex. 38(d)) | 99.00 |
| Birmingham Baptist Medical Center (Ex. 38(e)) | 4,860.00 |
| Birmingham Radiology Group (Ex. 38(f)) | 299.00 |
| Southern Medical Group (Ex. 38(g)) | 217.00 |

11

| | |
|---|---:|
| Physiotherapy Associates (Ex. 38(h)) | 2,984.00 |
| Dr. Dianne Barnard (Ex. 38(j)) | 15.00 |
| Lajuana Logan (Ex. 38(k)) | 576.00 |
| Dr. Leon Campbell (Ex. 38(m)) | 13,072.00 |
| The Radiology Clinic/ Tuscaloosa Radiology (Ex. 38(n)) | 519.00 |
| Laboratory Corporation of American (Ex. 38(o)) | 283.00 |
| **TOTAL** | $26,373.00 |

As with the medical expenses of Michael Allen, the government disputes that it is liable for all of these medical expenses. Instead, it contends that it is liable for $13,072 owed to Dr. Campbell, and $4,471, representing Blue Cross's subrogation interest. Once again, the government ignores that some of the medical expenses were paid by Lou Ellen Allen as co-pays.

Lou Ellen Allen also claims that she lost $9,520 in wages as a result of the accident. Although the government stipulated to the amount of lost wages, it incorrectly claims that the amount must be offset by the amount of taxes that she would have owed on wages.[8] Lou

---

[8] There is at least one Eleventh Circuit case requiring the award of lost wages to be offset by tax liability in a Federal Tort Claims Act case. *See Harden*, 688 F.2d at 1029-30. In *Harden*, the Eleventh Circuit held that the FTCA *required* that taxes be deducted from an award for lost wages "to avoid an award of punitive damages." *Id*. The FTCA specifically bars the award of punitive damages. 28 U.S.C. § 2674. The Supreme Court subsequently rejected the argument that damages that are not strictly compensatory in nature are prohibited under 28 U.S.C. § 2674 as an award of punitive damages. *Molzof v. United States*, 502 U.S. 301, 312 (1992). The Supreme Court clarified that "§ 2674 bars the recovery only of what are legally considered 'punitive damages' under traditional common-law principles." *Id*. One district court in the Eleventh Circuit has found that *Harden*'s analysis, which focuses on whether the effect of the award of damages was punitive, is no longer good law after *Molzof. See Childs v. United States*, 923 F. Supp. 1570, 1583-84 (S.D. Ga. 1996). Given the narrow definition of "punitive damages" put forth by the Supreme Court in *Molzof*, this court simply cannot conclude that § 2674 requires the court to offset the lost wages by the plaintiff's tax liability.

Ellen Allen also incurred out-of-pocket expenses because of the accident.  The parties agree that she is owed $349.49,[9] but the government contends that she is not entitled to an additional $349.46 for prescriptions as Lou Ellen Allen never testified as to these expenses. However, an exhibit regarding these expenses was entered into evidence by stipulation at the start of trial.

Lou Ellen Allen's injuries are even more severe than her husband's.  Indeed, the government concedes this point and suggests that she should be awarded damages between $40,000 and $50,000 for her pain and suffering.  Immediately following the accident, Lou Ellen Allen could not move and was trapped in the car.  Afterwards, she was in excruciating pain, and her body was covered in bruises.  When she returned home after the accident, she could not work.  She could not even lie down; she could only sit on a chair.  Today, she still experiences shoulder and neck pain.  When Dr. Weaver examined her to determine her impairment rating, his examination revealed a compression fracture that had not previously been diagnosed or treated.  She has permanent scarring on her body.  Her injuries still limit her activity.  She cannot work at the computer for long, garden, or go dune buggy riding.  Of the three Allens, she has the highest disability and impairment rating.  From the evidence before the court, it is clear that her injuries from the accident affect her daily life and are permanent.

Based upon a preponderance of the evidence in this case, the court finds that Lou

---

[9] These expenses include items destroyed during the wreck and mileage for doctor's visits and to the pharmacy to pick up prescriptions.

Ellen Allen's damages are $265,000.00, which includes compensation for pain and suffering; permanent impairment; reasonable and necessary medical expenses; lost wages; and out-of-pocket expenses.

        **c.**    **Lori Allen**

Lori Allen, Michael and Lou Ellen Allen's daughter, was also injured in the accident. At the time of the accident, she was employed by her father's company.  She seeks damages for medical bills; lost wages; out-of-pocket expenses; past and future pain and suffering; and permanent injuries.

As with the other Allens, the parties have stipulated to Lori Allen's injuries. Additionally, Lori Allen and Dr. Weaver testified at trial about the scope of her injuries.  Lori Allen has suffered the following:  compression fracture of the twelfth thoracic vertebrae; concussion and traumatic brain injury; breast hematoma from the seatbelt; rib and chest contusions; upper and mid back pain; chest sprains and pain; right posterior shoulder pain; bilateral shoulder inflammation; abdominal contusions, bruising, and pain; lumbar back pain; right knee and leg contusions; right leg sensory loss around the knee; and sleep disorder.  Dr. Weaver gave Lori Allen a four percent impairment rating, and Dr. Campbell gave her an eight to ten percent disability rating.

Lori Allen presented evidence about her medical expenses.

| Lori Allen's Medical Bills | |
|---|---|
| **Provider** | **Amount** |
| Butler County Emergency Medical Services (Ex. 41(a)) | $467.00 |
| Evergreen Medical Center (Ex. 41(b)) | 1,919.00 |
| Tri County Medical Center (Ex. 41(c)) | 65.00 |
| Roberts Clinic (Ex. 41(d)) | 185.00 |
| Birmingham Baptist Medical Center (Ex. 41(e)) | 1,043.00 |
| Birmingham Radiology Group (Ex. 41(f)) | 90.00 |
| Southern Medical Group (Ex. 41(g)) | 217.00 |
| Women's Care Specialists (Ex. 41(h)) | 110.00 |
| Chabot Chiropractic Clinic (Ex. 41(I)) | 2,475.00 |
| Physiotherapy Associates (Ex. 41(j)) | 2,989.00 |
| Dr. Leon Campbell (Ex. 41(k)) | 9,846.00 |
| The Radiology Clinic/ Tuscaloosa Radiology | 2,205.00 |
| **TOTAL** | $21,611.00 |

As with the other plaintiffs, the government contends that it is not liable for the full amount of medical bills. It claims that is only required to pay $9,846.00 owed to Dr. Campbell and $4,742.43, representing Blue Cross's subrogation interest. Again, the government ignores that the evidence shows that Lori Allen paid for at least some of these expenses herself.

Lori Allen also claims that she lost $2,908.22 in wages as a result of the accident. While the government agrees with the amount of lost wages, it claims that the amount must be offset by the amount of taxes that Lori Allen would have owed on that amount. The court

rejects this argument for the reasons stated above. The parties also stipulated to $565.00 of out-of-pocket expenses. The government disputes $603.60 spent on prescriptions because they were not testified to at trial. However, an exhibit regarding prescriptions was entered into evidence by stipulation at the start of trial.

Lori Allen's testimony revealed the serious nature of her injuries. The government suggests that she should be awarded between $25,000 to $30,000 for her pain and suffering. At the time of the accident, Lori Allen was not living at home, but because of her injuries she moved in with her parents for a month. During that month, she had a headache for three weeks, was frequently nauseous and dizzy, could barely walk, and had back and neck pain. Pictures from this time reveal that bruises covered her body. Because of her injuries, she had trouble sleeping, could not ride in a car, and could not do household chores. Her knee was swollen for two to three months, and she could not participate in normal activities until the swelling subsided. Lori Allen testified that her daily activities are still impacted by the accident. She experiences numbness in her knee and pain in her back, neck, and shoulders. She still finds it difficult to clean the house. Dr. Weaver's examination of her revealed that she had a compression fracture related to the accident. While Lori Allen's injuries are not as severe as those of her parents, she was in a great deal of pain after the accident, and the accident continues to impact her life.

Based upon a preponderance of the evidence in this case, the court finds that Lori Allen's damages are $110,000.00, which includes compensation for pain and suffering;

16

permanent impairment; reasonable and necessary medical expenses; lost wages; and out-of-pocket expenses.

**B.      Conclusions of Law**

This a negligence case.  The Allens claim injuries as the result of the negligence of the government's employee, Moore.  Under Alabama law, a plaintiff bears the burden of proving the four elements of a negligence claim:  "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury."  *S.B. v. Saint James Sch.*, 959 So. 2d 72, 97 (Ala. 2006); *see also* Alabama Pattern Jury Instructions Civil § 28.1 (2d ed. 1993).  In this case, the duty at issue is Moore's duty to exercise reasonable care in the operation of her vehicle so as to avoid injuring others using the same public highway.  Reasonable care means such care as a reasonably prudent person would exercise under the same or similar circumstances.  *See Jones v. Baltazar,* 658 So. 2d 420, 421-22 (Ala. 1995); *see also* Alabama Pattern Jury Instructions Civil § 26.00.  The government claims Moore did not breach the standard of care and that her conduct was not the proximate cause of the Allens' injuries.

**1.      Moore was Negligent in the Operation of Her Vehicle and is not Entitled to Application of the Sudden Emergency Doctrine**

The government has raised the issue of the sudden emergency doctrine, asking the court, in essence, to lower the standard of care to which Moore should be held accountable under the circumstances of this accident.  For the sudden emergency doctrine to apply, "there must be (1) a sudden emergency; and (2) the sudden emergency must not be the fault of the

one seeking to invoke the rule." *Friedlander v. Hall*, 514 So. 2d 914, 915 (Ala. 1987). Application of the sudden emergency doctrine is a question for the fact finder. *Id*.

Under Alabama law, the sudden emergency doctrine alters the standard of care when a person confronts a sudden emergency. *See Polansky v. Dixon*, 587 So. 2d 401, 403 (Ala. Civ. App. 1991) (stating that under the sudden emergency doctrine an individual "is not held to the same correctness of judgment and action as if he had time and opportunity to fully consider the situation"). As this court noted in an earlier order (Doc. # 57), the Alabama Supreme Court has questioned whether the sudden emergency doctrine has any real application because the ordinary negligence standard requires a person to act as a reasonably prudent person would under all the circumstances, including those of a sudden emergency. *See Merrit v. Simonson*, 630 So. 2d 428, 430 (Ala. 1993). The sudden emergency doctrine does not apply in this case because: (1) a tire deflation of this nature is not a sudden emergency; and (2) Moore contributed to the situation.

The situation in which Moore found herself does not constitute a sudden emergency. Both Peter Flanner, the plaintiffs' expert, and Ralph Cunningham, the government's expert, testified that Moore did not experience a "blow out" or a catastrophic tire failure. Instead, it is undisputed that the deflation was the result of a puncturing object – probably a screw or bolt. This object was in the tread of the tire toward the serial side (inside) and probably had been carried for a fairly long period of time.[10] The deflation occurred when this object was

---

[10] The object had been in the tire long enough to leave a hexagonal imprint on the rubber of the tread.

finally ejected from the tire and air escaped through the puncturing hole.  The government's expert testified that the time for deflation from the instant of ejection of the object could have been up to 10 seconds.  This full loss of air pressure would have followed some measure of deflation that would have occurred as the tire carried the puncturing object for as much as several hundred miles.  While the ejection of the object resulted in a total loss of air pressure, it was not explosive nor was it sudden.

Moreover, the evidence shows the deflation of the tire did not cause Moore to lose control of her vehicle.  Experts for both sides agreed that a tire deflation while a vehicle is traveling at highway speeds (above 50 miles per hour) will not cause a loss of control absent driver input.  This is especially true on a dry road surface as in this case.  Although Moore testified that she was changing lanes when she lost control, her testimony about her actions prior to changing lanes contains various inconsistent scenarios.[11]  The great weight of the evidence is that Moore was traveling straight in the left northbound lane when she experienced the tire deflation.  Accordingly, deflation of the tire alone should not have resulted in loss of control.  A preponderance of the evidence indicates that following the tire deflation some action by Moore caused loss of control.[12]  In determining whether an

[11]  Moore testified at trial that she lost control as she was changing lanes to pass another vehicle.  However, her testimony was inconsistent about when she lost control.  Moreover, in an earlier deposition, Moore stated that she lost control of the vehicle after changing lanes.  The court does not credit Moore's testimony because of its inconsistencies and for the reasons previously stated.

[12]  Even assuming that the tire deflation was a sudden emergency, a preponderance of the evidence shows that Moore contributed to the emergency.  "One who has by his own conduct brought about the sudden peril may not invoke the benefits of the doctrine."  *Williams v. Worthington*, 386 So. 2d 408, 409 (Ala. 1980).

individual contributed to the emergency, Alabama courts have recognized that speed is a factor the fact finder may consider. *See McKinney v. Ala. Power Co.*, 414 So. 2d 938, 939 (Ala. 1982); *Moore v. Horton*, 694 So. 2d 21, 22 (Ala. Civ. App. 1997).

Evidence indicates that Moore was traveling at an excessive speed prior to the accident. The physical evidence especially supports this conclusion. Moore's vehicle was traveling fast enough to cross the median, which was angled downward from both the north and southbound lanes, and emerge with sufficient momentum to become airborne as her vehicle entered the southbound lanes. After striking the Allens' vehicle, Moore either became or remained at least partially airborne prior to striking the Montgomerys' vehicle. All three vehicles were severely damaged and were totaled as a result of the catastrophic collisions.

Expert testimony regarding damage to the tire also indicated that Moore's speed was excessive. The tire deflated as air escaped through a puncture hole, but the tire itself reveals significant physical damage. The experts who testified agreed that the damage was the result of the tire's impact with one or more substantial objects. Plaintiff's expert, Peter Flanner, testified that in his almost fifty years in the tire industry he has never seen a tire damaged as severely from external forces as the one involved in this case. He explained that the circumferential damage to the steel-belt area of the tread is remarkably difficult to achieve because of the strength of that component of the tire.

Trooper Fisher also testified at trial that Moore was traveling at an excessive speed.

He based this conclusion on his investigation. The first evidence of Moore's speed was the eyewitness statement that Moore's vehicle was traveling 83 miles per hour before the accident. The eyewitness was visibly shaking when she voluntarily approached Trooper Fisher as he arrived at the scene. She explained that she knew the speed because she was also driving 83 miles per hour and that she and Moore were "running together."[13]

Trooper Fisher's review of the physical evidence also revealed that Moore was speeding. Trooper Fisher inspected the vehicles and retraced the path of Moore's vehicle. His review revealed no yaw marks, squeegee marks, or scuffs or scallops. However, where Moore's vehicle went through the median, the grass was plowed up. Based on this physical evidence, Trooper Fisher testified, without objection, that Moore's vehicle was traveling over 70 miles per hour[14] and her excessive speed caused the vehicle to become airborne. Because the court finds significant indicia of trustworthiness in the statement by the unknown witness,

_____

[13] The government filed a motion in limine (Doc. # 55) and objected to the testimony about the speed. The court admitted the evidence because it fell within the following hearsay exceptions: (1) excited utterance; (2) present sense impression; and (3) statement against interest. The statement qualifies as an excited utterance because it was voluntary, spontaneous, and made near in time to the event. *See* Fed. R. Evid. 803(2). The statement also is a present sense impression because the eyewitness observed the event, her statement described the event, and her statement was substantially contemporaneous with the event. *See* Fed. R. Evid. 803(1); *Miller v. Crown Amusements, Inc.*, 821 F. Supp. 703, 704-06 (S.D. Ga. 1993). Finally, the statement is a statement against interest. The declarant is unavailable and made a statement that could have exposed her to criminal liability as she admitted to speeding. A reasonable person would not have approached a state trooper and admitted to speeding unless the statement were true. *See* Fed. R. Evid. 804(b)(3). It is also noted that the government did not object to the testimony of Trooper Fisher when it was presented. In its briefing, the government rests on its motion to preserve the objection. The court expected a timely objection despite the motion, which would have been proper after the plaintiff laid the foundation for the testimony. Whether the objection was preserved or not, the government made no motion to exclude the testimony.

[14] Trooper Fisher testified Moore was traveling over 70 miles per hour "for definite," based upon his examination of the evidence at the scene.

the court concludes that Trooper Fisher's testimony regarding the speed of Moore's vehicle is trustworthy. Moreover, upon careful consideration of the totality of the circumstances, the credibility of the witnesses, and the physical results of the accident, the court would find that Moore was speeding irrespective of the statement of the unknown witness.

The court concludes that Moore breached the standard of care. The sudden emergency doctrine does not apply here because the deflation of the tire was not a sudden emergency and, even if it was, Moore contributed to the emergency.

### 2.    The Tire Deflation Was Not an Intervening, Superseding Cause

The government also argues that because the tire deflation is an intervening, superseding cause, Moore did not proximately cause the Allens' injuries. The facts do not support this defense. Under Alabama law, "an act is superseding only if it is unforeseeable. A foreseeable intervening act does not break the causal relationship between the defendant's action and the plaintiff's injuries." *Kelly v. M. Trigg, Enters., Inc.*, 605 So. 2d 1185, 1190 (Ala. 1992). An intervening cause only breaks the chain of causation between the act and injury if it was not reasonably foreseeable. *Gen. Motors Corp. v. Edwards*, 482 So. 2d 1176, 1195 (Ala. 1985).

The tire deflation here is not a superseding, intervening cause. First, because tire deflation is a foreseeable event, it cannot be an intervening, superseding cause. There was expert testimony at trial that there are standards about how drivers are to respond to tire deflation. The existence of these standards establishes that tire deflation is a foreseeable

event.  Moreover, common sense dictates that when driving a car it is not unforeseeable that tire deflation may occur.  Also, as explained above, Moore's additional driver input – not the tire deflation – caused the loss of control and collision in this case.

The court concludes by a preponderance of the evidence that Moore acted negligently, proximately caused injuries to the Allens, and that the government is liable in damages to the Allens in the amounts set forth above.

### III.  CONCLUSION

Based on the foregoing, the court finds in favor of Plaintiffs Michael Allen, Lou Ellen Allen, and Lori Allen, and against Defendant United States.  A judgment consistent with this opinion will be entered.

Done this 23rd day of June, 2008.

                  /s/   W.  Keith Watkins
         UNITED STATES DISTRICT JUDGE